**EXHIBIT 24**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

**DREW J. RIBAR, Pro Se Plaintiff**
3480 Pershing Ln
Washoe Valley, NV 89704
(775) 223-7899
Const2Audit@gmail.com

v.

**WASHOE COUNTY, et al.**

**Defendants.**

**Case No.: 3:24-cv-00526-ART-CLB**

_Filed _Received _ Entered _ Served On
Counsel/Parties of Record

MAR 2 4 2025

Clerk US District Court
District of Nevada
By: _____ Deputy

---

**EXHIBIT 24**

**Title:** Transcript of August 21, 2024, Library Board of Trustees Meeting – Suspension Hearing

**Date:** August 21, 2024

**Source:** AI-Generated Transcript (DaVinci Resolve)

**Bates Number Range: EXH190-EXH277**

**Description:**

This exhibit contains a transcript of the August 21, 2024, Washoe County Library Board of Trustees (LBOT) meeting, where Plaintiff Drew Ribar's suspension appeal was heard and denied. The transcript was created using AI speech recognition software (DaVinci Resolve) and

PLEADING TITLE - 1

documents statements made by Library Director Jeff Scott, Library Board members, and Plaintiff.

**Key Findings from the Transcript:**

1. **Due Process Violation – False Statements Justifying Suspension**

   o  Jeff Scott falsely stated that Plaintiff had prior restrictions without notice, violating **Mathews v. Eldridge, 424 U.S. 319 (1976),** which mandates notice and an opportunity to be heard.

   o  No documented prior restriction existed before Plaintiff's suspension, making the hearing fundamentally unfair.

2. **Denial of Fair Hearing & Cross-Examination**

   o  The Board refused to allow Plaintiff to cross-examine witnesses or present evidence.

   o  **Goldberg v. Kelly, 397 U.S. 254 (1970)** establishes that hearings affecting fundamental rights require procedural safeguards, which were denied in this case.

3. **Falsification of Public Records – Violation of NRS 241.035**

   o  The transcript contradicts the official meeting minutes, showing that Plaintiff's statements were altered or misrepresented.

   o  **Nevada Open Meeting Law (NRS 241.035)** mandates accurate and truthful public records.

4. **Selective & Discriminatory Policy Enforcement**

PLEADING TITLE - 2

o  The transcript confirms that library policies were applied inconsistently to Plaintiff versus others, violating the **Equal Protection Clause** under **Village of Willowbrook v. Olech, 528 U.S. 562 (2000)**.

5. **First Amendment Retaliation – Censorship of Public Criticism**

o  The transcript contains statements by board members indicating bias and retaliation against Plaintiff for engaging in public criticism.

o  **Nieves v. Bartlett, 587 U.S. 391 (2019)** establishes that retaliatory enforcement against constitutionally protected speech violates the First Amendment.

6. **Fourth Amendment Violation – Unlawful Detention & Movement Restrictions**

o  If Plaintiff was prevented from leaving the library or unlawfully detained by security, this would constitute an unlawful seizure under **Terry v. Ohio, 392 U.S. 1 (1968)**.

**Relevance to Case:**

- Supports **First Amendment Retaliation Claim**
- Supports **Fourteenth Amendment Procedural Due Process Violation**
- Supports **Equal Protection Claim**
- Supports **Monell Liability Against Washoe County**

---

# CERTIFICATE OF AUTHENTICITY

PLEADING TITLE - 3

I, **Drew J. Ribar**, hereby certify that the attached transcript is a true and correct copy of the August 21, 2024, Washoe County Library Board of Trustees (LBOT) meeting, obtained and transcribed using AI speech recognition software (DaVinci Resolve). This document has not been altered or modified in any way except for minor formatting corrections to improve readability.

Dated: **March 17, 2025**

**/s/ Drew J. Ribar**

Drew J. Ribar, Pro Se

3480 Pershing Ln

Washoe Valley, NV 89704

(775) 223-7899

Const2Audit@gmail.com

PLEADING TITLE - 4

All the meeting to order.

Let's start with the flag salute and Jeff, if you would lead us, thank you.

Ready, begin. I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

Thank you everyone.

I will now do the roll call of the board members.

Trustee Moser.
I'm here, I'm joining via Zoom. Terrific, thank you.

Trustee Jax. Present. Great. Thank you. Trustee Rogers.

Did someone say he was on? No, no.

Okay, and Trustee Ruck. Present. Terrific, all right.

We will now begin public comment. I do not have lists of those who have signed up for public comment.

I'm getting public comment.

If you wish to make public comment, please sign your name.

(Indistinct)

As a point of privilege before starting public comment, I would like to read the conduct code for business at this meeting. And it specifically says that the chair or presiding officer may order the removal of any person whose statements or other conduct disrupts the orderly, efficient or safe conduct of the meeting. Warnings against disruptive comments or behavior may or may not be given prior to removal. Thank you. Examples of disruptive conduct include without limitation, yelling, stamping of feet, whistles, applause, heckling,

EX H 190

name calling, use of profanity, threatening use of physical force or any other acts intended to impede the meeting or infringe on the rights of the library board of trustees, staff or meeting participants. And as a further point of order, and we will get to this in the minutes of the meeting previously last month, I'd like to mention the fact that Mr. Foster referred to, in his comments referred to us as a bunch of perverts. I will not tolerate that kind of comment being made again. Mr. Nell indicated that director Scott was a sexual deviant and he had his eye on Jeff because he's coming for him. So I'm warning anyone, those type of threats or scandalous remarks are made to this board. We will ask you to leave. I don't want to see ideological, political, religious or spiritual warfare at a library board meeting. So hopefully we'll be able to conduct the business of the library without any misconduct. Thank you. All right, public comment.

Excuse me, Madam Chair. Yes. Several of the audience have indicated that possibly if the audio and sound, if we could turn it up, they're having a hard time even hearing. I didn't know. People can't hear back there.

It just depends who talks, I think. But I think overall, if we can just- Can you hear me? If we do now, everybody's good. So, okay. Oh, this is close as possible. Hearing it's up. We will begin public comment. Mark Pritchard.

Good afternoon, Mark Pritchard, Reno resident. I didn't know about the rule regarding political comments but my shirt is inappropriate and I'll speak to that still.

Okay.

I just wanted to thank the library board and staff, the library for their eye-phone work. New to Reno, I came here from San Francisco where I visited my whole facility.

And I had recently been pretty proud of the system. I love it. I wrote my mark and thought of my life's help.

But the libraries at Reno have given me the tools to get to know Reno better, including how my area of my grant was developed. I checked out at a lot of land above the roots, left here in Nevada Rancid. And it's been full of great information that I really wanted to know about how my area started and how it got developed. So, I just wanted to thank you for that. I'm really glad that you can bring it on. I'm looking forward to the library being a tool for that. Thank you. Thank you.

EX#191

Next up, Joni Hammond.

Thank you, Senator Spatmer.

(Indistinct)

(Indistinct) Silver and trustees, I'm Joni Hammond. There are three individuals tonight that have been suspended from the library for a year. I object to how the suspension was done. Their due process rights have been violated. I was a witness to one of the three. Ms. Tibbetts was told by letter she violated several codes and policies. She was also told she disturbed other library users and blocked aisles. I was at the event. I witnessed Ms. Tibbetts being harassed and being kicked out of the eight to 10 adults present. We of us held signs. She was told in the letter, she was blocking views. No one was behind us. She was told in the suspension letter she was blocking the aisles. The aisles were only blocked by the librarians getting involved.

A librarian came up to me while I was sitting and yelled shame in my ear so loud that my ears rang for two hours. I said nothing. Why did this happen? All I did was attend the event with a child following the event rules.

Conservatives are being unfairly targeted by the librarians. I've been interrupted, laughed at, yelled at, shoved off a curb and told I could not protest. The letter also states, Ms. Tibbetts letter, attendees were interviewed. I was not interviewed.

I am a calm, peaceful individual who speaks in public and stands by my first amendment rights. I'm a reasonable person. I like law and order. Because someone does not like what happened does not mean violations occurred. Please dismiss the three suspensions as these suspensions violate their individual rights. (Mumbles) Hold your applause please. Next, thank you. Next, Sandy Tibbett.

EX #192

(Mumbles)

(Mumbles) Sandy Tibbett for the record. So I want to share the obvious for the record and say this long song and dance that we have been engaged in could have and should have been prevented by the library leadership. Every month for at least the past two years, members of this community, including myself, have come before this board and previous boards

to redress our grievances regarding men dressing as women to read to young children. We even suggested this event be held at alternative locations,

only to be ignored by the library director and previous board chairs.

During a past meeting, Chair Silver shared with the library director that she would like to See

SH added to the agenda for discussion.

Unfortunately, she was ignored and never given the opportunity to put on record her thoughts on this issue. The whole board's voice was silenced by this decision.

Our library's leadership is biased, which has hindered our community in the ability to work together harmoniously. A false narrative is being pushed by our library staff and our local media is complicit in helping spread the false narrative. Just because someone says it or prints it does not make it true. Real journalists reach out to all parties involved to get both sides of the story and they print both sides of the story without bias. Real journalists are not afraid to print the truth.

What we have here in Washoe County are gossip tolerance, spreading propaganda that is driving a wedge within our community. Our communities are leadership that will foster respect and love for one another.

It's a commender divided community

and nurture unity, overcome the hostility and anger that has taken root.

EXH 193

It's time for new leadership that will bring positive change to our county.

Thank you. Thank you.

Next, William Future. (Audio Cuts Out)

Good afternoon, Madam Chair and trustees. I'd like to speak to the cancellation of the Drag Queen Story Hour. While I appreciate and understand the safety concern for children and staff caused by the library opponents in the decision in discontinuing the program, I think it's unfair because it really seems like a reward for the library opponents bad behavior at library events and board meetings. Today you will hear appeals banning a few library opponents who display disruptive behavior and in one case allegedly abuse a library staff member from being banned from the library system for a year. I think that ban should be indefinite to send a message that disruptive behavior, threats, intimidation and abuse of the library staff will not be tolerated The library staff are public servants. They play a vital role to access to information, literacy, learning in our community.

I'm sure that none of them ever envisioned the hostile environment that they've been subjected to when they started their careers.

My journey in coming to these meetings and defending the library has been about the constant bullying the library opponents display not only here but at other local government boards and meetings. This behavior has even gained national attention on a CBS evening news broadcast where local elected officials spoke about the harassment and threats they were enduring. I know how it feels to have been the target of threats and intimidation because I've been so outspoken on this issue. I also felt compelled to speak up for members of our LGBTQ plus community whom there is a concerted effort to marginalize them for political purposes. And to those who suggest that drag queens are a danger to our children. They should first look at the actions of those being sanctioned by the library. My respectfully call on this board. Sorry, Mr. Kutcher, your time is up.

Make our libraries.

Sorry, your time is up, thank you.

ExH194

I wanna make sure I get this name right. Is it Kate?

Kate Salim?

Good evening.

Good evening, Kate Salim for the record.

I know my name is difficult.

First up, I wanna thank our libraries for what they did recently with the Gold Ranch Fire. Bless you. And giving members of our community safe haven during that very scary time. That is such an amazing use of our libraries and just reaching yet another way that our libraries have reached out to our community to support our community. And so I think the library should be commended for that. I want to congratulate our new library board member elect or appointed.

And I'm looking forward to hearing more from her as the boards move forward each month.

I'm appreciative of what was said tonight prior to public comment as a reminder of how we adults should behave in a meeting and in a room.

Unfortunately, it's unfortunate that we have to be reminded how to act like adults, but I do appreciate that. And I hope this will be the start of moving forward in a much more positive, inclusive manner and to allow us to continue to support and grow our libraries. So thank you all. I appreciate everything you're doing and thank you. Thank you.

Mr. Bruce Parks.

Just hang on.

Because we know I don't need it.

EXH195

Thank you, trustees.

I'd just like to clarify a couple things. First of all, you can't reach across aisle and talk with folks that have no interest at all in hearing what you have to say. When you're closed-minded and intolerant

and you label or they're the enemy, we're the good guys,

when you do that, you shut off any possibility or peaceful solutions to problems. It's called diplomacy.

And I'm a firm believer in diplomacy.

Unfortunately, not everybody is.

So when you shut off any possibility

of communication, dialogue,

you eliminate the possibility of coming to any kind of an agreement.

There can't be any compromise if there's no dialogue.

Now, I realize in compromise, not everybody gets everything they want, but everybody gets something. But you have to be able to have the conversations.

And that's just not possible on some issues.

And that's very, very unfortunate. It shouldn't be that way.
I'm also a firm believer that if you don't have that dialogue, if you don't have the diplomacy, you don't have the compromise, bad things happen. And I think recent events have proven that to be true. Thank you. Thank you. Next, Tara DeQuiros.

EXH 196

Hi, Tara DeQuiros. I just wanted to insert a positive note into the comment period. I had a feeling there were gonna be some negative vibes and I was right. We've been hearing a lot of complaints about the library, but as we all know, those complaints don't represent the opinions of Washoe County residents in general, and they definitely don't represent the opinions of library users.

The people who actually use the libraries, most of whom don't have the time to set aside a full weeknight evening each month, those people are very happy with the libraries and with what they're doing. I'm usually at the library once a week, and I was there at the Northwest Library this week, and what I saw was people picking up books that they had on full, kids playing in the treehouse room. I saw a family come in to pick up free Nevada State Parks pass.

I saw people using the free computers and free internet.

So every time I go to a library, all that I can see and feel there is library joy, except when I'm in these meetings, but I just wanted us to pause for a moment and think about what usually goes on in the library, and that's wonderful services and wonderful librarians and a lot of people who are enjoying those services.

Thank you.

Next is Kristin Ryan.

Hi, I'm Kristin Ryan. I'm actually the branch manager of the Downtown Reno Library, and for record, I am on my own time. I'm off the clock.

I just wanna give you my perspective of the suspensions from the agenda item. I manage the library with the most patron suspensions, and I want you guys to know that library staff do not suspend patrons lightly. We understand that patrons use the library, and the library is a vital resource for everyone. I work with many individuals who experience mental illness, substance abuse, or both, and using suspensions helps me ensure the safety of our public and our staff. Without these suspensions, we would have chaos at the Downtown Reno

EXH 197

Library. Your decision today will not only affect the three individuals who are in this room, but the future of all library patron suspensions, which is a big concern for me. Any appeal of suspensions will send the message to our community that our staff in the library, it might not be a safe place to visit or work. We're gonna hear from an individual who forcefully went into the North Valley's library when it was closed. We are gonna hear from an individual who purposely entered a children's purpose for the sole purpose to disrupt the program, and who showed no remorse when she upset the families in the program. And then we're also gonna hear an individual who was harassing the North Valley's library and preventing her from doing her job to ensure the safety of all members in there. These behaviors are horrific. If you appeal these suspensions, you're telling our community that the library tolerates hate and violence. I urge you to uphold the suspensions that the assistant director and the director upheld and for our safety of our community. Thank you.

Next, Nassim Shamni.

Hi, good evening.

Nassim, Jamni for the record, that's N as in Nancy, A-S, E-E, M as in Mary, J-A, M as in Mary, N as in Nancy, I-A.

So as always, I'd like to affirm my support for the library system, our library staff, our library director, you as trustees, and express my appreciation that the board is shifting back to library business, today's agenda notwithstanding.

My main concern is getting the board's support and renewing WC-1, the tax initiative renewal to keep our libraries funded. As the board of trustees, your guidelines state, the library board members job is to make sure the library operates well, and an effective trustee promotes the interest of the library at all times. As such, I'm asking you as individual members on this volunteer board to be actively involved in spreading the word about this renewal.

Over the next 11 weeks, Freedom to Read Nevada will be working tirelessly to promote the message, yes, on WC-1. We'd love to count on the board members' active involvement in advocating for the expansion fund in whatever capacity you're able, not necessarily to tell people how to vote, but to share the facts about the initiative.

I know many, if not all of you join the board because you love libraries, please make this a tangible love and not just slip service. Speaking to your personal and professional circles about the tax allocation renewal with factual information, that this is not a new tax, but a

ExH198

renewal of a tax allocation, that it allows for libraries to remain open on evenings and weekends, update technology, and renovate and create new libraries, is certainly within your purview.

In short, the message of not a new tax, even better libraries, is purely factual, and we're counting on you to spread it. As I said last month, and it's vital to repeat, across the nation, public libraries are being defunded, have they become a battleground for ultra-nationalist totalitarian ideologies. Public libraries are some of the last third spaces left in our society, and it's vital that we keep them funded and accessible to all to keep our democracy alive in a time where it's threatened. So thank you for everything that you're doing to support our libraries, its staff, and its director. Thank you.


Next is Drew Rebar. (Inaudible) Could everyone turn off their phones, please?

Mr. Rebar, turn off your phone, please. Thank you.

Hi there, Drew Rebar.

So the Supreme Court on Free Speech, we're going to have a constitutional thing here tonight.

The Supreme Court on Free Speech is a place, time, place, time, place, and manner restrictions.

My time, my three minutes, the place is proper, public forum.

And my manner, well, the only restrictions you can place in my manner is I can't issue direct threats. I can say whatever.

See how flat I was right there? I didn't say it, but I can say whatever word I want.

I can call out whoever I want.

And they don't get to place any restrictions on anybody's speech.

EXH199

That's number one.

So if, let me tell you, I'm very litigious at the moment.

Very litigious.

I just finished up with the Supreme Court state of Nevada, and they decided that Washoe County violated election laws and violated the Constitution.

I did that case pro se.

And I'm not going to be able to do that. I'm going to be able to do that. And the attorney helped me with this one.

I want to resolve the problems.

I don't think anybody quite understands. I think that canceling drag queen story hour is wrong.
Drag queen story hour shouldn't be banned from our libraries.

The county is trying to cover it, but some unconstitutional and unlawful actions.

And that's why we're doing things that never happened.

This is a cover up by the county is what's going on for a deficient library director. That's been making regulations and ad hoc manner in violation of the Constitution. You don't get to make up the rules. Director Scott, that's for the library board of trustees. And our S379 is very clear and he gets to make the rules in the library and it's not you and not your staff.

There's recent security ruling that overturned the Chevron doctrine. And that's why we're doing it. And that's why we're doing it. And that's why we're doing it. It's very clear.

Case loss. Spring courts already said it. You guys have blocked me from the social media. Your time is up. Thank you. Thank you.

EXH 200

Janet butcher.

I'm not a library. I like so many other people. The individual of his fondness ringing. Please turn it off. Grew up in the library. I love the library. I could go to the library without my parents when I was six years old.

I wouldn't send a child to the library now by themselves at six years old. Then grabs him. Disgusting book off the shelves. In the past.

We've been called bullies because we want to protect the innocence of the children.

Really.

Bullies because we want to protect. Children.

From books.

We're not asking for book banning and we lack. We, as it was reported before, you know, like local politicians. Have been harassed. And, and threatened.

They've never produced. One single.

Receipt that that has happened.

