LINDSAY LIDDELL
Deputy District Attorney
Nevada State Bar Number 14079
COBI BURNETT
Deputy District Attorney
Nevada State Bar Number 16505
One South Sierra Street
Reno, NV 89501
lliddell@da.washoecounty.gov
cburnett@da.washoecounty.gov
(775) 337-5700
ATTORNEYS FOR WASHOE COUNTY
DEFENDANTS

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

DREW RIBAR,

        Plaintiff,

    vs.

WASHOE COUNTY, et al.

        Defendants.
_____/

Case No. 3:24-CV-00526-ART-CLB

**MOTION FOR SUMMARY JUDGMENT**

**(ECF No. 2)**

    Washoe County, Washoe County Library System ("Library"), Jeff Scott ("Director Scott"), Stacy McKenzie, Jonnica Bowen, Jennifer Cole, Deputy "Rothkin" (Rothgeb), Deputy Sapida, and Sgt. Gomez ("Washoe County Defendants") hereby move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

    In this case, *pro se* Plaintiff Drew Ribar ("Ribar") brings his scheme of disrupting and antagonizing the Library and its staff into federal court. He claims First Amendment violations because he was denied access to a children's event and area, and because he was blocked from the Library's Facebook after repeatedly posting violative comments. He claims Fourth Amendment violations because Director Scott intervened to deescalate an altercation between Ribar and an upset patron, because law enforcement demanded his ID when he trespassed, and because Defendant Cole called law enforcement for the trespass. He pursues

1    a Due Process claim on his Library suspension, despite being given notice and three appeals.

2    He also claims battery, and that Defendant Cole "negligently" called 911.

3    County Defendants are entitled to summary judgment. Numerous records show that

4    the Library adhered to the First Amendment, Director Scott's actions were constitutionally

5    appropriate, law enforcement and Defendant Cole adhered to the Fourth Amendment, Ribar

6    received ample due process, and the battery and negligence claims fail or are otherwise

7    subject to discretionary act immunity. This Court should grant summary judgment.

8    **II. STATEMENT OF FACTS**

9    **A. The Library Maintains Code of Conduct and Adult Use of Youth Areas Policies.**

10    The Library's Code of Conduct Policy applies to any person, or "patron," visitor. Ex.

11    1; Ex. 2 at ¶3; Ex. 3 at ¶4. It prohibits "patron" conduct that "disturbs library users or that

12    hinders people from using the Library or library materials," "[b]ehavior that interferes with

13    staff's ability to do their job," and "behavior that could compromise the safety of [the patron]

14    or staff." *Id.* Patrons must "follow direction/instruction from library staff as issued." *Id.* It

15    also advises that any violation "may result in the suspension of Library privileges."

16    The Library's "Adult Use of Youth Patron Areas Policy" promotes the safety and

17    well-being of children in the Library. Ex. 4; Ex. 2 at ¶4; Ex. 3 at ¶5. The policy "reserves the

18    right to restrict adult patron use" or "youth areas" within Libraries. *Id.* "Adult patrons who

19    are not in compliance with this policy may be requested to leave the youth areas." *Id.*

20    **B. In 2023, Ribar Disrupted Library RainbowFest Events.**

21    In June and July 2023, the Library hosted RainbowFest events "to celebrate diversity

22    and practice self-acceptance." *See* Ex. 2 at ¶5; Ex. 3 at ¶8; Ex. 5; Ex. 6 at ¶2. The events

23    included arts and craft, music, food, and Drag Story Hour with limited seating and required

24    adults attending to be accompanied by a child. *See* Ex. 2 at ¶10; Ex. 3 at ¶¶15–17; Ex. 5 at p.

25    2; Ex. 6 at ¶5; Ex. 7; Ex. 8 at ¶¶3-4.

26    At Drag Story Hour, drag performers read approved stories to children for

27    entertainment, a spin on the usual "Story Hour" time with librarian readers. *See* Ex. 5*;* Ex. 2

at ¶6; Ex. 3 at ¶9; Ex. 6 at ¶3; Ex. 9. A drag performer is an entertainment artist who adopts a differently-gendered theatrical character with exaggerated bright clothing, makeup, and mannerisms. *Id.*; *see e.g.* Ex. 5 at p. 1; Ex. 9. For Drag Story Hour, performers adopt characters appropriate for children, maintaining age-appropriate clothing and dialogue akin to others performing for children such as princesses, superheroes, fairy godmothers, etc. *Id.*

### i. On June 15, 2023, RainbowFest was Held at the Downtown Library.

Ribar attended and filmed a "First Amendment Audit" at the event, where he demanded to attend Drag Story Hour. Ex. 2 at ¶16; Ex. 10 at 0:01:20–03:32. In several interactions with Ribar, staff explained that he could not attend and film Drag Story Hour because it is a ticketed children's event and requires adults to be with a child. Ex. 2 at ¶13; Ex. 10 at 0:01:20–03:32, 0:32:12–54, 0:37:16–40:15. In each interaction, Ribar engaged with staff with repetitive and condescending questions or commentary, questioning one about the Constitution (Ex. 10 at 0:01:20–03:32), expressing his belief to Director Scott that the Library was discriminating against single adult men while interrogating Director Scott (Ex. 10 at 0:32:12–54, 0:49:10–50:01), and arguing with others about the constitutionality of the children's area and Drag Story Hour attendance restrictions (Ex. 10 at 0:37:16–40:15).

### ii. On July 15, 2023, RainbowFest was Held at the Sparks Library.

Ribar attended the 2023 Sparks Library RainbowFest, where he walked around with a bulky tripod camera filming and antagonizing participants and Library staff; disrupting the event; and was ultimately trespassed. *See* Ex. 2 at ¶¶15–24; Ex. 3 at ¶¶11–14; Ex. 8 at ¶5; Ex. 11[1] at pg. 6, nos. 23, 24; Ex. 12; Ex. 13. Ribar does not possess a Library card, has never checked out a book, and only visits Libraries to film. Ex. 11 at p. 5, no. 20. Early in Ribar's visit, a volunteer and an attendee told him he was being "creepy," and it was "disrespectful having a camera in [her] face." Ex. 12 at 0:16:14–32. Ribar later interrupted Defendant Bowen's conversation with staff, telling her it was a "public discussion because [she] is paid

---

[1] These Requests were conclusively admitted, except for requests 7, 27, and 59. (ECF No. 98); FRCP 36(a).

with public money." Ex. 8 at ¶5; Ex. 12 at 0:27:27–36.

Signs displayed at the event advised that Drag Story Hour was a "ticketed event," and that the children's area was for "children under 18 and their families." Ex. 8 at ¶4; Ex. 13 at p. 2. Ribar interrogated staff about whether adults were permitted into the Drag Story hour without a child, filming a teenager and their mother. Ex. 12 at 0:32:41–37:00. He antagonized security staff to trespass him or call law enforcement, and interrupted and antagonized staff as they tried to explain the terms of Drag Story Hour. *Id.* He claimed he identified as a teenager, asking for the between that and identifying as male or female. *Id.* Ribar attempted to enter the children's area, despite the sign advising of the age restriction. Ex. 12 at 0:47:39–49:16; Ex. 13 at p. 2. He then antagonized staff about his opinion that the age restriction for the children's area was "exclusionary." *Id.*

Outside, Ribar interrupted Director Scott's conversation with law enforcement, interfering with his ability to manage the event and its safety. Ex. 2 at ¶17; Ex. 12 at 0:52:11–53:18. Defendant McKenzie, the Library's Assistant Director, asked Ribar to move after he blocked a walkway, and then Ribar interrogated her and Defendant Scott. Ex. at 2 at ¶18; Ex. 3 at ¶¶13–14; Ex. 12 at 0:57:33–59:11. Ribar continued to antagonize attendees and participants, one exclaiming, "you're not supposed to be filming kids without their consent," (Ex. 12 at 1:14:40–50), and another who told Ribar, "Sir, you are scaring children," to which he asked her "Why would you presume that? Do you like children?... Why would you presume an adult is staring at children- is that because you do?" (Ex. 12 at 1:15:00–16:21).

Ribar then engaged in an altercation with an attendee. Ex. 12 at 1:21:29–22:49. An attendee told him "Hey, no recording children," and her opinion that it was not allowed. *Id.* at 1:21:29–42. A person holding a child stated to Ribar, "Get that camera out of my fucking face," told him to move, and was aggressive with Ribar who did not simply walk away. *Id.* at 1:22:10–23. Ribar claimed the man touched his camera, loudly stated "He just assaulted me," demanded his name, and yelled "That's Battery!" *Id.* at 1:22:23–32. Defendant Scott, observing the escalating disturbance, intervened between Ribar and the attendee with his

hands up to signal de-escalation and disengagement, instructing Ribar to back up. *Id.* at 1:22:29–49; Ex. 2 at ¶19–21. The other person, a large man, remained close behind Director Scott and continued to step toward Ribar with his arm over Director Scott's should toward Ribar. *Id.* For about two seconds, Director Scott's palm was gently on Ribar's arm while Director Scott told him "You need to back up." *Id.* After many requests to back up, Ribar backed away a few feet, but refused to stand elsewhere. *Id.*; Ex. 12 at 1:22:44–58.

