# EXHIBIT 2

# EXHIBIT 2

## DECLARATION OF JEFF SCOTT

I, Jeff Scott, do hereby declare, under penalty of perjury, the following:

1. I was the Director for the Washoe County Library System ("Library") until I resigned in April 2025. I am one of the named defendants in *Ribar v. Washoe County, NV*, District of Nevada case number 3:24-cv-0052-ART-CSD. I am being represented by the Washoe County District Attorney's Office.

2. The Library serves a very diverse population, and host a variety of events and programs catered to serve different populations in the community.

3. The Library has also maintained a Code of Conduct policy that has been in effect since before I began employment at the Library. Among other things, the Code of Conduct prohibits "patron" conduct that "disturbs library users or that hinders people from using the Library or library materials," "[b]ehavior that interferes with staff's ability to do their job," and "behavior that could compromise the safety of [the patron] or staff." It mandates that patrons "following direction/instruction from library staff as issued." It also advises that violation of any Code of Conduct provision "may result in the suspension of Library privileges," and that any suspension is subject to appeals rights under the Suspension Policy.

4. The Library also maintains an "Adult Use of Youth Patron Areas Policy," to promote the safety and well-being of children in the Library that has been in effect since before my employment with the Library. This policy "reserves the right to restrict adult patron use" or "youth areas" within Libraries. It also advises that "[a]dult patrons who are not in compliance with this policy may be requested to leave the youth areas."

5. During the summers of 2023 and 2024, the Library hosted RainbowFest events to celebrate Pride Month. RainbowFest's goal was to provide the community with "the opportunity to celebrate diversity and practice self-acceptance." The events included "arts and crafts, music, food, stories and fun." The events also included Drag Story Hour programs.

1  6. Drag Story Hour is a program where performers read stories approved by the Library's Youth Services team to children. Outside Drag Story Hour, the Library regularly hosts a "Story Hour," where librarians or volunteers read approved books to children in libraries to entertain them and inspire a love of reading. For RainbowFest, the "story hour" reader was a drag performer–an entertainment artist who adopts a theatrical character with exaggerated bright clothing, makeup, and mannerisms most often in a different gender than their own.  For the Library's Drag Story Hour, drag performers adopt characters appropriate for children, maintaining age-appropriate clothing and dialogue akin to others performing for children as princesses, superheroes, fairy godmothers, etc. Drag Story Hour, like other story time programing, was designed for children from the ages of three to eight.

7. All Library volunteers, including performers for Drag Story Hour, undergo a standard criminal background check prior to their work for the Library.

8. The PDF file titled, "ADULT PATRON USE OF YOUTH AREAS POLICY," bates stamped WC0890 is a true and correct copy of the Library's policy regarding adult use of the children's areas within each Library branch.

9. The PDF file titled, "CONDUCT POLICY," bates stamped WC0891 is a true and correct copy of the Library's policy regarding visitor conduct.

### 2023 RainbowFest – Downtown Library

10. On June 15, 2023, the Library hosted a RainbowFest event at the Downtown Library, and I was present. Inside the Library, there was a sign informing attendees that the Children's area Story time room was "CLOSED" because the Drag Story Hour event was a ticketed event. Due to high demand for the Drag Story hour program, the Library required tickets to make sure the room was not overfilled and remained safe. It also ensured that attendees were children and their parents to secure the purpose of the program, which was to entertain children. There was also a sign that is always placed outside the Children's Area, which informs visitors that the area is reserved for children and their parents. This ensures children have safe access to the area designed for them.

1    11. On page 2 of the PDF file titled "Photos of 2023-2024 Rainbow Fest Signs," bates stamped WC0767 is a true and accurate depiction of the signs placed inside the Sparks Library near the Children's Area and Drag Story Hour program during the 2023 RainbowFest event on July 15, 2023.

12. I observed Plaintiff Drew Ribar ("Ribar") present at the event and walking around with a hand-held tripod camera recording attendees.

13. I explained the Library was not "letting general adults in—just the children with adults." Ribar expressed his belief that the Library was discriminating against single adult men.

14. Ribar later interrogated Defendant Scott, who again explained that the Drag Story Hour is a children's event, "no people without children" are allowed because it is for children.

