# EXHIBIT 3

# EXHIBIT 3

# DECLARATION OF STACY MCKENZIE

I, Stacy McKenzie, do hereby declare, under penalty of perjury, the following:

1. I am the acting Library Director of the Washoe County Library System ("Library") based in Reno, Nevada. In 2023, 2024, and until April 2025 I was the Assistant Director for the Library. I am one of the named defendants in *Ribar v. Washoe County, NV*, District of Nevada case number 3:24-cv-0052-ART-CSD. I am being represented by the Washoe County District Attorney's Office.

2. The Library serves a very diverse population and hosts a variety of events and programs.

3. During the summers of 2023 and 2024, the Library hosted RainbowFest events to celebrate Pride Month. RainbowFest's goal was to provide the community with "the opportunity to celebrate diversity and practice self-acceptance." The events included arts and crafts, music, food, stories and fun. The events also included Drag Story Hour programs.

4. The Library maintains a Code of Conduct policy that has been in effect since before I began employment at the Library, with various minor revisions throughout the years. Among other things, the Code of Conduct prohibits "patron" conduct that "disturbs library users or that hinders people from using the Library or library materials," "[b]ehavior that interferes with staff's ability to do their job," and "behavior that could compromise the safety of [the patron] or staff." It mandates that patrons "following direction/instruction from library staff as issued." It also advises that violation of any Code of Conduct provision "may result in the suspension of Library privileges," and that any suspension is subject to appeals rights under the Suspension Policy.

5. The Library also maintains an "Adult Use of Youth Patron Areas Policy," to promote the safety and well-being of children in the Library that has been in effect since before my employment with the Library. This policy "reserves the right to restrict adult

patron use" or "youth areas" within Libraries. It also advises that "[a]dult patrons who are not in compliance with this policy may be requested to leave the youth areas."

6. The PDF file titled, "ADULT PATRON USE OF YOUTH AREAS POLICY," bates stamped WC0890 is a true and correct copy of the Library's policy regarding adult use of the children's areas within each Library branch.

7. The PDF file titled, "CONDUCT POLICY," bates stamped WC0891 is a true and correct copy of the Library's policy regarding visitor conduct.

8. During the summers of 2023 and 2024, the Library hosted RainbowFest events to celebrate Pride Month. RainbowFest's goal was to provide the community with "the opportunity to celebrate diversity and practice self-acceptance." The events included books, arts and crafts, music, food, stories and fun. The events also included Drag Story Hour programs.

9. Drag Story Hour is a program where performers read stories approved by the Library's Youth Services team to children. Outside Drag Story Hour, the Library regularly hosts a "Story Hour," where librarians or volunteers read approved books to children in libraries to entertain them and inspire a love of reading. For RainbowFest, the "story hour" reader was a drag performer–an entertainment artist who adopts a theatrical character with exaggerated bright clothing, makeup, and mannerisms most often in a different gender than their own. For the Library's Drag Story Hour, drag performers adopt characters appropriate for children, maintaining age-appropriate clothing and dialogue akin to others performing for children as princesses, superheroes, fairy godmothers, etc. Drag Story Hour, like other story time programing, was designed for children from the ages of three to eight.

10. All Library volunteers, including performers for Drag Story Hour, undergo a standard criminal background check prior to their work for the Library.

### 2023 RainbowFest – Sparks Library

11. On July 15, 2023, I was present at the Sparks Library for the RainbowFest event. Inside the Library during the event, Ribar approached me pointing his hand-held tripod

camera toward me and questioned me regarding whether I was aware that the Library "blocks people from their Facebook site." I responded, explaining to him, "I don't work in that area." Ribar then interrogated me, asking "What do you think of that?" I responded, "I think that there must be a very good reason for that, but again, I'm not familiar with that policy so-" Ribar cut me off, saying "I asked Director Scott. He admitted there are a lot of people blocked, and so. Inclusion. That's what you guys are about. Not exclusion. So if you disagree with somebody's free speech on the public Library that's funded by tax dollars. You believe that some people should be blocked by Director Scott or whoever within the Library because they've exercised their constitutional right to free speech on a government social media site?" I explained, "If we have a policy dealing with that, then that's what we would follow and that would be approved, um, by the County. So that's what we would follow." Ribar debated with me, saying a Ninth Circuit "ruling" found that this was unconstitutional. I again explained that we would follow any applicable policy. Ribar again attempted to debate me, talking about a Ninth Circuit decision. I responded, "We follow our policy." In an antogistic tone, Ribar stated, "So you follow your policy over the Constitution? I appreciate that. Policy over Constitution. So you like policy over the Constitution?" I explained that I am a government employee and I follow the policies. Ribar continued to antagonize me, saying "So government employees follow policy above Constitution?... I'm just saying your policy outweighs the Constitution. 'Cause you're saying you follow the policy. And if the Constitution differs from the policy, you're gunna follow that."

