LINDSAY LIDDELL
Deputy District Attorney
Nevada State Bar Number 14079
COBI BURNETT
Deputy District Attorney
Nevada State Bar Number 16505
One South Sierra Street
Reno, NV 89501
lliddell@da.washoecounty.gov
cburnett@da.washoecounty.gov
(775) 337-5700
ATTORNEYS FOR WASHOE COUNTY DEFENDANTS

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

DREW RIBAR,

    Plaintiff,

vs.

WASHOE COUNTY, et al.

    Defendants.

Case No. 3:24-CV-00526-ART-CLB

**WCSO DEFENDANTS' MOTION TO DISMISS**

**(ECF No. 65-1)**

Deputy "Rothkin" (Rothgeb), Deputy Sapida, Sgt. Gomez, and Washoe County ("WCSO Defendants") hereby move to dismiss Plaintiff's First Amended Complaint ("FAC") (ECF No. 65-1).[1] This motion is based on FRCP 12(b)(6), the following Memorandum of Points and Authorities and all pleadings and papers on file.

//

//

//

//

---

[1] This Motion is filed on behalf of the above-named WCSO Defendants. Washoe County joins as a moving party to the extent the claims against Washoe County arise out of claims against Deputy Rothgeb, Deputy Sapida, or Sergeant Gomez. The library employee defendants who have appeared in this case will separately move to the dismiss the FAC, and the County will join that motion as it relates to those defendants.

-1-

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    I.INTRODUCTION**

Plaintiff Drew Ribar ("Ribar"), using ChatGPT,[2] carries his scheme of harassing government employees into the courtroom. The original Washoe County Defendants and Ribar participated in discovery, which closed in June 2024, and was followed by the original Washoe County Defendants expending substantial resources briefing a summary judgment motion. During summary judgment briefing in August 2025, this Court granted Ribar's March 2025 Motion for Leave to Amend, superseding the original complaint and mooting the motion for summary judgment. Nevertheless, the FAC does not resolve any of the original Complaint's insufficiencies and only adds more defendants and more baseless claims to this case.

Ribar's claims against the WCSO Defendants arise from an incident in November 2024 at the South Valleys Library. Ribar's previous Library suspension was upheld in August 2024. Then, in November 2024, Ribar appeared at the South Valleys Library where he harassed staff, refused to leave, asked staff to trespass him so that he could have more standing" for the instant case, and resulted in the on-duty librarian calling 911. The WCSO Defendants responded to the call for service to investigate a possible trespass. Deputy Sapida and Sergeant Gomez requested Ribar's identification ("ID") card, while Deputy Rothgeb investigated the matter with Library staff. Ultimately, the WCSO Defendants found that Ribar was validly suspended from the Library, but let him off with a warning. Now, Ribar is suing the WCSO Defendants for a myriad of frivolous claims.

The FAC fails to state a claim upon which relief can be granted. Ribar attached thirty-two (32) exhibits to his FAC, including several videos of incidents. The FAC fails to plausibly allege any claim. The exhibits attached thereto show that leave to amend is futile, and the Court should dismiss all claims against the WCSO Defendants with prejudice.

---

[2] *See, e.g.* (ECF No. 64-6 at p. 27); Ribar's YouTube video titled "How to Sue the Government Yourself," available at https://www.youtube.com/watch?v=y8gqaNZELpg.

## II. FACTUAL BACKGROUND

On November 12, 2024, Ribar entered the South Valleys Library and antagonized staff to "trespass him." *See* (ECF No. 71-1 at 0:01:38, 0:18:01–21:09). Ribar explained to Defendant Cole, the librarian in charge, that he "want[e]d" or "need[ed]" to be trespassed, "because [he's] going to file a federal lawsuit," and he "just want[ed] to have more standing." *See* (ECF No. 71-1 at 0:18:20–28). Defendant Cole asked him to leave based on the suspension, but he refused. *Id.* at 0:05:00–06:26. She then asked him to wait by the front door, but Ribar again refused. *See id.* at 0:08:52–09:00.

Defendant Cole called law enforcement to report that Ribar had been trespassed and was refusing to leave. *See* (ECF No. 71-1 at 0:18:00–19:35). When Defendant Cole located Ribar's suspension record, Ribar responded with admittance, stating, "Yeah, I'm restricted from the Library for a year." *Id.* at 0:18:01–09.