We talk about.

The top. The library staff being taller. Or people being tolerant towards the library stuff. How about the other way around? I've said it was a very, very, very, very, very, very, very, very, very, very, very, very, very, very, very, very, very, very, very, very, very, very Thank you.

Thank you. That was interesting. How about the other way around? I've said at some of these meetings and had somebody. I don't know why.

But most of all, I want to say the audio for this is. When zooming in. Re-watch. I also noticed that it does change for the speaker. That's interesting.

EXH201

remedy. It hasn't happened. I'm sorry, Ms. Richard, out of time. Thank you. Is there

any other public comment? I've covered the sign-in sheet. Okay. Let me start with the signatures. Thank you. Victoria Meyer, please. Victoria Meyer, I just wondered where the policy is that says you can have a private event at a publicly funded library. Where is the policy that says you have to ask permission to use the bathroom in a public library? Where is the policy that says that there's a free speech zone outside in the parking lot when you're out in the parking lot? I didn't know there was such a thing.

Where is the policy that says a child can be locked inside a library by a librarian and not allowed to leave? I'm feeling a little bit like Drew. I'm feeling a little litigious myself these days. We have a constitutional right to attend, to speak, and we have been bullied over the past year and a half. There's so much video footage on our side of the equation how police reports have had to been filed for Mr. Scott putting his hands on several people, my husband being one. I think Mr. Reed Barr is another one. Another patron to the event pushed this woman here, Val White. That's on video. There's a lot of aggression on video, but it's not from our side.

Black is white, white is black. It's the communist manifesto. Let's turn everything around and inside out Alice in Wonderland. So NRS 379120 says to be free and accessible to public. The library.

NRS 200.4860, false imprisonment, which happened to my granddaughter, is an unlawful violation of the personal liberty of another. NRS 200.571, harassment, NRS 233.010, hereby declare. Mrs. Meyer, thank you. Your time is up. I believe there was someone else who indicated. Yes, please. And state your name if you would. Val White. The comments from the chair surprised me at the beginning of this meeting. As an attorney, I would expect you to understand First Amendment a little more clearly. There's this Supreme Court case that says, first of all, First Amendment states, Congress shall make no law abridging the freedom of speech. The First Amendment protects most forms of political hyperbole, safeguarding the public's interest in debate on issues that is, in the words of the Supreme Court, uninhibited, robust, and wide open. And that may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. Your attempt to limit the speech away from spiritual, political, whatever else you said in that intro is just ridiculous, unbelievable from an attorney. And

*ExH 202*

a previous speaker claimed to know the opinions of all the Washoe County community. I'd like to know how she accessed the opinions of everyone. And regarding the attempted suspensions of some individuals in the room, the facts are on video. The truth is completely contrary to what Mr. Scott's employed librarian militia claim. They simply want to remove individuals they perceive as irritants. I fully agree with the comments made by Mr. Rebar, Ms. Hammond, and Sandy Tibbitt. What is happening is that library personnel are deciding to twist, stretch, and absolutely

distort public library policy. It's dishonest. I'm sorry to say it's not unexpected from library personnel. Mr. Scott should be fired. Thank you.

Is there anyone else who wishes to make public comment?
Right. And we do have an all-time comment. Oh, do you please? Thank you.

Sorry, the hand went down now. But there it is.

All right. Brooke, can you hear us?

Yes, thank you. For the record, Brooke may laugh. I've been monitoring these meetings for quite a while now. Some of you may know me. I have been working very hard for over a decade now in being able to extend civil rights protections and access to health care for many in the marginalized community, particularly transgender people. What I've seen here in the conduct of the three individuals that are appealing their ban from access of the library system is that they have engaged in stochastic terrorism. Let's say that again. Those three are terrorists.

Engaging in speech to elicit violence is not a protected part of speech. It is not covered by the First Amendment. Get that clear, you folks. And speaking to the three individuals, not the board, I think that the board has a very good and clear idea that these appeals must be denied and that the bans of the year are justified. If I could, I would make them longer. But I believe that's probably the limit of what you can be able to do. Let's hope that we can learn as a society that we can have disagreements, but be able to have the discussions in a civil matter and not have to engage in the acts of violence that are recorded and reported in, I believe, the library staff and these three individuals have earned their bans and it must be upheld. Thank you for your time. Thank you. And Bob Blackstock.

Yeah, Bob Blackstock from West Reno. First, I'd like to say my thanks to the board for your

*EXH203*

fantastic service and also my thanks to the library staff for their fantastic work and also congratulations to Maria Rodriguez for your recent appointment to the board. Thank you.

Thank you. Any other public comment at this time? And I'm sure some of those one more online. Please.

All right, Stacy, can you hear us? Yes, I can. Can you hear me now?

Yes, we hear you. Go ahead. Great, thank you. This is Stacy Spain for the record. I just wanted to say thank you to the library staff up and down the ranks of the library staff for their hard work and dedication toward literacy for young people in this community. They're unparalleled in their work ethic and in their long standing dedication to their work. Also, I wanted to say that two things can be true at the same time. We can say that the Drag Story Hour deserves to be in public space, but if it is not going to be in public space, we can find other places for it to be. That doesn't abrogate the idea that LGBTQ population deserve representation in public spaces where we pay our taxes and represent a portion of the community. I'd like to thank the board for their hard work and for having to sit through these contentious meetings and to let you know that the LGBTQ community is not going away and our partnership with the library will remain strong even though it has changed a little bit. The Library, the mobile library is at our center right now and I just want to let you know I just checked out three books. I know Why the Caged Bird Sings by Maya Angelou, Amazing Peace by Maya Angelou, and Just Give Me a Cool Drink of Water Before I Die, again Poetry by Maya Angelou. Thank you to the Washoe County Library for making that possible.

Thank you. Ursula Burnett.

Take your time.

Okay, can you guys hear me? No? Yes. All right. Okay, I did not plan on saying anything,

but when you call people terrorists, it is a very dangerous and slippery slope.

When you call somebody an existential threat, it is a very dangerous and slippery slope that we've gone down. When you do not watch the videos that are tangible, physical evidence that shows the lies that have been told by the staff, Jeff, when you don't watch it,

EXH 204

it's a slippery slope. When we start teaching our children as librarians,

that lying is okay. What do we have for our future?

We have a screwed up mess and all these adults that want to say they're adults that are teaching their kids to lie, and I am not against LGBTQ, I am not. I have family, I have a daughter, I have loved ones, best friends that are. I would never go against any of it.

Just don't keep it from the public. Like that's all people are asking. Like if you've got nothing to hide, don't hide it. Why would you hide something if there's nothing to hide? That's the only thing that I think a lot of people are having issue with. My issue, my other issue besides that is again, watch the videos. Drew films everything. It's annoying. It's annoying.

Thank you. Thank you very much.

Is there further public comment? Anyone else? Someone on Zoom? Yes, please.

Okay, RC, is that Reaver Crump? You can go ahead. Yes, it's Reaver Crump. Thanks for recognizing me, Jeff. This body, this board, this Library Board of Trustees voted in May of 2024 that Library Trustees must attend in person if they're to vote or their attendance is to be counted. It is worded very specifically must attend in person, and yet this is the third meeting that this board is not requiring its own trustees to follow its own bylaws that these trustees voted in and are refusing to abide by. Third time, please note that without the rules, you have chaos, and this is what you're now creating. Unfortunately, you did not write in at the discretion of the chair, at the discretion of extenuating circumstances. You didn't write in any of that because you don't listen to anyone, apparently, when these bylaws are written and you all vote. Every time you do this, a complaint is filed with the attorney general that you will not find you are not following your own bylaws. Bylaws are legally binding. You have to follow your bylaws. If you don't like them, change them. You can do that any meeting at any time. You have that freedom.

I don't know if she went away.

There's no honor showing, so I don't know if she was finished or not.

All right. Thank you. Any other public comment before we continue with the agenda?

EXH205

If not, we will move on to item three, board comment. It is a non-action item limited to announcements, strategic plan activity, updates, or issues proposed for future agendas and or workshops. I'll ask my fellow trustees if you have any board comments.

I would like to make one, which is just to note that as chair, I have changed the meeting time to 5.30 p.m. from 5 p.m. Future meetings will be at 5.30, allowing people to perhaps get a bite to eat, get here before their work day may have ended. I know it's difficult for me to be here at 5. And so I hope I have an inconvenience to anyone, but we will adjourn at 5.30 p.m. going forward. Any other comments from my colleagues?

Go ahead.

Is trustee Raff? I just wasn't sure if this is the place or under staff announcements I wanted to make just like thank Al Rogers for his service to the board. And I appreciated his strong leadership skills. He was very welcoming when I joined the board. So I'd like to thank him for his service. I'd like to welcome our new trustee, and I look forward to meeting Ms. Rodriguez, hopefully at our next meeting. I also did want to thank the Northwest Reno branch

to for their staff being involved in as an evacuation center and also the Verdi library. I know that it was going to be closed, and then when they found they were able to open, they very quickly opened it again. So they were very attentive to the community needs. So I just wanted to thank those two branches for helping with that Verdi fire.

That's it for now. Thank you, trustee Raff. I think we all appreciate the acts of the library system in response to the fire and sheltering people. Anything else? Madam Chair, if I may, thank you, trustee Jax for the record. Good evening, everybody. I appreciate the time, chair Silver and all your hard work on this agenda. I just wanted to address a few issues. Maybe if we could get clarification from our, if Madam Chair would allow. I did have a question about attending the meetings. We had several emails about it. Is this reading correctly, Mr. Kaplan, on the attendance of the trustees, if we could talk about that in the future.

I would appreciate that. May I make a comment on that? I have no recollection of voting that people must be in person. This is the current. I remember recommending it. I didn't know that we voted to make it a policy. And I was hoping maybe we could get clarification

EXH 206

from the actual minutes and the recordings of that meeting to verify like what you're saying, because I know many of us discussed this. So what we're reading versus what we're hearing in other issues. I wonder if we should just double check that in our records. Do you want me to respond to that? Yes, please. The way it's phrased in the bylaws is that board members must land in person unless otherwise referred to it in other parts of the bylaws. The bylaws does allow for virtual meetings. So it does allow for virtual attendance. Thank you, Mr. Scott. However, I have it right here, exactly what it says. But in the reference, I would appreciate the legal aspect of interpreting this for the board. Because I think we all have a different version of maybe what was voted on versus what the records are actually reflecting. And that would be my question for legal or the other board members moving forward. Just want to make some comments. I know we can't have discussion on it at that time. But I think there's something off on there because we're getting

solid complaints regularly multiple times. And I researched it and I can't see otherwise where it says as otherwise provided in these bylaws. So I think something cut loss in translation, quite honestly. Do you have any comment, Mr. Scott? I've made the statement. Order of us can attend virtually. We prefer them in person, but they can attend virtually in bylaws. Say so.

Okay. Well, is that clarified? Not at all. Not at all. She can talk to me offline and talk to her. Okay, but for the board's clarification. Thank you. I just also wanted to address.

Well, I know we have a it's all coming up on the agenda. So thank you, Madam Chair. That was all. No problem. Okay. Item number four, approval of meeting minutes. Do I have a motion to approve the minutes of July 17th? Chair, I move that we approve the minutes from July 17th. Do I have a second on that motion from Trustee Ruff? Thank you, Madam Chair. I'll second. Thank you. Leah, Trustee Mosher? Yes, can you repeat? Yes, can. Do you vote to approve the minutes of the July 17th meeting? Yes, I vote to approve. All right. And I approve them as well. So they are approved. Item number five, old business. I don't have any. Does anyone have any? A non-action item? No, Madam Chair. If not, we'll move on to item number six, new business. And our first item is discussion and possible action on appeal of the denial of a proposed constitution event submitted by Bruce Parks. Library cooperative events must meet these criteria in alignment with the strategic plan. The presenter must demonstrate knowledge, expertise, and experience in the particular subject matter. The desired dates for the presentation must be acceptable to the library. Resources required, including publicity and corresponding collateral, may be shared and will be agreed upon well in advance of the event. And the library will provide the opportunity to present different viewpoints. Each presenting group will have equal access and equal rights. The applicant will have five minutes to present the case in support of the appeal. Mr.

EXH 207

Parks. Thank you.

Sir, you have five minutes to present your appeal.

Thank you so much, Madam Chair. This has been a long process. I'd like to, first of all,

go over the timeline a little bit. I originally submitted my proposal on May 23rd, last year. It was acknowledged receipt of it on the 28th. On July 22nd, I had a conversation with my representative on the Board of County Commissioners, Clara Andreaola, Commissioner for District 4. And I just offhand mentioned that I had submitted a proposal and I hadn't heard anything yet. She took the lead, as you'll see in the emails in the packet I gave you, and not only did she ask the library about it, but she also contacted the county manager and got him involved in it. And they were both probably ignored. In October or July 24th was when the commissioner informed and requested assistance from the county manager. On October 3rd, I sent an email to this board requesting an agenda item to discuss the proposal policy. That afternoon, I received an email from the library director saying, "It's still being considered." Okay. And I would be informed of when a decision was made. April 22nd of this year, I filed a complaint with the Washington County Human Services Division. I would be more than happy to provide you all of that information. Just shoot me an email. It's interesting to say the least. Two days later, I was informed by the HR director that I'd be hearing something real soon, two weeks or sooner. On May 1st, I received an email from Mr. Scott informing me that my proposal was rejected by the Youth Services Library event team. Now, I realized that the director did correspond with the county manager and say, "Yeah, it's still being considered. I'll let you know when we've made a decision about this." One of the things that didn't happen during the course of all this, I had 22 days short of an entire year before I heard whether or not this was going to happen or not. When I originally submitted the proposal, it was my intent to be able to present it in the libraries on Constitution Day, which for those of you that are not aware, is September 17th, right around the corner here.

I was told in the email from the director that it did not meet the needs of the library at this time.

This decision was made, and I refer you to what you say right here in the minutes about the presenter must demonstrate knowledge, expertise, or experience in a particular subject matter, one of the requirements. I would never have contacted once about what the content of my presentation was going to entail or whether or not I'm actually qualified to do that. Now, I'm not going to get into my bonafide about whether or not I'm qualified. However,

EXH 208

there's an email included in your little pack there where the assumption by library staff

about material that I may use for the presentation I was going to do, that I use for the Constitution class that I do every week, except this week because, well, I'm here, widely recognized as authoritative, but it was disparaged by library staff.

What the YSLE team didn't bother to find out about what I intend to present was the material that I was using to put together my presentation.

Hillsdale College,

Chris Ann Hall, a noted constitutional scholar and lawyer, the Federalist Papers,

and the Constitution itself. I was never asked not once. Now, I've heard the library director say that if we want to do a presentation on the Constitution, we can get a PhD in here to do that. By all means, let's do it.

I'm sorry, Mr. Parks. I don't know. I was going to ask. Are we allowed to ask questions?

Mr. Parks, can you remain at the podium so we can ask you questions? Yes. Could we ask you to remain? Thank you. Sorry. That's all right. I wasn't sure we could ask questions. Please go ahead. Thank you, Madam Chair. Through you, Mr. Parks, I do have a question.

The reference materials you were just speaking about, those items of information, what is that? What were you just referring to, the Hillsdale- Federalist Papers. But, I mean, what was that? A packet of what you were teaching or where are you referencing? Did you send that at all? It is not in the information I shared, but you know. My concern here is not so much the content or even the presentation itself. It's the policy. I understand. Thank you. Another question, Madam Chair. Mr. Parks, had you not given this class before at the libraries?

No, I have not.

Okay. Never a Constitution class in a library? Never once. Okay. Had you made a prior request to this May 23rd? No, I have not. Okay. But, I am familiar with the policy about using the meeting rooms because I have made extensive use of the meeting rooms for another

EXH 209

thing that I'm involved with. That would be Nevada Patriots.

And we used to use the meeting rooms quite frequently, once a month. Understood. Thank you, Madam Chair, by Madam Chair. So, Mr. Parks, I believe in prior meetings and discussions, the request that you had made for the Constitution class to the Washoe County Library was not just for the rental of the room, per se, because we learned before when we discussed some policies, the room meeting policies, etc., there is the acceptance or denial of that room use. But then there's also the acceptance or denial of what they would say as promoted by the library. Lifted up, heightened, advertised, etc. So, Mr. Parks, in your request, where is it? Were you requesting, is there different forms for those two different options? No. There's only one form made available for the proposal of a presentation. And you are absolutely correct, Trustee Jax. It was my intent to have the library do the promotion of this. I'm quite aware that I can use a meeting room anytime I want. That was not the intent here. The intent was to present this at multiple libraries, if possible. I just wanted to know whether the presentation proposal would be accepted, and then we could discuss further details. But that never happened. Okay, thank you. Mr. Parks, if I understand correctly, you were never asked for collateral material? I was never asked what my presentation entailed. Then what did you, what exactly did you ask the library to promote or secure a room for? In my original proposal presentation, I submitted that it would be not only informational, but I would also be clearing up some constitutional myths. Like, for instance, if I may, that our Constitution was based on the principles of the ancient Greeks and Romans. Not true at all. While they did incorporate some of the aspects of democracy, which by the way, for everybody's edification here, no true democracy has ever lasted more than 200 years ever. It's my rule. Our founding fathers were advocates of people rule, not mob rule and not king rule or monarch rule. Thank you for answering my question. I have another question. It does say that the library will provide the opportunity to present differing viewpoints. Were you aware of that as a qualification? I was absolutely aware of that. And I was

actually looking forward to somebody that would step up and say, wait a minute, our Constitution is based on a bunch of old white men, racist, slave owners.

Boy, was I looking forward to welling that. So if I understand, and we're all aware of the dates, which seem extraordinary to me that you have waited this long. And thank you for the documents refreshing us with the time period that you waited to receive word. What was your understanding when you were notified as to why your class or whatever you might call it was rejected? Well, unfortunately, there was no dialogue about that. The email that I received simply stated it did not meet the needs of the library at this time. I responded by saying, well, I'm very disappointed in that decision. And I intend to appeal.

EXH 210

Thank you. I would like to provide five minutes to I were not a courtroom. So and we're not judges, we're not jurists, but I would like to know if the library would like to utilize five minutes to respond to Mr. Parks's appeal. I mean, I got asked to come up here, but we can, I can just go briefly on it. I'll put my own timer if you like. Sure. So, you know, we're looking at the information for writing presentations, we want to make sure it's something that's by an expert, and something as interested in the community. And so from what we can tell Bruce Parks is having expertise on this matter. Him being chair of a cab doesn't make him an expert. You know, he's the class he teaches is a program organization which he actually founded and runs. So it's not exactly having a third party, a testament as far as quality of that programming. Based on this inquiry, though, we have made an inquiry for our library staff to provide a program on the Constitution. And we have a professor from University of Nevada, Reno, and someone from the Northern Nevada Literacy Council to talk about the importance of the Constitution. And we plan to have that program on Constitution Day on September 17. You do or you have, or you will. We will. You will. Okay. Do you have comments? Trustee. I'm not putting you on the spot. Do you have any other comments?