Director Scott explained to Ribar, "You are harassing people with the camera and people are upset. You need to stand over there." Ex. 2 at ¶22; Ex. 12 at 1:22:45–22:59. Ribar said, "No, I'm not going to." *Id.* Talking over Director Scott's repeated instruction to stand "over there," Ribar said "I'm standing right here out of the way…" *Id.* Director Scott said, "I need to ask you to leave the property then if you're not going to listen to me." *Id.* Ribar antagonized him stating "Are you going to trespass me under threat of arrest?" *Id.* Defendant Scott responded, "You're trespassed, yes. Please leave." *Id.*; *see also* Ex. 11, pg. 6, No. 28.

As Director Scott escorted Ribar out, he pointed his camera toward himself saying, "So Jeff Scott just trespassed me from the library." Ex. 12 at 1:23:09–20. In the parking lot, Ribar refused to leave the property, demanding that Director Scott call law enforcement to effectuate the trespass. Ex. 2 at ¶23; Ex. 12 at 1:23:28–24:07. Ribar antagonized Director Scott while placing the camera toward him about the ban. *Id.* Defendant Scott stated that if he did not leave, he would be banned for one year. [2] *Id.* Ribar refused to leave, but Director Scott walked away when security guards arrived to assist. *Id.*; Ex. 12 at 1:24:08–29:29.

## C. Ribar Disrupted the Library Facebook Account and was then Blocked.

The Library has a Facebook page to provide the public with information about Library services and events, and to provide information to commenters about any given post. *See* Ex. 2 at ¶25; Ex. 6 at ¶8. Washoe County maintains a publicly posted "Social Media

---

[2] Director Scott later mailed Ribar a letter suspending him for one year, but it was not enforced against Ribar when he appeared at RainbowFest the next summer, and does not appear the be the suspension at issue in this case. Ex. 2 at ¶24; Ex. 15; *see also* (ECF No. 2 at p. 5 lns. 16–25).

Terms of Use Policy" applicable to the Library.[3] Ex. 6 at ¶13 Ex. 16; Ex. 17. The public may not post or share posts onto the Library's Facebook page, but may engage with a post by commenting regarding its content. Ex. 2 at ¶25; Ex. 6 at ¶10; Ex. 11 at pg. 5, no. 21; Ex. 16. The Library, under this policy, reserves the right to remove various comments including: those entirely unrelated to the post, content that promotes, fosters, or perpetuates discrimination based on sex, gender identity, or sexual orientation, abusive, vulgar, or obscene language or content, sexual content, "[a]pparent spam or trolling," and "[l]inks to third-party and personal sites." *Id.*; Ex. 11 at p. 6, no. 22. It warns users that "Failure to comply with these terms could lead to the user being blocked or banned." Ex. 16.

Library staff regularly enforces the policy, conducting a manual review of comments posted on its social media sites and removing or blocking violative comments or users. Ex. 6 at ¶9. By enforcing its policy, the Library prevents abuse of its platforms, prevents misinformation, prevents scams, avoids chilling effects on public participants who may not comment if they will be harassed by others, and ensures staff time is better spent responding to individuals with legitimate questions or feedback concerning Library events or services. *Id.* at ¶¶11–12. Other than Ribar, the Library has blocked accounts from its Facebook page for spamming and/or posting repeat violative comments. *Id.* at¶14; Ex. 19.

In 2023 and 2024, Ribar posted repeated violative comments on the Library's Facebook using three accounts, which were then blocked. Ex. 6 at ¶¶15–17; Ex. 11 at p. 3, nos. 1–3; Ex. 19; Ex. 20. Using his personal account, in June 2023, Ribar posted numerous violative comments: twice on June 14th, with an off topic comment that the "government can promulgate sex on children…," and another with a link to his YouTube (Ex. 20 at p. 2); three times on June 18th, "why would a man want to be around young children in a sexual manner??," and responding a user, "…According to the Diagnostic Statistical Manual of Mental Health Disorders, it is because the (sic) get sexually aroused," (*Id.* at pp. 4–5); once

---

[3] The Library's policy requires its social media sites follow the County's policies. Ex. 18 at p. 2.

on June 21st that was both off-topic and had a link to his YouTube (*Id.* at pp. 6–7); six times on six different posts on June 22nd, all with links to his YouTube (*Id.* at pp. 7–11); twice on June 23rd, both off-topic and with links to his YouTube (*Id.* at pp. 11–13). On June 23, 2023, the Library blocked Ribar's personal account for repeated policy violations. Ex. 6 at ¶15.

Next, Ribar used his "Audit Reno" account to comment on the Library's posts: on or about July 4, 2023, twenty-seven (27) times on twenty-seven different Library posts, all with just a link to his YouTube (Ex. 20 at pp. 15–38); and on or about July 6th, seven (7) times on five different Library posts with the same link, and off-topic comment regarding his video (*Id.* at pp. 38–44). *See also* Ex. 6 at ¶16; Ex. 11 at p. 3, no. 2. In total, Ribar's "Audit Reno" account posted violative comments account thirty-five (35) times over two days. *Id.* When discussing how to address this, Director Scott explained "He has first amendment rights, but he can't interrupt our flow of business." Ex. 21 at p. 1. On July 6, 2023, the Library blocked "Audit Reno" for repeated violative comments. *See id.*; Ex. 2 at ¶¶26–27; Ex. 6 at ¶¶16–17.

In August 2024, with a third account, "Ribar for Nevada Assembly 40," Ribar commented on the Library's posts: on August 28th, thirteen (13) identical comments were left on thirteen different posts all with off-topic content, all with a YouTube link, and some with abusive and/or discriminatory language, referring to drag performers as "transexuals.[4]" Ex. 6 at ¶¶16–17*; Ex. 11 at p. 3, no. 3; Ex. 20 at pp. 44–57).

**D. On June 15, 2024, Plaintiff Disrupted RainbowFest at the North Valleys Library.**

Ribar attended the June 2024 RainbowFest at North Valleys Library where he antagonized, interfered with, and interrupted staff, and eventually injured a staff member. *See* Ex. 3 at ¶¶20–25; Ex. 6 at ¶20; Ex. 8 at ¶¶13–28; Ex. 11 at pp. 7–8, nos. 32–38; Ex. 22 at 0:13:29–14:34, 0:16:29–29:09, 0:51:02–12, 1:09:05–1:13:13; Ex. 23; Ex. 24 at pp. 8–12; Ex. 25; Ex. 26 at ¶¶4–8; Ex. 27; Ex. 28. The event included a ticketed Drag Story Hour program

---

[4] "Drag" typically involves performers' characters in different genders, but it is not a display of the performer's gender or sexuality. Ex. 6 at ¶4. They are, most often, not transgender persons. *Id.* The term "transsexual" is inaccurate and offensive, perpetuating transphobia and shaming nonconforming gender identities. *Id.*

only for children and their parents to promote safety and prevent disruptions. Ex. 3 at ¶15; Ex. 8 at ¶8; Ex. 14 at p. 1; *see also* Ex. 11 at p. 7, no. 34. The main Library building was closed except for the Drag Story Hour program, and the closure was advertised in advance and through a sign on the door during the event. Ex. 3 at ¶17; Ex. 8 at ¶¶8–10; Ex. 14 at p. 1

When Ribar was informed that if he was interviewing people, he must to go to the protest zone, Ribar cited case law, and threatened to sue Defendant Bowen. Ex. 8 at ¶16; Ex. 22 at 0:13:29–14:34. Despite refusing to comment, Ribar continued to antagonize and question Defendant Bowen, and defied the protest zone instruction. When Defendant Bowen attempted to speak to law enforcement, Ribar caused five interruptions, which delayed and interfered with providing information to them. Ex. 8 at ¶¶17–21; Ex. 22 at 0:16:29–29:09.

Ribar was on notice of the Library's closure except for Drag Story Hour. *See* Ex. 3 at ¶21; Ex. 13 at p. 1; Ex. 22 at 0:03:55–04:10 (filming Defendant McKenzie explaining to another person that the Library was closed), 0:51:02–12 (filming a protester who explained the Library is normally open that day, but "they…closed it down to us."). Ribar did not have a child with him, or otherwise have a Drag Story Hour ticket. *See* Ex. 22; Ex. 11 at p. 9 no. 46. Chatting with law enforcement, Ribar said he planned to "test" the 2023 situation where he was prohibited from entering the Library's children's area. Ex. 22 at 1:01:32–02:02. Ribar observed the Library door with prominent signage stating, "Most regular library services will not be available during the festivities." Ex. 14 at p. 1; Ex. 22 at 1:08:43.