### 2023 RainbowFest – Sparks Library

15. On July 15, 2023, I was present at the Sparks Library for the RainbowFest event. This event included a Drag Story Hour.

16. In the outdoor event space, Ribar approached me pointing his hand-held tripod camera toward my face and interrogated me regarding whether the Library was required to obtain licensing for the music playing the in background, which included Cher, ABBA, Dua Lipa, Madonna, Etc.

17. Later, outside I was talking to a Washoe County Sheriff's Deputy next to her vehicle regarding a matter unrelated to Ribar. Ribar approached us, interrupted the conversation and stood next to us while he pointed his camera toward us. The Deputy said to Ribar, "Sir, could you please back away from my car?" Ribar claimed, "I'm not in anybody's way… Have you read NRS 171.1232 ma'am?" I explained to the Deputy that Ribar was "our First Amendment auditor." I turned to Ribar, and said, "We're actually having a conversation… just let us have the conversation." Ribar cut me off, stating, "I can speak—" I cut him off, and said, "I know, but I mean, be respectful because we're having a

conversation. You can talk to her [the Deputy] afterward." Ribar was verbally combative, and said "Then conversate and don't direct your speech toward me." I responded, "that's fine, but you're interrupting." I quickly finished the conversation with the Deputy. This interaction was frustrating, because Ribar interfered with my ability to manage the Library's event and confer with law enforcement for event safety.

18. Later outside the event entrance, I observed Ribar interfering with Assistant Director Stacy McKenzie's position greeting attendees. I approached them, and Ribar interrogated me regarding a Ninth Circuit decision. Ribar said to me, "She [Assistant Director McKenzie] said she's going to enforce policy over the Constitution." Assistant Director Stacy McKenzie responded, "No, that's not my words. I said I like to follow policy." I responded, "So, like told you, we have our own legal director who advises us on it. So you were spamming the Facebook page. It's not getting a lot of views though…" Ribar responded, "So why did you block me if it's not getting any views?" I responded describing an instance where Ribar commented on a post regarding "cards for kindness" with a link to his YouTube video regarding Drag Story Hour, and told Ribar "You're just obviously spamming it to get revenue for YouTube." Ribar said, "… I just wanna make change, and what I want to change is exactly what you guys have done here, which is you guys want to enforce policy over the Constitution." I stated, "Well, we have our own legal counsel on that, so—" Ribar interrupted, in an antagonistic tone saying, "So you're legal counsel wants to enforce policy over Constitution?" Ribar continued to debate the Library's advice from their legal counsel, discussed Section 1983 lawsuits, argued with me regarding potential damages for blocking people from Facebook, and demanded I conduct on-the-spot mathematics to add up potential damages. Assistant Director McKenzie interrupted Ribar and calmly said, "You're harassing him [me], is what you're doing." Ribar raised his voice, pointed his camera at Assistant Director McKenzie, and said "No, I'm questions of the guy that's getting paid with MY tax dollars and making two hundred thousand dollars a year." Ribar and I then walked away.

4

19. Later in the outdoor event area, I observed attendees becoming agitated with Ribar for filming tent booths with children attendees and getting into verbal altercations with attendees. I noticed Ribar antagonizing a large man attending the event and placing his camera in the man's personal space. It appeared that the verbal altercation was escalating, as I heard Ribar shouting "You just assaulted me! What's you're name sir?" "That's battery! That's battery!" at the man. Ribar was aggressively pointing his finger at the man while he was shouting at him. I observed the large man placing his hand at Ribar's camera and arguing with Ribar.

20. I rushed over to intervene and deescalate the altercation between Ribar and the large man so that it would not break out into a physical fight between them or cause more of a disturbance to the other event attendees. My decision to intervene was a split-second reaction to attempt to diffuse the situation. I did not observe any security guards or law enforcement who were closer to the altercation. While I had not previously observed Ribar become physically violent, I had observed or been the recipient of Ribar's pattern of posing repeated antagonistic or condescending questions or statements that appear orchestrated to elicit a heighten emotional or physical response from the recipient while Ribar films them. While the Library staff undergoes training on how to deal with these kind of disruptive and stressful interactions, I do not expect that to general members of the public have similar training. Instead of simply walking and turning away from this man, Ribar continued to egg him on and invite attention to the altercation. To put it frankly, in the face of Ribar's persistent antagonism, it seemed like this man was about to punch Ribar.