12. With this interaction, I tried to remain calm and professional in responding to Ribar. It felt as though Ribar was attempted to evoke a reaction from me that he could use in a clip and earn revenue from on YouTube. He did not seem legitimately interested in what I had to say. Instead asked repetitive condescending requests that seemed designed to get me to become angry or get me to slip up for his video.

13. In the event's outdoor space, I was standing near the event-space entrance next to Our Center volunteers displaying rainbow umbrellas for the event. Ribar approached, stood in the walkway, and I told him that people were having to walk around him. Ribar responded in an argumentative tone saying, "So what you're saying is they [the volunteers] can block but I can't block." I told him, "Yes, because they are with the Library." Ribar remained verbally combative, saying "So they're with the Library so they can block the public from coming in?" This felt like an attempt to twist my words and frustrate me. As I explained, "No, they're not blocking anyone from coming in," Ribar talked over me, saying "But they just did. She put her umbrella in my face." I said, "You put your camera in her face." Ribar denied this and stated, "… So are you saying she can block people but nobody else can?" I tried to remain calm and told him, "I'm just asking you not to block the entrance." Ribar argued that he was not blocking the entrance. Ribar moved, and I told him his position "was great," but Ribar continued to bait me, saying "Well no, I was no different than what those people were doing but they're okay to block the entrance. So you're saying your double standard stands. It's not inclusive. It's exclusive—depending on if you're gay, lesbian." I interrupted him and calmly said, "I just asked you to move, and thank you very much for doing that." Ribar continued to question me.

14. The then-Director Jeff Scott then approached us, and Ribar interrogated him regarding a Ninth Circuit decision. Ribar said to Director Scott, "She [me] said she's going to enforce policy over the Constitution." I responded, "No, that's not my words. I said I like to follow policy." Director Scott responded, "So, like told you, we have our own legal director who advises us on it. So you were spamming the Facebook page. It's not getting a lot of views though…" Ribar responded, "So why did you block me if it's not getting any views?" Director Scott responded describing an instance where Ribar commented on a post regarding "cards for kindness" with a link to his YouTube video regarding Drag Story Hour, and told Ribar "You're just obviously spamming it to get revenue for YouTube." Ribar said, "… I just wanna make change, and what I want to change is exactly what you

4

guys have done here, which is you guys want to enforce policy over the Constitution." Director Scott stated, "Well, we have our own legal counsel on that, so—" Ribar interrupted, in an antagonistic tone saying, "So you're legal counsel wants to enforce policy over Constitution?" Ribar continued to debate the Library's advice from their legal counsel, discussed Section 1983 lawsuits, argued with Director Scott regarding potential damages for blocking people from Facebook, and demanded Director Scott conduct on-the-spot mathematics to add up potential damages. I interrupted Ribar and calmly said, "You're harassing him [Director Scott], is what you're doing." Ribar raised his voice, pointed his camera at me, and said "No, I'm questions of the guy that's getting paid with MY tax dollars and making two hundred thousand dollars a year." Ribar and Director Scott then walked away.

### 2024 RainbowFest – North Valleys Library

15. On June 15, 2024, during Pride Month, the Library hosted another RainbowFest event at the North Valleys Library. I was present and working this event as the Assistant Director of the Library. The RainbowFest event included a ticketed Drag Story Hour. The building for the Library was closed, except for the Drag Story Hour program inside the main Library building. This was to protect the safety of attendees and prevent disruptions to the programming.