Outside the Library, Defendants Deputy Sapida, Deputy Rothgeb, and Sergeant Gomez arrived in response to the 911 call. *See* (ECF No. 71-1 at 0:26:12–31:21). Deputy Sapida asked for Ribar's ID, and Ribar did not comply and instead asked whether Deputy Sapida had reasonable cause. *Id.* at 0:29:26–31:07. Deputy Sapida informed Ribar that they were contacting him for a "call for about a trespass." Ribar spoke over Deputy Sapida, stating, "Yeah, but, do you have reasonable articulable suspicion that I committed a crime?..." Deputy Sapida explained he was looking into a possible trespass and that Nevada law requires that he provide his ID. *Id.* Ribar told Deputy Sapida he would only provide his ID card "under threat of arrest." *Id.* Ribar claimed he was not being argumentative yet continued to argue with Deputy Sapida regarding his perception of the constitution and his belief regarding whether he was required to confirm his identification. *Id.* Defendant Sergeant Gomez stepped in and informed Ribar that he had to provide his "ID, please." *Id.* at 0:31:08–59. Sergeant Gomez explained that the deputies were doing a lawful investigation and explained Ribar was required to provide his ID for their investigation. *Id.* Ribar ultimately complied and provided his ID card. *Id.*

1   Ribar informed the WCSO Defendants that he has ongoing lawsuits, he intends to
2   sue Washoe County, and "this will just add to it or not add to it." (ECF No. 71-1 at 0:32:52–
3   33:09). Discussing his presence at the South Valleys Library in relation to filing the instant
4   case, Ribar explained, "I'm just building up the lawsuit by coming here and asking
5   questions." (ECF No. 71-1 at 0:38:42–52).

6   After Deputy Rothgeb investigated the matter inside the Library, he informed Ribar
7   that was he "officially trespassed" and that he could not access Library services. (ECF No.
8   71-1 at 0:38:27–51). Ribar then argued with Deputy Rothgeb, claiming he was not accessing
9   Library services, and that he was "accessing [his] press rights." *Id.* He claimed not to know
10  whether he was restricted from the Library, despite acknowledging to the Librarian inside
11  that "I'm restricted for a year" minutes earlier, and soon after acknowledging this to the
12  WCSO Defendants. *See id.* at 0:37:44–38:42.

13  To assist Ribar in his professed confusion, Sergeant Gomez explained to Ribar that
14  he would obtain clarification regarding the trespass inside the Library. (ECF No. 71-1 at
15  39:013–20).  Importantly, Sergeant Gomez informed Ribar that he was not under detention,
16  but Sergeant Gomez would bring him more information on the contours of the suspension
17  if he waited. *Id.* While they waited, Ribar asked Deputy Sapida his age. *Id.* at 0:59:30–40.
18  Ribar told Deputy Sapida, who is Filipino, "Asians always look younger than you are." *Id.*
19  Sergeant Gomez returned from speaking to Library staff and explained to Ribar that his
20  suspension was upheld after Ribar appealed. When Ribar questioned Sergeant Gomez
21  whether he was "restricted or trespassed," Sergeant Gomez explained that he was
22  trespassed. Ribar then attempted to antagonize Sergeant Gomez about restricting his press
23  rights and the Constitution. *Id.* at 1:05:15–09:46. Ribar was eventually given a "trespass
24  warning," and then left. *Id.* at 1:11:07–25. Ribar was not arrested. *See id.*
25  //
26  //
27  //

-4-

Ribar now sues the WCSO Defendants for violation of the First Amendment, violation of the Fourth Amendment, violation of the Equal Protection Clause, a *Monell* claim, Conspiracy, violation of the Nevada Constitution, intentional infliction of emotional distress, and defamation. (ECF No. 65-1 at pp. 7–9).

## III.   ANALYSIS AND DISCUSSION

### A.  Legal Standard.

To withstand Rule 12(b)(6), a complaint must contain enough facts to "nudge[] their claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). It must consist of "more than labels and conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2009). When a complaint contains facts that are "merely consistent with" liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Twombly*, 550 U.S. at 557. Further, when allegations do not establish "all material elements necessary to sustain recovery under some viable legal theory," dismissal is appropriate. *Stevo Design, Inc. v. SBR Marketing Ltd.*, 2013 WL 308996, at *4 (D. Nev. Jan. 25, 2013) (quoting *Twombly*, 550 U.S. at 562). The Court need not accept as true allegations that contradict documents attached to the complaint or incorporated by reference. *In re Giliad Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### B.  Ribar Fails to State First Amendment and Nevada Constitution Claims.