Thank you, Madam Chair. I was looking for a copy of the policy on this particular library. Yeah, those four items. So this would be the policy, Mr. Parks, that you're familiar with regarding this, the events and trees. Frankly, my intent for being here today.

This board is final authority on all things. And I very related in Marshall County. That's not a debatable statement. That is, this board can change that policy. And as demonstrated,

I hope I have accomplished that. That policy is in dire need of major revision. It's my contention that once a proposal is submitted, the person submitting it should be contacted, at least the receipt of the proposal acknowledged. And then they should be informed of a timeline of when a decision will be made. I further submit, if I may, that if there's a question about the qualifications of the proposal or the material that will be presented, then the YSLE board contact that person and ask, hey, can you come in and let's talk about this. That's not in that policy at all. In fact, in that policy, it doesn't even state that they are required to acknowledge the receipt of a proposal. I've just asked you as representatives of these people in Marshall County and in your capacity as the final authority on all things library in Marshall County, can we please take a look at this policy? I would ask, I would prefer actually that you, the trustees, write the policy,

because it is definitely skewed in favor of the library staff and not, in my humble opinion,

EXH 211

in the best interests of the people. Thank you, Mr. Parks. Trustee, you madam chair, through you. And also in listening to what Director Scott said, in reading the policy,

we could go at length over interpretation exactly of how it means from one team to another.

But I mean, it's pretty obvious that even in your application, you seem to demonstrate knowledge, expertise, and experience in a particular subject matter. It doesn't say it requires some sort of degree or professional statement. So I feel like it did align with some of these criteria. And the fact that they are now doing the same program shows that it does quite line up with their programming ideals. They are doing a constitution class from what I just heard. So again, another blatant denial, Mr. Parks, based, I believe, on your relationship with the library and their judging appeals with you personally. So, so far, I think you meet all the required criteria. Excuse me, Madam Chair briefly. And it says at the very last line, you know, present the library's opportunity to differing viewpoints and each presenting group will have equal access and equal rights. So I do not feel you were granted equal access or equal rights, especially now that I just discovered they are in fact doing a constitution class. So I would vote in favor of repealing your denial, sir, as we move forward. And I respectfully thank you, Madam Chair, for the time. Further additional comments. I understand your request. Do you have comments? Trustee Ruff? Yes, thank you. Chair Silver, this is Trustee Ruff for the record. So I don't have a copy of the policy. I don't see it in here. I'm just looking at it right away. But I do recall that there weren't dates with responses from the library. It is not our job to write the policies. That is very definitely in the NRS statutes. We don't write the policy. We oversee the library policies. So I would return the policy to the policy committee with the library and have them revise. I mean, we do approve that. We could then see how quickly, you know, would this process normally take place with response to the initial request and then getting information from you or from whoever is giving the, you know, the application to give a program, give that person, you know, time to even present their, you know, whatever their workshop or their, you know, discussion will be and their qualifications for giving it.

And then I think it's returned. We don't speak of, I mean, we do not choose programs on the board either. That was something that Mr. Kaplan defined for us also. So then it would be whether the board, the youth services group decides or the library personnel as a group decide. And then if they chose not to use that application, then at least it would be timely in their response to the applicants. And then it could come to the board if there was a denial and that person felt like they're sort of due process in the process of wanting to do a program, we're not met. I would say that the library actually listened to you because they are going to be doing a program.

EXH 212

So, kudos because they've then seen that there's, you know, a need or a desire. I suppose I would ask for, you know, to revise the policy to then decide if that's, you know, because I see your presentation at some point, you did give us an outline. But I think the group here would also acknowledge that there are constitutional attorneys that don't agree on the Constitution and its interpretation. And as a social studies teacher who is familiar with the Federalist Papers, I understand that there's definitely biases in that interpretation as well.

So, that's kind of where I am. In the revision of the policy, if you will consider that, I would highly recommend that you do incorporate language in that policy, that the presenters or whoever is proposing a presentation presents themselves to the YSLE board. And this is what we're going to talk about. I mean, the last thing in the world we want is not classed by the KKK. No, no. However, I still am a firm believer that there are a lot of very knowledgeable folks out there that can make proposals for presentations. There should be a review process. There should be some definitive timelines delineated in the policy moving forward. And thank you. I agree. Mr. Parks, and Trustee Mosher, do you have any comments on this? If not, I'd like to make a comment. Mr. Parks, I think on behalf of the board, I apologize for an egregious delay in your submission of a proposal and the lack of response and the time it took. And in reading the emails that transpired, you have every right to be annoyed at the time it took for a review of your proposal. Secondly, I completely concur that the policy needs to be revised so that there are timeline boundaries for the presentation, the materials, the review, and the response, because that was not accorded to you. And I won't delve into what assumptions could be made based on email records, but I would suggest that we have work to do on a proposal that enables anyone in the community to suggest a topic. And I would agree with you that there are some that would be outright refused from the beginning. And I also agree with Trustee Ruff that the constitution is continually subject to debate on its nuances and what people may have met meant hundreds of years ago and may not be relevant or timely now. But with that said, I think we owe you an apology for the delay. We owe you a new policy. We owe the public a new policy. I can only apologize for the fact it's basically a year since you started this process. I do not have any documentation because you weren't asked for any on what your subject matter would contain or pertain to. But I think if you would be so kind as to provide that to me, I will ensure that on the next agenda, we take that up because I don't have any idea what you were proposing. I don't have any idea, therefore, why it was rejected. And I have nothing but an apology to give you as to why we're basically a year from the time you originally submitted it. Madam Chair, I greatly appreciate your position. I accept that apology, although it shouldn't ever have come to this. Again, we're here now. And so I can't go back. So let's move forward. You would finally take a look at this policy, and I will be happy to provide you the material that I wanted to present. And Trustee Ruffier, actually, we can't even get nine Supreme Court justices to agree on what the Constitution actually says. So and by the way, they don't refer to the Federalist Papers anymore as a Supreme Court,

ExH 213

which is problematic, in my opinion. Mr. Parks, I will make a motion that we place on the agenda for our next meeting a review of your materials, or that you submit your materials, and that we develop a new procedure for members of the public who would like to have a presentation that is promoted by the library made public by the library and assigned to a particular library on a date and time. And we will go forward with apologies for the fact we're standing, you're standing here almost a year from the time of your request. May I get a second? I'm not. I'm not seconding. Okay.

Excuse me. Excuse me. I'm sorry. What are you doing? Not Mr. Parks. Hang on. I just made a motion, but I'm happy to withdraw if there are comments at this point in time. Trustee Ruff, please let me know when you had a comment. I think that gets us into writing policy when our, when we've asked for a revision of the policy. Right. But when you're in your motion, you said that we would write the policy. I think that needs to be the library staff who writes the policy and then you review it. But I appreciate that. Yeah, that's the only thing I was concerned with, but it is us writing it. It is the library staff writing. Then in clarification, I would make a motion that Director Scott and his team review the policy for members of the public to submit topics, not for just use of a room, but approval by the committee. And I'm not asking for a change in the qualifications, but certainly timeliness, you know, within, let's say no less than 30 days of a submission. And if there is acceptance notification as to what alternative view or opposition there might be at that time. And if there's a rejection, an opportunity for an appeal at the next scheduled board meeting. Do I have a second comment? Yeah, we can do that. Yeah. Okay. There's a second from Trustee Moser.

I think that this is Trustee Moser for the record. I think the outcome in terms of there being a constitution day provided is the ideal that we wanted for those connections at the library board to be used in such a way to get the points of views of other people to also be enjoyed and celebrated. And so I think moving forward, this should be the expectation in terms of, as you said, timeliness and just overall our demeanor that we use for the public to be respectful to all of those. Thank you. Any other comments with a motion on the table?

So are we, I'm sorry, Madam Chair, are we, so our motion right now would be, we're basically bringing this back next month with some his information. We've asked that the motion is that we accept a proposal from Mr. Parks that contains the content of what he was attempting to present with an opportunity for the library team to indicate to him if there is an opposing or differing presenter who would also be part of that program and to ask the

EXH 214

library director and his team to revise the policy so that there are timelines within that policy that it's no longer than 30 days from the time a proposal is made that the library staff respond to that proposal. So we don't sit here a year later. Right. I do need some clarification on that. Sure. Because it's very long. Yeah. I mean, the policy part, I got some timelines in there. We can do that. Okay. I have turnaround time. I don't have the other part. The board is asking me to do put timelines in the policy. Yes. Okay. That's all I have. And the other part of the motion is that we request from Mr. Parks, the content of what he intended to deliver as a formal program for the library. It was rejected, but without attention to content, which he was never asked for, if that's what I understand. So we can request his presentation. Absolutely. There's no way to know what's being presented. We would never blindly approve of his qualifications as well. Qualifications, whatever that means. And we may want to, I think the board reserves the right to take a look at what we mean by qualifications. I'm unclear. And when I read the policy,

we're not saying to do a constitutional program, you must be a constitutional attorney or you must have previously instructed on the constitution. I do think we have some vagary in the policy. And so I would ask you and your team to be as exacting as you can in coming back to the board next meeting with the revised policy, which we would reserve the right to review. Is that clear? Fantastic. It feels like two different motions kind of wrapped into one. Probably so. The direction is for the policy. So it's not necessarily emotions giving me direction.

Just saying, but you would vote on it if you want to. I'm just saying it's up to direction. Well, I would like to have a vote of my colleagues on this particular item, which is that we take a look at the policy. We ask you to do your best to tighten it up, reframe it with time bound

calendarized dates. And if you prefer, I can leave that as the motion and make a second motion that during the next meeting, Mr. Parks, or by the next meeting, Mr. Parks has delivered to you the content of his proposed program. Thank you, Madam Chair. Is that clear? I think that's yeah, that's a great motion. Just to clarify, is there a way we can also get

introspect onto maybe how they, the process of which that team goes through? Is there some sort of, you know, procedural that we have that team presents? I think that would be a great presentation. That would give the public greater knowledge of what your team is doing and what it determines is approved or not approved. We can have the team leads.

EXH 215

Right. Thank you. Thank you. I'd appreciate that. And then if we do have the, did you second? I didn't, but I feel like Mr. Kaplan, D.A. Kaplan has Mr. Kaplan for the record.

I just want to clarify what you're suggesting here. Again, the bringing the policy back next month with a presentation from the team. Totally understand. What I don't understand is the direction. Is Mr. Parks submitting this? Are you remanding this to the library director for Mr. Parks to submit to him that information for his consideration and for this engagement and discussion between maybe Director Scott and Mr. Parks or just that he's submitting the information and that we're going to reconvene next month to consider his appeal for something that even, well, none of the library staff has even considered at this point. I did not suggest we have an appeal next month. What, and I'm not remanding Mr. Parks to do anything. I have suggested that in light of the fact Mr. Parks was never asked for the content of his program, that he, if willing, submit that as should have been requested in the beginning a year ago, that he submit that proposal to Mr. Scott.

Thank you for that clarification. Mr. Parker. I'm very pleased to present that and I'm sure you've provided very long. Thank you very much. Do I have a second on what I hope is a clear

motion? Can we restate the motion for, okay. I move that we

ask the library policy committee to revisit the policy. What's the, I'm sorry, Director Scott, what is the name of this policy? It's the library events. Library events that, okay, I move that the library policy committee will revise, revisit their events policy, including calendar

specificities regarding responses to an applicant.

And I would simply add that it be presented at the next meeting. Yes. Thank you. Yes. All right. I think we have a clarified motion. Thank you all for your work. Second. Do we have a second? I'll second. Thank you. Trustee Mosher.

I was just going second. Ah, I'm sorry. Okay. And I approve. So we have a cleared motion and approval. Thank you. Thank you, Mr. Parks. I think we still need to call for vote on motions. I thought I, I'm sorry. Well, we need to specifically call for vote. Sure. All those in favor. All those against every motion. All right. Thank you. All those in favor of the motion. Say aye. Aye. Aye. Aye. That motion carries for to none. All right. Moving on to item B. Thank you. Thank you, Mr. Parks. All right. Item 6B, discussion for possible action on appeal of the

EXH 216

suspension of Sandy Tibbitt from all Washoe County libraries. The library will be given five minutes to present the case in support of the suspension and the person appealing will then be given five minutes to present his or her case in support of the appeal. So let's start with the library having five minutes to present the case in support of Ms. Tibbitt's one year suspension. Is it what? I'm sorry. It doesn't say one year from her, for her suspension. Who is speaking, please. Stacy McKenzie, assistant library director. And there's five minutes available to you. John and I, John and I will be available to answer any questions from the board, but I'm making this summation statement to serve as support to help all three of the one year suspensions and in an effort to save time and energy in the process. I won't need to speak after each defense. The events of rainbow fest on June 15th this year and the subsequent results were and are still traumatizing for our library staff that witnessed and were the targets of these library policy violations. Leading up to these events, library staff had several meetings specifically about security and it was some of these specific individuals in mind because of their attempts to disrupt previous library events. This year they came prepared with extra forethought and even more aggressive plans to interfere with and to attempt to shut down this year's rainbow fest event. Fred Meyer engaged with a staff member about his religious views of the event and when staff member refused to engage he continued to bombard her in a more and more aggressive nature, yelling inappropriate questions and comments at her. The staff member was interrupted by Meyer numerous times as she tried to do her job, including interrupting her as she engaged with other attendees, as she communicated with security personnel, and as she worked to maintain safety and order in the event. He was argumentative when she asked him to return to the free speech zone based on his comments of protest of the event. Security had to step in and PD was called to help carry out our requests for him to comply with library policy. Sandy Tibbitt brought children to the event to gain access inside and once the event started she and two others revealed insulting and child inappropriate signage, including the logo of a known LGBTQ hate group all under the guise of free speech which we allowed. She wandered around the room refusing to stop blocking exit aisles, was argumentative with staff, and lost track of the children she brought with her. Her disruption traumatized attendees of the event, including upsetting children and parents who came to the event to enjoy the inclusive programming in a safe place and to participate in early literacy education. Her activities and disregard for other attendees distracted staff who were trying to maintain the event for legitimate attendees. She then came back after the event with false reports of a crime and got in staff's faces and personal space yelling and drawing a crowd to agitate attendees and staff. Drew Rybar was aware and was told many times at the library space closure. Services were redirected and available on the bookmobile at the event, however he still tried to force his way into the children's program, taking advantage of a moment when an authorized staff member was exiting the building. He then blocked the doorway, violently pushing the door open and wedging his foot in the doorway, arguing with two staff who were again telling him he could not come into the building. He continued to gauge with them until I exited the door forcing him to step back and let him know that his

EX#217

conduct was dangerous and unacceptable. His videos show this. After the event, staff had an unscheduled debriefing meeting where we went over the numerous numerous policy violations and as a group decided who would receive the suspensions for the most egregious of the policy violations. Director Scott was not involved in that decision. When appeals were submitted, I spoke with volunteer and attendee witnesses and revisited the issues with staff. It was unanimous that these individuals violated library policy in a purposeful and orchestrated manner. Security staff who witnessed the interactions were extremely complimentary of how staff handled the issues and agreed that these individuals were in violation of policy and that appropriate actions were taken. These suspended individuals constantly speak against library staff and specifically against drag story hour. They target staff maliciously on social media and make unfounded, wild and slanderous accusations about crimes committed by staff. Most of them don't even have library cards and only come to those events that they complain about. They came to the event on June 15th with the sole intent to distract and disrupt. Unfortunately, that is exactly what they did. No one should be surprised that they upped their game to become disruptive both inside the event and violent outside the event based on their past actions and commentary about our staff and our programs. Anything less than upholding the suspensions for less than the year given would be interpreted as an approval of their behavior and would encourage them to repeat said behavior at future events that they just don't like it would be a slap in the face of the program attendees and volunteers who had to witness their disruptive and violent behavior. More importantly, it would be a professional and personal insult to library staff who worked so hard to uphold and maintain library policy and integrity for their own safety and for the safety and enjoyment of all library patrons and program attendees. There's no question these individuals intentionally and knowingly violated library policy and there should be no question that their suspension is upheld for the full 365 days. Thank you. Thank you.

Sandy Tibbitt, you have five minutes. Thank you.


Sandy Tibbitt for the record. Harassment is defined as aggressive pressure and intimidation and violates NRS 200-571. Discrimination is the unjust treatment of different categories of people and violates NRS 233-010. As evidenced by my 34-minute video I provided to the board, the legal counsel and today's Iaro and for the Constitution I did nothing wrong. The U.S. Constitution is the supreme law of the land in every NRS code to precede any library policy.

Stacy McKenzie and other library staff victimized me during the event. I was harassed and intimidated with the threat of security and then discriminated against when library leadership suspended my library privileges for the year even though there were two other people inside the event peacefully protesting and holding similar signs with the exact same

EXH 21B

logo on it as mine. Why just me?

Leadership is claiming I violated Washoe County code 80520 by not getting approval to display my signs with the Nevada mass resistance logo during the event. Washoe County code 80520 states it is unlawful for any person to solicit or offer to sell any goods, merchandise, or any services on any property owned or being least accredited by Washoe County. Please clarify what goods or services was I selling besides freedom of speech that day and explain why I was the only one targeted with this nonsense. Again, two other people have the exact same logo on their signs but no suspension for them. I moved to the back of the room and asked and I cleared the aisle staff commanded me to do so. I spoke to no one unless spoken to and never once did I put my sign over my head and block anyone with views. Nor did I push it towards anyone. Where's your proof? Everybody with videoing, where's your proof?

As you can see in the picture someone else pulled their sign up over their head during the damn portion of the event. Not blocking anyone with view yet I'm the one being targeted and punished. Yes, I didn't say I had a role. I don't know when aggressively asked for the location of my grandkids while I was surrounded by a handful of triggered library staff. I didn't want them to know their location because they were angry and for the record my granddaughter is 10 years old and once supervised by someone over 13 years of age as per your unintended children of faculty both NRS 379120 and 379040 were violated by the library leadership when they unilaterally decided to close North Valley's public library to the public. NRS 379040 state the library and reading group of any consolidated county district or town library must forever be remained free and accessible to the public subject to such reasonable regulations as the trustees of the library may adopt. This board never voted to adopt the closing of this location to the public for this event. This is another instance of the library's leadership showing a complete disregard for proper procedures thereby risking legal action against the county and the board. This is so-called malfeasance in his grounds for dismissal. My denial letter states a thorough investigation was conducted by interviewing staff and patrons who attended the dragged story outlet and because of these interviews I was found guilty of violating multiple library policies. 14th amendment clearly states that the government cannot deprive any person of life, liberty, or poverty without due process of law. Procedural due process refers to procedures that the government must follow before depriving an individual of life, or poverty which includes the right to notice and a fair hearing. By due process rights were encouraged upon when legal counsel felt provided need with the principle legal notice which is required by MRF 241033. When meaning to consider a person's character, misconduct, confidence, or help or to consider an appeal of a designation revolt. Do you see the hypocrisy here? Staff can surround me in my personal space, intimidate me, and attempt to block me from watching the event. Yet I am the long accused and found guilty to violating the policy. When I confront them outright out of the event, when I learned we were locked in the library and our kids were unlawfully detained and held against their will. Washoe County employees are violated NRS statutes

EXH 219

and my civil rights. Where is their accountability? Where? Thank you. Hold your applause.