When Library staff member Thanh Nguyen ("Nguyen") opened the Library door to assist another staff member's exit, Ribar grabbed the door to pull it open. Ex. 11 at p. 7, no. 37; Ex. 22 at 1:09:05–10; Ex. 26 at ¶4. Nguyen, startled, exclaimed, "Oh no!" Ex. 22 at 1:09:05–10; Ex. 26 at ¶5. Ribar held his foot in the door to prevent it from shutting while he interrogated her as to Library hours. Ex. 11 at p. 8, no. 38; Ex. 22 at 1:09:10–26; Ex. 26 at ¶¶5–7. Ribar proceeded to argue with Nguyen about the Library's general hours. *Id.* Another staff entered the doorway and explained, "We are doing a story time. Please move your foot." *Id.* at 1:09:10–26. Defendant McKenzie entered the doorway, stating, "Sir, move your foot

or you will be trespassed." *Id.*; Ex. 3 at ¶¶22–23. Ribar antagonized her, stating "Trespass me please…" and argued about the Library hours. Ex. 3 at ¶¶22–23; Ex. 22 at 1:09:10–26.

Defendant McKenzie walked through the doorway, which caused Ribar to move his foot from obstructing the door's closure. Ex. 3 at ¶24; Ex. 22 at 1:09:26–29. Ribar then interrogated her regarding her name, and the Library's closure for the event. Ribar raised his voice arguing about the Library's closure for Drag Story Hour. Ex. 3 at ¶24; Ex. 22 at 1:09:29–10:01. Ribar loudly talked and antagonized anyone around him, including a security guard and Defendant Bowen, regarding the closure and his belief that it was discrimination. 1:10:02–50 (asking if he was excluded "because I'm a white man?).

When Defendant Bowen informed him Drag Story Hour was a ticketed children's event, Ribar antagonized her asking, "…so why don't you have transsexuals reading to the elderly? Why don't we do that?...so do we not do transsexuals reading to homeless?... so do we not do transsexuals reading to the sick?" Ex. 22 at 1:11:55–13:13. He continued despite Defendant Bowen responding, "I have no comment." *Id.* Defendant McKenzie told Ribar, "I don't want to trespass you, I really don't. We just really need you to keep the peace." Ex. 22 at 1:13:13–15:44. Ribar raised his voice, and continued to interrogate staff regarding the Library's hours and the terms of the Drag Story Hour event. *Id.* Later, Ribar again approached the Library door and attempted to open it. Ex. 22 at 1:27:51–28:27.

Nguyen eventually reported an injury to her arm from the altercation with Ribar. Ex. 26 at ¶8; Ex. 27; Ex. 28. Nguyen's left arm had been up against the locked door while she used her right hand to pull the other door closed. *See id.*; Ex. 22 at 1:09:09–12. Nguyen's arm was forced against the locked door when Ribar pulled on the door as she attempted to close it. *Id.* A bruise appeared that day, and her arm was sore. *Id.*

**E. Following the Event, Ribar was Suspended From the Library for One Year**.

The Suspension Policy permits suspensions for visitors who violate the law or Library Policy. Ex. 30. It provided three levels of appeal: (1) to the Assistant Library Director, (2) to the Library Director, and (3) to the Library Board of Trustees. *Id.*; Ex. 11 at p. 4, nos. 9–10.

On June 18, 2024, Defendant McKenzie created a packet with a Notification of Suspension report and copies of the code of conduct and suspension policies ("Suspension Packet") to issue Ribar a one-year Library suspension based on his conduct. Ex. 3 at ¶31; Ex. 30.

On June 20, 2024, Ribar appeared at the Downtown Library and was served with the Suspension packet. Ex. 1; Ex. 29; Ex. 30; Ex. 31 at 0:12:41–13:12, 0:25:30–26:23. Staff verbally informed him he was suspended for one year due to his behavior at the 2024 RainbowFest event—"forcefully entering the library and injuring a staff person"—and explained "… you will not be able to go into the library. If you do enter the library we will have to trespass you." Ex. 31 at 0:12:41–13:12.

On June 28, 2024, staff received Ribar's Appeals Form for his suspension, wherein he claimed his suspension was based on protected activity. Ex. 3 at ¶32; Ex. 11 at p. 4, no. 8; Ex. 32. Defendant McKenzie reviewed the appeal and sent Ribar a letter via email explaining that he violated the Code of Conduct by harassing staff with repeated questions or accusatory comments, Ribar was disruptive and disturbing to staff and patrons, he interfered with staff's ability to do their job, and he engaged in unsafe and dangerous behavior that resulted in a staff injury. Ex. 3 at ¶¶33–34; Ex. 11 at p. 4, no. 12; Ex. 33; Ex. 34.

Ribar exercised his second appeal to Director Scott, who denied the appeal. Ex. 2 at ¶¶32–33; Ex. 11 at p. 4, nos. 13–15; Ex. 35; Ex. 36. He sent Ribar the denial letter via email and mail stating, "Your actions, which include harassing staff and patrons and attempting to break into a Storytime for children, disrupt our operations and make it difficult for us to fulfill our mission. Regardless of your personal opinions, this is not acceptable to us." *Id.*

Third, Ribar exercised his appeal to the Library Board of Trustees ("LBOT"), who upheld the suspension after a hearing on August 21, 2024. Ex. 37 at 2:22:06–53:31; Ex. 38 at pp. 2–3; Ex. 11 at p. 5, nos. 16–17. Ribar and Defendant McKenzie attended the hearing and provided statements to the LBOT. Ex. 3 at ¶36; Ex. 37 at 2:15:57–50:51; Ex. 38 at pp. 2–3; Ex. 11 at p. 5, no. 19. The LBOT denied the appeal and upheld Ribar's one-year suspension. Ex. 2 at ¶34; Ex. 3 at ¶37; Ex. 37 at 2:51:00–53:31; Ex. 38 at p. 3; Ex. 11 at p. 5,

no. 17. Ribar asked Director Scott about his "restrictions," who explained he was not permitted on Library property except for public meetings, elections, evacuations, etc. Ex. 2 at ¶36; Ex. 39 at p. 1.

**F. In November 2024, Ribar wasTrespassed at a Library During his Suspension.**

Months later, on November 12, 2024, Ribar entered the South Valleys Library and antagonized staff to "trespass him." *See* Ex. 11 at p. 8, no. 39; Ex. 40 at 0:01:38, 0:18:01–21:09; Ex. 41 at ¶¶2–9; Ex. 41. Ribar explained to Defendant Cole, the Librarian in charge, that he "want[e]d" or "need[ed]" to be trespassed, "because [he's] going to file a federal lawsuit," and he "just want[ed] to have more standing." Ex. 40 at 0:18:20–28; Ex. 41 at ¶8.

Defendant Cole told Ribar she knew he was suspended and asked to take the conversation outside. Ex. 40 at 0:05:00–06:26; Ex. 41 at ¶3; *see also* Ex. 11 at p. 8, nos. 40–41. Ribar did not leave and instead responded, "Well why would I do that?" *Id.* Defendant Cole explained it was because he was suspended. *Id.* Ribar continued to antagonize her about a "legal trespass," that he did not believe he was trespassed, and regarding Library standards to trespass visitors. *Id.* While she searched for the suspension records, Ribar continued to interrogate her about press rights, the definition of "the press," and his belief that he was not disrupting staff. Ex. 40 at 0:07:17–08:51; Ex. 41 at ¶¶4–5. She asked him to wait by the front door, but Ribar refused. Ex. 40 at 0:08:52–09:00; Ex. 41 at ¶5; *see also* Ex. 11 at p. 8, no. 41.

Defendant Cole called law enforcement to report that Ribar was trespassed and refusing to leave. Ex. 41 at ¶5; Ex. 43 at 0:00:00–45; Ex. 11, p. 8 at no. 42. She provided 911 with Ribar's name and physical description. Ex. 41 at ¶5; Ex. 43 at 0:01:20–01:55. When Defendant Cole found Ribar's suspension record, Ribar responded, "Yeah, I'm restricted from the Library for a year." Ex. 40 at 0:18:01–09; Ex. 41 at ¶7. He antagonized her about being "lawfully trespassed" despite attempts to disengage. Ex. 40 at 0:18:09–21:09; Ex. 41 at ¶¶7–9. On his way out, he asked about "rainbows" and "gay shit" Ex. 40 at 0:21:09–32.

Outside the Library, Defendants Deputy Sapida, Deputy Rothgeb, and Sergeant Gomez arrived in response to the 911 call. Ex. 40 at 0:26:12; Exs. 44–50. Deputy Sapida

asked for Ribar's ID card, and Ribar did not comply and instead asked whether Deputy Gomez had reasonable cause. Ex. 44 at ¶4; Ex. 45 at 0:03:40–4:32. Deputy Sapida explained he was looking into a possible trespass and that Nevada law requires that he provide his ID. *Id.* Deputy Sapida attempted to confirm Ribar's name, but he did not comply and instead talked of the Fourth Amendment. Ex. 11 at p. 9, no. 44; Ex. 44 at ¶4; Ex. 45 at 0:05:03–23. Defendant Sergeant Gomez informed Ribar that he had to provide his "ID, please," and explained Ribar was required to provide his ID for their investigation. Ex. 44 at ¶5; Ex. 45 at 0:05:23–50; Ex. 48 at ¶4. Ribar then complied. Ex. 44 at ¶5; Ex. 45 at 0:06:12–16.