21. I got between Ribar and the other man, facing Ribar. I held up my hands, palms outward to signal disengagement and de-escalation, and to create a physical boundary between Ribar and the other man. I instructed Ribar to "Please back up," "No finger pointing please." While Ribar shouted "No!" several times, the large man continued to respond to Ribar's conduct, placing his palm toward Ribar over my shoulder. I continued to repeat my instruction to Ribar, "You need to back up," while my palms remained up.

5

Riber continued to shout "No!" repeatedly at me. At this point, it seemed like Ribar might become physically aggressive toward the man. Trying to create space between Ribar and the other man after the other man moved closer to me, my palm on my right hand made slight, unforceful, contact on Ribar's left shoulder. I repeated to him, "You need to back up." The large man remained close behind me. According to Ribar's video footage, my palm may have been in actual contact with Ribar's shirt/arm for about two seconds. Ribar then yelled, "Jeff, stop touching me!" With this, I made sure to move my hand farther away from Ribar's shoulder and I continued to repeat my instruction to him, "You need to back up." I then told him, "You need to stand over there," and Ribar continued to verbally argue with me. I told him, "You're harassing people here with the camera. People are upset." Ribar took a few steps back, but continued to argue with me and refuse to stand where out of the walkway.

22. When asked to stand elsewhere, Ribar said, "No, I'm not going to." "I'm standing right here [against the wall in the walkway] out of the way next to the rope line." I then told Ribar, "I need to ask you to leave the property if you're not going to listen to me." Ribar then attempted to antagonize me, saying "So, are you going to trespass me under threat of arrest?" I said, "You're trespassed. Yes. Please leave." Ribar said, "Thank you I will leave now," and slowly backed up.

23. On his way out, Ribar walked backwards with his camera still in my personal space. Ribar continued to repeat questions to me while he filmed my reaction, saying "So I'm trespassed?" I said, "You're trespassed. Banned from the Library for the day." In a condescending tone, Ribar responded, "So I'm *banned* from the Library." I was following Ribar to make sure he left the premises. Ribar turned to walk forwards, and placed the camera toward me and him. Ribar talked at the camera, "So Jeff Scott just trespassed me from the Library…. I just wanna be clear…" Facing the camera toward me as I continued to escort him off the premises, Ribar said to another person, "So they're just trespassing me." The other man said, "make them call law enforcement!" Ribar then turned to me and

6

said, "Actually yeah I'll do that. Call law enforcement." I said, "No, you have to go over there [pointing to the sidewalk]." Ribar interrupted me and loudly said "Call law enforcement." I told him, "If you don't listen to me right now, you're going to be banned for one year." Ribar raised his arm and tripod above my head to film us, and said, "Well, call law enforcement. So you're trespassing me for filming." I responded, "Yes, trespassing for harassing the public." Ribar then antagonized me, saying "For filming," and I said "For harassing the public," back and forth several times. At this point, I was extremely exhausted by Ribar's conduct. Two security guards came over to effectuate the trespass, and I walked away.

24. Following this event, I issued a one-year suspension to Ribar for his conduct in getting into an altercation with an attendee, refusing to deescalate the altercation, and refusing the leave when instructed. The PDF titled "2023 Suspension Letter," bates stamped WC033 is a true and correct copy of the letter I wrote and sent to Ribar's address to inform him of the suspension.

### Library Blocked Ribar from its Facebook Page

25. During my time as Library Director, the Library welcomed public engagement related to the content on a particular post on its social media pages. The Library did not allow members of the public to publish or share posts onto the Library Facebook page. The Library reserved the right to remove comments for various reasons including: comments entirely unrelated to the post, content that promotes, fosters, or perpetuates discrimination based on sex, gender identity, or sexual orientation, abusive, vulgar, or obscene language or content, sexual content, apparent spam or trolling, and links to third-party and personal sites.

26. In July 2023, I learned that Ribar was spamming the Library Facebook page, and that his personal account had been blocked. I learned that shortly thereafter, Ribar used a different Facebook account he controls to continue spamming by posting links on Library posts regarding Drag Story Hour on posts that had nothing to do with Drag Story Hour.