16. On page 1 of the PDF file titled "Photos of 2023-2024 Rainbow Fest Signs," bates stamped WC0766 is a true and accurate depiction of the sign placed on the door of the North Valleys Library during the 2024 RainbowFest event on June 15, 2024.

17. Notices were also posted online that the Library would be closed for the event, except for the ticket Drag Story Hour program, which was limited to children and one parent.

18. Even though the main Library area was closed, we had a separate indoor area open as a "cooling off" area. The area provided attendees with an air-conditioned space, cold

1 water, and restrooms. The "cooling off" area's entrance was separate from the main
2 Library entrance, over fifteen feet away, and clearly identified as open during the event.

3    19. We also had a bookmobile in the event outdoor space, which is a large van with
4 various Library materials available for check-out to anyone with a Library card. It also has
5 the ability to distribute Library cards to those who do not have them, and return Library
6 materials.

7    20. At the event, I observed Ribar attending and filming one of his self-proclaimed
8 "First Amendment Audits" using his hand-held tripod with camera attached and a
9 bodyworn camera on his chest.

10    21. In the outdoor event space, I approached Jonnica Bowen who was explaining to
11 two visitors that the Library was closed that day. Ribar approached the group at the same
12 time. Jonnica Bowen explained to them, in Ribar's presence, that "Library services are
13 available throughout Washoe County. We have twelve locations and we also have the
14 bookmobile here today [in the parking lot]. So we're happy to offer those services to
15 anyone…" One of the individuals responded, in Ribar's presence, acknowledging that the
16 Library was closed that day.

17    22. I was inside the Library building when I heard a loud slam and another staff
18 member, Thanh Nguyen, in distress. I looked toward the commotion and saw Ribar in the
19 doorway, holding it open with his foot, and refusing to leave. I rushed toward the door to
20 assist my staff.

21    23. When I got to the doorway, I told Ribar, "Sir, move your foot or you will be
22 trespassed." Ribar then antagonized me, stating "Trespass me please. You're open from 10
23 a.m. to 4 p.m. according to the sign right?" I responded, "nope, not today."

24    24. I then walked through the doorway, which caused Ribar to move his foot from
25 obstructing the door's closure. Ribar proceeded to interrogate me regarding my name, and
26 the Library's closure for the event. I told him, "This was a disturbance and if you make
27 another disturbance, which is outside our Code of Conduct, then we will ask you to leave."

6

Ribar spoke over me pointing to the general sign outside the Library that contains general Library hours, saying "This says you're open from 10 to 4 though" with an antagonistic tone. I told him, "We are not open today and that's been posted several places." Ribar raised his voice to argue regarding the Library's closure for the ticketed Drag Story Hour program, speaking over me as I tried to continue explaining that the Library was closed for the event. He argued that we were closing the Library for a "private event," and I explained it was not a private event while he continued to argue with me. Another staff member pulled me aside because I was needed elsewhere.

25. I later observed Ribar interfering with Jonnica Bowen outside the Library's main entrance, so I approached him and stated, "I don't want to trespass you, I really don't. We just really need you to keep the peace." To this, Ribar began arguing that he was keeping the peace, raised his voice, and continued to interrogate me and anyone who would listen regarding the Library's hours and the terms of the Drag Story Hour event. He shouted, "Answer my questions. Who is allowed to go in the Library? What age restrictions are on the Library?" To this, Ribar began arguing that he was keeping the peace, raised his voice, and continued to interrogate Jonnica Bowen and anyone who would listen regarding the Library's hours and the terms of the Drag Story Hour event. He shouted, "Answer my questions. Who is allowed to go in the Library? What age restrictions are on the Library?" After Jonnica Bowen attempted to answer Ribar's questions, Ribar continued to interrogate me and Jonnica Bowen with the same questions. When I repeatedly told him I answered his questions and was not going to answer more, Ribar was argumentative saying "Because you don't like the answer because you know it's a discriminatory action that you're engaged in and you're violating the Constitution of the United States of Nevada." I responded, "Sir, I'm not going to engage with you." Jonnica Bowen said, "We have already explained everything to you… we're done." I told him that this was harassment. Ribar continued to loudly argue with us, shouting "No. It's not harassment. This is exercising freedom of speech because I'm NOT blocking–" I interrupted him asked him to