In Count I, Ribar alleges that all defendants violated his First Amendment rights by censoring his speech, blocking him from the Library's social media, and excluding him from libraries. (ECF No. 65-1 at p. 7 lns. 14–19). In Count VIII, Ribar alleges "All Defendants" "violated [his] speech and petition rights" under Article 1, Sections 9 and 10 of the Nevada Constitution. *Id.* at p. 8 lns. 20–23. He includes no specific relevant allegations to support these claims against the WCSO Defendants. *See* (ECF No. 65-1).

To determine whether an exclusion violated the First Amendment, courts must look to (1) whether the speech is "protected by the First Amendment;" (2) "the nature of the

forum;" and (3) whether the government's "justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). The Nevada Constitutional claims are analyzed under the federal constitutional standards. *See Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 597 fn. 5 (9th Cir. 2010); Nev. Const. Art. 1, 9 & 10 (providing no greater protection to speech or assembly activity than the First Amendment of the United States Constitution).

"Under Ninth Circuit law, the First Amendment is not a license to trespass." *Devi v. Sacramento Bhartiya Sabha*, 2:24-cv-00689-DJC-CKD, 2025 WL 1294944, at *6 (E.D. Cal. May 5, 2025). "[T]he Ninth Circuit has held that premises are not open to the public with regard to a particular individual when that person has previously been barred from the property." *James v. City of Long Beach*, 18 F.Supp.2d 1078, 1085 (C.D. Cal. 1998). The First Amendment is not implicated when an individual has been banned from public property and ignores the ban to enter the property for some purported free speech purpose. *See Virginia v. Hicks*, 123 S. Ct. 2191, 2198–99 (2003). The unexpressive conduct—entry onto property in violation of a suspension—not speech, serves the basis for law enforcement intervention. *See id.*

The First Amendment does not grant journalists, whether self-described or actual members of the objective reporting press, any additional or special right to access information or locations over the general public. *See Pell v. Procunier*, 417 U.S. 817, 833 (19874); *Branzburg v. Hayes*, 408 U.S. 665, 684–85 (1972). Though Ribar refers to his antagonistic behavior, ambush theater, and manufactured YouTube videos as "journalism," this label does not grant him or anyone else a license to trespass. *See id.*

The WCSO Defendants did not offend Ribar's First Amendment rights. As an initial matter, Ribar inappropriately states claims against "All Defendants." (ECF No. 65-1 at pp. 6–7). In a Section 1983 claim, a plaintiff cannot hold an employee liable because of their membership in a group without showing individual participation in the unlawful conduct. *Chuman v. Wright*, 6 F.3d 292, 294 (9th Cir. 1996). Dismissal is appropriate where a claim is

1  "based on conclusory allegations and generalities, without any allegation of the specific
2  wrongdoing by each Defendant." *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012); *see
3  also Peck v. Montoya*, 51 F.4th 877, 889 (9th Cir. 2022). Dismissal of Counts I and VIII would
4  be appropriate for the WCSO Defendants solely due to Ribar's failure to include any First
5  Amendment allegations against each of them.

6      Next, the interaction between Ribar and the WCSO Defendants cannot plausibly
7  form the basis of any First Amendment claim. Ribar had no First Amendment right to enter
8  a Library during his suspension. His conduct in violating the suspension and appearing at a
9  Library to "get standing" for the instant case was not protected by the First Amendment.
10 The WCSO Defendants' response to a 911 call for trespassing and subsequent investigation
11 does not have "anything to do with the First Amendment." *See Virginia*, 123 S. Ct. at
12 2198–99. Ribar's video exhibit of the interaction with the WCSO Defendants further shows
13 that any amendment would be futile. (ECF No. 71-1 at 0:25:37–1:11:11). The Court should
14 dismiss the First Amendment claim with prejudice as to the WCSO Defendants.