Do my fellow trustees have any comments? Yeah, Ms. Tibbetts, could you stay for some questions? Ms. Tibbetts, could you resume at the podium for questions?

Thank you, Madam Chair. A few questions. I do believe, Ms. Tibbetts, that some of the my fellow board members were possibly in attendance at one of these events. Some of these board members? Only at the downtown story hour? Correct. Okay, so let me just really quick back up. We've got two different events happening on two different dates, two different locations.

So you went to North Hills was June 15th event when that one was where you're saying the whole library was closed down. So to get in the entire library was for that event. Correct. Okay. And they let you in and you had a child? Correct. Okay. I've said this before and I don't know, I think some of the other board members were there, but I'm shocked that they let you in. Me too. To begin with. Since they know me so well. Since your history. So I do have a few questions. So you were let in the main library that was completely closed. Did you get a wristband to get in the North Hills on June 15th? You had one of these wristbands? Yeah. You got in and the whole library was for this event. Correct. Okay. So I saw the video and you were here in your seat and then did you have your sign out before they let you in or did you pull your sign out once you were in? I pulled it out after I was inside. Okay. But they knew who you were. Yes. Okay. So. Well, I heard them say that they prepared days beforehand. Yeah. For us. Yeah. So were you asked to leave at that time to leave that event that day in North Hills? No. Okay. So at that event, you stayed, you were stayed for the whole thing and then your granddaughter was locked in, but no one ever said, hey, you got to go. Nope. Okay. That was not where you were surrounded. Okay.

This, these things that you passed out to us, these are pictures all from North Hills. Correct. Okay. Sorry. North Valley. It's just what it says on your card. Okay. So these are all North Valley pictures. Correct. So your suspension was Tibbetts when you were given at the next event at downtown. I'm six 20. Correct. Okay. Was it referencing the events that happened before? Correct. Okay. So, so how did you get into the downtown event? I walked in. Okay. So they let you in the downtown. It was ambushed. No, not too far inside. Okay. Okay. Because the event was in one particular room. Okay. Well, it's, we definitely saw earlier with the library's testimony,

you know, there and the pictures, not exactly customer service oriented temperaments. And we just saw that earlier on display. And I saw the, you know, the crowding, Ms. Silver was there. We saw all the video. It's hard to decipher, you know, all the events.

EXH 220

But it is no shock that it's coming to you and that, you know, everything that transpired, like I said, I'm still shocked that they let you in. Even if your sign wasn't out. So that might been a little lack of, of leadership and, you know, proper direction, even from the start.

You know, so I just wanted to clarify some of those things. And I'll turn it over to my fellow board. Thank you, Mr. It's just one further question of clarification. You were not suspended on June 13th. No, I wasn't spent on June 15th. I got the notice on the 20th that I was suspended.

At the downtown library. Correct. Okay. Thank you.

Trustee Ralph. Yes. Trustee Ralph, for the record, through you to Trustee Jax, I think that if you gave it a little bit more thought, you would think that the library staff was following their policy, which was to allow an adult with a child to come into Drag Story Hour. And the intent from those who came was this time to bring a child to gain admittance. What was your intent when you entered with the child to attend the story hour? Exactly what I did. Disrupt it with a sign?

I sat with my sign in my chair and I was quiet.

Stacy McKenzie approached me. I spoke to no one. Library staff approached me. I spoke to no one. But you don't support. But you don't support Drag Story Hour, Madam. So for you even to be there, you asked a question. I am. I'm saying, but your intent to be there is would seem to be disruptive in its very nature. Did you watch the video? Did you watch it? I was never able to download it. I sent it to you. You did. And it was through a second party and it did not download. I didn't think so. So let's go back because I think what Trustee Ruff was getting to was in light of your displeasure with the Drag Queen story. You in fact did arrive to have a grandchild attend story. Is that correct? Yes. Okay.

And we've been in front of this board many times and none of you, the library leadership, none of you would even put this on the agenda to talk about it. That's a different issue. Okay. We still be here with the challenges, the full challenges on the agenda, but we couldn't put Drag Queen story out. We're going to stick to tonight's agenda. And there are lots of issues all over the place. But we're dealing with your appeal tonight. And I just wanted to clarify what you are appealing is your suspension that you were notified of on the 20th. Yeah, which you would assume was a result of the behavior or alleged behavior, I should say on the 15th. Correct. Okay. Thank you, Madam Chair. I have a call for you. The

EXH 221

thought I did put into the comment was it would have been difficult for library staff to say, whoa, whoa, you can't come in even though you got a child. We know you. We're still not going to let you in. We'd rather deal with the backlash of that than having a known disruptor come in and then now see what happens. So my thought was just to the hindsight of they probably had to let her in because she showed up with a child, but just because you showed with a child, you have to let everybody in.

You have to let everybody in. That's holding a child's hand to come and drag queen story hour. That's the last one. Do you want to direct questions? I'm not talking to you, Director Scott. I understand. My question is, I mean, it, it would seem like library staff or somebody could say, look, uh, we see you brought a child, but we still aren't going to let you in based on our forethought of possible security issues with you. What if a person showed up looking drunk with a beer? Would you let them in with a child? Trustee Jax, I don't think this is an appropriate line of questioning only because it's making presumptions on both sides. Cause she showed up with a child. So I didn't give her a right to get in. She was allowed in and she did sit down. Okay. That much is a fact. Right. And I was just saying it's odd that they would let her in would be like letting in a drunk person just cause he's holding a child. No, no, that's not the case. Uh, they, they, they, thank you. They let, um, her in because she had a child and you're saying your intent was to attend drag queen story. Okay. So let's stick to the facts that we can all agree upon. You were allowed entry as is the procedure for the library. And then someone approached you while you were seated in a chair. And what did that individual ask you to lower my sign

and what happened to after you, I've seen it. I'm sorry. She calls. My sign. I'm sitting down in the chair. I have my phone right here.

One hand has my phone. One has my sign and I'm leaning forward. And I'm like this. That's how I was sitting. That bothered her. And did you get up and leave voluntarily from the reading hour or you were asked to leave? I'm unclear about that. So I would never ask the name. I would ask to sit down to through the aisle that was already in the three year hours. Why actually open it around when I think it was one library that was actually nice and ask me to please. But I was asked men to move back in the back of the room. Everyone's view. But I'm unclear. And I you know this is not a court of law. This isn't an evidentiary hearing. But I'm unclear about something even having watched the video. You were seated the entire time during the reading hour. No. At the end of the program. So you stayed throughout the program. You stayed. You remained with your child grandchild to listen to the reading. And then at the conclusion of the program. Then you were approached. I'm just confused on the sequence of events. They did the last song and dance. And everybody

EXH 222

stood up at first. And the library staff said no. But if I could sit down and I didn't want to sit down. I wanted to stand up until the three and. They asked me to move back. I was walking.

So you might understand that was possible. Okay.

And I was surrounded by them. In my personal space.

The interaction is really good.

Big all security again. I didn't like you. Why. Stacy McGinsey had her hand up in front of my camera. All over my face. And then it ended. Then you received the letter on the 20th. Okay. What is the date that the drag queen story hour was at the downtown library. That was on the 20th. Because you were there on the 20th. Trustee and I were both there. So is your appeal based on the original based on the suspension based on North Valley's the North Valley's incident.

I'm just trying to understand what. Both.

But the suspension was based on North Valley's. Correct. Right. Okay.

Was just delivered. I delivered on the 20th.

I'm just trying to clarify what we're. I have a follow up question for Mr. That's Madam Chair. Mr. Tibbetts did you receive any paperwork. I did watch the video that day outside the North Valley's library. All that video. Did you receive any notification or possible warning a piece of paper like hey you're going to be suspended. Here's a nothing on that day. At that time. At the 15th. Okay. Yeah. We saw all the video of that. Very clearly. And I think when we're talking about the video of what transpired Madam Chair. It's important that we do see all the videos that were sent because there are multiple ones. And that's that is helpful along with the pictures. So thank you for those. Thank you Madam Chair. Thank you. Trustee Thank you. Miss Tibbetts have you been suspended before from the library use. No. Okay. I do have a question about the policy itself. Are there is there progressive what I would call progressive discipline. Is there does start with three months six months. It was decided. It was decided at the pre meetings that depending on the fractions that we would probably start with a year.

EXH 223

Depending on what was going on after delivering the policy explaining the issues and moving from there and in the policy it does state that we will get that notification at the earliest opportunity that day was so overwhelming with so many infractions so many things happening that again we get after the event and as a group decided who would get their suspensions and then we delivered them at that time and we did start with a year at that event. Is that the maximum. It is the maximum. Yes. So you went straight to maximum. Yes. I only one of you please. May I interject just for a moment and I don't mean to correct Mackenzie. I'm John Kavoe branch manager of the North Valley's library. I was the manager on duty the day of the North Valley's rainbow vest and drag queen story are I initiated many of the written incident reports. We collected supplemental reports from other staff who were there and witnesses but you'll see my name involved in a lot of those reports. We actually did not go straight to the first one year suspension. Can I ask you to stop talking right by the microphone. Mr. Perkin. Well could you sit down or leave or just so there's not a distraction. We're very distracted up here by everything going on over there. Go ahead please. Thank you. In this case and as common branch manager Kristin Ryan commented earlier brought her capacity as a branch manager issuing suspensions for the library. My experience is similar. My training is the same and in this case we asked many of these people you're hearing from today with appeals to leave for the day. Their behavior was impeding our ability to do our jobs as library staff which is a violation of our conduct policy and it was as it happens every day in any branch across the system that we asked them to leave for the day. Some of them flat out refused. They absolutely refused and at that point they were issued trespass notices which is common practice for any person who refuses to leave when asked for violation of the conduct policy or any other library calls. That's when Allied security stepped in to issue those trespasses at different points. There were PD involved to help mediate that decided to stay and allow them to stay. When acts are so egregious we will go to higher levels of suspension and that is often determined based on the situation at hand, the day you're presented and other circumstances. So there were cases where those were necessary to be 365 days but we didn't just go to 365 days. We asked to work with folks please leave for the day you're violating the policy and these are conversations that library staff have had with many individuals over the course of years so the policy is known. Thank you. May I ask is is the um you refer to the term egregious. I would

let's stick with the person who used that. May I ask you in terms of what you consider egregious what exactly was the egregious act just so I know what you were dealing with. Yes I understand the trust. I'm only going to speak to Ms. Tibbetts' appeal in this case because that's the one we're hearing right now. That's what we're hearing right now. And what hasn't been discussed so far that I heard in this is that I think one of you referenced, I'm sorry I lost track of who, one of you referenced the video outside might have been trustee checks. Probably you've seen my face in much of that video. I was not in the direct story hour event inside the building. I was outside throughout the event to monitor safety conduct, make sure the event and the volunteers had what they needed. So I was outside the entire time.

EXH 224

What happened inside was made privy to me as branch manager after the fact

which we made assessments based on that. But when we were outside after the first story hour that Ms. Tibbetts was in attendance as well as other folks, I and I will cite my colleague Kristen Ryan who was also up front with me watching the security perimeter saw Ms. Tibbetts coming towards us from outside of the security line where the event was being held. And it's a security line because that's where we had drawn a security line in the parking lot for safety. It's a public parking lot. You've been to North Valley. May I stop you for one moment. You've lost me just a moment. Were you witness to the egregious event that's which is what occurred in the reading hour or in the parking? The suspension for please don't get was for accumulation including the behavior inside the story hour. But if you read what I have written in that suspension, it also included the behavior in the parking lot of Ms. Tibbetts and others. So it was a cumulative issue. It wasn't just one incident. It was incidents throughout the day.

As a branch manager, I train my staff and I am trained to watch for behaviors of the public and staff that may imply that there is danger. That is what I felt when I saw Ms. Tibbetts and Victoria Meyer approaching. Let's leave this Meyer out of this for the moment. With their phones, their body language and the tone of voice that they were using as they came at me in any other situation day in day out at my library. If I saw anyone coming at me that way with that body posturing, I wouldn't have read that as a threat. I intervened and asked what was going on. Can I help? They videoed the whole thing as is there right? They indicated that a child was locked in and wanted to know what happened. I thought Ms. Meyer's issue. Is this your issue as well? She was right next to the brain of life. The behavior is what was egregious to me. If anyone else had come at me at any point in any part of my facility with that tone and that posturing, I would have perceived that as threat. I would have asked them to leave. To me, that is an egregious motion. The egregious act is to not leave when asked. Does that come with threatening body posturing, threatening behavior, stand behavior? First, he doesn't like it. Thank you. Like this?

Ms. Madam Chair, I have one question. Was the police called? Were the police called at the North Valley Library that day? Was outside attendees? Were the police on site? Oh, I'm sorry. I misspoke. We called. Allied security called. Okay. And nothing was filed. Everybody left?

One at a time. But the police were on site, but it wasn't for you. Okay. Okay. Thank you.

EX# 225

Madam Chair. Yes. Can I just ask one question because Ms. Tibbitt indicated in her presentation that we had failed to provide her the notice pursuing to NRS 241.033,

which is the open meeting law, which requires notice to those individuals who are going to be discussed specifically their alleged misconduct in a public meeting. And I think the board members were all cc'd on this line of communication. What we asked Ms. Tibbitt was to waive the actual notification that set forth in NRS 241.033 because we did not have adequate time to provide that notice and have this appeal today. Eventually, Ms. Tibbitt did waive that notice. So I think her statement is slightly misleading where she indicated that I failed to provide her notice. She waived that notice. That is what we were informed that you would waive that notice. I still didn't come to the written. They were late. You had given me that. They didn't follow the NRS code was my point. And yes, I did waive it. Yes. Okay. That was a very good email. I did. I did. I did. That's why you're here and speaking.

Are there threatened? I couldn't even though I was told by this board by you, by Stacy McKinsey, by Jeff Scott, that we would be on the agenda. But then I get an email from Herb Kaplan and Dave Celaro that said I got to waive the rights. Otherwise we were going to be on it. What is that? Excuse me. Mr. Kaplan, would you like to explain and can the audience refrain from making their comments? I know you've all lectured us on first amendment rights and yet we're trying to conduct business here. So sidebars from the audience is very distracting. Thank you. Thank you, Madam Chair. Herb Kaplan for the record. Again, I was unaware of the practice that the notices were indicating when this would be on a library board agenda. That was erroneous. And I'd ask staff not to do that in the future. They don't have the ability to state when anything is going to be on any agenda. So I'd ask they cease doing that in these notifications. However, any item that is placed on an agenda can be withdrawn based on a failure to

meet the requirements of the open meeting law. That occurred in June meeting because we didn't have adequate notification in how Mr. Park's appeal was noticed. So all I was offering you was the opportunity to have this appeal heard today. And the only way that that was going to occur is if you waived the 14-day notification that's required under NRS 241.033. I indicated in my email that you were free not to waive that notice and that we would provide that notice. And we would put this appeal on a future agenda, most likely the September agenda. So it was to accommodate you and to hear this appeal. It wasn't to penalize you. It wasn't to trick you. Each of these appeal, each of these appellants were provided the same notice, the same notification, the same request.

EXH 22 G

Do you have any questions about that, Stephen? No. Okay. And we saw your waiver because we've wanted it on the agenda for this evening and hoped you would waive it so that that 14-day requirements so that we could have it on this evening's agenda. And I'm sure that was made clear to you. Yeah. Okay. Great. Are there other comments from the trustees?

Any other comments or questions? Yes, Madam Chair, Trustee Ruff for the record. I do in this, and we've only heard one of these so far, but I do believe that

there has been behavior that warrants a suspension. I think that immediately going to a year is what I'm stumbling upon here because there isn't sort of a progressive discipline. I do understand for librarians listening that there is a history with one or more of the individuals that have been suspended. I guess I'm looking at maybe a revision to the policy again where there could be

steps to the suspensions instead of going to a full year.

Thank you. Sorry. I have a comment. That's fine. Thank you. I mean, this isn't a criminal trial, but it occurs to me that with all due respect to the librarians, and it's not for me to say you weren't feeling threatened or that Ms. Dibbitt wasn't feeling threatened. You know, I heard behavior that can warrant concern of a threat. I'm not in a position to evaluate that even by the videos. I will say though, I do think to Trustee Ruff's point, the punishment needs to fit the crime. And I'm not sure because we're not talking about a crime and we're not talking about anything that was thought of less than a year, that I would agree with Trustee Ruff that perhaps a year was an overreach. Not being there, not understanding what the librarians felt in terms of a threat, not understanding what your intent was on being there. None of that is really anything this board can delve into. This is not a criminal hearing. It's not an evidentiary hearing. We're just a voluntary board hearing your version and the librarians, the manager of the libraries version, and she was not a witness to part of it, but witness to other. We have photos. We've seen videos. So I would look to my fellow trustees for any recommendation, which I understand may mean taking a look at our suspension policy  that may model more employers who use a series of corrective actions versus an immediate. Can I, can we refrain from having discussions? Order. Order in the room. Please

thank you so much. I'm sure I do have a comment. Yeah, if I can just finish my thought that I think what I am hearing is that much like any other policy, this policy may be something we need to look at so that we're not moving to extraordinary measures such as a year's suspension. Now I have librarians in the back, you know, who are, I'm feeling intimidated

EXH 227

by. I must say I want to show you decent respect. I want to show you the respect you deserve as professionals managing people day in and day out in a public setting. And I've been at commissioners meetings and city council meetings, and there is much more in the way of security and activity that goes on, even screening that goes on. So I don't want to see us step into a rabbit hole here on what occurred. There are videos, there are photos, there's testimony, which one, oh, I shouldn't say testimony, public comment or your comments, librarians comments.

So, you know, having given this some thought, my only reference point is, is what Trustee Ruff alluded to. I'm not sure if the punishment hits the crime because I don't really truly understand the crime or the policy well enough to know that an immediate one year suspension was warranted. I've heard that they were threatened by you or felt a fear. But on the other hand, you were allowed in the library and into the event, there was probably some expectation of behavior that might occur. I would have felt that way if I were at the library, and you were holding a sign, and there may be an assumption of your intent to disrupt the event. I have no proof of that one way or the other. That's not even in question. But I would look to my fellow trustees, including Ms. Mosher, who's on the line, regarding a review of the policy that enables librarians to, in a sequestered environment, review what are their perceptions and photos and videos as to whether a year is warranted on a first offense. And I don't even like the word offense because I don't see it written anywhere that that's an offense. But we'll just use that word for generic purposes.