Law enforcement investigated the trespass. Ex. 46 at ¶¶3–5; Ex. 47 at 0:01:37–0:3:17; Ex. 48 at ¶¶6–10. Outside, Ribar discussed filing the instant case, explaining, "I'm just building up the lawsuit by coming here and asking questions." Ex. 40 at 13:00–10. Ribar was eventually given a "trespass warning," and then left without being arrested. *Id.* at 1:11:07–25; Ex. 11 at p. 10, no. 53; Ex. 44 at ¶10; Ex. 46 at ¶9; Ex. 48 at ¶11.

## III.   ANALYSIS AND DISCUSSION

### A. Legal Standard

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the non-moving party and a dispute is "material" if it could affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248, (1986)."The mere existence of a scintilla of evidence in support of Plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. When "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. The Library is Not a Separate Suable Entity.

The Library, as a department of Washoe County, should be granted summary judgment because it is not a political subdivision of the State of Nevada subject to suit. A department of a county is not a suable entity because it is not a political subdivision of the State of Nevada. *Wayment v. Holmes*, 912 P.2d 816, 819 (Nev. 1996); *see also Schneider v. Elko County Sheriff's Dep't*, 17 F. Supp. 2d 1162, 1165 (D. Nev. 1998) (dismissing suit against a county sheriff's department for lack of capacity to be sued). County departments are "immune from suit," and not suable entities. *Wayment*, 912 P.2d at 820.

**C. Summary Judgment is Appropriate for Ribar's First Amendment Claims.**

In Count I, Ribar alleges that "Defendants violated [his] First Amendment rights" by blocking him from public discourse on the Library's Facebook page, and denying him access to public library spaces during public events. (ECF No. 2 at p. 6). In Count IV, Ribar alleges a *Monell* claims for "[o]fficial policies blocking individuals on social media," and for "[p]ractices excluding the public from library spaces without legal authority." *Id.* at p. 7 lns. 15–21. As set forth below, summary judgment is appropriate for both claims.

Throughout the Complaint, Ribar inappropriately states claims against all "Defendants." (ECF No. 2 at pp. 6–7). In a Section 1983 claim, a plaintiff cannot hold an employee liable because of their membership in a group without showing individual participation in the unlawful conduct. *Chuman v. Wright*, 6 F.3d 292, 294 (9th Cir. 1996). Dismissal is appropriate where a claim is "based on conclusory allegations and generalities, without any allegation of the specific wrongdoing by each Defendant." *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012); *see also Peck v. Montoya*, 51 F.4th 877, 889 (9th Cir. 2022). Summary judgment should be granted on Ribar's First Amendment Claims, Count I, to Defendants Bowen, Cole, Deputy Rothkin (Rothgeb), Deputy Sapida, and Sergeant Gomez because there are no First Amendment allegations against them. *See* (ECF No. 2 at pp. 3–6).

**i.    The Restricted Physical Access to the Library was Constitutional.**

Ribar's "physical access" claim appears to be based on his allegation that on June 15, 2023, "Library staff denied [Ribar] access to the reading room because he did not have a

child with him." (ECF No. 2 at pg. 4 lns. 25–27). This occurred at the 2023 Sparks Library RainbowFest event, where Ribar demanded entry into the Drag Story Hour and entry into the children's area. Ex. 12 at 0:32:41–37:00, 0:47:39–49:16. He further alleges that Director Scott and Defendant McKenzie were involved in excluding or denying him access. *Id.* at p. 3, lns. 14–20. He also claims Washoe County is liable under *Monell* with a broad claim that the exclusion violated his "First Amendment rights." *Id.* at p. 6, lns. 16–22. Ribar does not use the Library or have a Library card. Ex. 10 at p. 5, no. 20. Instead, he appears to believe that he has a First Amendment right to enter a library's children's area or story time reading room to film, even though he is not otherwise adhering to the conditions of those spaces.

The First Amendment does not provide a right of free and unconditional access to all government properties or events. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985). The government may restrict speech and access to its property–the nature of the forum determines the extent of permissible restrictions. *Id.*

### 1. The Children's Areas and Story Hour Rooms are Limited Forums.

"The Supreme Court has classified forums into three categories: traditional public forums, designated public forums, and limited public forums." *Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 496 (9th Cir. 2015)(cit. omitted). A designated public forum is created when "government property that has not been traditionally regarded as a public forum is intentionally opened up for that purpose," and is subject to strict scrutiny. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469–70 (2009). Limited public forums are forums "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Id.* at 470. "In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." *Id.* (cit. omitted).

The Ninth Circuit "focus[es] on the government's intent" to determine whether government created a designated public forum versus a limited public forum. *See Seattle Mideast*, 781 F.3d at 496. "[W]hen the government intends to grant only 'selective access,' by important either speaker-based or subject matter limitations, it has created a limited public

forum." *Id.* at 497 (cit. omitted). "[S]everal factors" are relied on to assess intent. *Id.* The Court must first look to the terms of the government's policy governing "access to the form." *Id.* If the government requires speakers to obtain permission under pre-established "speaker-based or subject-matter limitations, the government generally intends to create a limited, rather than a designated, public forum." *Id.* Second, the Court examines "how that policy has been implemented in practice." *Id.* "[C]onsistency in application is the hallmark of any policy designed to preserve the non-public status of a forum." *Hopper v. City of Pasco*, 241 F.3d 1067, 1076 (9th Cir. 2001). Third, the Court "take[s] into account the nature of the government property at issue," and whether the permitted expressive activities are incidental to a commercial use. *Seattle Mideast*, 781 F.3d at 497.

Most courts analyzing a library's forum-status have held that public libraries are "limited public forums." *Van Den Heuval v. Dorothy*, No. 2:21-cv-2176, 2022 WL 95237, at *3 (E.D. Cal. Jan. 10. 2022). Some courts have found that the First Amendment's "right to receive information and ideas" encompasses "the right to some level of access to a public library." *Id.*, *quoting Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992). In *Kreimer*, the Third Circuit found that the general spaces in the library were limited public forums. 958 F.2d at 1259; *see also Engl. v. Jackson Cnty. Pub. Library*, 596 F. Supp. 3d 1164, 1174 (S.D. Ind. 2022)(agreeing that the library is a limited public forum).

Here, the Library, its Children's Area, and its Story Hour rooms are limited public forums. The Library enforces a Code of Conduct policy to preserve its purpose of exchanging material and maintaining a safe environment for Library staff and patrons. *See e.g.* Ex. 1; Ex. 2 at ¶¶22, 24; Ex. 3 at ¶¶28, 31; Ex. 8 at ¶16; Ex. 12 at 1:22:45–22:59; Ex. 15; Ex. 24 at pp. 7–9(documenting trespassing violative patrons); Ex. 30. The Library also maintains and enforces an Adult Use of Children's Area policy, prohibiting unaccompanied adults into the children's areas including the story hour rooms. Ex. 2 at ¶4; Ex. 3 at ¶5; Ex. 4 (explaining the policy promotes "safety and well being" of young Library patrons); Ex. 10 at 0:37:16–40:15 (enforcing policy against Ribar); Ex. 12 at 0:32:41–37:00, 0:47:39–49:16

(enforcing policy on story hour and children's area); Ex. 34 (explaining the policy is enforced on story hour programs). This demonstrates the Library's intent for Children's Areas and Story Hour rooms are to remain limited forums, with only select access granted for limited purposes of providing Library-based services to children.

### 2. The Children's Area and Story Hour Restrictions are Constitutionally Permissible.

As noted in *Kreimer*, "the Library is obligated only to permit the public to exercise rights that are consistent with the nature of the Library and consistent with the government's intent" in designating it as a limited forum. 958 F.2d at 1261. "Liberty interests of the individual must yield to the health and safety interests of the community." *Branch-Noto v. Sisolak*, 576 F. Supp. 3d 790, 798 (D. Nev. 2011), *appeal dismissed*, 21-1711, 2022 WL 17972184 (9th Cir. Nov. 30, 2022). "[A] library's enforcement powers are at their peek when protecting the security of its staff or other patrons." *Van Den Heuval*, 2022 WL 95237, at *3.

There are numerous documented unsafe incidents involving adults in library children's sections. *See, e.g.*, *People v. Bywater*, 320338, 2015 WL 2448684, at *2–3 (Mich. Ct. App. May 21, 2015)(entering the children's area, luring five and seven-year-old girls from the children's section into the stairwell and sexually assaulting them); *Com. v. Gorassi*, 432 Mass. 244, 250 (2000)(sexually assaulting girl in the children's area); *Chapman v. State*, 01-05-00923-CR, 2006 WL 3316705, at *3 (Tex. App. Nov. 16, 2006)("Appellant exposed himself in the children's section …"); *Sokell v. Amsberry*, 2:18-cv-02118-SB, 2022 WL 4586246, at *1 (D. Or. Aug. 30, 2022)(sexually assault eight-year-old in children's section).