7

27. I consulted with legal counsel to determine how best to handle Ribar's repeated spamming the Library Facebook page. After consulting with legal counsel, I made the decision to direct Jamie Hemingway, the Library's public information officer, to block Ribar's new account. I determined that Ribar's behavior was interrupting the Library's ability to conduct its business, which includes posting information about Library events and updates on its social media pages. People are not permitted to post weblinks in comments on the Library's social media pages. Moreover, Ribar's repeated spamming comments disrupted staff's ability to locate and respond to comments from individuals wanting to discuss or obtain more information about the Library or a Library event. It also disrupted the public's ability to meaningfully comment with other commenters regarding the substance of the Library post.

28. The PDF file titled "Email - Ribar Facebook Suspension for Spamming," bates stamped WC0914-919 is a true and correct copy of the email correspondence between me and Library Public Information and Development Officer Jamie Hemingway regarding Ribar's Facebook spamming and discussing blocking his accounts.

**Ribar's Suspension from the Library**

29. The Library maintains a Suspension Policy to suspend visitors who "exhibit or engage in behavior that violates any Library Policy, City or County Ordinance, or State Law." The Suspension Policy in effect in 2024 provided three levels of appeal: (1) to the Assistant Library Director, (2) to the Library Director, and (3) to the Library Board of Trustees. The PDF file titled "Patron Suspension Policy," bates stamped WC0198-190 is a true and correct copy of the Library's policy regarding suspending visitors from the Library that was in effect for Ribar's 2023 and 2024 Library suspensions.

30. After the 2024 RainbowFest disruption at the North Valleys Library, I approved Assistant Director McKenzie suspending him from the Library for one year. She compiled a written notice of suspension that included the basis for the suspension, a copy of the code of conduct policy, and a copy of the suspension policy that included the appeals form. This

8

packet was sent to him via mail. I also had staff personally provide Ribar a copy of this packet when Ribar attempted to attend the next RainbowFest event on June 20, 2024, at the Downtown Library.

31. Ribar subsequently submitted a form to appeal his suspension. The PDF file titled "Appeals Form for Ribar 2024 Library Suspension," bates stamped WC0038 is a true and correct copy of the signed appeals form that the Library received from Ribar to appeal his 2024 Library Suspension. The then-Assistant Director of the Library, Stacy McKenzie reviewed the appeal and issued a denial letter.

32. Next, Ribar exercised a second-level appeal, which went to me as the Director. After reviewing the Code of Conduct policy and all relevant records regarding Ribar's behavior at the 2024 RainbowFest, I denied the second appeal. On August 9, 2024, I sent Ribar a letter via email and regular mail, stating in part, "Your actions, which include harassing staff and patrons and attempting to break into a Storytime for children, disrupt our operations and make it difficult for us to fulfill our mission. Regardless of your personal opinions, this is not acceptable to us."

33. The PDF file titled "Letter Denying Ribar 2nd Appeal for 2024 Suspension," bates stamped WC0041 is a true and correct copy of the letter I sent to Ribar denying his second-level appeal for his 2024 Library suspension. The PDF file titled "August 9 2024 Email to Ribar - 2nd Appeal Denial," bates stamped WC0578 is a true and correct copy of the email I sent to Ribar on August 9, 2024, containing the letter denying his second-level appeal.

34. On August 21, 2024, I attended a Library Board of Trustees meeting where the Board heard Ribar's third and final appeal. The Board upheld Ribar's suspension.

35. The PDF titled "August 2024 Library Board of Trustee Meeting Minutes," bates stamped WC0143, WC1046-47 contains a true and accurate copy of the relevant portions of the Minutes for the August 21, 2024 Library Board of Trustees Meeting where Ribar's suspension was upheld.

//

36. On August 26, 2024, I received an email from Ribar asking details regarding his suspension. I responded to him that day, and I explained to him that "When a patron is suspended they are not permitted on the library property," and explained exceptions for things like library board meetings, election, and court which are held at the library but not held in a library capacity. The PDF titled "August 26 2024 Email Correspondence with Director Scott and Ribar," bates stamped WC0266-67 is a true and correct copy of an email I received from Ribar, and a response that I sent to Ribar.

JEFF SCOTT    7/8/25