7

1  go to the protest area, and said "You're preventing us from doing our job." Ribar spoke
2  over me, and said "You can disengage with me any time you want and walk away."
3  Jonnica Bowen walked away, and I stayed to direct Ribar to the protest area. Ribar loudly
4  declared, "See! Freedom of speech is a beautiful thing. You can continue to engage with
5  me or you can walk away just like I can walk away." I told him I would no longer engage
6  and I walked away because he was not complying and was wasting my time. He appeared
7  to be attempting to elicit responses from staff by persistently asking the same questions over
8  and over, using a condescending tone, and refusing to simply disengage with staff.

   26. After the event was concluded, I learned that Thanh Nguyen already had a bruise appear on her arm and that her arm was very sore.

   27. Ribar, like any person, is free to passively film government employees doing their jobs in public spaces. However, Ribar's behavior was well beyond simple passive filming.

   28. Ribar engaged in multiple instances of disruptive conduct during the event. His conduct prevented staff from focusing on hosting the event several times. He harassed, antagonized, and engaged in repeated unwanted conduct with staff that left staff, including myself, stressed, emotionally drained, and threatened. My staff should not be subjected to Ribar's cross-examination-style questioning, often in a condescending or harassing tone, simply because they are at the Library trying to do their job. Ribar also injured a staff member, leaving her with a bruise and sore arm. Despite seeing staff's physical struggle, Ribar continued to physically insert himself into the Library which escalated the situation and the staff's injury. Additionally, by instigating several verbal and one physical altercation, Ribar's behavior disturbed other Library visitors who were attending the event. He created a tense environment that was uncomfortable for staff and members of the public alike. This is completely unacceptable behavior for a Library visitor.

   29. The PDF titled, "June 15 2024 North Valleys Incident Report by Stacy McKenzie," bates stamped WC0030-32 is a true and correct copy of the incident report I created following the incident involving Ribar at the North Valleys Library for RainbowFest.

**Ribar's Suspension from the Library**

30. The Library maintains a Suspension Policy to suspend visitors who "exhibit or engage in behavior that violates any Library Policy, City or County Ordinance, or State Law." The Suspension Policy in effect in 2024 provided three levels of appeal: (1) to the Assistant Library Director, (2) to the Library Director, and (3) to the Library Board of Trustees. The PDF file titled "Patron Suspension Policy," bates stamped WC0198-190 is a true and correct copy of the Library's policy regarding suspending visitors from the Library that was in effect for Ribar's 2023 and 2024 Library suspensions.

31. After the 2024 RainbowFest disruption at the North Valleys Library, I issued a one-year suspension and filled out a Notification of Suspension Report. The PDF file titled, "2024 Notification of Suspension," bates stamped WC0107-09 is a true and correct copy of the report I created to notify Ribar of his Suspension. This was in a packet along with a copy of the Code of Conduct and Suspension Policies to be personally delivered to Ribar the next time he appeared at a Library.

32. Ribar subsequently submitted a form to appeal his suspension. The PDF file titled "Appeals Form for Ribar 2024 Library Suspension," bates stamped WC0038 is a true and correct copy of the signed appeals form that the Library received from Ribar to appeal his 2024 Library Suspension.

33. In accordance with the Library Suspension Policy, I reviewed the appeal. After reviewing the Code of Conduct policy and all relevant records regarding Ribar's behavior at the 2024 RainbowFest, I denied the appeal. I wrote a letter to Ribar denying his appeal and outlining his specific Code of Conduct policy violations, including:

- Ribar engaged in conduct that disturbed library users or that hinders people from using the library or library materials. Specifically, I found that "[h]arassment of staff by asking the same questions over and over and then turning toward inappropriate and accusatory comments was disruptive and disturbing to staff and patrons."

9

- Ribar behaved in a way that interfered with staff's ability to do their job. Specifically, "[t]he time staff took to deescalate [Ribar's] repeated harassing questioning and no explain numerous times that the library building was closed for a special event took us away from our regular job duties and disrupted patrons attending the event."
- Ribar engaged in behavior that could compromise the safety of [the library user] or others. Specifically, "[u]pon being told several times by numerous staff, including a notification on the library door about the closure, [Ribar] attempted to force [his] way into the library building… This resulted in a staff injury."
- Ribar's "behavior was dangerous and put library staff, resources and equipment in danger."