15     **C. Ribar's Fourth Amendment Claim Fails.**

16     In Count II, Ribar alleges "Defendants assaulted" him, and "detained him without
17 suspicion." (ECF No. 65-1 at p. 7 at lns. 20–25). Ribar does not allege who assaulted or
18 detained him. *See* (ECF No. 65-1). The video exhibit shows there was absolutely no assault
19 from the WCSO Defendants, and that the only near contact was handing over and returning
20 Ribar's ID card. *See* (ECF No. 71-1 at 0:31:08–59, 0:36:57–58). The assault portion of Count
21 II should be dismissed with prejudice as to the WCSO Defendants because the FAC's video
22 exhibit shows there can be no possible Fourth Amendment violation on that theory. *See id.*

23     "There is no constitutional right to be free from threats of arrest; an actual civil rights
24 violation must occur before a cause of action arises under § 1983." *Sharkey v. Duke*, No. 2:23-
25 cv-00449-CDS-DJA, 2024 WL 5170821, at *5 (D. Nev. Dec. 19, 2024) (quot. and citations
26 omitted), *appeal dismissed*, No. 24-7801, 2025 WL 947286 (9th Cir. Mar. 10, 2025). There is
27 likewise "no constitutional right not to be investigated by law enforcement for suspected

violations of law." *Spreadbury v. Bitterroot Pub. Libr.*, 862 F.Supp.2d 1054, 1057 (D. Mont. 2012); *see also United States v. Trayer*, 898 F.2d 805, 808 (D.C. Cir. 1990) ("But, of course, there is no constitutional right to be free of investigation.").

For a Fourth Amendment claim, plaintiff must prove he was seized, meaning a government actor "terminated his freedom of movement through means intentionally applied." *Tajalle v. City of Seattle*, C07-1507Z, 2008 WL 630061, at *4 (W.D. Wash. Mar. 7, 2008). He must then show he was seized in a way that was not "objectively reasonable." *Id.* Nevertheless, a seizure only exists "if in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*. 446 U.S. 544, 554 (1980). For example, there was no seizure where officers approached a plaintiff in public, did not display weapons, touch him, or restrain him in any way. *U.S. v. Brown*, 884 F.2d 1309, 1311 (9th Cir. 1989).

Traditionally, asking questions is an essential part of police investigations, and as such, an investigating officer may ask an individual for their identification without necessarily implicating the Fourth Amendment. *See INS v. Delgado*, 466 U.S. 210, 216 (1984). Nevada Revised Statute ("NRS") 171.123(3) is a "stop and identify" statute that allows law enforcement to ascertain a suspect's identity and the suspicious circumstances surrounding their presence. Notably, the United States Supreme Court specifically found that Nevada's stop and identify statute "d[oes] not contravene the guarantees of the Fourth Amendment." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 189 (2004).

Here, the WCSO Defendants adhered to the Fourth Amendment in requesting Ribar's ID card and speaking with him. *See* NRS 171.123(3); (ECF No. 71-1 at 0:25:37–1:11:11). In Nevada, it is a crime to willfully go onto or remain "upon any land or in and building after having been warned by the owner or occupant thereof not to trespass." NRS 207.200. A request to leave satisfies the "warned… not to trespass" element. *Scott v. Justice's Court of Tahoe Twp.*, 435 P.2d 747, 749 (Nev. 1968); *see also Solomon v. Las Vegas Metro. Police Dep't*, 23-4166, 2025 WL 1678174, at *2 (9th Cir. June 12, 2025). There was reasonable

suspicion that Ribar committed the crime of trespass. (ECF No. 71-1 at 0:18:00–19:35). Defendant Cole reported that Ribar was suspended from the Library and was refusing to leave despite being trespassed. *Id.* Based on this information, Deputy Sapida and Sergeant Gomez reasonably concluded that Ribar was the man reported to have trespassed. *Id.* Deputy Sapida and Sergeant Gomez's requests to obtain Ribar's ID was, as it was in *Hiibel*, a commonsense inquiry, rather than an "effort to obtain an arrest for failure to identify." *See Hiibel*, 542 U.S. at 178. The request for an ID was to confirm Ribar's identification for purposes of investigating the trespass and does not offend the Fourth Amendment.