Any comments? Yes. Per capita for the record. I understand your want your your desire to have that policy brought to the board as well. That will be done sometime in the future. We're here today on Ms. Tibbetts' appeal.

And I understand what the trustees have stated in their comments.

Essentially, it's been two months since the appeal was the suspension rather was issued. The board can either uphold the appeal or deny the appeal. So at this point,

the board can also say it's been two months. We feel that this is adequate punishment. Thank you. That fits this and I'll use this term incident because there was, you know, based on the presentation, as far as I know, Ms. Tibbetts has never been suspended before. I'm unaware of any other incidents of this nature in her use of the library facilities. It's to me an isolated incident that is in conjunction with, you know, let's call it what it is, a hotly contested emotional program and event that was occurring. So though that's my guidance

EXH228

to the board is you can either uphold the one year suspension, deny the one year suspension or modify the amount of time that the suspension is in effect. And again, today is essentially two months. I appreciate that. And that's where I was going. But I wanted to ask my colleagues for any further commentary or if you have other questions. Thank you. I move that we uphold the suspension for Sandy Tippett, but amend the length of time to six months. Is there a I offer. I did have a quick question, Madam Chair. Thank you. There are no more drag queen story hour events proposed on the calendar for the near future. I don't think that that's a possibility. I think this was the one contentious event that's, you know, you know, was kind of hosting this kind of. So I would say time served would be appropriate on modification on that motion as of now. And that's all I have. Thank you, Madam Chair. Well, we've had a suggestion. I said Trustee Ruff and a suggestion.

It's a punishment. I know. Yes. That was a suggestion to amend that motion. Right. So I have an additional amendment, if I might.

I would amend the suspension to the period of time that has elapsed with an understanding

that and I can't control this, but I can only say in the spirit of what Mr. Parks started our meeting with diplomacy and decorum and appropriate behavior that you are that we reinstate your privileges

with the understanding that these type of incidences, whether on a now gone drag queen story hour or any other thing you wish to protest, do not threaten any librarian. And in turn, no librarian would threaten you because threats are perceived or real, but they're in the eye of the beholder. So I can't force you to agree to this, but I'm suggesting for everyone here, because the fact that we're spending this much time on this is rather incredible to me.

As I sit working a full time job and wanting very much to serve on this library board, watching videos, reading emails, seeing statements flying back and forth, waivers and whether you wave or not, and all the things going on here, I think it gets down to poor behavior, just poor behavior. And we all should be better than that. Every one of us, whether you were engaged in that particular event or not, these are public libraries, they're free and open to the public. And yes, people are free to say things and perhaps hold a sign up, but decorum and proper etiquette and behaving like adults so that children, I think, learn from our behaviors the way they should be, because all of this is happening or happened in front of other children. So I think Mr. I'm sorry, the Assistant DA's comments, it's more an incident than a crime. And we're balancing the tremendous professionalism and concern of librarians who day in and day out deal with the public and have every right to perceive or feel distress or fear or the threat of action. I would amend your amendment,

EXH 229

which says to reduce it to six. Yours is to end it this evening. And I would amend it further to say it would end this evening with an understanding by you that this behavior will result in further suspensions regarding any event, anything that goes on that threatens librarians and their ability to do their jobs. And I wasn't there. I've watched the videos. I'm not proud of any of these photos. I don't think they do justice to the work of librarians or their professionalism or their training in trying to deter perceived fear or behavior. I don't think it does justice to their efforts to deescalate, which they are taught to do. But we're facing something quite bizarre in my mind. I was about to say weird, but that's too political. I think these kind of incidents just appall me. I'm just not accustomed to, as was stated earlier, being in a library where people are photographing and taking videos and confronting each other and speaking and talking and talking and speaking to each other within six inches. And I think we're all going to have to do a better job. Drag Queen story hour is no longer at the public library. So hopefully, whether we agree with that decision or not, hopefully that will not give you cause to arrive with a sign in protest. Hopefully if you are a library user, you will avail yourself of library privileges and behave in accordance with library policy. I don't know if I may ask the hellent if that is something she would agree to. I'm not attempting to put you on the spot, but I don't think you're hearing from this board that we want to deal with year-long suspensions. We're not accomplishing anything other than hearing consistent appeals and hearing she versus she said she said she did she didn't. And I frankly am dizzy from just the videos, the pictures, what went on and ashamed that any of us behave in that manner. So do you want to think we should buy something? So I'm sorry, I'm allowed to speak.

We do have a motion. I do know that. That there have been suggested revisions. Yes. Which have to either be accepted by Trustee Rupp or we need a second on Trustee Rupp's motion.

Thank you for timing me. Trustee Rupp. Okay. Okay. That's what I was saying. So could you revise your motion? I won't. Not revising. You are not revising. You are saying six months. Trustee Rupp. Okay. Are you withdrawing your motion? Okay. Thank you. You are withdrawing your motion.

Leah Mosher, Trustee Mosher, do you have any commentary or questions? No, but can we reiterate what is the motion? The motion has been withdrawn. Okay. Thank you. From Trustee Rupp. I believe, yes, I believe there's another motion that has been made as well. Thank you, Madam Chair. I moved to uphold the suspension with the change in the date to end on August 21st, 2024,

EXH 230

with the provision that this would serve as a warning to Ms. Chibitz moving forward from the board, kind of a, just as a warning with the suspension, considering time served from June 15th to August 21st. Thank you. Any questions on that motion? Trustee Mosher, were you able to hear that motion? I could hear it and I second it. Okay. Second. I will call for a vote on the motion by Trustee Jax. May I have a vote by the Trustees? Trustee Rupp. Yay. Yay. Aye. Three carries it. The suspension ends at midnight tonight with the understanding that this behavior was confined to an incident that we don't expect to have, again, for your safety, the safety of our librarians. Thank you. You're welcome. I appreciate what you have done. Thank you. And I appreciate what you have said about being an example to our children. Be that that's what it means. And we do need to be an example. I completely agree with you. We need to be good partners for children. So I would just like to say that I totally agree with what you just said. I just would like for the library staff to agree to it as well because their behavior. We have a motion and we approved that. So I understand what you're alluding to. Thank you. Thank you. All right. Let's move on to item C, discussion and possible action on appeal of the suspension of Drew Rebar from all Washoe County libraries. I believe that is for one year. The library will be given five minutes to present the case in support of the denial or suspension. The person appealing will then be given five

minutes to present his case in support of the appeal. May I ask the library who will be providing five minutes for all or up to five minutes. Mr. Rebar if you could stay seated.


I am reclaiming my time just to reiterate that based on the last comment that multiple incidents Drew Rebar was already in suspension whenever North Valley's event occurred. He had not He had not returned to the library to get that. He has also forced his way into other libraries without a suspension. Last year at Reno he was asked not to enter the library and forced his way in again. So he has had multiple suspensions. This is the second one and we did have a staff injury due to his actions. We did call the police on that and filed a report. And with that that's all I'll need to add. What is going on here?


Recess the meeting. Recess for five minutes please.


No.

There's public comment at the beginning of the meeting and public comment at the end of the meeting. No we do two of the three. So at the beginning at the end is what it's a society. There's two there's three different items. Herb Kaplan for the record. The open meeting law requires one of two things. Either public comment period at the beginning of the meeting before any action item is taken and at the end of the meeting before adjourning the meeting or on action items. Boards do take additional public comment sometimes on action items even though they have public comment periods as we do on this agenda in the beginning

EXH 23)

and at the end of the agenda. So we are not taking public comment as the chair indicated on action items. Thank you. I'd like to proceed.

Mr. Rebar you have five minutes if you'd like to step to the podium. She she had I believe you were allowed. She. Right. Right. And thank you for that information. I appreciate that. Mr. Rebar would you like to begin your five minutes.

May I ask you to restate what you said if you would. Thank you. And Mr. Rebar if you would sit down please. Would you please sit down. Thank you. At the time of Rainbow Fest at North Valley's on June 15th Mr. Rebar was already under a suspension that actually wasn't up for a few days.

And we notify people when they come back to the next time he seemed like he didn't know but that is in our security report. And I was also notified during my investigations of this appeal that he has done this before without suspension at Reno last year tried to force his way in the library when he was told multiple times that the library was closed. This was actually even before opening. So he was told they're not even open yet they're closed and he still forced his way in.

And we have a witness to that if that's needed. Thank you. So just multiple.

Mr. Rebar you have five minutes. (Silence)

My phone or phone? Yeah microphones.

Nevada revised statute 200.510 definition penalties truth may be given an evidence jury to determine law and fact a libel is a malicious defamation expressed by printing writing signs pictures or the like tend into the black in the memory of the dead or to impeach the honesty integrity virtue or reputation or to publish the natural defects of a living person or persons or community of persons or association of persons and thereby expose them to public hatred. I'm a terrorist according to some of the people around here contempt and ridicule the ACLU is after me isn't that great news. My name is Drew Rebar. I'm a business owner. I've been in the community for many decades. I've employed many people. I decided to become what's called a First Amendment auditor after discovering government corruption. What is a First Amendment auditor? Well I'm basically a member of the press. Why do I say

Ex H 232

I'm a member of the press? Well Monday I was in a courtroom with a judge and according to the court rules I was allowed to record the courtroom. You understand what that means Mr. Kaplan and Ms. Silver don't you. I'm a member of the press. I'm a member of media. My YouTube channel has several million views yet things happen. My purpose in doing First Amendment auditing is to audit the government. I'm here to check and see what you're doing and then my job is to take action and try to make change policy wise political wise. I was a candidate for Assembly District 40. I just recently got an Nevada Supreme Court ruling pro se. They didn't grant my writ of mandamus but they did hold that Washoe County violated the Constitution and the law in the way that they ran the last election. It wasn't done properly. If you'd like to see the ruling I can share that with you. This whole purpose of me going into a library whether it was transsexuals locked in libraries with children or prior to that just going into the downtown library. I've been in this library, recorded this library too. I've recorded many libraries. I've never protested anything. There's a Supreme Court case called Neves. Neves has a test. It's called but for.

Would I be here but for the fact that I was peacefully recording, documenting, and disseminating information to the public? Did I take any other action other than to but for record document and disseminate? I've asked for information. I hope all you guys have seen my Twilight Zone email series. Probably going to continue. As I said I'm feeling very litigious. I think case law is on my side. I think Mac versus Williams will be having a very long relationship. Mr. Rebar. It's my time, place, and manner and it's proper. I'm allowed to talk to whoever I'd like to talk to. It's hard to hear you when you're back as far as. That was a Supreme Court decision on that one. But anyways, you know, we were talking about with Mr. Parks' Constitution. That's really all that I'm about. What are my intentions in coming to these meetings? What is my intention for running for assembly district? What is my intention in recording? To make policy change. That's my only intention. Like I said, I don't think that County Manager Brown should have canceled Drag Queen Story Hour. You know, Plata wasn't called not transsexual. I think he should have left it going. The only thing that I think he should have changed was it should have been totally open to the public. Why not have it open to the public for everybody to attend? Why can't I attend? Why can't homeless people attend? Why can't people without children attend? Why can't crazy cat ladies attend? Why can't crazy orange people attend? Why can't everybody attend Drag Queen Story Hour? Why is it a ticketed item only? So now let's read NRS 379-040.

The library was open when I was there when your librarian violently took the door and pulled it back and forth in the video. Did you see that? Why did your librarian attack me? But NRS 379-040 says library to be free and accessible to public regulations of trustees. Trustees, not the manager, not the director, not the people that work here. You guys, the library and reading room of any consolidated county, district or town library must forever be

*EXH 233*

and remain free and accessible to the public. Not just to the LGBTQ community wearing our rainbows.

Shouldn't it be welcoming to everybody? But it's not. Thank you, Mr. Rebar. You guys have a nice day. Mr. Rebar, thank you. Thank you. Any comments or questions from Mr. Rebar from my fellow trustees?

I have one question. Mr. Rebar, I'm not clear on what your appeal to this particular issue is. I've heard you cite many Supreme Court rulings. I've heard you loud and clear. We're trying to make a decision on your suspension. My understanding is that you had been previously suspended. What was that suspension? I was just aware of that. Trust passed after the crime of battery, if I got it last year. Just got it up and laid hands on it. Wait, just answer my... Just one moment. I'm just trying to clarify this appeal is based on... And you had a prior suspension. Well, let's not get into editorializing here. I'm just trying to get the fact. You were under suspension previously or no? Not that I'm aware. Not that you're aware. Like I said, I've just got a trespass over a year ago.

Okay. Were you suspended at that time or notified of a suspension? No, I was trespassing. No trespass is a very specific statute of NRS.

Excuse me. So Mr. Scott, was he suspended previously? He was suspended, but we did not see him again until the next strike story. Was a letter sent to... We did send a letter to his house, yes. Okay. No commentary from the audience, please. I know it's tempting. Mr. Rebar,

I don't recall seeing the letter, no. So you were not aware you had been previously suspended prior to this suspension? No, it's kind of like the new process...

The new process is rather interesting. It was a Saturday I received an email from Jeff Scott saying we're going to skip right over the first and kill part of the product. But then he seemed to have a preference for the direction he was supposed to have. And we're going to go right to the board. And then after that, we got another email from the assistant director saying that she'd looked at the appeal and denied it. And we got one from Scott saying we need the writer. And then we got that email saying we need to waive our rights. Now, if you go to my email, hopefully you all can ask.

Sorry. Did I have a waiver?

*EX H234*

Well, Mr. Kaplan. Perfect. Kaplan, for the record. Yes. You indicated an email that you were waiving your notice pursuing to... Well, then we'll terminate this hearing right now and we'll hear it at a future date when we can give you appropriate notice. Yes, we'll show you your copy of the email. Yeah, I mean, because of this whole thing. I want you guys to tell me what librarian accusations that I've entered them. Guys, put that out there. You published in the press, got the ACL you involved, got these people with their rainbows standing behind you.
Madam chair.

We either are hearing this appeal upon a waiver by Mr. Rebar or we're terminating this item and we'll hear it at a future time.

Sir, to be in accordance, you have either waived or you have not. You claim not to have been notified of the request to waive so we could hear your appeal this evening or you did not. Well, here's what I'll do for you. If you go... Just... Yes or no. Let me say what I want to say.

If you don't read the emails, they're going to be very specific in my language and I try to be very clear.

I did not make, but here's what I wrote. Well, then we can't... Sir, let me... Sir, sir, this is a hearing about a suspension. What I'm going to do, I'm just describing the laws in your process because that's what I'm looking at as an audit. I'm looking to process. Well, if you are auditing, you know we're in violation right now hearing this appeal. Right now I'm going to waive and allow you to make whatever the issue you're going to pay and then I'm going to go to the whatever I'm going to go do and we're going to keep moving forward. I would have to consult Mr. Kaplan because I don't know if he is permitted to waive at this meeting. I know you're stating he did not waive prior to the meeting.

My interpretation of Mr. Rebar's email, which went to all of you as well, was that Mr. Rebar was waiving the notice requirements so we could hear this today. Right.

If he's indicating otherwise, he can waive that notice requirement right here right now and we can continue.

So do you waive that requirement?

EXH 235

Hang on, please. Do you waive that requirement?

Thank you. So for the record, you have waived that requirement. Is there something else you want to say?

Because your five minutes was not used to rebut the contention by the library staff that led to your suspension.

No, no need. I'm just wondering, you had five minutes to respond to what the librarian had to say.

Do you want me to ask a question? Excuse me one second. May I ask a question? Yes, of course. Thank you. I'll just share through you. Mr. Rebar, may I ask you a few questions, sir?

Okay, just to bring it back into focus, again, we're at the North Valley's Library, June 15th. You're there.

Are you already inside the event? Did you go inside? Did you have a child? At what point? Just give me that direction. Did you actually ever go in the library? I never went into the library.

I asked Reno PBS, I said, "Is the library open for me to go in?"

I said, "You'll go in there." He said, "Yes."

Right after that conversation, I walked up to the door and looked at the sign and said, "10 a.m. to 4 p.m." And they had something coming out, and I started to go in. As soon as I started to go in, they started screaming at me, and it's the video show. They pulled on the door like that. Okay, thank you, Mr. Rebar. But you did not have a child with you? Okay, you weren't holding a child's hand. No, I'm sorry. Okay, at what point did you address a police officer? Did he just happen to be standing by the door? No, he was probably standing by the door. But I mean- He was fired.

Was outside of their phone dock, so in the library. But how did you- excuse me, Mr. Rebar. The police was not in response to you. So the policeman was already there. You just simply addressed him verbally. He gave you some sort of nod that, "Yeah, the library should be open." Okay, but to the librarians, you did look like somebody coming in without a child. But you know, right? Which is not allowed.

*EXH 236*

I understand, but it was posted that it was actually closed to the public.

Right? On the door? They had a sticker up. Again, I hope that's where the trustee never closed it up. I understand, but just for this purpose, just for this purpose. You were notified by that sign that the library was closed. So then- After police officers were told to go- So they just backtracked. I'm sorry, madam chair. You were told then by library, and you thought, "Oh, I'll just go in." And the library was like, "Oh, nope, sorry, it's closed." And that kind of incident happened, and then the door was shut, and you were locked out. Essentially. I think we're touched. Did you turn around and leave at that time? I think I recorded for a few more minutes. Okay. But no more trying to get in. No. Okay. So, okay. And at that time, you weren't notified, hey, of any problems. We're going to suspend you. Nobody gave you anything at that time.

I have some more video.

Okay. And what that video means to me, I have to go back and read pre-watch it, perhaps you won't be able to see it sometime here. It looks like they'd already talked about suspending everybody prior to this event.

Okay. Because there was a conversation that seems like they were going to suspend me at that event.

So I think that based on the videos that I have, I think that there was a conspiracy among the library employees. I believe that's point two US 1985. I just have another follow-up question, Mr. Webar. I'm sorry. Would you say that is fair to say that maybe there was some confusion? I mean, you're asking a police officer who doesn't know the library rules of the day, let's say a general question, maybe a miscommunication you thought you could go in. They said no. Subsequently, you weren't let in completely understood. You weren't there for the drag queen story hour per se. I would there to see what the constitutionality was, what they were doing by allowing the public and only allowing certain special groups in or discriminating against certain groups and allowing other groups to do certain public property. That's my own gift. I understand. Property are you discriminating against? So Mr. Rebar, you I'm sorry, you weren't surprised that they didn't let you in because you didn't have a child. You weren't really there for the event. No risk. They were right. So you weren't really surprised that they didn't let you in per se for the event because the whole thing was closed for the event. And then there was the sign. Well, I was surprised because of previous events. They just closed up. I understood you did see the sign that said closed. It's it's OK, but normally, yeah, as in you, yeah, the whole thing was for the whole library. Understood. Understood. Previous points of state pulled out the reading books. I right.

EXH 237

Understood. A little confusing. The whole library. OK, so then you left that day, Mr. Rebar, and then you came back to the downtown library or you attended the downtown library event. Again, you're in the big library. You go in and then at what point did they give you your OK, so you were given notice. So there was no incident there in downtown. They just say, oh, there he is. Go give him his notice. And it was one year. OK, I'd like to ask no other questions. Just for clarification.