Here, the Library's restrictions on adult patrons in children's areas and Story Hour room are reasonable, viewpoint neutral, and therefore constitutionally sound. *See* Ex. 4. The Policy explains that it promotes "the safety and well-being" of children, which is reasonable. *Id.* It ensures safe children have safe access to the areas designed for them. Ex. 2 at ¶2. Story Hour rooms are subject to this Policy because they are children's events and the Policy promotes safety. Ex. 2 at ¶10; Ex. 7 at p. 2; Ex. 8 at ¶8; Ex. 10 at 0:37:16–40:15; *see also* Ex.

34 at p. 2. It was also reasonable to require tickets to Drag Story Hour, promoting safety by ensuring the room remained at an appropriate capacity. Ex. 2 at ¶10; Ex. 3 at ¶15. The ticketing requirement also prevented disruptions to the program from individuals walking in during the performance. *See id.* Moreover, the Policy was applied in a viewpoint neutral manner, as demonstrated in Ribar's own video. Ex. 22 at 1:32:48–53 (showing an adult with a child leaving the Drag Story Hour she attended, holding a sign saying, "STOP PERVERTING OUR KIDS"). Ribar, on the other hand, was denied entry because he did not have a child nor a ticket. *See generally* Ex. 11 at p. 9, no. 46; Ex. 12; Ex. 22. Regardless of viewpoint, adults may access the children's areas and events if they are accompanying their child, and if applicable, a ticket. *See* Ex. 22 at 1:32:48–53; Ex. 2 at ¶10; Ex. 4; Ex. 7 at p. 2; Ex. 8 at ¶8. Therefore, the Library's Children's Area policy and its application to Ribar reflects a reasonable, viewpoint neutral restriction on Library access and is connotationally permissible.

The Court should grant summary judgment in favor of Washoe County, Director Scott, and Defendant McKenzie on Ribar's First Amendment claim regarding access to the Library. The Library, as a limited forum, may restrict access to its property in a way consistent with its purpose. *Kreimer*, 958 F.2d at 1261. The Library's adult-restrictions for children's areas and events reasonably promote safety and are viewpoint neutral. The policy application to Ribar was likewise reasonable and viewpoint neutral at the 2023 Sparks Library RainbowFest and others, because it was applicable to everyone regardless of viewpoint.. Lastly, with no constitutional violation, there is no viable *Monell* claim against Washoe County. *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996).

### 3. Director Scott and Defendant McKenzie are Otherwise Entitled to Qualified Immunity.

Government actors performing discretionary functions are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Employees are immune if it was objectively reasonable

for them to believe their actions were lawful at the time of the challenged act. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987). To overcome a qualified immunity defense, the burden is on plaintiff to show "(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *Harlow*, 457 U.S. at 818. For a statutory or constitutional right to be clearly established, "its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quot. omitted).

Here, even if the Library's policy restricting adults from children's areas and story time programs and its application to Ribar violated his constitutional rights, Director Scott and Defendant McKenzie should be afforded qualified immunity. The right for an adult, without a child, to attend a Library's children's areas or children's events is not clearly established, and Defendants could not locate any applicable case on the matter. Moreover, it would be reasonable for a Library employee to prohibit adults from children's areas and events as a matter of course because their presence may give rise to safety issues as set forth above. Qualified immunity is therefore appropriate.

### i. The Library's Facebook Page is a Limited Forum, and Staff Appropriately Applied its Policy to Block Ribar's Accounts.

Ribar's only allegations of First Amendment claims arising out of the Facebook blocking are against Director Scott and against Washoe County under *Monell*. (ECF No. 2 at p. 5 lns. 10–13, p. 6 ln. 16, p. 7 lns. 18–19). The Court should grant Director Scott and Washoe County summary judgment for the reasons set forth below.

### 1. The Library's Facebook Page is a Limited Public Forum.

As set forth above, limited public forums are "limited to use by certain groups or dedicated solely to the discussion of certain subjects," and reasonable, viewpoint neutral restrictions are permissible. *Pleasant Grove City,* 555 U.S at 470. Government social media accounts that serve a limited purpose for a certain topic are limited public forums when their restrictive policies are enforced. *See Gilley v. Stabin*, 652 F. Supp. 3d 1268, 1286 (D. Or. 2023), *vacated in part on other grounds, appeal dismissed in part*, 23-35097, 2024 WL 1007480 (9th Cir.

Mar. 8, 2024); *see also Krasno v. Mnookin*, 638 F. Supp. 3d 954, 968–74 (W.D. Wis. 2022)(finding that a University's Facebook and Instagram pages were limited, or nonpublic, forums based on their policy and sufficient attempts to moderate the pages).

The District of Oregon found that a University's Division of Equity Twitter account was a limited public forum based on its publicly posted policy. *Gilley*, 652 F. Supp. 3d at 1286. "The guidelines provide that comments within certain categories, including off-topic posts, can be deleted and that users who violate the guidelines can be blocked." *Id.* at 1286. The Court also noted that prior approval for comment posting was not necessary to create a public forum, and doubted that such a practice would be a "feasible method of content restriction." *Id.* at 1286–87. Moreover, imperfect enforcement of the policy was not enough to determine there was an "affirmative act to create a designated public forum." *Id.* at 1287. Therefore, the University did not affirmatively open the account as a designated forum, and instead it was a limited public forum whose restrictions must be reasonable and viewpoint neutral. *Id.*

Similarly, the D.C. Circuit found that the National Institute of Health's ("NIH") Facebook and Instagram pages were limited public forums. *People for the Ethical Treatment of Animals v. Tabak*, 109 F.4th 627, 633–36 (D.C. Cir. 2024). The NIH's policy stated the pages were not intended to serve as public forums, and its stated purposes suggested it was limited solely to the discussion of certain topics concerning NIH functions. *Id.* at 634. Its guidelines further prohibited off-topic posts, endorsements of commercial products, and profane, repetitive, or discriminatory comments. *Id.* NIH's inconsistent or imperfect enforcement arising from manual review was not an affirmative choice to allow violative comments. *Id.* at 635. Moreover, the court found that even though "social media is inherently compatible with expressive activity," after considering NIH's stated purpose, policy, and enforcement, the NIH social media pages were intended only to create a limited forum. *Id.* at 635–36.

Here, the Library's social media pages, including Facebook, are limited public forums. *See* Ex. 6 at ¶¶9–17; Exs. 15–18. The purpose of the Library's Facebook page is to share information about Library services and events with the general public. Ex. 6 at ¶8; *see also*

Ex. 16 at p. 1. The County maintains a policy regarding its social media sites, which is publicly posted and informs the public that the platforms are "not a public forum." Ex.16 at p. 1; Ex. 6 at ¶13. Like in *Tabak*, this demonstrates that there is no intent to create a public forum through the Library's social media pages. 109 F.4th at 634. Facebook users may submit on-topic comments on Library posts. Ex. 2 at ¶25; Ex. 6 at ¶10; Ex. 16 at p. 1. Users may not comment with links to third party websites, abusive content, content that promotes, fosters, or perpetuates discrimination based on various protected classes, and comments that are "not topically related to the post for which they are made." *Id.* These policy restrictions further show the lack of intent to create a public forum.

Additionally, the Library regularly enforces its social media policy. *See* Ex. 6 at ¶¶14–15; Ex. 19. In addition to blocking Ribar's three accounts for repeated violative conduct, it has blocked several other accounts in the past six years. *Id.* Accounts were blocked for repeated comments constituting spamming, for commenting weblinks, for posting content that promoted and fostered discrimination based on gender, sexual orientation, and gender identity, and for including abusive language. Ex. 19 at pp. 2–6; Ex. 6 at ¶14. The Library's enforcement of its policy shows that it is a limited public forum.

### 2.  The County's Social Media Policy and the Decisions to Block Ribar's Accounts Adhere to the First Amendment.

Where a policy applies to all individuals regardless, without drawing a distinction as to its applicability, it is textbook viewpoint neutral. *See Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 130 S. Ct. 2971, 2993 (2010). Additionally, a policy prohibiting "off-topic" comments "is a reasonable and viewpoint neutral rule that furthers the [government's] permissible interest in preserving the interactive comment threats for discussion of the subjects posted by the [government]." *Krasno*, 638 F.Supp. 3d at 977.

Here, the County's policy adheres to the First Amendment because it is reasonable and viewpoint neutral. Ex. 6 at ¶¶14–17; Ex. 16; Ex. 19. *Hopper*, 241 F.3d at 1075. The policy is reasonable because it facilitates the purpose of the forum, which is to provide information and clarification regarding Library services and events. *See id.* As the Court in *Krasno*, noted,

"off-topic comments are, by definition, more disruptive than on-topic comments," given the government's legitimate interests in hosting a moderated forum. 638 F. Supp. 3d at 975. Prohibitions on spamming, posting weblinks, posting off-topic or discriminatory comments are viewpoint neutral because they are applied to all commenters.