34. On August 2, 2024, this denial letter was sent to Ribar via email. The PDF file titled "Letter denying Ribar 1st Appeal for 2024 Suspension," bates stamped WC0039-40 is a true and correct copy of the denial letter I sent to Ribar. The PDF file tiled "Aug 2 2024 Email to Ribar – 1st Appeal Denial," bates stamped WC0590 is a true and correct copy of the email that I sent to Ribar informing him that his appeal was denied, and attaching the denial letter.

35. I later learned that Ribar exercised the second-level appeal to Director Scott, which was denied. I also learned that Ribar was exercised his third-level appeal to the Library Board of Trustees ("LBOT"), which would require me to present information to the LBOT during a public meeting.

36. On August 21, 2024, the LBOT heard Ribar's appeal. Ribar, Jonnica Bowen, and I were present. Ribar and I both provided five-minute statements to the LBOT, and both answered questions from LBOT members. Ribar's statements to the LBOT including reading a definition of libel, saying the ACLU was after him, describing himself as a "First Amendment Auditor" and member of the press, claiming his YouTube channel has

1  "several million views," describing a legal "but-for" test, telling the LBOT that he was
2  "feeling very litigious," that he records "to make change," claiming Nguyen "violently took
3  the door," claiming Library closures violate the law, etc. The LBOT expressed confusion
4  regarding the actual basis for his appeal of the underlying facts. Ribar claimed various
5  things, including that the staff injury was a "false accusation." The LBOT asked Ribar if
6  there was "something else [he] want[s] to say, because [his] five minutes was not used to
7  rebut the contention of the library staff that lead to [his] suspension." This gave him an
8  additional opportunity to provide the LBOT with any information to support his appeal,
9  despite his prior irrelevant rantings. Ribar then claimed that a Reno Police Sergeant told
10 him the Library was open for him to go into. A LBOT member confirmed Ribar did not
11 have a child with him, and that a sign on the door informed him that the Library was
12 closed. After questioning, Ribar confirmed, "My foot was definitely in the door" at the
13 North Valleys Library RainbowFest event. The LBOT Board Chair explained, "This
14 suspension is based on a very small moment in time where an actual injury was received by
15 a librarian [Ribar attempted to object to the Chair's statement, who informed Ribar that it
16 was not a courtroom]."

17   37. The LBOT then passed a motion to deny the appeal and uphold Ribar's one-year
18 suspension during the meeting. In so doing, the LBOT informed Ribar that his suspension
19 was for one year, effective from the date of issuance.

20   38. The PDF titled "August 2024 Library Board of Trustee Meeting Minutes," bates
21 stamped WC0143, WC1046-47 contains a true and accurate copy of the relevant portions
22 of the Minutes for the August 21, 2024 Library Board of Trustees Meeting where Ribar's
23 suspension was upheld.

### Ribar's November 2024 Library Visit

25   39. In November 2024, Ribar was still suspended from the Library. This means that he
26 was prohibited from going into any Library for any reason, other than to attend a public
27 meeting under Nevada's Open Meeting Law.

40. On November 12, 2024, I received a message from Librarian Jennifer Cole, who was managing the South Valleys Library that day. She reported that Ribar was present and refusing to leave the building. I instructed her to call law enforcement to assist her.

41. Within the hour, Jennifer Cole told me that law enforcement had questions regarding the suspension. I then spoke to Washoe County Sheriff's Sergeant Gomez on the phone. I informed Sergeant Gomez that Ribar *was* served with notice of his suspension and other paperwork in person and via mail in June 2024, Ribar appealed the suspension to me, which was denied through a detailed letter sent to Ribar explaining the bases for the denied appeal. I informed Sergeant Gomez that Ribar then appealed his suspension to the Library Director Jeff Scott who denied that appeal, and Ribar was sent written notice that second appeal was denied. I also told Sergeant Gomez that Ribar then exercised a third appeal to the Library Board of Trustees, and finally, in August 2024, the Library Board of Trustees upheld Ribar's Library suspension.

_____
STACY McKENZIE

12