Additionally, Ribar was not detained. *See* (ECF No. 71-1 at 0:25:37–1:11:11). He remained free to leave. *Id.* He was never handcuffed, never blocked from leaving, never told he could not leave, and nothing about the interaction objectively shows that a reasonable person would not feel free to leave. *Id.* Nothing about this interaction can plausibly serve the basis as a Fourth Amendment claim. *See id.*

The Court should dismiss with prejudice Ribar's Fourth Amendment claim, Count II. Ribar fails to allege a viable claim, and the video exhibit shows that amendment would be futile. Ribar was not detained, and Deputy Sapida and Sergeant Gomez lawfully requested his ID card.

**D. Ribar Does Not State a Plausible Equal Protection Claim.**

Ribar's Equal Protection claim, Count IV, against the WCSO Defendants wholly fails. A class-of-one equal protection claim can only be stated if defendants intentionally treated a plaintiff differently than other similarly situated individuals and without a rational basis for doing so. *Gerhart v. Lake Cnty., Mont.*, 637 F.3d 1013, 1021 (9th Cir. 2011). A "class-of-one plaintiff must be similarly situated to the proposed comparator in all material respects." *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1123 (9th Cir. 2022).

Here, Ribar does not and cannot allege a viable Equal Protection claim against the WCSO Defendants. He fails to include any allegation that any WCSO Defendant directly treated Ribar differently than any other person. *See* (ECF No. 65-1). The video exhibit of

the WCSO Defendants' interactions with Ribar show he was not treated differently than they would when responding to a call regarding a person at the Library who was violating his suspension. *See* (ECF No. 71-1 at 0:25:37–1:11:11). The video likewise demonstrates there was no intent to treat Ribar any different, as deputies spoke to him, heard his side of the story, and spent additional time with Library staff to get clarification and assist Ribar. *See id.* The Equal Protection Claim against the WCSO Defendants should be dismissed with prejudice because he does not state a viable claim and amendment would be futile.

### E. The Conspiracy Claims Fail.

#### 1. The Section 1983 Conspiracy Claim Fails.

"Conspiracy itself is not a constitutional tort" under Section 1983. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012). "It does not enlarge the nature of the claims asserted by the plaintiff, as there must always be an underlying constitutional violation." *Id.*

Ribar cannot state a viable Section 1983 Conspiracy claim against the WCSO Defendants because there are no underlying constitutional violations as set forth above. The Section 1983 conspiracy claim, Count VI, should be dismissed with prejudice

#### 2. The Section 1985 (3) Conspiracy Claim Fails.

To state a claim under 42 U.S.C. Section 1985, plaintiff must allege "(1) a conspiracy; (2) for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Steshenko v. Gayrard*, 70 F. Supp. 3d 979, 998 (N.D. Cal. 2014). The second element also requires a showing that the deprivation was "motivated by some racial, or perhaps other class-based, invidiously discriminatory animus behind the conspirators' action." *Id.*

Ribar's Section 1985(3) Conspiracy claim, Count VII, against the WCSO Defendants wholly fails. Ribar does not allege that any of the WCSO Defendants' actions were motivated by some racial or other protected class-based animus. *See* (ECF No. 65-1). As set forth above,

there was no deprivation of rights. Additionally, Ribar's video exhibit of the November 2024 interaction demonstrates there was no deprivation of rights, and no action was taken with any animus based on a protected class. *See* (ECF No. 71-1 at 0:25:37–1:11:11). The only protected class animus within the video is from Ribar, who refused to directly provide his ID card to the Filipino Deputy, instead providing it to the Caucasian Sergeant, and who later told the Filipino WCSO Deputy that "Asians always look younger than you are." *Id.* at 0:29:26–31:07, 0:59:30–40. Amendment to this claim would be futile because the video exhibit is uncontroverted evidence that no deprivation nor protected-class animus occurred. Count VII should be dismissed with prejudice as to the WCSO Defendants.

### F. The *Monell* Claim Fails as to the WCSO Defendants.

Local governments may be liable under Section 1983 in limited circumstances, referred to as a *Monell* claim. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Hong v. Cnty. Of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). But a local government "cannot be held liable solely because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under [Section 1983] under a *respondeat superior* theory." *Monell*, 436 U.S. at 691; *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 984 (9th Cir. 2002). Liability attaches only where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694; *Ulrich*, 308 F.3d at 984. After proving a method of *Monell* liability, Plaintiff must also show that the local government was both the cause in fact and the proximate cause of the constitutional deprivation. *See Harper v. City of L.A.*, 533 F.3d 1010, 1026 (9th Cir. 2008).