Putting aside your glasses. At some point you heard or understood the library was closed, but you made an effort to go in. Am I correct? Well, I completely understood it when they blocked the door and physically battered me. Well, but you then pushed. OK, then made your false complaint. I was clear out of the map. But prior to that, no, that's why I asked law enforcement what the rule would be. They were. He said, Peter, the sergeant, after you spent time talking to the librarians, didn't have to recognize people have free speech rights in front of the library on the public forum. They went away. And I asked law enforcement officer because you have conversations. Hey, are they open right now?

I'm just referring to the incident at the door because the video shows you pushing. And I should say not pushing your foot is in the door. Is that the door? I touched the one door and walked to the right hand side of my right hand. I believe if you look at the picture, you'll see my left hand is right down at my side. It's not touching anything. Not breathing or anything. Not pulling anybody. Not attacking anybody. Clearly at my side, not moving. And my other hand is holding that camera in the gable. So. But I did see your foot in the door. My foot was definitely in the door because they were trying to come out. I figured I want to go in when they come out because the library doesn't go. Now let's see what they do. They block the library from the public. Is the library supposed to be blocked from the public so that we keep everybody out while we have a special witness we've been there. I think we're going to have to differentiate your overall concern about process from the actual incident of you putting your foot in the door when you knew the library was closed. No, I was not understanding about the police officer. Let's put aside the police officer because he has no impact on whether a librarian chooses to close the library. The library is not allowed to close the library. The library is not allowed to close the library. But that's why, and I know you know we couldn't call a public meeting of the trustees at that moment. So I'm trying to differentiate the process from the incident. The process is something that is differentiated from the actual incident of you putting your foot in the door. And it's unclear from the video whether you're trying to prevent the person from coming out or you're trying to keep the door open so you can go in. And I'm not sure why.

Ex H 238

But it was closed.

Even though you acknowledge it was closed.

Not in the video. It's closed.

And I'm only trying to get to the facts of what that incident was. And I've watched the video 15 times.

And you made an effort to keep the door open.

And I think that injured librarians. Why do they need to lie?

Is there an understanding of what your appeal is based on? My appeal is based on it's always the library.

Without process, you kept the public out of the library without process. And now you're saying you're making up lies saying that I injured a librarian to cover up the county's failure to have a process to have you guys meet the board heaps and to say we can close the library for this effect and have to have a meeting to close the library in public. We have to have reasonable rules to close a public forum for the public.

And Director Scott and his friends closed the library in public. You guys wrote the law.

I'm having a chair. In 2009-04, library reader and the bank saw that this entire library has forever created free access to the public. So it's reasonable regulation. Mr. Trustee. I think we can continue. I think we're very clear. We're very clear on what your claiming should be.

That the library should have renamed open. My understanding is your appeal was based on a suspension based on your action. And Mr. Kaplan, I want to frame this correctly so the board can take action on this matter. And I'm confused only because I'm trying to segregate the process from the actual incident. Sure. Herb Kaplan for the record. My understanding is that Mr. Rebar was issued the suspension based on his actions in trying to force his way into that library that day. That's all we're concerned about here today.

EXH 239

So through you to Mr. Rebar. So subsequently some of the pictures we got from earlier shows the actual inside of the library and what would be somebody holding the door. Right. So we have an inside view here. Well, this is from our previous presenter. This was just for her case. But I can see here, you know, it wasn't a security person at the door. Probably hard. I'm surprised somebody didn't get a finger pinched a child's finger pinched. I mean, that's my like worst nightmare. Those hurt horribly.

Having a door where someone's opening and shutting and you've got multiple things happening. I mean, it's not right that somebody got hurt. These are very dangerous doors.

So just not having a security guard there. You might have been a little stronger. This could have been a lot worse. Just trying to, you know, navigate a big front lock door with people trying to come in and out and librarians acting as security guards. So thankfully there was nothing worse. But we did have a librarian get hurt. And I understand. And I understand what you're saying. But you're right. There might be a but for excuse me, Mr. Rebar. There might be a but for this whole little incident and then someone got a bruise. That's, you know, unacceptable as well. But you know, the confusion of a policeman telling you you can go in and then librarians telling you you can't, you know, I mean, I just feel the whole security parameters were probably not up to par of what they should be. Or now that we learn what they should be in hindsight. So I think working together with the library and the staff, you know, we're trying to navigate through this again, because we're going on a lot of discussion and video and things like that. So I can see how all this transpired and could be just an unfortunate event. And since there are no more of these events happening and we've learned a lot from this, I'm not exactly sure that, you know, again, a warning suspension wouldn't happen. We have no prior notice of what was happening, but we only know what was here.

So that was all. Thank you, Madam Chair.

Trustee. Madam Chair, Trustee Ruff, for the record.

Mr. Rebar. So you you had been previously suspended for a year, but you said you weren't aware of that. So you didn't attempt to use the library services for the year.

I never used library services. My sole goal was to come into the library. Just to record government. I see. Okay, thank you. That's it.

But your question was asked and answered. Yeah, he's never used the library. Never used

EXH24D

the library, but you acknowledge being suspended previously or not? No.

Director Scott said I would, but I never received notice of that. Right. You never received notice like this kind of notice. So if you were suspended before, there would have been a similar sort of packet. Well, I would. Maybe we can. I said my purpose is to audit government.

That's what I'm doing here. I'm testing classes, seeing what it is. I'm going to carry forward and try to make policy changes. That's my goal.

Okay, so we all know what I want to do. I want to have a constitution by all. I don't have a system.

Once again, I appreciate your passion for process.

It's.

It's admirable. And I think you call yourself a.

What's the term you used? The term is the term is a first amendment first amendment auditor. Well, if you go back to history, you want to I don't I don't need to do that. I just wanted to make sure I was quoting the right term. So you've called yourself an auditor.

This suspension is based on a very small moment in time where an actual injury was received by a librarian.

This is in a courtroom, sir. I'm just saying we we know and a library. Well, it's not a court, so it's not an evidentiary hearing, but you were suspended because you were making an effort to get in to a library that was closed by your own acknowledgement. Put aside a police officer had no no standing with which to tell you to go in the library. So your your action was to resist the person on the other side of the door. Would you agree to that? I'm just saying I think I'm just standing in space. There were kind of forces.

Well, every for every action, there's a reaction. So were you reacting to someone trying to push forward with them as they were standing the block. I did not touch them. I did not

*ExH 241*

raise a hand. I did not advance on them other than I put my foot in an empty space where somebody could just move down that space. And I tried to move to a door and the violent librarians walked.

So I would not I would not use the word push. I would not use the word touch. I would not use the word threaten. I just merely insisted in a space that I tried to walk to a public library open door.

Can I move to please trust you, Mosher? Can I make a motion that we keep this that his suspension remain for one year.

Seconds.

We have a motion on the floor to retain the period of suspension for one year based on its date of issuance.

Any further comment? I would thank you, Madam Chair. I would I would like to further discuss that, you know, some of the information that we see now, some of the hindsight that we see now probably could have we've all learned a lot from this process. I mean, you could have been anybody walking in. You could have been a suspicious character or somebody there to do something else. Right. So their initial reaction is supposed to stop you. But again, locking those doors, it seemed like it was a, you know, a but for case of we're lucky someone even didn't get more injured throughout the day with this locking and unlocking

seem like a bad procedure in place.

And I think that's unfortunate. And I think there is a history of contention.

So this is not shocking.

Really, I'm sure you agree. I'm just saying, you know, there's a history with, you know, yourself and members of the library and the directors. So I think they were, you know, used to a certain temperament with you. But the reaction on the other person on the side of the door, they didn't know who you were. Possibly things are loud. Everybody's having a good time. Things like that. So, you know, I'm not sure without proper notice and even knowing that you haven't suspended before that, you know, a full one year would would lend to that. But so I will not support that motion.

EXH242

Thank you, Madam Chair.

Well, I had not yet called for the vote. Is there any Trustee Mosher any comment or Trustee Ruff on motion? Which was to uphold the one year suspension.

And may I call for the vote?

I agree. I agree. Nay. Aye.

Three to one. The suspension remains for one year. All right. We will go to the next item.

Mr. Rebar, could I ask you to be quiet?

Item 6D, discussion and possible action on appeal of the suspension of Fred Meyer from all Washoe County libraries. The library will be given five minutes to present the case in support of the denial or suspension. The person appealing will then be given five minutes to present his case in support of the appeal. May I ask a librarian? Madam Chair, before we begin this, Herb Kaplan, for the record, again, as I stated earlier, I provided each of the three individuals with the same offer of waiving the notice requirement.

Mr. Rebar and Ms. Tibbitt provided waivers. Mr. Meyer did not. Then we will not be hearing this item tonight.

We are not entitled to hear this item without that waiver. (Inaudible) Could you refrain from that commentary?

Well, I mean, the fact is I'm here and I'll wait even now. Please.

That works. That works fine. Go ahead, sir.

Yes, we wanted the library manager. Thank you. Donica Bowen, branch manager at the North Valley's library for the record.

In addition to the statements made by Assistant Director McKenzie regarding this appeal,

*EXH 243*

which I stand by, I will just add that since there have been other questions about whether or not 365 days is too much of a suspension for various acts that we're hearing, Mr. Meyer was one of those individuals who I suspended.

I asked him to leave for the day.

Based on the behavior and violations of our library conduct policy, Mr. Meyer absolutely refused to leave. He said, call the police. I will not leave. That's not a quote. That's a paraphrase. He refused to leave when I was asked to leave just for the day.

We followed our established procedure for this event, which was to, at that point, notify him of trespass for refusal to leave.

Anytime we've trespassed somebody in a Washoe County library branch and they refuse to leave the premises, it becomes a 365-day suspension. I have done this with many individuals, unfortunately, when it's gotten to that point. So I did not see any issue with this being outside of regular procedure that's normally followed by myself in the management of my branch. The Allied security came up, handed off the event to Allied security. Their job was to call the police to enforce trespass. I stepped away and let that process happen. That's when our PD arrived and spoke with various people. Outside of any other questions, I think that the statements that assistant director McKinsey's made in my recap here will help you with your decision. Thank you. I have a question if you don't mind. Yes. If any of the other trustees have questions.

I'm not exactly sure what action occurred that caused you to ask him to leave. If you could clarify that for me. Again, it wasn't just one action. It was a variety. It was a continuance of behavior by Mr. Meyer towards myself. It started before the event. It started before the event at the entrance line of the event space. Mr. Meyer was engaging in questions and about the event, which I answered to the best of my ability. The questions were repetitive and continuing to the point of harassment. I was not able to disengage to do the rest of my job. There's a, and I don't know the specific number off the top of my head in this moment, but in our library conduct policy, there is language that if patron behavior interferes with staff's ability to do their job, that is a violation of conduct policy. I was not able to do my job. I was not able to walk away and make sure that the event was getting ready to start. The questions continued. There were in what I perceived very disheartening comments made towards me, calling me a pervert, repetitively, repeatedly.

EXH 244

Those sorts of interactions are meant to distract and keep me from doing my job.

When I asked him to leave for the day, he flat out refused and I issued the trespass. Did he remain? He remained on site all day. He remained on site. Thank you. Are there other questions? All the way downtown.

This was the North Valley's land. Oh my gosh. Okay. It was June 15th, correct? Correct.

Trustee Moser or Trustee Ruff, any questions or comments?
None.

None for me. Thank you. Generally speaking, when you ask people to leave, they must leave, right? Is it very often that you have to do a one-year suspension?

It depends on the situation and the individual involved.

I have issued trespass and had to have law enforcement come completely aside and separate from any special event, just on an average day in the library. It really, really just depends on the situation.

My first line, and I think any of my colleagues first line, is always to find a common ground, which is why we start with, "This isn't a good library day. It's time to leave. Come back tomorrow. Let's try again."

People refuse to do that and continue the behavior of pushing or doing whatever it is, pushing in the physical sense, but metaphorical sense.

Continuing the behaviors and refusing to leave requires us to put extra time into doing something that is taking us away from other elements of our job. There's multiple points in that conduct policy that we can enforce

based on different behaviors that are presented in the library. Sometimes it's a combination of things. Was Mr. Meyer ever suspended before? Not at my library then. Okay.

EXH 245

Is there other terminology you can use that was offensive to you?

You know, honestly, the word pervert comes to mind. Thank you. That was loved at me personally several times. Thank you.

All right.

Please, trustee.

Sorry, quick question. Did you type up this incident report? Was this... Not being able to see exactly what you have in your hand. Oh, sorry. I'm sorry, but I have authored many incident reports. There should be a name or employee number associated with those. Oh, yes, yes. That's you at the bottom. Okay, so when you said just real quick, when you asked them to leave for the day, you guys were still outside the library, right? He never went in? He was outside the perimeter of the event space, yes.

Okay, so you wanted him to leave?

The compounding issue at North Valleys. Is that we are actually on private property. It is not county owned property. We are in a lease space. The library event space was cordoned off and identified as library space for the function. And we had permission from the shopping center property owner to hold the event in that space. Okay. As a tenant and a lease of the property, both Washoe County Sheriff's Department and Reno PD, when I have worked with them in the past to enforce trespass, require me as the lease and the leasee. And in lieu of the property owner who is in California,

I have the jurisdiction as the tenant to issue trespass on that private property. Oh, yeah, yeah, understood. I was just saying that he was basically not inside. So you guys were outside and you asked him to leave, meaning just go further out away. I asked him to leave the event for the day. Okay, but he was not inside the library. No, no, he was not inside the library building. And he at that time was not inside the perimeter we had identified as event space. Okay. He was in across that line. There was what they self identified as a free speech zone. Okay. Our free speech zone is actually located in a different spot, but they set up on their own in a different place. Okay, thank you. It's just hard to clarify. That was all. Thank you.

*EXH 246*

I should just a minute. Just a minute. This is just some further questions for clarification, because I don't have a video. I don't think I've seen a video. This was very early. The event hadn't even started when Mr. Mayor started speaking. So to clarify, you were concerned that he was out of the perimeter where he would have been allowed to remain outside the library.

He had come further in. He was standing. Yeah, he was standing at the threshold. This is a virtual. Right. Yeah. Outdoors. Why didn't you just not go back in the library? I wasn't in the library. I had the outside entrance point for the event. Right. In the outside space of the event. But instead of going back into the library,

your dial his dialogue continued with you out in that space. Because that was my duty station. Yes. He was standing. You can imagine a perimeter line. This is. I understand. Yeah. And people are crossing over into our event space. I was there to conduct crowd control and safety and welcoming people in. It's a concierge duty that we do in all of our library locations. That was my role for the day. I was in that duty station.

Mr. Mayor on the other side of the line, or even if he had ever crossed, would have been right next to me the entire time. That was on him to stand there and continue the dialogue. If he had stepped back.

Beyond that perimeter line, he would have had no interaction with him.

It was verbal interaction. So and. Right. But he would have been entitled to stand there if it was outside of the zone. Well, yeah. Until he was trespassed. He was when he was trespassed. That was for the property. That's the whole shopping center.

So I'm confused. You have the authority to.

To consider it trespass anywhere in that strip mall. Yes.

Even though it's property. It's the property. But it's not the library property. You said it was owned by a private. It is. And as tenants, I have been told by Washoe County Sheriff's Department and Reno PD when I have enforced trespassing other event that other incidents with different people that I'm enforcing that it's for the property that we are on. That's the entire campus of the shopping center. Sorry.

EXH 247

Go ahead. Trustee. Thank you, Madam Chair. Did he receive the trespass from allied security intervene to enforce the trespass? Was the trespass ever whatever that means? Is there some sort of notice or? I noticed him that he was trespassing. Okay. He did not leave that we would notify the police. He said he refused to leave to go ahead and notify the police. And I stepped away and physically stepped away and let allied security take it from there. That was a protocol established within the event. Okay. Thank you. And we can ask him what happened from there because then. Okay. Thank you. Another question. So if he had stepped six feet to, if I'm facing the libraries, six feet to the left to the Hawaiian Pizza or whatever that is there, would he have still been considered trespassing? Yes. He was trespassing. Would I have gone and tried to enforce that down there? No. Okay. Look, I'm just there to run an event. Okay. Got it. Okay. Thank you very much. Mr. Meijer, you have five minutes, please.

Mr. Meijer, you have five minutes and you will.

Please turn on the microphone and you have five minutes to.

Provide your statement.

Do I really need to defend myself here? I think she just made my case. I mean, I want to. I can't even I'm pulling my hair out. I don't have a lot left here.

I have very little conversation with the young. Just please address us so I can hear you. Okay. Very little conversation. My conversation was I approached the cones and I said, can I use the bathroom? And she said, no, this is exactly what happened. She said, no, you cannot. We are not open till 10 o'clock. 15 minutes. You'll have to wait. I had no problem with that. God is my witness. Then she said, oh, and you're going to have to go back over to the free speech. So that's when I was like, oh, what? Oh, yes. Free speech zone. And I was like, I've never heard that. And I don't even know where that is.

And why is there a free speech zone? I thought the whole country was a free speech. So so and then she said, well, if you don't and really, this was the only conversation. I never called her any names. I will call people names. Um, my only conversation with her was that I needed to use a bathroom and I was not going to move because she was telling me I'm a commercial real estate agent. The attorney knows this that parking lot is a place of public accommodation. They do not have purview over the entire parking lot. It's a very large

*EXH248*

parking lot. It is a place of public accommodation.

So I had a right to be outside of her cones. I had a right to be inside her home. It's a public library, although I wasn't. So I don't even know why they I've been to other drag queen story hours. They have an issue with me.

But nothing happened between her and I that day that she's talking about. It is made up fantasy. They are trying to exaggerate. So I request a complete dismissal of the suspension.

And the libraries are free and open to the public. I simply asked to use the bathroom that others were using at the time, at which time agreed to the librarians. That I wait for 15 minutes. I really had no problem with that. That point her response to me was that while I waited, I had to move to the other side of the parking lot to the free speech zone. I said, what is that? I already told you this. My next bullet point. You have no right to create a free speech zone and detain me in it. It's unconstitutional as if I should have to say that. This person has yet identified, although now I know who made a false allegation against me, actually said this is this in her false exaggerated report. I was in a parking lot and where and where in the US is there other free speech zones? I don't know of any. There isn't. I think I have a constitutional or I think I have a constitution that says I can speak freely regarding her claim of other people being involved in my encounter, which she had said earlier with the library staffs and members. I do not recall anyone else except for myself and your husband employee. And she was hostile. She was a costing and hostile. All I asked was to use the bathroom, please.

My focus was solely on my unbelievable encounter with your hostile librarian, having the trespass by security or asking to use the bathroom and then refusing to go to the free speech zone. This is ridiculous. And you all, please, I know it. I have a right to free speech at the public parking lot designated for public accommodation, as I've said under the law.