Additionally, the Library and Director Scott's decision to block Ribar's accounts was constitutionally appropriate. *See* Ex. 6 at ¶¶14–17; Ex. 16; Ex. 21 at p. 1. Ribar's personal account was blocked after he posted repeated comments in a short period, at least eleven (11) comments with weblinks to his YouTube videos, engaged in a dispute with other commenters, nine off-topic comments (some of which had weblinks), and three comments with language that perpetuates discrimination based on gender identity and sexual orientation. Ex. 6 at ¶15; Ex. 20 at pp. 2–13. Undeterred, Ribar used his "Audit Reno" account to post just a weblink to his YouTube video(s) twenty-seven (27) times in one day, and at least seven (7) times the next day. Ex. 2 at ¶¶26–27, Ex. 6 at ¶¶16–17; Ex. 20 at pp. 15–38. After conferring with counsel, Director Scott instructed staff to block Ribar's "Audit Reno" because his spamming and weblinks violated Library policy and his behavior was interrupting the flow of Library business. Ex. 2 at ¶27; Ex. 6 at ¶¶11–12, 16–17; Ex. 21 at p. 1. A month later, Ribar was again blocked after using a third account, "Ribar for Nevada Assembly 40" thirteen (13) identical comments on thirteen posts with YouTube links and with off-topic language over a one-day period. Ex. 6 at ¶¶16–17; Ex. 20 at pp. 44–57.

The restriction on Ribar's behavior, assuming it was protected speech, was reasonable and viewpoint neutral and therefore constitutional. Each time one of Ribar's Facebook accounts were blocked, it was due to behavior that repeatedly violated the policy. *See* Ex. 2 at ¶26–27; Ex. 6 at ¶¶16–17; Ex. 16; Ex. 20; Ex. 21 at p. 1. Ribar's behavior caused the Library's Facebook page to be flooded with off-topic, and at times discriminatory commentary that may chill other users' engagement, and "notifications" that consumed staff time to locate legitimate comments that may require a response. Ex. 6 at ¶¶11–12, 17.

Even if the page was a designated public forum, it would still be constitutional in this

case. The Library's prohibition on spamming and posting weblinks are narrowly tailored to further a government interest in maintaining a Facebook account to share information about its agency. Ribar's spamming in this case was so incessant that the only option to address it was to block the account. *See* Ex. 19. If staff were to just remove the violative comments, they would be stuck in an endless cycle of removing Ribar's comments as he continued to post them. This would disrupt staff's ability to timely receive and respond to comments actually seeking or providing information about the Library's post(s). Summary judgment is warranted because Library's policy and its application to Ribar adhered to the First Amendment.

### 3. Director Scott is Entitled to Qualified Immunity.

Even if blocking Ribar's accounts was unconstitutional, Director Scott would be afforded qualified immunity on the First Amendment claim regarding social media blocking. Given the novelty surrounding First Amendment implications of government social media accounts, the rights of users commenting and the government's ability to block disruptive users was and is still not clearly established.

### D. Summary Judgment is Warranted on the Fourth Amendment Claims.

In Count II, Ribar alleges that "Defendants violated [his] Fourth Amendment rights" by (1) demanding identification without reasonable suspicion; (2) physically assaulting him under the color of law; and (3) making false reports to law enforcement. (ECF No. 2 at p. 6 ln. 25, p. 7 at lns. 1–4). In Count V, Ribar claims a violation of Nev. Const. Art. 1 Sec. 18, which is the right to be free from "unreasonable seizures and searches." Nev. Const. art. 1, § 18. *Id.* at p. 7 lns. 26–27. Courts apply federal law to Nevada Constitutional claims regarding excessive force. *See Sommer v. Las Vegas Metro. Police Dep't*, 2:23-cv-01682-GMN-NJK, 2025 WL 1180174, at *15 (D. Nev. Apr. 22, 2025).

The claims are improperly alleged against Defendants, without allegations of specific involvement. (ECF No. 2 at p. 6, ln. 25, p. 7 at lns. 1-4). Ribar's other allegations include that Director Scott "pushed" him, Deputy Sapida, Rothgeb and Sergeant Gomez demanded his ID, and that Defendant Cole called the Sheriff's Office. As an initial matter, summary

1    judgment is appropriate for the Defendants not specifically alleged in the claims and sub-

2    claims. *Peck*, 51 F.4th at 889. Summary judgment is otherwise appropriate as set forth below.

3    **ii.    There was No Physical Assault nor Constitutional Violation.**

4        For a Fourth Amendment claim, plaintiff must prove he was seized, meaning a

5    government actor "terminated his freedom of movement through means intentionally

6    applied." *Tajalle v. City of Seattle*, C07-1507Z, 2008 WL 630061, at *4 (W.D. Wash. Mar. 7,

7    2008). He must then show he was seized in a way that was not "objectively reasonable." *Id.*

8        Here, Ribar was not seized, and any use of "force" was objectively more than

9    reasonable. *See* Ex. 2 at ¶¶19–22; Ex. 12 at 1:21:29–22:59. Ribar remained free to move, and

10   free to leave at any time. *See id.* He was therefore not "seized" within the meaning of the

11   Fourth Amendment or Nevada Constitution. *See id.* Additionally, in light of Ribar's past and

12   present persistent antagonism, it objectively appeared as though a physical altercation was

13   imminent. Ribar was causing a disturbance that objectively warranted intervention. *Id.* Next,

14   Director's Scott's intervention was objectively reasonable. *Id.* He remained calm but stern,

15   created a physical shield to discourage Ribar and the man from physically contacting each

16   other. *Id.* He placed his arms up to signal disengagement while calmly but firmly instructed

17   Ribar to back up. *Id.* With the other man inching forward, pushing Director Scott toward

18   Ribar, it was reasonable that Director Scott's palm lightly touched Ribar's shoulder for about

19   twenty (20) seconds. *Id.* This is not an instance of a government official holding a weapon at

20   a person to restrict their movement, pushing them to the ground, or grabbing their wrist to

21   pull them away. *See id.* The minimal contact was incidental to Director Scott diffusing a

22   disturbance and potential physical altercation and to Ribar's refusal to follow instructions to

23   leave. *Id.* It was therefore objectively reasonable. The Court should grant Director Scott

24   summary judgment as to Counts II and V.

25       **1. Director Scott is Entitled to Qualified Immunity for the Federal**
             **Constitutional Claim.**

26       Even if there was a constitutional violation, Director Scott is entitled to qualified

27   immunity because it is not clearly established that a Library Director may not intervene in

two patrons' altercation in the manner that he did. Summary judgment would also be warranted on Count II for Director Scott based on qualified immunity.

### 2. Director Scott is Entitled to Discretionary Act Immunity for the State Constitutional Claim.

Under Nevada law, no action may be brought against a public employee or political subdivision "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty…whether or not the discretion involved is abused." Nev. Rev. Stat. 41.032(2). There is "a two-part test for determining whether a discretionary-function immunity under Nev. Rev. Stat. 41.032 applies to shield a defendant from liability, "which looks to whether "the decision (1) involves an 'element of individual judgment or choice,' and (2) is 'based on considerations of social, economic, or political policy.'" *Clark Cnty. Sch. Dist. v. Payo*, 403 P.3d 1270, 1276 (Nev. 2017) (citations omitted).

Here, Director Scott is entitled to discretionary act immunity on Count V. The decision to intervene was split-second, good faith, and was to diffuse an escalating disturbance. Ex. 2 at ¶¶19–22; Ex. 12 at 1:21:29–22:59. It also involved social considerations of public and event safety, and preventing event disruption. *Id.* Director Scott is therefore protected by discretionary act immunity, and summary judgment is appropriate on that basis.

### iii. Law Enforcement Appropriately Demanded Ribar's ID.

Traditionally, asking questions is an essential part of police investigations, and as such, an investigating officer may ask an individual for their identification without necessarily implicating the Fourth Amendment. *See INS v. Delgado*, 466 U.S. 210, 216 (1984). Nev. Rev. Stat. 171.123(3) is a "stop and identify" statute that allows law enforcement to ascertain a suspect's identity and the suspicious circumstances surrounding their presence. Notable, the United States Supreme Court specifically found that Nevada's stop and identify statute "d[oes] not contravene the guarantees of the Fourth Amendment." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 189 (2004).

Here, Deputy Sapida and Sergeant Gomez adhered to the Fourth Amendment in requesting Ribar's ID card. Nev. Rev. Stat. 171.123(3); Ex. 44 at ¶¶2–5; Ex. 45 at 0:03:40–

6:16; Ex. 48 at ¶¶6–11. Reasonable suspicion existed. Ex. 41 at ¶6; Ex. 43; Ex. 44 at ¶2. Defendant Cole reported that Ribar was suspended from the Library and was refusing to leave despite being trespassed, and provided the 911 operator with Ribar's physical description. *Id.* Based on this information, Deputy Sapida and Sergeant Gomez reasonably concluded that the aged 50-60 white man standing outside of the Library filming on two separate devices was the man reported to have trespassed. *Id.* Deputy Sapida and Sergeant Gomez's requests to obtain Ribar's ID was, as it was in *Hiibel*, a commonsense inquiry, rather than an "effort to obtain an arrest for failure to identify." *See Hiibel*, 542 U.S. at 178. The request for an ID was to confirm Ribar's identification for purposes of investigating the trespass and does not off the Fourth Amendment, thus summary judgment is appropriate.