Here, the *Monell* claim, Count X, should be dismissed with prejudice as to the WCSO Defendants. There are no constitutional violations, as set forth above, and therefore no *Monell* claim arising from the WCSO Defendants' actions. Even if there were, Ribar's conclusory allegations do not establish a *Monell* claim. He alleges only one incident involving law enforcement, specifically involving WCSO Defendants who clearly lack any

policy making authority. *See* (ECF No. 65-1 at p. 4, lns. 25–26); (ECF No. 71-1 at 0:25:37–1:11:11). The *Monell* claim against Washoe County based on the WCSO Defendant's actions should be dismissed with prejudice.

### G. Deputy Rothgeb, Deputy Sapida, and Sergeant Gomez are Entitled to Qualified Immunity.

Section 1983 liability can attach only if Plaintiff provides that an officer (1) caused a deprivation of plaintiff's rights while acting under the color of state law, and (2) the officer is not entitled to qualified immunity. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Qualified immunity protects government officials so long as their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Baker v. Racansky*, 887 F.2d 183, 186 (9th Cir. 1989).

Qualified immunity protection is "ample." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It shields "all but the plainly incompetent or those who violate the law." *Id.* It applies "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted).

Courts can decide which of the two prongs for the qualified immunity test to analyze first. *Pearson*, 555 U.S. at 236. If the alleged facts do not show conduct in violation of a constitutional right, or if that right was not clearly established at the time the alleged events occurred, the defendant is immune from suit. *Id.* at 243–45. A court can review the second prong without requiring discovery–whether the right was clearly established at the time of the violation. *See id.* at 238–39 (permitting courts to proceed to prong two at the pleading stage where it might be difficult to determine existence of a constitutional violation on facts pled); *see also C.V. v. City of Anaheim*, 823 F.3d 1252, 1257 (9th Cir. 2016) (holding that an officer was entitled to qualified immunity because it was not "clearly established that use of deadly force violated the Fourth Amendment, even though there was a triable dispute whether deadly force did in fact violate the Fourth Amendment), *cert. denied sub nom.*

In 2017, the U.S. Supreme Court "reiterate[d] the longstanding principle that clearly established law should not be defined at a high level of generality;" instead, it "must be particularized to the facts of the case." *White v. Pauley*, 137 S. Ct. 548, 552 (2017). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 136 S. Ct. 305, 308(2015) (per curium) (internal quot. and cit. omitted).

Here, Deputy Rothgeb, Deputy Sapida, and Sergeant Gomez are entitled to qualified immunity on the federal constitutional claims. No case addresses the particular circumstances of this case with respect to Ribar and the WCSO Defendants in a Section 1983 action. There is no clearly established law precluding law enforcement from investigating a possible trespass and requesting an ID card from an individual who was banned from the library for a year after his suspension was upheld at a public hearing, and where that individual later appears at a library during the suspension period refusing to leave. There is likewise no clearly established law preventing law enforcement from providing a trespass warning to that same individual. Moreover, given existing law permitting law enforcement to "stop and identify" a suspect, it would not be clear to a reasonable officer that their conduct in requesting Ribar's ID was unlawful.

WCSO Defendants performed a comprehensive search and could not locate any cases involving the Fourth Amendment, First Amendment, or Equal Protection Clause with facts similar to this case such that a reasonable officer would be on notice that any conduct was unlawful. Therefore, qualified immunity is appropriate as a matter of law for the First Amendment claim (Count I), Fourth Amendment claim (Count II), the Equal Protection claim (Count IV), and the Conspiracy claims (Counts VI and VII). These claims should be dismissed as to the WCSO Defendants.

//

//

1  **H. Ribar's Intentional Infliction of Emotional Distress Claim Fails.**

An intentional infliction of emotional distress ("IIED") claim cannot be based on "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Candalore v. Clark Cnty. Sanitation Dist.*, 975 F.2d 588, 591 (9th Cir. 1992). It instead requires "(1) extreme and outrageous conduct on the part of the defendant; (2) intent to cause emotional distress or reckless disregard for causing emotional distress; (3) that the plaintiff actually suffered extreme or severe emotional distress; and (4) causation." *Miller v. Jones*, 970 P.2d 571 (Nev. 1998). Extreme or outrageous conduct is conduct "outside all possible bounds of decency" and is deemed "utterly interoperable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998).