She then informed me she was calling the police. I responded to her, go ahead. Please do. The security came over and asked me if I would please comply. You all have videos of me standing in front of her, which I did comply. You can see that.

Which for some crazy reason, I voted here. I did. I didn't comply. I don't know why I did. I didn't have to. And that was the full extent of my encounter that day with your staff. Entire staff.

EXH 249

I stayed in the parking lot.

You all have been sent a copy of the video. The police showed up about 20 minutes later and said that I had done nothing wrong.

Hello.

No reports were made by anyone and nothing happened except waste taxpayer funded police money and time. They were made to show up for what was a legal activity. Mr. Meyer. Being in the parking lot. Thank you. You have exercised your five minutes and I need to hold you to that and fairness to the other party. So I appreciate your commentary.

I'm going to defer.

Well, I'll first ask.

Excuse me.

If I could first ask my fellow trustees if there are any questions for Mr.

I have a brief question, Madam Chair. Mr. Meyer, you mentioned a video we were unable or at least I was unable to download and view any video that you had recently sent to this board before the meeting. I have a short video that I sent everyone maybe it was unable to be opened even through the county portal. Okay, just a moment, please. None of us have seen it. We see it. I'll tell you what it shows.

Please sit down from the side view.

From the side view. Thanks. Oh, what happened right there with this? So you have a video. Sir, I'm sorry. This is the video of exactly what she's talking about. Oh, okay. Yeah. So it clearly shows that I wasn't so other than happy, but I wasn't like over this tasking or calling her names. I did have another question, Madam Chair. Mr. Meyer in the report, though, it says that there was another man that was brought into the conversation. So about that time, another man approached.

Then I engaged with this. The report says they engaged with this man and that Mr. Meyer was interfering with that conversation.

*EXH 250*

You know who that was, who this other man was. There's no, maybe he looked like you.

I remember by the days if I was like, oh, you know, jumping in, I know that I am. And I did have one other. He was probably excited.

He was an exciting day. And she's this communicated on with the race here. This could be played into the events. So Mr. Meyer, in the letter that you received dated August 2nd by Ms. Mackenzie.

It says here after repeated attempts,

you were notified you were trespassed and needed to leave the area. You were refused and PD PD police department was called.

Was that where they called? Yeah. Like when she did, they show up. Yeah. Okay. She said you're trespassed. Okay. That's what she said. Okay. Like you said earlier, I don't know what that means. I think it. Okay. And nobody ever told me you that I had to leave because I was trespassed. Number one. Number two is the public place of accommodation. She can't have me leave. Thank you. Did you categorically deny calling her a name? Categorically denied that.

Somebody called him that. Sorry. Final question. I don't remember. One like with the big move there. I remember being one on one. Now somebody else might have walked up when I was focused with her and I wasn't aware. No, that wasn't my question. I just, you answered my question. And finally, Madam chair, just the signature, the last line on that paragraph on that letter to you, Mr. Meyer just says that we were advised to issue a one year suspension by PD. So was the police department suggested your one year suspension? Or is that the reason? I said, come on. Well, it's saying, I'm just saying that this letter says that the librarians use the police department suggestion of a one year suspension. I'm not sure that that was framed correctly either.

EXH 251

Okay. Stop. Can we not have comments while we process this information? Thank you. With, I'm sorry, Madam chair, will we be allowed to view the video? Mr. Kaplan.

Very sure. Kaplan for the record. That's entirely up to you. Fantastic. That'd be great. I never saw anything. Can you start with the chair? Thank you. I just think if you will, we'll all look at it.

That's John.

There's the other side of us. Is this the other man? Okay.

Is he with Mr. Matt? Looks like him.

I was supposed to open that earlier and the government has great security on their email. So I tried multiple times, I was not able to, so thank you. (Blank Audio) I hadn't either.

(Blank Audio) Are there other questions? Trustee Glosier, I wanna make sure you're included in this. (Blank Audio)

She's still on, so, she unmuted, so. (Blank Audio) I can't hear anything.

(Blank Audio) Can you not hear us?

(Blank Audio) No, sure, I'm sorry, I had turned off my microphone. Okay, sounds good. Okay, you can hear me now? I wanted to know if there's any other questions or comments of Mr. Meyer. Nope, I'm good. Thank you. (Blank Audio)

You used your five minutes, sir, thank you.

It's now a discussion, and you're welcome to sit down, thank you.

Comments or questions?

EXH 252

Comments or questions? Sorry, just a follow up. So your suspension, Mr. Meyer, according to the documents, had began on 615. Is that, or library staff can confirm that's the start? I believe that's what it was. Same as, okay. Yeah, same. And you were approached then, sir, at the downtown library? Sure. Okay. I started to go in.

(Blank Audio)

Okay. Right there. Did you stay around then or did you leave? Yeah, there were the- You were out in the- I was staying, but I was still under a tent. No, no incident? No, no incident. Thank you.

Trustee Ruff?

Not to be terribly argumentative, but underneath the tent, there was a sign that said, "Honk, if you hate gays." So that was there.

That, the sign, the day that we were at the downtown Reno library, that was there. What was that when you talked? No, I thought you said you were at the tent. That was up outside the-

There was one on a truck driving around. Oh, oh, truck, yeah. There was not, no. I don't know. There was no sign on any tent that I was at. No.

Yes. But you were at the downtown Reno library, drag story hour.

Yes. Is that called? No, I was just saying you were there. Yeah. And there was a sign that said- I have no idea. I was just saying, "How are you?"

All right. What are you- May I have the floor? Yes. I don't even know why you would bring that out. Okay.

Trustee Mosher, please. Your comments? Like your trustee wrote.

EX# 253

I think we have heard a lot and can decide at this point. So thank you for your comments.

I think if the PD is recommending one year, that must be very severe. And so I would say one year should be followed. So I would motion that be- Ms. I'm sorry, Madam Chair, through you, unfortunately, Trustee Mosher was not able to see the video.

If we're going to talk about- sorry, Trustee Mosher, unfortunately, you weren't able to see the video here that we did see.

Trustee Mosher didn't make a motion about it. And it was related to the police report, not necessarily the video. What police report? What police? I don't have a place- Well, the information that was in the report from Blackberry's house. But not from the police department?

No. I would just say, Madam Chair, unfortunately, Trustee Mosher did not. Did not see the video. And if you did see the video, it would lend to some different, I think, results. And we couldn't get it through on email. So I'm sorry for that, Mr. Meyer. But- I can I finish my motion? I think we should start his sentence or his year starting from 615, the day that it was suspended.

Trustee Mosher, I just have a- I hadn't finished asking questions. So if I can just- Oh, yeah, go for it. Despite the fact you have a motion and Mr. Kaplan, if I might.

I watched the video, which I'd never seen before. I'm confused only because Mr. Meyer is to the- he's not in the protected zone. He's outside of the cones, at least based on the video.

Well, I'm not asking you really. I'm just stating what I saw in the video is you are at least six feet away from the librarian and you're behind the zone. Mr. Kaplan, I'd ask you to clarify for us. I'm not a commercial realtor. I really have never seen the lease of the library. I don't understand what a zone-free area is or if that's something that is within the purview of the

EXH 254

library or any tenant of that parking lot. I'm not sure what anyone's referring to as a pre-speech zone.

But we not have you talk so we can talk amongst each other publicly. So can I clarify, Madam Chair, can I ask to clarify, in that video, who set up that red rope? The keynote, was that you guys? The rope in the video? Who's-

Please don't answer. Let the librarian answer. Who did that? Was that you, Mr. Meyer, or the librarians? You guys put the red rope?

It's the librarian staff. I'm sorry. Man- Those are the stanchions that are from the library. Okay. All right. That's not something these folks brought and did. Okay. So basically the library is putting up a kind of a stay that way and we won't bother you and you don't bother us. So- That was not the intent of that. Oh, can you explain the intent then? We asked for permissions explicitly to host additional library events outside in the parking lot from the shopping center. We asked for a specific space within that. We presented a map that cordoned off this specific area around the North Valley's library. It's a unique shape. So it affords us a place to set up like a safety barrier because it is a public driving area. People are driving through. We wanted to try to make that as safe as possible. So the stanchion and the vehicles or cones that were there were specifically there to demarcate that space where the event was happening on the inside. So people knew kind of from a safety standpoint, you don't want to let your kids just run free out there or had nothing to do with keeping anyone separated for any other reason other than safety. Okay. Have you in fact seen the video? I have not.

Well, we've just seen it. And Mr. Meyer is on the other side of the cones that you've referred to as creating a protected area.

So I'm trying to understand then what provoked you to ask him to leave considering he was in the area that you were not protecting.

And I'm sorry, this is difficult I know. And we're in an awful situation because this is not a

EXH 255

courtroom. No one's on trial. We're discussing as a voluntary board a suspension and just trying to better understand what we can. We've watched a video. It might help you if you saw the video, but we clearly see Mr. Meyer at least six feet away from you, not in your face as you suggested, but six feet away on the other side of the cones. And if you're a woman who doesn't appear to be with Mr. Meyer, at some point he makes a comment, Mr. Meyer, I'm not sure if he's your friend or was there with you. He had a very large sign, but he also was on the other side. So there's no intention of upsetting you. You're not on trial. No one is on trial here. We're trying to do our best to understand an appeal that is before us. And so if you don't feel comfortable at the moment, I understand completely. And I'll defer my question to Mr. Scott.

What is a, what did you see the video? I did not watch the video. Can we ask you to watch the video? Sure. Because I think that would be helpful because we only know what we're seeing. Sure. Okay.

I think in, in consideration, it would just be that what do we think the right amount

of time or is there a amount of time that is worthwhile now that there is this video that I haven't seen?

Well, Trustee Mosher, we're asking, we're asking the library director to view the video because that's all we have to go by. And we have the librarians report.

(Inaudible) Okay. So I'm now trespassing and we will call back to account for your work. Oh, come on.

(Inaudible)

Well, what it appears to me to subscribing to the video is that, uh, Mr. Meyer is getting a confrontation with John Ocoban and that at the entry point for the rainbow fest. So where

EXH25C

they're arguing is that where people would enter, there's a storytime inside the library, but outside there is the rainbow fest. That's where we have booths and people can do crafts, that kind of thing. So, but you see that you didn't go beyond those phones. Yeah, but he's like within three feet of her. I mean, that looks very confrontation on something. I can't respond. He originally asked me to send these to, I admit, and I apologize for my decorum. It's just a lot.

And I wear my notions on my sleeve.

So I apologize if this is not very articulate.

And I don't know if this will help clarify. I'm just going to try to articulate to you my duty station that day. And again, not having seen the video, but knowing the description that you're giving my charge, that was the threshold of the event.

My charge was to be upfront at that threshold, to be aware and be able to respond to anything and everything going on to the best of my ability.
When individuals such as Mr. Meyer came up and spent excess amounts of time asking the same questions over and over or engaging me verbally, whether or not they were on the other side of that threshold, it was close enough that I had to have my attention to that activity that takes my attention away from other things. You could hopefully see in that video that wasn't just the only stanchion or barrier space. I needed to be situationally aware for the whole space.

My attention was unduly focused on those individuals there. And I don't know for sure, but based on what it sounds like you're viewing,

that was not the only portion of interaction with Mr. Meyer. And I'm not sure if it was the one that was on the other side of that threshold. It may be a portion of it and I will admit. Yeah.

This is my recollection. And I appreciate that. That's all. Someone else recalls could be different from what I recall.

*EXH 257*

I appreciate it. I hope that helps answer your question. And I'm sorry for your discomfort. It was not important. Okay.

I think that's all. I think that's all. Okay. We have a couple of proceedings that way. This is not meant to create. The amount of discomfort we're all hearing about this.

Mr.

Why.

Oh, you're microphone. Sorry.

I'm so sorry.

I don't know why I'm trying to get it off.

Mr. Kaplan.

I understand what Mr. Scott said in his interpretation of.

Three feet versus what looked like six feet on the video. I have no idea. We didn't have tape measure. We understand that the library manager felt confronted by. And. And. Spoken to rudely. And we have Mr.

We have a denial of that. Of that.

Name that she was called.

And I think that's one issue. And another issue is this free speech zone. And Mr. Kaplan, I don't know anything about. That nor do you. If I can address. And so if someone can help us

EXH 258

understand what that. Has what we call a petitioner zone. That's the free speech. So. Petitioner zone. And so typically if you want to like register people to promote or get them to sign a petition. Okay. That's the area you go.

I mean, I know that people are going to have to have their own, their own program to do that.

You need to have your say in that cell. So if you're not protesting in the zone, if you're just walking around, we're not going to make you go to the zone. If you start confronting us and.

getting in confrontation with the branch manager. She is basically saying, okay, that's enough. And you step back and he's refusing to do so.

She called security, security calls PD. PD makes a decision on what to do. There's no more information of a priest's son. Excuse me, where's the record of,

or I don't want to get deep in the weeds, but we're understanding the police advised a trespass notice to be delivered? I don't have that information. I don't either. But you can see in the exchange in the video that they're basically waiting for PD to make a decision. Did the PD make a decision? Well, if it's in the report, it says that the PD recommended a one year suspension. How would PD know that there's a one year suspension policy? Well, I think it's more, I mean, I don't know, I wasn't at the event. So I would be, if we are saying the person is trespassed and refused to leave, and we tell the police that, they'll uphold that. And so that's also the happen with Mr. Rybar as well. (Indistinct) Can we recess for two minutes, please? Right.

(Indistinct)

There were recess, yes.

(Indistinct)

(Indistinct) I'm very more back in session. I could ask everyone who's here to take this. (Indistinct)

We're doing our best to evaluate what is before us.

EXH 259

We are not police officers. We are volunteer board trustees. I appreciate the video being on hand. I wanna stick to the issue before us. Whether a one year suspension is warranted, I believe we have a motion that Trustee Moser has on the floor. Can you repeat that for us, Trustee Moser?

Sure, so I would like to motion that we suspend Mr. Meyers for one year starting on 6-15.

To suspend him effective the 15? Yes.

I thought she was saying not to. Okay, so it is to suspend. That is your motion. Oh yeah.

Okay. Oh wait, wait. So I don't know. Cause what is your guys' recommendation actually based on this video?

So I was prepared to make motion, Madam Chair.

Madam Chair, if Trustee Moser wants to withdraw her motion for the time being, let her withdraw it. And if you want to explain what your perception of that video shows, you know, maybe she doesn't make this motion.

Sure, I will withdraw my motion. Thank you. Thank you, Trustee Moser. I would ask my fellow colleagues, we all watched at the same time, the same video. So if I can ask you, Trustee Ruff, what you observed, and I will ask you what you observed, and I will say what I observed. Okay.

Trustee Ruff, for the record. So in the video, I don't know how long it was, but, and we're only seeing a snapshot, as Johnica said, a snapshot of the day, of those few minutes. And it does appear that Mr. Meyers is,

from what I understand, at the entrance to where Rainbow Fest is, not in the free speech zone, for lack of a better term for it.

But it honestly didn't feel terribly confrontational. He didn't leave when she asked him to leave,

but that's what was observed. I had a disagreement between a couple of people about where to stand and what was going on. And I'm sorry, but in those few minutes,

I don't see anything.

Trustee Jax. Thank you. That would warrant a year's suspension, frankly. Thank you. And with that being said, I can see how it was a hot day in a hot parking lot.

I know those frustrations that they're going through. The fella next to you, he looked like he could have been a troublemaker without knowing who he is. Kind of your same disposition, kind of similar.

He had a sign.

We could see in the video what the staff is going through. And you have to sympathize with that, I'm sure. As do we.

So maybe not the whole year, but it was a very heated and emotional video. I could see and we can feel from the staff and that needs to be taken into account.

But we appreciate what had transpired and the video is clear to some of us that it, probably won't happen again. I don't know that you were, trying to be exactly a big troublemaker according to the video, but you can see what they're going through. You can see what's happening.

So with that, I would be prepared to make a motion when you're ready, Madam Chair. Thank you. Thank you. Thank you.

I think I watched 45 seconds perhaps of a video where Mr. Meyer was from all I could tell and I had my glasses on five feet away from the librarian,

from the library manager, excuse me. Clearly it was hot, it was confrontative.

EXH 261

And I think this board is very conflicted because we want to show the utmost respect to the jobs undertaken by our library staff. You're put in confrontational situations. Your reactions are in seconds based on the threat you may feel or perceive or the tone of voice or the behavior of a particular individual and in this case, Mr. Meyer. But I, like my colleagues, do not see it warranting a year's suspension. Now I say that having only seen one clip, I am not seeing an entire landscape. I appreciate you were looking out and your command post as you called it was to look out for everyone. We're not able to visualize that. You do have completely contradicted each other and we are not in a courtroom. It is very difficult for us to be put in a position where we're not calling witnesses, we're not an evidentiary hearing, but I think I would entertain a motion on this either to forego the year's suspension or reduce the suspension based on purely what we have seen.

Thanks.

Madam Chair, I'll be prepared to make a motion.

I would move that the suspension be upheld but amend at the time as served as to expire 8-21-24 at midnight today through June 15th.

I will- June 15th, sorry. I'm sorry. June 15th until today. From June 15th through August 21st, midnight.

Trustee Mosher, have you heard that motion? Yeah, I heard it, I second it. Okay, that has been seconded. Let me call for a vote. Trustee Rupp? Yeah.

Yay, Trustee? Yeah.

Trustee Mosher?

Aye.

Yes.

All right.

EXH 262

We have voted to constrain that suspension to midnight tonight.

Moving along.

Thank you, you may be seated.

We have a library director update by director Jeff Scott. This is a non-action item. Mr. Scott, if you'd like to give your update, we'd appreciate that. Thank you, I'll just go over the written report to save some time since it's getting late.

As you- We wait for silence in the audience, thank you. As we saw, the Northwest Reno Library is an evacuation center, so that happened developed on Sunday night. Our staff was on top of it. Allied Security was there. Washoe County oversaw the evacuation center, so a lot of people were leaving to get out of the heat, were leaving to be able to power the phones, get some water, get some food. Lots of activity that day. I was on site with Chris Narenke, and it was definitely happening in locations, so I'm glad we're able to provide that relief too. People are affected by the fire.

And as you know, we canceled Drag Story Hour based on recommendations from the county. I won't go over that since that's unknown at this point.

I'll mention it again, I mentioned at the last meeting, Alistair's passing, he was former chair of the board during a really difficult time at the library with the budget situation. So we're gonna do a memorial for him, probably like the October meeting, similar to what we did for his wife, who was also a trustee who passed away.