Notwithstanding, even if an issue of fact exists as to whether Deputy Sapida and Sergeant Gomez's requests for Ribar's ID violated the Fourth Amendment, they are entitled to qualified immunity. Both reasonably believed that Ribar was the suspect of the trespass, and reasonably believed that Nevada law and corresponding case law allowed them to demand Ribar's ID card. Given existing law permitting these requests, it would not be clear to a reasonable officer that their conduct in requesting a suspect's ID was unlawful. Therefore, qualified immunity would be appropriate.

### iv. The Claim of False Reports to Law Enforcement Fails.

For any Section 1983 claim, the defendant must have been acting under color of law, *and* deprived the plaintiff of his constitutional rights. *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986). "[R]eporting an actual or perceived crime to the police do[es] not meet the 'color of law' requirement." *Lucas v. Riggi*, No. 07-CV-6200L, 2008 WL 4758706, at *3 (W.D.N.Y. Oct. 29, 2008). A library director did not act under color of law in filing a police report against a visitor because her "authority to make the report arose from her status as a private citizen." *Noel v. Teller*, No. 1:21-cv-00024-LAG-TQL, 2021 WL 12300058, at *3 (M.D. Ga. Aug. 18, 2021), *report and rec. adopted*, 2022 WL 22867319 (Apr. 20, 2022). In Florida, a court dismissed a claim that a librarian "phoned in a false 911 call," because her

"status as a private citizen gave her the ability to place the 911 call and not her position as a public librarian...." *Perkins v. State of Fla.*, No. 3:20-cv-6012-MCR-HTC, 2021 WL 2384563, at *5 (N.D. Fla. Apr. 22, 2021), *report and rec. adopted.*, 2021 WL 2384306 (June 10, 2021).

Additionally, "[t]here is no constitutional right to be free from threats of arrest; an actual civil rights violation must occur before a cause of action arises under § 1983." *Sharkey v. Duke*, No. 2:23-cv-00449-CDS-DJA, 2024 WL 5170821, at *5 (D. Nev. Dec. 19, 2024)(quot. and citations omitted), *appeal dismissed*, No. 24-7801, 2025 WL 947286 (9th Cir. Mar. 10, 2025). There is likewise "no constitutional right not to be investigated by law enforcement for suspected violations of law." *Spreadbury v. Bitterroot Pub. Libr.*, 862 F.Supp.2d 1054, 1057 (D. Mont. 2012); *see also United States v. Trayer*, 898 F.2d 805, 808 (D.C. Cir. 1990)("But, of course, there is no constitutional right to be free of investigation.").

Here, Defendant Cole, the only individual who is alleged to have called law enforcement, was not acting under color of law and there was no constitutional violation. Her call was not based on false claims, as Ribar was not permitted to be at the Library and was refusing to leave. Ex. 11 at p. 5, no. 16, p. 8 nos. 40–41; Ex. 40 at 0:18:01–09. She called law enforcement as a private citizen to request assistance. *See* Ex. 41 at ¶6; Ex. 43. Moreover, there was no constitutional violation on which Ribar could base a claim. As set forth above, Deputy Sapida's request for ID was constitutionally sound, and Ribar was not arrested. Defendant Cole is nonetheless entitled to qualified immunity because no clearly established law prevents a library employee from calling 911 for a trespassing patron. The Court should grant Defendant Cole summary judgment on Ribar's Fourth Amendment claim.

**E. Ribar Received Ample Due Process in His Library Suspension.**

In Count III, Ribar alleges that "Defendants imposed a one-year restriction on Plaintiff without notice or opportunity to be heard." (ECF No. 2 at p. 7, lns. 10–11). A procedural due process claim has two elements: (1) deprivation of a constitutionally protected interest, and " (2) a denial of adequate procedural protections." *Brewster v. Bd. of Educ. of the Lynwood Unified Sch.Dist.*, 149 F.3d 971, 982 (9th Cir. 1998). "Although it is by no

means well established, a protected interest in accessing public libraries has been recognized by some courts." *Upton v. Cnty. of San Bernardino Library*, EDCV 23-1691-AB (JPR), 2024 WL 5466464, at *7 (C.D. Cal. May 9, 2024). "But the right is no absolute and can be lost for engaging in conduct" that violates its policies. *Id.* (quot. and citations omitted).

Assuming *arguendo* that a library suspension involves a cognizable liberty interest, due process generally requires that the party affected is given notice and an opportunity to be heard. *Upton*, 2024 WL 5466464, at *7. Neither a pre-deprivation nor post-deprivation hearing are required. *Id.* at 7–8. For example, adequate due process was provided where a person was provided a letter notifying him of a six-month suspension based on behavior that violated library policies, and the library policies allowed the person one appeal to the library director. *Nappi v. Timberline Reg'l Libr.*, No. C14-5945 JRC, 2015 WL 3936308, at *1, *3 (W.D. Wash. June 26, 2015); *see also Hill v. Derrick*, 240 F.App'x 935, 937–38 (3d Cir. 2007) (per curium) (holding that plaintiff banned from the library "indefinitely" after a physical altercation received due process when the on-duty librarian verbally informed him of their policy against physical abuse and provided him an opportunity to "tell her what had happened"). In Montana, a person was indefinitely banned from the library after he engaged in disruptive behavior that "frightened staff" and "confronted staff in an intimidating manner." *Spreadbury*, 862 F.Supp.2d at 1056. There was adequate due process, because the library provided the person written notice of the ban and its basis, and afforded him one opportunity to request reconsideration from the library's board. *Id.* at 1057–57.

Here, the Washoe County, Director Scott, and Assistant Director McKenzie provided Ribar with more than adequate due process for his one-year suspension *See* Ex. 2 at ¶¶32–33; Ex. 3 at ¶¶31–36; Ex. 11 at p. 4, nos. 8, 13–17; Ex. 30; Ex. 31 at 0:12:41–13:12, 0:25:30–26:23; Ex. 32; Ex. 36; Ex. 37 at 2:22:06–53:31; Ex. 38 at pp. 2–3. Ribar was provided verbal notice along with a printed packet that included the basis for his suspension, a copy of the Library's code of conduct, and a copy of the Library's suspension policy with the appeals procedures. Ex. 30; Ex. 31 at 0:12:41–13:12, 0:25:30–26:23. Ribar was then provided *three*

appeal opportunities, which he exercised. Ex. 11 at p. 4, nos. 8, 13–17. These procedures go far beyond the notice with *one* appeal opportunity that were held sufficient in *Nappi*, and *Spreadbury*. 2015 WL 3936308, at *1, *3; 862 F.Supp.2d at 1056–57. There is no reasonable dispute that the Library provided Ribar notice of his suspension. There is likewise no reasonable dispute that the Library provided Ribar an opportunity to be heard on his suspension through three different appeals.  Summary judgment is therefore warranted.

Director Scott and Assistant Director McKenzie are further entitled to qualified immunity. Whether there is a liberty interest in using a library is not a clearly established right. *Upton*, 2024 WL 5466464 at *7. Moreover, the level of due process required for library suspensions is not established, and existing case law shows that Washoe County, Director Scott, and Defendant McKenzie provided more process than provided in existing case law. As such, Director Scott and Defendant McKenzie are entitled to qualified immunity.

Lastly, Ribar's claim does not identify any specific defendant, and therefore summary judgment is appropriate as to the remaining defendants who were uninvolved in effecting Ribar's suspension. *See Peck*, 51 F.4th at 889. Neither the Complaint nor the evidence shows that any other defendant issued the one-year suspension or issued decisions on his appeals. *See* (ECF No. 2); Exs. 29–38. Summary judgment regarding Ribar's Due Process claim is appropriate for the remaining defendants based on their lack of individual involvement.

**F.  Summary Judgment is Appropriate for the Assault and Battery Claims.**

In Count VI, Ribar contends Defendants Jeff Scott and Library Employee Doe #1 committed battery against him, while Defendant Jennifer Cole "negligently involved law enforcement without imminent danger." (ECF No. 2 at p. 8).

**i.  No Battery Occurred, and Thus Summary Judgment is Appropriate.**

In Nevada, to establish a battery claim, plaintiff must show the defendant "(intended to cause harmful of offensive contact, and (2) contact did occur." *Hunt v. Zuffa, LLC*, 361 F.Supp. 3d 992, 1009 (D. Nev. 2019). A "plaintiff may not recover the damages sought if oral abuse or provocation is accompanied by an overt hostile act because such oral abuse may

amount to a challenge to fight and constitute consent." *Gonzalez v. Las Vegas Metro. Police Dep't*, No. 2:21-cv-01247-LDG, 2014 WL 1091012, at *15 (D. Nev. Mar. 18, 2014)(cleaned up). Where a person "was resistive, non-compliant and, in one instance, combative," "any reasonable person would realize that such actions would cause an altercation" and effectively consents to a responsive battery. *Id.* Additionally, defense of others does not constitute battery. Nev. Rev. Stat. 200.275; *Batson v. State*, 941 P.2d 478, 482 n. 2 (Nev. 1997). Moreover, "battery is not established unless and until plaintiff proves unreasonable force was used." *Pernell v. City of Los Angeles*, 650 F. Supp. 3d 910, 929 (C.D. Cal. 2022).