Ribar's own video exhibit of the interaction with the WCSO Defendants demonstrates there was no extreme or outrageous conduct. *See* (ECF No. 71-1 at 0:25:37–1:11:11). Instead, the video reflects law enforcement responding to a trespass call with extreme civility and patience for Ribar. *See id.* The FAC lacks any allegation that could plausibly state an IIED claim against the WCSO Defendants. *See* (ECF No. 65-1). More importantly, the video exhibit shows that no such allegations can be made. *See* (ECF No. 71-1 at 0:25:37–1:11:11). Nothing about Ribar's interaction with the WCSO Defendants was extreme or outrageous. *See id.* Amendment would therefore be futile. The IIED claim should be dismissed with prejudice as to the WCSO Defendants.

**I. The Defamation Claim against the WCSO Defendants Fails.**

Defamation cannot be based on a statement that is true, substantially true, an opinion, hyperbole, exaggeration, or generalization. *Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 715, 57 P.3d 82, 88 (2002). Defamation requires that there be "(1) a false and defamatory statement by [a] defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault…; and (4) actual or presumed damages." *Id.* 118 Nev. at 706, 57 P.3d at 90. Publication involves communicating the defamatory matter to another person other than the person claiming to be defamed. *Simpson v. Mars Inc.*, 929 P.2d 966,

967 (Nev. 1997). Communication between employees is not publication. *M & R Inv. Co., Inc. v. Mandarino*, 748 P.2d 488, 491 (Nev. 1987).

In Count XII, Ribar alleges a defamation claim against "All Defendants," specifically alleging that "Defendants falsely accused Plaintiff of misconduct (Exhibit 24), harming his reputation." (ECF No. 65-1 at p. 9, lns. 6–7). There are no allegations of any statements made by the WCSO Defendants in the FAC. *See* (ECF No. 65-1). The exhibit referenced within Ribar's defamation claim is an unofficial A.I.-generated "transcript" of the August 2024 Library Board of Trustees ("LBOT") meeting. *See* (ECF No. 70-3); *see also* (ECF No. 71) (video of the August 2024 LBOT meeting). No WCSO Defendants were present or spoke at the 2024 LBOT meeting. *Id.* To the extent Ribar's Defamation claim against WCSO is based on the August 2024 LBOT meeting, that claim fails because WCSO did not make any statements, false or otherwise, at that meeting. *See id.*

To the extent Ribar's Defamation claim against the WCSO Defendants is based on the November 2024 South Valleys incident, that claim also fails. There were no false statements of fact made by any WCSO Defendant. *See* (ECF No. 71-1 at 0:25:37–1:11:11). Additionally, all statements were either between Washoe County employees or were made to Ribar, and thus there was no publication. *See id.* The only known potentially defamatory statement involving WCSO Defendants was *made by Ribar, not the WCSO Defendants*—Ribar published an edited YouTube video of the November 2024 interaction with WCSO Defendants, displaying the words "LUNATIC LIBRARIANS & DEPUTIES." (ECF No. 64-6 at p. 7). The November 2024 incident, which Ribar filmed, does not form the basis for any plausible defamation claim against the WCSO Defendants. Therefore, the Court should dismiss the Defamation claim, Count XII, as to the WCSO Defendants with prejudice.

**J. The WCSO Defendants are Entitled to Discretionary Act Immunity for the State Law Claims.**

Under Nevada law, no action may be brought against a public employee or political subdivision "[b]ased upon the exercise or performance or the failure to exercise or perform

a discretionary function or duty…whether or not the discretion involved is abused." NRS 41.032(2). There is "a two-part test for determining whether a discretionary-function immunity under NRS 41.032 applies to shield a defendant from liability, "which looks to whether "the decision (1) involves an 'element of individual judgment or choice,' and (2) is 'based on considerations of social, economic, or political policy.'" *Clark Cnty. Sch. Dist. v. Payo*, 403 P.3d 1270, 1276 (Nev. 2017) (citations omitted).