Then we had the Reno Housing Authority ribbon cutting that actually happened on Monday. So we had Dr. Hilly Lopez, we had Commissioner Alexis Hill and other dignitaries there, Senator Rose, some of us, Senator Rose's office there. So that's a new kiosk so people can come in and they can apply for housing, they can check on the status of housing. What's great about that is that it has its own printer, you can scan. So a lot of the limitations we have in a public access computer is that we're gonna be able to upload documents or do some of the things that's required. And this shortcuts a lot of that. So a lot of times you have to have documentation, ID, you have to take a picture, and then how do you get it on the computer? It's a whole process. This actually shortcuts a lot of that stuff. So we got a demonstration from the folks and they're actually looking at putting it out of the locations already. So we're hoping to see good activity for that. We've also expanded the legal kiosks. So we have that North Valley is an inclined village. We're expanding that at

EXH 263

downtown Reno and at Sparks Library is definitely a big need for that. I think it wasn't installed an hour and there's people using it. And it's great too for downtown with both of these kiosks since we have a community court. A lot of times we may have to refer people to getting more information that they might have onsite but going to the kiosk, they actually can access it right away, which really accelerates getting people assistance on Wednesdays as well. So that's exciting. And then we have a new trustee. So Maria Rodriguez was appointed yesterday. So she's still on the audience. Is she still in the audience? I don't know. Yes, congratulations. Congratulations. Thank you, we welcome you at the next meeting. Thank you very much. So I'll go to the start of September and that goes through the 28th. Terrific.

Go ahead, please. And then we had the tax override. So the language had to be corrected. So it went back to the commission to correct it. And then we have people who are on the ballot language committee. So there's people on the pro and people on the against. So I think it's Ron Ariel, Bruce Parks and Penny Brock are on the against. And then it's Sharon Honigbear, Marcia Downs, Megan Downs. Sorry, Megan Downs. And then Gail Townsend are on the four side. So that was approved yesterday. And then other things will have the file explorer coming out end of August. So you see all of our file activities. And then we have the, we're having to restock the Reno, Washington County libraries brochure. So you've seen those in front of you. I'm definitely going out of our libraries very quickly which is great. People getting that information. And then we have the completion of the ARPA project at Spanish Springs and South Valley's libraries. One of the pictures are gonna be featured in the brochure for fall. So it's gonna show our teens enjoying the Spanish Springs teen space which is really great. And I've included some pictures there. And there's also a new covering for the South Valley's area. If you go into the garden area, there's a lot of the sun exposure and then snow exposure. So now you have a cover for that as well as new meeting space and then more team better teen space at South Valley's as well. So that's just my report. Questions. Director Scott, I just want to commend you on all the activities. Certainly the kiosks are incredible for both housing and legal aid. That's just terrific. And I can imagine they were used immediately once they started. So congratulations to you and your entire team for all the activities you have planned, everything you do every single day, seven days a week. And I certainly hope you can give me additional copies of this. Yeah, we got all the friends so you can grab a bunch of them to go. Thank you.

Their comments or questions from Director Scott. Thank you very much for your report. Our library manager.

She's got the light. Sarah, thank you. Welcome.

EXH264

No. Hello.

Sorry, Sarah Jack, CRV library branch manager for the record.

Welcome.

So it has been a year since we've been renovated and we have had such positive feedback on our new furniture, the cleanliness of the facility. So thank you to Director Scott, Flaucher County and the mall for hoping this happened.

Saturday we had somebody come into the library who hadn't been here in more than 10 years and said they could not come previously because of their allergies. And it was a great surprise to see the facility and its cleanliness and the renovations that have happened. So thank you very much for that. It has been a great boost for our community. So, all right. So I'll try and be quick. I know it's been a long night. We have some bread and butter programs. Our baby story times and County Manager Brown came out and supported us and did one of our baby story times as you can see there. And I think we have one more picture of that as well. Oh, our steam story times, apologies. So in addition to baby story times, we have family story times and once a month we do steam story times. And as you can see in the next slide, we did a snail story time there and kids got to examine the snail slime under microscopes and such and they experimented to see what stuck better, snail slime or blue stick. Spoiler alert, it is a blue stick.

(Laughing) And then one of the other really popular ones that we just did a couple months ago was an owl story time. And our staff found sanitized owl pellets and they got to dissect those and they investigated. We found lots of interesting bits and pieces from other creatures there. And the staff has done a really wonderful job on these steam story times. They've been incredibly popular in the community.

We've done ones on dirt and soil, rainbows, hibernation, and experimenting with frosting and plastic bags to see what it's like having like blubber versus not blubber and ice. And it's been a really great experiment for the kids.

So we've also gone out and done the arboretum story times like the rest of the staff at Wilber D. May and those are incredibly popular in the community.

EXH 265

And the other really big program that works well for us here is Lego Camps. So during school breaks, winter breaks, summer break, spring break, we do different sorts of Lego camps and give them directed builds. And these are some of the creations that the kids come up with. We have a different challenge every day that we do it and it's normally a three day camp. And I think we have some more of the structures on the next slide.

Some of the flowers and stuff, you can see the Ukrainian one and the examples that we give them and what they come up with. Yeah, perfect. And then the big activity for us was Ellea and we had a really wonderful, wonderful day. We were so lucky to have two performances there. One was from Maya Salle and they kicked off our day

with performances and people got to be involved and experience that.

And then in the next upcoming slides, you'll see staff created different experiences

for the different continents and activities for the kids to participate in. We had every continent, including the Antarctica, the crazy continent, where everything, yeah.

But we also had participation from UNR student groups, being the Filipino Student Union, the French. We had other staff participants. The other branches are really wonderful in giving their support and lending their staff to participate from Sparks and North Valleys and Northwest and Spanish Springs. Everybody is supported to accomplish a big event like this and we had a great, great turnout. And we continue on through DIA with some of the other tables and activities and I didn't want to forget Louise from Incline there who dressed up as a beef eater that day for us and brought a bunch of her British English.

I was gonna say paraphernalia there, so yes.

And then we ended the day with Sarunakai and that was such a special, special experience.

We didn't have our new bookcases yet which worked out really well for us. As you can see,

EXH 266

we were so lucky. We wouldn't have been able to have the number of people we did if we did it in a meeting room. It really needed to be out in the main part of the library and people were just all over the stacks and everything. And if you've never got to experience Sarunakai, it's such a wonderful, wonderful performance and they are so energetic and it is just, I can't describe the experience that we have never gotten to see them. Please watch for when they come to us and I think I have one more picture of Sarunakai at the end there. So they're dragging and people being able to participate and try the tiger drums.

And then obviously my favorite, may the fourth be with you. My favorite activity is obviously creating your own cool new light saber. We had a great time doing paper plate boards, celebrating Star Wars,

Death Star bowling. It was just a fun, fun couple of hours to celebrate Star Wars and having non-lethal light sabers to be able to attack your sibling.

And then I know you've seen some of the other programs that the system has had this summer and I just wanted to highlight

the Nevada Department of Wildlife and we had Bell Canto at the holidays.

I believe it was a Skins and Skulls program that the Department of Wildlife did and people got to be hands-on and examine the different creatures that were available and then Bell Canto performed a wonderful bell concert and then people got to experiment and try the bells afterwards.

And they're just great well-received programs in the system.

And then these are some of the other programs and activities not limited to everything we do, but we have started homework help and that has started slowly, but it has gained traction. So we're doing it again this year. We have some very loyal users and some dedicated adult retired teacher volunteers. Crafternune is one of our brand better programs.

We celebrated of Dia de Los Muertos. We did thank you cards for veterans

EXH 267

the holidays, we did the gingerbread houses, we do our normal school outreaches and we even participated and did a story time at the Nevada Museum of Art.

And then we are very excited to have just started or launching a diverse abilities program for people who have neuro disabilities and just offer them some different experiences and programs and being able to connect with other families.

Our toddler time is new. Our babies have grown up, so we've needed to add a toddler time. So we have added that story time and we are very excited next month to be launching Club Latino, just a wellness social club to build positive experiences for the Spanish community.

We are looking to develop a better relationship and show what the library and services have to offer. So we're hoping that will generate some positive experiences for that community and can grow to other libraries. And then finally next month, we are starting our lifelong learning series. We start with a three week watercolor class and I believe we have one spot left. It's on Saturdays for three Saturdays next month, excuse me. And then we'll follow it with the writer's workshop and then now with our enrichment series.

And then we also oversee our Duncan trainer library. And that has been a bit of a struggle for the pandemic. The attendance there is very inconsistent. We've worked and reached out to the afterschool programs there, but they have their own activities and stuff. So we're looking for different ways to be able to reach that community to see what we can offer to them and how we're going to do that.

But you can see we do the sugar spells there, decorating and then we also participate with the county and activities doing the top retreats out there and the kids will walk over to the county complex. And we with the county departments hand out candy to the kids over there. And then finally, we also oversee the Gerlock library.

And so we make three or four trips out there a year. We go over our databases that they will have access to and how the students and teachers can use them. We try and take activities out there as well. You can see slime in one of them and we made journals together. And then this year we are gonna work with our technical services department to really refresh their collection. They have a small collection out there and they are very good at using holds, but to get some different materials on their shelves for them and have a big over-

EXH 268

term there for them. And I think my last slide is some cows. We have a nice little interesting story. So during the Reno Rodeo, we had a visitor come into us who either had their phone lost or stolen. And they were able to use our public computers and utilize the staff to figure out that his phone had fallen out in his Uber. And we were able to locate the Uber driver through county records, public records with the assessor to connect him with the Uber driver. If he was able to get his phone back, but his life was in the phone, he didn't know any of his contacts or numbers or whatnot, but he runs a dairy farm in Wiltshire, England and he's been sending us pictures of his cow. And then got a very nice thank you letter of how appreciative he was of our help and that he will pay that forward. So thank you. That's fantastic.

Sarah, that was a great report. And I can say my first meeting was a year ago and you gave a report and you have really upped your game and the renovation of this library is fantastic. And the fact that the other door is open enables me to come here almost every single day from the Chamber of Commerce and walk in and your staff is incredibly helpful. And I think what you and every library manager and his or her team does is just spectacular. It's the positive side of serving on this board and seeing all the activities that are developed by librarians and pros who figure out creative ways and innovative ways to entertain kids and adults alike with music and books and all sorts of culture. So congratulations.

Thank you. Great.

Well, it's always nice to end on such a positive note when we see what each library manager is doing in way of, by way of culture and arts and innovation and curiosity and all the things the library should provide to the public. So thank you very much for your report.

All right.

Item eight, any staff announcements? This is a non-action item. We cannot take action on anything, but is there any staff announcement?

Director Scott, you or anyone else? You, the staff, you've heard from me. Right, okay. So no other staff announcements for those staff who are here. All right. We now end with another section for public comment, a two minute time limit per person. If there is anyone who wishes to make public comment,

EXH 269

I do believe there's a list. Thank you so much.

Great, thanks. All right, first person, Janet Butcher.

I don't think it's on.

There we go. Janet Butcher for the record. Thanks for returning the ending public comment so that we can comment after everything. Can you speak a little louder, please? Oh, sure. See, I'm not a loud person. I appreciate that. My mother would have disagreed, but anyway, I appreciate the fact that you've added the public comment again back at the end of the meeting. Sometimes it's nice to comment about things that happened within the meeting. I appreciate the fact that it's too bad it took so much time. I think that there were a lot of people that maybe overreacted to some things.

I do have to say that I had lengthy conversation with the police department at the end of all of this as they were leaving.
And typically it is something that I tell my granddaughter all the time when she has something happen in the community with her. Did you get a number? Did you get a report? Where is the report? What's the number?

There was no documentation from the police department.

And so I think it's really sad. I know that a lot of people are upset about a lot of things, but, and then again, I want to add, I love the report that the librarian just had. There are a lot of good things in the library,

but when they're bad, we have the ability, we have the right to speak out about them. And we have the right to protest them.

So anyway, I just want to, it's too bad we couldn't have come up here. I was there at the Northwest Valley.

There were hardly any people in the zone.

All right, thank you very much. Victoria Meyer, you have two minutes of public comment.

EXH 270

Thank you for hearing these. I do have to protest that my husband has been treated fairly here. He did nothing wrong. I do appreciate you guys all taking the time on me to come up and show the video. I appreciate that very much. You know, he does too.

However, you know, he didn't do anything. And it's clear that there was an issue with what Johnica was saying happened.

And she's supposed to be representing our library. And it's clear that those things didn't happen. And so we will be wanting to redress these grievances. The other issue is that I had talked to you chair

Silver last month about my granddaughter being locked in the library. I'm not sure why this issue is being shut out everywhere, but it is. And it's not going to be much longer. My patience is wearing thin.

There was a young girl, 11 years old, whose grandfather was five feet away and she was not allowed to pass through the door.

The door was locked. This is a serious matter. And you all have been ignoring it, including the press despite attempts to get the story out. The story is going to come out. You promised me this would be on this agenda chair Silver.

And it wasn't.

So we're going to have to take another course of action since you didn't bother to respect this situation. The girl was very disturbed and distressed.

So not sure what's going on with our libraries does seem to be moving in a little bit better direction, but we still have a lot of work to do more. Thank you for your comments.

Mr. Rebar, two minutes for public comment. Thank you.

(Audio Cuts Out) Quick continuation of the Twilight Zone, violent librarians in conjunction

EXH 271

with transsexual.

Currently there's a bunch of retail producers department outside the back of the monitor.

Criminal compliance being filed against Director Scott again.

If he likes to body check people touch people and the crime is called faddling into the statutes.

A lot of touching, that's what he does.

I asked a bunch of different things in my emails. I get it with one year suspension. I'm going to keep coming around the mechanics. I'm going to take legal action. I'm going to do things to try to make sure we read our grievances.

The interesting thing is, as I said, I've been declared a member of the press

by the courts under their rules.

There was a member of the press inside of this event

that you excluded me from.

It was a female. How come an female was not in there as a member of the press but I wasn't a female?

I've never said anything against her after the story hour other than our first amendment should apply to everybody.

And it got created at the library board. You guys specifically didn't do anything.

EXH 272

You're lucky executive branch you just create the role of regulations.

That's the brief work just to overturn the Chevron doctrine.

I assume that applies to libraries too. The board gets to make the rules and pass things and pass the laws and the director gets to administer them. But that doesn't happen here. Why would we follow up? Due process or anything, you know, constitutional.

Much better just to listen to the line librarians that demonstrate by the video.

And I got hours of video.

She cried now, got positioned to be fun.

Have a nice night.

Thank you, Mr. Rebar.

The last public comment I see is Stacy McKenzie.

Can you speak?

Hello, thank you for taking such intense time to look at the suspensions and thank you for upholding them albeit not the amount of time that would normally been regular for what we give. I think that going through this process did allow some people to get a little time off of those suspensions. And it speaks to the process, which actually did end up being followed. So appreciate that. I would like to speak briefly to the crime that keeps coming up and accused of the library of keeping people falsely detained. We had a very rigorous in and out the door policy at the library so that we could keep traffic going and make sure that that front door, nobody was to come in and out of that front door except employees. And that's why we had someone there. There were no members of the audience or people who attended who came in and out of that door. At some point, a couple of young girls came up

EX4273

to the door. I know one was 10 years old and wanted to leave. A staff member said, "Where's your adult?" And asked that for several reasons because we are trying to make sure that they leave with their adult. And one of the requirements of that event was that they have an adult and a child with them. So that was the check. They went back, apparently those children went in the bathroom. Again, they lost track of where their children were. And at all times, while those children were in there, their caretakers, the people who were with them, were with them at the same time. I invite that if a crime was committed, that the police are contacted and formal charges aren't brought, but there was none based on what they are sharing. So I wanted to address that and make sure that our side was heard because we keep hearing that we've done something unlawful and yet no police officers have contacted us. There's nothing going on. Because again, there is nothing going on. And the fire department was called, made a walk through the facility, said there were no violations. All fires, exits were able to be accessed. Thank you, Ms. McKenzie.

Please sign in. So we have it for the record. Thank you.

I don't even know your name.

OK.

Val, please go ahead. Two minutes, public comment.

I've worked for companies big and small, corporations, Exxon, et cetera, et cetera. When an employee lies, presents false information, or fails to uphold the ethics of the company, there is a write up. There is disciplinary action taken against the employee for doing that. It's obvious tonight that one of the librarians at the North Valley's incident, wowed out why, accusing, in writing, Mr. Myers of doing something he didn't do. I would expect that that employee would receive some kind of write up or warning.

That's a professional HR.

Secondly, Mr. Scott deserves to have a negative write up.

Delaying a response to Ms. Parks for his request where Mr. Parks followed the process and

*EXH 274*

was basically just shunted off by Mr. Scott. That was intentional. There was no accident. Nothing got lost. He needs to be written up and have that in his file for the next time you evaluate him. Thank you. Thank you.

Mr. Meyer, two minutes for public comment. So when my granddaughter was sent out to the door by my wife and she wasn't feeling well, I was on the other side of the door waiting to receive her when they wouldn't let her out. So there was an adult at both ends of this transaction, you might say.

So there's that. And the young lady that was crying here before,

she was crying because of her mis-recollection.

And I understand things can get tense in those situations. And she didn't have mis-recollection. A big one.

A really big one, in my opinion. Some of the things she said were flat lies.

I can't say it any other way. I don't want to belabor this, but it's a little obnoxious to me to sit down with a suspended two months' suspension. No, it's on my record now. No, I want it off. Off. This is a culture and a problem under Jeff Scott.

Yeah, Mr. Scott. That has helped to create this mess we are all in today. You know this, Sam. So we're in.

All of you guys know this. It's a culture. We need to get some change here. Things need to change. They have been changing. Things are moving. They need to keep moving. We cannot stop here because there is a big problem. And it's the culture, the culture.

EXH 275

Thank you, Mr. Meyer. Seeing no further public comment. One hand up. I'm sorry. I'm sorry. I always forget that. Please, go ahead.

Kate, I have your hands up. Go ahead.
Kate Salim, for the record.

I had to leave early.

And wasn't able to finish this board meeting. However, I'm so disappointed in our board, in the board, for their lack of support for the library staff and the librarians. You had one board member act as a defense attorney for the library or for these people. And hardly anyone spoke up on behalf of the librarians. And that was wrong. I was present at the North Valley's rainbow day. And of course, no witnesses were called. There was a large number of security that could have been called. But they were not.

And that was a choice because this was apparently not a court except for the one defense attorney that seemed to speak up for all of these people.

Shame on this library board for their lack of support for the librarians. They deserve better than what you gave them tonight.

Thank you, Kate.

Are there any other individuals on Zoom, Mr. Scott? There's one more, Tara DeQueros. Terry, please go ahead. Two minutes.

Terry, you can go ahead.

I just want to echo what Kate said. I actually left because I was so upset.

I assumed that the library board would look at this matter and come in from the point of

*EXH 276*

view of supporting library staff.

 Library staff were put in the position of defending a library event from people who were there to spread anti-LGBTQ hate and slander. And instead, the library board seemed to have taken the view that there are two equal sides to this issue. This is not an issue with two equal sides. And I am extremely disappointed by the lack of support for library staff that the board showed tonight.

 Thank you, Terry. Are there any other comments from anyone in the audience or on the phone?

 Hearing none, I will move to adjournment. Hereby adjourned. Thank you. Thank you all for being here.

EXH 277