Here, no reasonable jury could find that the minimal contact Director Scott made was offensive or unreasonable, and there is no evidence of harm to Ribar. As set forth above, any "force" was objectively reasonable. Ex. 2 at ¶¶19–22; Ex. 12 at 1:21:29–22:59. Even if it was unreasonable, harmful, or offensive, Ribar consented to the contact when he continued to be combative and hostile with the other man and Director Scott. *Id.* Notwithstanding, Director Scott was acting in defense of Ribar, who he believed would be imminently punched by the man based on Ribar's behavior, and thus "defense of others" precludes his claim. *Id.*

Assuming *arguendo*, a battery claim against Director Scott exists, summary judgment is otherwise warranted based on discretionary act immunity. Nev. Rev. Stat. 41.032(2). It was a split-second judgment call susceptible to social policy and public safety considerations, and thus Director Scott is immune. *Id.*; Ex. 2 at ¶¶19–22; Ex. 12 at 1:21:29–22:59.

### ii.   The Negligence Claim Fails Because There was No Duty.

For negligence, plaintiff must show he was owed a duty, defendant breached that duty, this caused his injury, and he suffered damages. *Scialabba v. Brandise Const. Co.*, 921 P.2d 928, 930 (Nev. 1996). Whether a defendant owes plaintiff a duty is a "question of law." *Id.*

Here, the negligence claim fails because no duty exists. Defendant Cole could not locate any Nevada law establishing a duty for Librarians to only "involve" law enforcement when there is "imminent danger." There is no such duty. Likewise, Defendant Cole could not locate any law establishing that a Librarian owes a general duty of care to visitors,

including to individuals suspended and refusing to leave the Library. *See, e.g. Salus v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*, 2:10-cv-01734-GMN, 2011 WL 4828821, at *5 (D. Nev. Oct. 10, 2011)(finding a university owes no general duty of care to its students). Summary judgment is appropriate because as a matter of law, Defendant Cole did not owe Ribar any duty not to "involve[] law enforcement without imminent danger."

Assuming *arguendo*, that Ribar could otherwise establish a negligence claim against Defendant Cole, summary judgment is otherwise appropriate based upon discretionary act immunity. Nev. Rev. Stat. 41.032(2). Whether and when to call law enforcement for a suspended patron refusing to leave involves an element of personal judgment or choice. It is also the type of decision that involves elements of social policy, such as whether it could worsen Ribar's behavior, whether law enforcement presence would disturb other visitors, and whether her other job duties could be put on hold to address law enforcement's subsequent investigation. It involves elements of political policy, because Ribar is litigious and posts videos that invite harassment and doxing onto the Library and its staff. *See* (ECF No. 64). Even if Ribar could establish a claim, it would be barred by discretionary act immunity.

**IV.    CONCLUSION**

The Court should grant County Defendants summary judgment in its entirety. The insurmountable evidence shows there are no reasonable disputes of material fact. The Defendants' policies and actions respected Ribar's constitutional rights, while Ribar continued to harass and antagonize the Library.

Dated this 9th day of July, 2025.

By ____/s/ Lindsay Liddell_____
LINDSAY LIDDELL
Deputy District Attorney

ATTORNEYS FOR WASHOE COUNTY
DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to FRCP 5(b), I certify that I am an employee of the Office of the District Attorney of Washoe County, over the age of 21 years and not a party to nor interested in the within action.  I certify that on this date, I deposited for mailing in the U.S. Mails, with postage fully prepaid, a true and correct copy of the foregoing document in an envelope addressed to the following:

DREW RIBAR
3480 PERSHING LANE
WASHOE VALLEY. NV 89704

ALISON R. KERTIS, ESQ.
SIERRA CREST BUSINESS LAW GROUP
6770 SOUTH MCCARRAN BLVD
FIRST FLOOR
RENO, NV 89509

Dated this 9th day of July, 2025.

/s/ S. Haldeman
S. Haldeman

EXHIBIT INDEX

| | | |
|---|---|---|
| EXHIBIT 1 | Washoe County Library Conduct Policy | 1 page |
| EXHIBIT 2 | Declaration of Jeff Scott | 10 pages |
| EXHIBIT 3 | Declaration of Stacy McKenzie | 12 pages |
| EXHIBIT 4 | Washoe County Library Adult Patron Use Of Youth Areas Policy | 1 page |
| EXHIBIT 5 | Press Release for RainbowFest 2023 | 2 pages |
| EXHIBIT 6 | Declaration of Jamie Hemingway | 6 pages |
| EXHIBIT 7 | RainbowFest Announcement 2023 | 1 page |
| EXHIBIT 8 | Declaration of Jonnica Bowen | 7 pages |
| EXHIBIT 9 | KUNR Drag Story Hour Photo | 1 page |
| EXHIBIT 10 | Video Footage from June 15, 2023 Drag Queen Story at the Reno Library | 1 USB |
| EXHIBIT 11 | Washoe County's Requests For Admission To Plaintiff,1st Set | 12 pages |
| EXHIBIT 12 | Video Footage from June 15, 2023 Drag Queen Story at the Sparks Library | 1 USB |
| EXHIBIT 13 | Screenshot from June 15, 2023 Drag Queen Story at the Sparks Library | 1 page |
| EXHIBIT 14 | Photos of RainbowFest 2023 Signs | 2 pages |
| EXHIBIT 15 | Suspension Letter | 1 page |
| EXHIBIT 16 | Washoe County Social Media Policy | 2 pages |
| EXHIBIT 17 | Declaration of Bethany Drysdale | 1 page |
| EXHIBIT 18 | Library Social Media Policy | 2 pages |
| EXHIBIT 19 | WC Library Record of Blocked Users | 6 pages |
| EXHIBIT 20 | Plaintiff's Facebook Comment Record | 57 pages |
| EXHIBIT 21 | Emails re: Plaintiff's Facebook Suspension | 6 pages |

| | | |
|---|---|---|
| EXHIBIT 22 | Video Footage from June 15, 2024<br>Drag Queen Story at the North Valleys Library | 1 USB |
| EXHIBIT 23 | Screenshot from June 15, 2024<br>Drag Queen Story at the North Valleys Library | 1 page |
| EXHIBIT 24 | Incident Report by Jonnica Bowen | 12 pages |
| EXHIBIT 25 | Incident Report by Stacy McKenzie | 3 pages |
| EXHIBIT 26 | Declaration of Thanh Nguyen | 3 pages |
| EXHIBIT 27 | Notice of Injury for Thanh Nguyen | 1 page |
| EXHIBIT 28 | Photos of Thanh Nguyen's Injuries | 4 pages |
| EXHIBIT 29 | Washoe County Library's Suspension Policy | 2 pages |
| EXHIBIT 30 | Notification of Suspension | 3 pages |
| EXHIBIT 31 | Video Footage from June 20, 2024 | 1 USB |
| EXHIBIT 32 | Appeal Form from Plaintiff for Suspension | 1 page |
| EXHIBIT 33 | Email to Plaintiff, dated August 2, 2024 | 1 page |
| EXHIBIT 34 | Letter to Plaintiff Denying 1st Appeal | 2 pages |
| EXHIBIT 35 | Email to Plaintiff, dated August 9, 2024 | 1 page |
| EXHIBIT 36 | Letter to Plaintiff Denying 2nd Appeal | 1 page |
| EXHIBIT 37 | Video Footage from August 21, 2024 | 1 USB |
| EXHIBIT 38 | Library Board of Trustees Meeting Minutes<br>Dated August 21, 2024 | 3 pages |
| EXHIBIT 39 | Email Correspondence between<br>Mr. Scott and Plaintiff | 2 pages |
| EXHIBIT 40 | Video Footage from November 12, 2024 | 1 USB |
| EXHIBIT 41 | Declaration of Jennifer Cole | 4 pages |
| EXHIBIT 42 | Incident Report by Jennifer Cole | 1 page |
| EXHIBIT 43 | Non Emergency 911 Dispatch Call | 1 USB |

1

EXHIBIT 44          Declaration of Deputy Sapida                    3 pages

2

EXHIBIT 45          Body Cam Footage of Trespassing Incident        1 USB

3

EXHIBIT 46          Declaration of Deputy Rothgeb                   2 pages

4

EXHIBIT 47          Axon Body Camera Footage                       1 USB

5

EXHIBIT 48          Declaration of Sergeant Gomez                  3 pages

6

EXHIBIT 49          Body Cam Footage of Unwanted Subject-Video 1    1 USB

7

EXHIBIT 50          Body Cam Footage of Unwanted Subject-Video 2    1 USB

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

<u>EXHIBIT INDEX</u>

23

24

25

26