For a law enforcement agency "to come within the discretionary function exception, the challenged decision need not actually be grounded in policy considerations so long as it is, by nature, susceptible to a policy analysis." *Paulos v. FCHI, LLC*, 136 Nev. 18, 26 (2020) (citing *Vickers v. United States*, 228 F.3d 944, 950–51 (9th Cir. 2000); *United States v. Gaubert*, 499 U.S. 315, 325 (1991) ("The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute of regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."). "Whether to detain or arrest a suspect and how to do so are discretionary functions." *Napouk v. Las Vegas Metro. Police Dep't*, 669 F. Supp. 3d 1031, 1047 (D. Nev. 2023); *see also Gonzalez v. United States*, 814 F.3d 1022, 1033 n.4 (9th Cir. 2016) ("Even if the FBI negligently conducted an investigation, that does not detract from the fact that the manner of conducting an investigation … is rife with discretion and policy judgment and not appropriate for judicial review in a tort action.)

Additionally, discretionary act immunity specifically precludes actions for negligent hiring, training, and supervision. *Paulos*, 456 P.3d at 596; *Neal-Lomax v. Las Vegas Metro Police Dep't*, 574 F.Supp. 2d 1170, 1192 (D. Nev. 2008) ("Because Nevada looks to federal case law to determine the scope of discretionary immunity, and because federal case law consistently holds training and supervision are acts entitled to such immunity, [Defendant] is entitled to discretionary immunity…"). The Nevada Supreme Court clarified in *Paulos,* that Nevada law precludes claims for negligent hiring, training, and supervision against government defendants. 456 P.3d at 596.

//

Here, even if the claims did not otherwise fail, the WCSO Defendants are entitled to discretionary act immunity on the following claims arising under Nevada state law: Count VIII, the Nevada Constitution claim; Count XII, Defamation; and Count XIII, Negligence/Negligent Supervision. The WCSO's decisions regarding how to investigate Ribar, whether he was the suspect from the trespass call, what words to use when speaking with him, whether to request his ID to confirm his identity, whether to assist him in getting clarification on his suspension, and ultimately whether to arrest or simply let him off with a warning all involved elements of judgment or choice and are susceptible to policy considerations. Even if Ribar could otherwise allege plausible claims against the WCSO Defendants under the Nevada Constitution for defamation, or negligence, those claims would be barred under Nevada law.

Additionally, Ribar's Count XIII against Washoe County for negligent hiring, training, and supervision should be dismissed with prejudice because it is barred as a matter of law under discretionary act immunity. *Paulos*, 456 P.3d at 596. Ribar's negligence/negligent supervision claim is not cogent, but even if it was, it would fail as a matter of law. The Court should dismiss Count XIII against WCSO Defendants based on discretionary act immunity.

To the extent the Court would otherwise permit Ribar to amend his claims against the WCSO Defendants for a third time, it should not. Discretionary act immunity precludes Ribar's state law claims against the WCSO Defendants and serves as an additional basis to dismiss the state law claims with prejudice.

//
//
//
//
//
//

## V. CONCLUSION

The Court should dismiss the FAC with prejudice against the WCSO Defendants. All claims against the WCSO Defendants are baseless, and Ribar's video of the interaction demonstrates that amendment would be futile.

Dated this 15th day of August, 2025.

By   /s/ Lindsay Liddell
LINDSAY LIDDELL
Deputy District Attorney
COBI BURNETT
Deputy District Attorney

ATTORNEYS FOR WASHOE COUNTY DEFENDANTS

# CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I certify that I am an employee of the Office of the District Attorney of Washoe County, over the age of 21 years and not a party to nor interested in the within action. I certify that on this date, I deposited for mailing in the U.S. Mails, with postage fully prepaid, a true and correct copy of the foregoing document in an envelope addressed to the following:

DREW RIBAR
3480 PERSHING LANE
WASHOE VALLEY. NV 89704

I certify that on this date, the foregoing was electronically filed with the United States District Court. Electronic service of the foregoing document shall be made in accordance with the Master Service List as follows:

DREW RIBAR

ALISON R. KERTIS, ESQ.

Dated this 15th day of August, 2025.

                                          /s/ S. Haldeman
                                          S. Haldeman