1  LINDSAY LIDDELL
   Deputy District Attorney
2  Nevada State Bar Number 14079
   COBI BURNETT
3  Deputy District Attorney
   Nevada State Bar Number 16505
4  One South Sierra Street
   Reno, NV 89501
5  lliddell@da.washoecounty.gov
   cburnett@da.washoecounty.gov
6  (775) 337-5700
   ATTORNEYS FOR WASHOE COUNTY
7  DEFENDANTS

                    **UNITED STATES DISTRICT COURT**
8
                         **DISTRICT OF NEVADA**
9
                                 * * *
10 DREW RIBAR,

11            Plaintiff,                Case No.  3:24-CV-00526-ART-CLB

12     vs.                              <u>**DEFENDANTS SCOTT,**</u>
                                        <u>**MCKENZIE, AND BOWEN'S**</u>
13 WASHOE COUNTY, et al.                <u>**MOTION TO DISMISS**</u>

14            Defendants.               <u>**(ECF No. 65-1)**</u>
   _____/
15

16        Jeff Scott ("Director Scott"), Stacy McKenzie, Jonnica Bowen, and Washoe County

17 hereby move to dismiss Plaintiff Drew Ribar's ("Ribar") First Amended Complaint

18 ("FAC") (ECF No. 65-1). This motion is based on FRCP 12(b)(6), the following

19 Memorandum of Points and Authorities and all pleadings and papers on file.

20              **MEMORANDUM OF POINTS AND AUTHORITIES**

21 **I.  INTRODUCTION**

22        Ribar is a chronic provocateur who has now spilled his scheme into federal court

23 after he earned a one-year suspension from the Library.  He is not a bystander passively and

24 quietly filming government officials. He interrupts, antagonizes, escalates, vexes, and

25 distorts rather than clarifies.[1] For a consecutive timeline of events, Defendants Scott,

26 McKenzie, and Bowen refer the Court to the now moot Motion for Summary Judgment

27

---

[1] *See e.g.* (ECF No. 70-6 at 0:01:20–03:32; 0:32:12–54; :37:16–40:15; 0:49:10–50:01) (ECF No. 70-7 at
0:27:27–36; 0:32:41–37:00; 0:47:39–49:16); (ECF No. 70-8 at 0:13:29–14:34, 0:16:29–29:09, 0:51:02–12,
1:09:05–1:13:13); (ECF No. 71-1 at 0:05:00–06:26; 0:07:17–09:00; 0:18:01–21:09).

(ECF No. 99), which used many of the same exhibits as the FAC.[2] In his sprawling FAC, Ribar attempts to allege thirteen claims against the moving Defendants. *See* (ECF No. 65-1). None of the claims are viable. Defendants acted within the confines of the law when addressing Ribar's disruptive behavior as set forth in detail below.

The Court should end Ribar's current campaign of using litigation for the improper purpose of harassment, and dismiss his claims against Defendants Scott, McKenzie, Bowen, and Washoe County with prejudice. The FAC's exhibits and documents, subject to judicial notice, show that Ribar's claims, whether constitutional or state torts, are baseless and amendment is futile.

## II. ANALYSIS AND DISCUSSION

### A. Legal Standard.

To withstand Rule 12(b)(6), a complaint must contain enough facts to "nudge[] their claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). It must consist of "more than labels and conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2009). When a complaint contains facts that are "merely consistent with" liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Twombly*, 550 U.S. at 557. Further, when allegations do not establish "all material elements necessary to sustain recovery under some viable legal theory," dismissal is appropriate. *Stevo Design, Inc. v. SBR Marketing Ltd.*, 2:11-cv-00304-LRH-CWH, 2013 WL 308996, at *4 (D. Nev. Jan. 25, 2013) (quoting *Twombly*, 550 U.S. at 562). The Court need not accept as true allegations that contradict documents attached to the complaint. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Additionally, the Court may take judicial notice of documents filed in court. *Harris*

---

[2] Ribar's FAC videos were also attached to the MSJ: the 2023 Downtown Library video is (ECF No. 70-6) and (ECF No. 99-10); the 2023 Sparks Library video is (ECF No. 70-7) and (ECF No. 99-12); the 2024 North Valleys Library video is (ECF No. 70-8) and (ECF No. 99-22); the 2024 Downtown Library video is (ECF No. 70-9) and (ECF No. 99-31); the August 2024 Library Board of Trustees video is (ECF No. 71) and (ECF No. 99-37); and the 2024 South Valleys Library video is (ECF No. 71-1) and (ECF No. 99-40).

1   *v. Cnty. of Orange*, 682 F.3d 1126, 1254 (9th Cir. 2013); *see also Reyn's Pasta Bella, LLC v. Visa*

2   *USA, Inc.*, 442 F.3d 741, 746, n.6 (9th Cir. 2006) (taking judicial notice of pleadings,

3   memoranda, and other court filings); *Santa Monica Food Not Bombs v. City of Santa Monica*,

4   450 F. 3d 1022, 1025 n.2 (9th Cir. 2006) (taking judicial notice of government documents as

5   public records). Defendants Scott, McKenzie, and Bowen respectfully request that the Court

6   take judicial notice of the following filings: the Library's Code of Conduct Policy (ECF No.

7   99-1); Library's "Adult Use of Youth Patron Areas Policy" (ECF No. 99-4); a 2023

8   RainbowFest announcement (ECF No. 99-7); Washoe County's and the Library's social

9   media policies (ECF Nos. 99-16, 99-18); the Library's social media blocked user record,

10  Ribar's Facebook comment record, and emails regarding blocking Ribar's accounts (ECF

11  Nos. 99-19, 99-20, 99-21); the Library's Suspension Policy (ECF No. 99-29); the

12  Notification of Suspension report for Ribar (ECF No. 99-30); Ribar's suspension appeal

13  form (ECF No. 99-32); the email to Ribar attaching a PDF of the letter denying Ribar's first

14  suspension appeal and the letter itself (ECF Nos. 99-33, 99-34); the email to Ribar attaching

15  a PDF of the letter denying Ribar's second suspension appeal and the letter itself (ECF Nos.

16  99-35, 99-36). These records are both public records and filed into this case. Notably, Ribar

17  does not dispute these records. *See* (ECF No. 103). Therefore, the Court should take judicial

18  notice and may do so without converting the instant Motion to Dismiss.

19  **B. Ribar Fails to State First Amendment and Nevada Constitution Claims.**

20       In Count I, Ribar alleges that "all defendants" violated his First Amendment rights

21  by censoring his speech, blocking him from the Library's social media, and excluding him

22  from libraries. Count I cites an irrelevant email "Exhibit 3" (ECF No. 68-2) discussing

23  Director Scott and a drag queen possibly participating in an interview with KUNR

24  regarding Drag Story Hour.. It also cites video exhibits of RainbowFests in 2023 and 2024

25  (ECF Nos. 70-6, 70-7, 70-8, 70-9). In Count VIII, Ribar alleges "All Defendants" "violated

26  [his] speech and petition rights" under Article 1, Sections 9 and 10 of the Nevada

27  Constitution. *Id.* at p. 8 lns. 20–23.

1

2

###     i.    Ribar was Lawfully Excluded from the Library's Children's Areas and Story Hour Rooms, and Eventually from the Entire Library.

3

4      The parties agree that the Library and its internal areas are limited forums. *See* (ECF

5   No. 99 at pp. 16–17); (ECF No. 103 at p. 4 lns. 20–21) (Ribar stating that libraries are limited

6   forums where restrictions must be viewpoint neutral); *Kreimer v. Bureau of Police for Town of*

7   *Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992). "In such a forum, a government entity may

8   impose restrictions on speech that are reasonable and viewpoint neutral." *Pleasant Grove City,*

9   *Utah v. Summum*, 555 U.S. 460, 469–70 (2009). "[T]he Library is obligated only to permit

10  the public to exercise rights that are consistent with the nature of the Library and consistent

11  with the government's intent" in designating it as a limited forum. *Kreimer*, 958 F.2d at 1261.

12  "Liberty interests of the individual must yield to the health and safety interests of the

13  community." *Branch-Noto v. Sisolak*, 576 F. Supp. 3d 790, 798 (D. Nev. 2011), *appeal dismissed*,

14  21-1711, 2022 WL 17972184 (9th Cir. Nov. 30, 2022). "[A] library's enforcement powers

15  are at their peak when protecting the security of its staff or other patrons." *Van Den Heuval*

16  *v. Dorothy*, No. 2:21-cv-2176, 2022 WL 95237, at *3 (E.D. Cal. Jan. 10, 2022).

17      There are many documented unsafe incidents involving adults in library children's

18  sections. *See, e.g.*, *People v. Bywater*, 320338, 2015 WL 2448684, at *2–3 (Mich. Ct. App. May

19  21, 2015) (entering the children's area, luring five and seven-year-old girls from the children's

20  section into the stairwell and sexually assaulting them); *Com. v. Gorassi*, 432 Mass. 244, 250

21  (2000) (sexually assaulting a girl in the children's area); *Chapman v. State*, 01-05-00923-CR,

22  2006 WL 3316705, at *3 (Tex. App. Nov. 16, 2006) ("Appellant exposed himself in the

23  children's section …"); *Sokell v. Amsberry*, 2:18-cv-02118-SB, 2022 WL 4586246, at *1 (D.

24  Or. Aug. 30, 2022) (sexual assault on an eight-year-old in children's section).

25      Here, the Library's Code of Conduct Policy applies to any person, or "patron,"

26  visitor. (ECF No. 99-1). It prohibits patron conduct that "disturbs library users or that

27  hinders people from using the Library or library materials," "[b]ehavior that interferes with

28  staff's ability to do their job," and "behavior that could compromise the safety of [the

patron] or staff." *Id.* Patrons must "follow direction/instruction from library staff as issued." *Id.* It also advises that any violation "may result in the suspension of Library privileges." The Library's "Adult Use of Youth Patron Areas Policy" promotes the safety and well-being of children in the Library. (ECF No. 99-4). The policy "reserves the right to restrict adult patron use" within "youth areas" within Libraries. *Id.* "Adult patrons who are not in compliance with this policy may be requested to leave the youth areas." *Id.*

Here, the Library's restrictions on adult patrons in children's areas and story hour rooms are reasonable, viewpoint neutral, and therefore constitutionally sound. *See* (ECF No. 99-4); Ex. 1; Ex. 2. The policy is viewpoint neutral, applying to all patrons regardless of opinion. *Id.* It promotes "the safety and well-being" of children, which is inherently reasonable. *See id.* Story hour rooms are subject to this Policy because they are part of children's events, and the Policy itself promotes safety. *See id.*; (ECF No. 99-7); (ECF No. 70-6 at 0:37:16–40:15); *see also* (ECF No. 99-34 at p. 2). It was also reasonable for the Library to require tickets to Drag Story Hour, promoting safety by ensuring the room remained at an appropriate capacity, and ideally by preventing disruptions to the program from individuals walking in during the performance. *See id.*; Ex. 3.

Moreover, the children's area policy was applied in a viewpoint neutral manner, as demonstrated in the FAC videos. In June 2023, Ribar, Janet Butcher, and another woman were excluded from the children's area because they did not have children with them. *See* (ECF No. 70-6 at 0:37:16–40:15); Ex. 1. After Ribar antagonized staff, the Library eventually permitted Ribar and others to go into the children's area when there were no children present. *See id.* at 0:40:16–43:31. Director Scott explained to Ribar that "no people with children" could attend Drag Story Hour because it is an event *for children*. *Id.* at 0:49:10–50:01. In July 2023, the same policy excluded Ribar from entering the children's area and from attending story hour without a child or ticket. (ECF No. 70-7 at 0:32:41–37:00, 0:47:39–49:16); Ex. 2. In June 2024, Ribar was again excluded from Drag Story Hour for the same reason. Ex. 3; (ECF No. 70-8 at 1:09:05–13:13). The policy was applied in a

viewpoint neutral manner, and individuals with tickets and children were permitted to attend regardless of whether they disagreed with the event, drag queens, or the Library. *See* (ECF No. 70-8 at 0:03:55–04:10) (filming Defendant McKenzie explaining to another person that the Library was closed); 1:32:48–53 (showing drag story hour attendees exiting, which included an adult with a child holding a sign saying, "STOP PERVERTING OUR KIDS"); *see also* Ex. 4. Therefore, the Library's children's area policy and its application to Ribar reflects a reasonable, viewpoint neutral restriction on Library access and is connotationally permissible.

Additionally, to the extent Ribar attempts to state a First Amendment claim arising out of his Library suspension, he fails. As set forth below, the Library maintains reasonable viewpoint neutral code of conduct policies. Ribar violated several portions of policies which gave rise to a valid one-year suspension. *See* (ECF Nos. 99-1, 99-4, 99-29, 99-30, 99-34, 99-36) (ECF No. 71 at 2:22:06–53:31). The suspension was lawful and Ribar does not have a viable First Amendment claim.

The Court should dismiss with prejudice Counts I and VII as to the Library exclusions. The Library, as a limited forum, may restrict access to its property in a way consistent with its purpose. *Kreimer*, 958 F.2d at 1261. The Library's adult-restrictions for children's areas and events reasonably promote safety and are viewpoint neutral. Likewise was to the restriction on Ribar at the 2023 Sparks Library RainbowFest and all other RainbowFests he attended. Lastly, with no constitutional violation, there is no viable *Monell* claim against Washoe County. *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996). Even if Ribar properly plead his claims with individualized allegations for Defendants Scott, McKenzie, and Bowen, and with proper *Monell* allegations for Washoe County, the FAC video exhibits show that Ribar cannot state a viable First Amendment claim. Dismissal with prejudice is therefore warranted.

//

//

1    **1.  Defendants Scott, McKenzie, and Bowen are Otherwise Entitled to
2        Qualified Immunity.**

3        Qualified immunity protects government officials from Section 1983 claims so long
4    as their conduct does not "violate clearly established statutory or constitutional rights of
5    which a reasonable person would have known." *Baker v. Racansky*, 887 F.2d 183, 186 (9th
6    Cir. 1989). Qualified immunity protection is "ample." *Malley v. Briggs*, 475 U.S. 335, 341
7    (1986). A court may decide qualified immunity based on whether the right was clearly
8    established at the time of the violation without requiring discovery. *Pearson v. Callahan*, 555
9    U.S. 223, 238–39 (2009). "[C]learly established law should not be defined at a high level of
10   generality;" instead, it "must be particularized to the facts of the case." *White v. Pauley*, 137
11   S. Ct. 548, 552 (2017).

12       Here, even if there was a constitutional violation, dismissal is still warranted based
13   on qualified immunity. The right for an adult, without a child, to attend a Library's children's
14   areas or children's events is not clearly established, and Defendants could not locate any
15   applicable case on the matter. The right to require tickets to a drag story hour event is likewise
16   not clearly established. The right for a self-proclaimed journalist to gain special access despite
17   such policies is not clearly established. Moreover, it would be reasonable for a Library
18   employee to prohibit adults from children's areas and events as a matter of course because
19   their presence may give rise to safety issues as set forth above. Additionally, as set forth below,
20   the right to access the Library at all is not a clearly established right in the Ninth Circuit.
21   Dismissal based on qualified immunity is appropriate as to Defendants Scott, McKenzie, and
22   Bowen.

23   **ii.  The Library's Facebook Page is a Limited Forum, and Staff Appropriately
24       Applied its Policy to Block Ribar's Accounts.**

25       Government social media accounts that serve a limited purpose for a certain topic
26   are limited public forums when their restrictive policies are enforced. *See Gilley v. Stabin*, 652
27   F. Supp. 3d 1268, 1286 (D. Or. 2023), *vacated in part on other grounds, appeal dismissed in part*,

1   23-35097, 2024 WL 1007480 (9th Cir. Mar. 8, 2024); *see also Krasno v. Mnookin*, 638 F. Supp.

2   3d 954, 968–74 (W.D. Wis. 2022) (finding that a University's Facebook and Instagram pages

3   were limited, or nonpublic, forums based on their policy and sufficient attempts to moderate

4   the pages).

5           The District of Oregon found that a University's Division of Equity Twitter account

6   was a limited public forum based on its publicly posted policy. *Gilley*, 652 F. Supp. 3d at

7   1286. "The guidelines provide that comments within certain categories, including off-topic

8   posts, can be deleted and that users who violate the guidelines can be blocked." *Id.* at 1286.

9   The Court also noted that prior approval for comment posting was not necessary to create

10  a public forum and doubted that such a practice would be a "feasible method of content

11  restriction." *Id.* at 1286–87. Moreover, imperfect enforcement of the policy was not enough

12  to determine there was an "affirmative act to create a designated public forum." *Id.* at 1287.

13  Therefore, the University did not affirmatively open the account as a designated forum, and

14  instead it was a limited public forum whose restrictions must be reasonable and viewpoint

15  neutral. *Id.*

16          Similarly, the D.C. Circuit found that the National Institute of Health's ("NIH")

17  Facebook and Instagram pages were limited public forums. *People for the Ethical Treatment of*

18  *Animals v. Tabak*, 109 F.4th 627, 633–36 (D.C. Cir. 2024). The NIH's policy stated the pages

19  were not intended to serve as public forums, and its stated purposes suggested it was limited

20  solely to the discussion of certain topics concerning NIH functions. *Id.* at 634. Its guidelines

21  further prohibited off-topic posts, endorsements of commercial products, and profane,

22  repetitive, or discriminatory comments. *Id.* NIH's inconsistent or imperfect enforcement

23  arising from manual review was not an affirmative choice to allow violative comments. *Id.*

24  at 635. Moreover, the court found that even though "social media is inherently compatible

25  with expressive activity," after considering NIH's stated purpose, policy, and enforcement,

26  the NIH social media pages were intended only to create a limited forum. *Id.* at 635–36.

27  *//*

Here, the Library's social media pages, including Facebook, are limited public forums. *See* (ECF Nos. 99-16, 99-18, 99-19, 99-20, 99-21). The purpose of the Library's Facebook page is to share information about Library services and events with the public. *See* (ECF No. 99-16 at p. 1). The County maintains a policy regarding its agencies' social media sites, which is publicly posted and informs the public that such platforms are "not a public forum." *Id.* Like in *Tabak*, this demonstrates that there is no intent to create a public forum through the Library's social media pages. 109 F.4th at 634. Facebook users may submit on-topic comments on Library posts. (ECF No. 99-16 at p. 1). Users may not comment with links to third party websites, abusive content, content that promotes, fosters, or perpetuates discrimination based on various protected classes, and/or comments that are "not topically related to the post for which they are made." *Id.* These policy restrictions further show the lack of intent to create a public forum.

Additionally, the Library regularly enforces its social media policy. *See* (ECF No. 99-19). In addition to blocking Ribar's three accounts for repeated violative conduct, it has similarly blocked several other accounts in the past six years. *Id.* Accounts were blocked for repeated comments constituting spamming, for commenting weblinks, for posting content that promoted and/or fostered discrimination based on gender, sexual orientation, and gender identity, and for including abusive language. (ECF No. 99-19 at pp. 2–6). The Library's enforcement of its policy shows that it is a limited public forum.

Next, when a policy applies to all individuals, without drawing a distinction as to its applicability, it is textbook viewpoint neutral. *See Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 130 S. Ct. 2971, 2993 (2010). Additionally, a policy prohibiting "off-topic" comments "is a reasonable and viewpoint neutral rule that furthers the [government's] permissible interest in preserving the interactive comment threads for discussion of the subjects posted by the [government]." *Krasno*, 638 F.Supp. 3d at 977.

Here, the County's policy adheres to the First Amendment because it is reasonable and viewpoint neutral. *See* (ECF Nos. 99-16, 99-19); *Hopper*, 241 F.3d at 1075. The policy is

reasonable because it facilitates the purpose of the forum, which is to provide information and clarification regarding Library services and events. *See id.* As noted in *Krasno*, "off-topic comments are, by definition, more disruptive than on-topic comments," given the government's legitimate interests in hosting a moderated forum. 638 F. Supp. 3d at 975. Prohibitions on spamming, posting weblinks, and posting off-topic or discriminatory comments are viewpoint neutral because they are applied to all commenters.

Next, the decision to block Ribar's accounts was constitutionally appropriate. *See* (ECF No. 99-16) (ECF No. 99-21 at p. 1). Ribar's personal account was blocked after he repeatedly commented in quick succession, posting at least eleven (11) comments with weblinks to his YouTube videos, engaging in a dispute with other commenters, posting nine additional off-topic comments (some of which had weblinks), and three more comments with language that perpetuated discrimination based on gender identity and sexual orientation. (ECF No. 99-20 at pp. 2–13). Undeterred, Ribar used his alternate "Audit Reno" account to post just a weblink to his YouTube video(s) twenty-seven (27) times in one day, and at least seven (7) times the next day. *Id.* at pp. 15–38. After conferring with counsel, Director Scott instructed staff to block Ribar's "Audit Reno" account because his spamming and commented weblinks violated Library policy, behavior that interrupted the flow of Library business. (ECF No. 99-21 at p. 1). A month later, Ribar was again blocked after using a third account, "Ribar for Nevada Assembly 40" to post thirteen (13) identical comments on thirteen (13) posts with YouTube links and off-topic language over a one-day period. (ECF No. 99-20 at pp. 44–57).

The restriction on Ribar's behavior, assuming it was protected speech, was reasonable and viewpoint neutral and therefore constitutional. Each time one of Ribar's Facebook accounts were blocked, it was due to behavior that repeatedly violated the policy. *See* (ECF Nos. 99-16, 99-20, 99-21 at p. 1). Ribar's behavior caused the Library's Facebook page to be flooded with off-topic and at times discriminatory commentary, that may chill other users' engagement, adding "notifications" that consumed staff time in locating

legitimate comments that may require a response. (ECF No. 99-6 at ¶¶11–12, 17). Director Scott explained to Ribar that he was blocked because "you were spamming the site. It's against our terms of service." (ECF No. 70-7 at 0:05:22–32). Director Scott also explained, "you can't spam the site… we've blocked other people who have spammed the site… you're not the only one." 0:05:35–45, 0:06:15–25.

Even if the page was a designated public forum, it would still be constitutional in this case. The Library's prohibition on spamming and posting weblinks is narrowly tailored to further a compelling government interest in maintaining a Facebook account to share information about its agency. Ribar's spamming in this case was so incessant that the only redress was to block his accounts. *See* (ECF No. 99-19). If staff were to just remove the violative comments, they would be stuck in an endless cycle of removing Ribar's comments as he continued to post them. This would disrupt staff's ability to timely receive and respond to comments legitimately seeking and providing information about the Library's post(s). Summary judgment is warranted because the Library's policy and its application to Ribar adhered to the First Amendment.

The Court should dismiss the social media portion of the First Amendment claims with prejudice as to Defendants Scott, McKenzie, and Bowen. Ribar makes no individualized allegations for this claim as to Defendants McKenzie and Bowen. As to Defendant Scott, an FAC video exhibit explains that Ribar was blocked because he was "spamming the site" and violating the "terms of service." (ECF No. 70-7 at 0:05:22–32). This action was constitutionally permissible. The undisputed records subject to judicial notice show that the policy is reasonable, viewpoint neutral, and was applied in a viewpoint neutral manner. Even if blocking Ribar's accounts was unconstitutional, Defendants would be afforded qualified immunity on the First Amendment claim regarding social media blocking. Given the novelty surrounding First Amendment implications of government social media accounts, the rights of users commenting and the government's ability to block

//

1    disruptive users is still not clearly established.  The Court should therefore dismiss this claim

2    with prejudice.

3    **C. Ribar's Fourth Amendment Claim against Director Scott Fails.**

4            In Count II, Ribar alleges "Defendants assaulted" him, and "detained him without

5    suspicion." (ECF No. 65-1 at p. 7 at lns. 20–25). Ribar does not allege who assaulted or

6    detained him in his claim. *See* (ECF No. 65-1).  The FAC contains an allegation that Director

7    Scott "assaulted" him, but its video exhibit directly contradicts that allegation. *See id.* at p.

8    6 ln. 16; (ECF No. 70-7 at 1:21:29–22:59).

9            For a Fourth Amendment claim, a plaintiff must prove he was seized, meaning a

10   government actor "terminated his freedom of movement through means intentionally

11   applied." *Tajalle v. City of Seattle*, C07-1507Z, 2008 WL 630061, at *4 (W.D. Wash. Mar. 7,

12   2008). He must then show he was seized in a way that was not "objectively reasonable." *Id.*

13          Here, Ribar makes insufficient conclusory allegations with the FAC's video exhibit

14   showing he cannot state a plausible claim. The Fourth Amendment claim against Director

15   Scott arises out of Ribar's attempts to harvest outrage while filming a RainbowFest event

16   on July 15, 2023. (ECF No. 70-7 at 1:21:29–22:59); Ex. 5. An event attendee told Ribar,

17   "Hey, no recording children," and expressed her opinion that it was not allowed. *Id.* at

18   1:21:29–42. Another person holding a child stated to Ribar, "Get that camera out of my

19   fucking face," told him to move, and was aggressive with Ribar who did not simply walk

20   away. *Id.* at 1:22:10–23. Ribar claimed the man touched his camera, loudly stated "He just

21   assaulted me," demanded his name, and yelled "That's Battery!" *Id.* at 1:22:23–32.

22   Defendant Scott, observing the escalating disturbance, intervened between Ribar and the

23   attendee with his hands up to signal de-escalation and disengagement, instructing Ribar to

24   back up. *Id.* at 1:22:29–49. The other person, a large man, remained close behind Director

25   Scott and continued to step toward Ribar with his arm over Director Scott's shoulder toward

26   Ribar. *Id.* For about two seconds, Director Scott's palm was gently on Ribar's arm while

27   Director Scott told him "You need to back up." *Id.* After many requests to back up, Ribar

backed away a few feet, but refused to stand elsewhere. *Id.* at 1:22:44–58).

Then, Director Scott explained to Ribar, "You are harassing people with the camera and people are upset. You need to stand over there." (ECF No. 70-7 at 1:22:45–22:59). Ribar said, "No, I'm not going to." *Id.* Talking over Director Scott's repeated instruction to stand "over there," Ribar said "I'm standing right here out of the way…" *Id.* Director Scott said, "I need to ask you to leave the property then if you're not going to listen to me." *Id.* Ribar antagonized him stating "Are you going to trespass me under threat of arrest?" *Id.* Defendant Scott responded, "You're trespassed, yes. Please leave." *Id.* Without using any physical touch, Director Scott walked Ribar out of the event while Ribar continued to antagonize, pointing his camera toward himself to record soundbites for future posting to his revenue-generating YouTube channel. *Id.* 1:23:09–20.

Ribar's Fourth Amendment claim fails because he was not seized, and any use of "force" was objectively reasonable. (ECF No. 70-7 at 1:21:29–22:59). Ribar remained free to move and free to leave at any time. *See id.* He was therefore not "seized" within the meaning of the Fourth Amendment. *See id.* Additionally, given Ribar's past and present persistent antagonism, it objectively appeared as though a physical altercation was imminent. *See id.* Ribar was causing a disturbance that objectively warranted intervention by Director Scott. *Id.* He remained calm but stern, creating a physical shield to discourage Ribar and the man from physically contacting each other. *Id.* He placed his arms up to signal disengagement while calmly but firmly instructing Ribar to back up. *Id.* With the other man inching forward, pushing Director Scott toward Ribar, it was reasonable that Director Scott's palm lightly touched Ribar's shoulder for about twenty (20) seconds. *Id.* Ribar's own video shows he was not pushed, but remained standing sturdily upright with full control of his large camera and gimbal/tripod continuing to record (*see e.g.* Ex. 5), he did not jolt back from any apparent force, and was loudly talking at Director Scott and the other man. *See id.* at 1:22:29–49. This is not an instance of a government official holding a weapon at a person to restrict their movement, pushing them to the ground, or even grabbing their wrist to pull

them away. *See id.* The minimal contact was incidental to Director Scott diffusing a disturbance and avoiding a potential physical altercation and to Ribar's refusal to follow instructions to leave. *Id.* It was objectively reasonable and Count II is not viable.

Even if there was a constitutional violation, Director Scott is entitled to qualified immunity because it is not clearly established that a Library Director may not intervene in two patrons' altercation in the manner that he did. Count II should also be dismissed with prejudice as to Director Scott based on qualified immunity.

The Court should dismiss Count II against Director Scott. The FAC's video exhibit shows there was no objectively unreasonable use of force. Moreover, Director Scott is entitled to qualified immunity based on lack of clearly established law. Dismissal with prejudice is therefore appropriate.

**D. Ribar's Due Process Claim Fails Against Scott, McKenzie, and Bowen.**

In Count III, the Due Process claim, Ribar alleges that "Defendants imposed suspensions without notice or hearing…and falsified records." (ECF No. 65-1 at pp. 7–8). A procedural due process claim has two elements: (1) deprivation of a constitutionally protected interest, and "(2) a denial of adequate procedural protections." *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.,* 149 F.3d 971, 982 (9th Cir. 1998).

**i.    Ribar Received Ample Due Process in his Library Suspension.**

"Although it is by no means well established, a protected interest in accessing public libraries has been recognized by some courts." *Upton v. Cnty. of San Bernardino Library*, EDCV 23-1691-AB (JPR), 2024 WL 5466464, at *7 (C.D. Cal. May 9, 2024). "But the right is no absolute and can be lost for engaging in conduct" that violates its policies. *Id.* (quot. and citations omitted).

Assuming *arguendo* that a library suspension involves a cognizable liberty interest, due process generally requires that the party affected is given notice and an opportunity to be heard. *Upton*, 2024 WL 5466464, at *7. Neither a pre-deprivation nor post-deprivation hearing are required. *Id.* at 7–8. For example, adequate due process was provided in a

situation where a person was provided a letter notifying him of a six-month suspension based on behavior that violated library policies, with library policies allowing the person one appeal to the library director. *Nappi v. Timberline Reg'l Libr.*, No. C14-5945 JRC, 2015 WL 3936308, at *1, *3 (W.D. Wash. June 26, 2015); *see also Hill v. Derrick*, 240 F.App'x 935, 937–38 (3d Cir. 2007) (per curium) (holding that plaintiff banned from the library "indefinitely" after a physical altercation received due process when the on-duty librarian verbally informed him of their policy against physical abuse and provided him an opportunity to "tell her what had happened"). In Montana, a person was indefinitely banned from the library after he engaged in disruptive behavior that "frightened staff" and "confronted staff in an intimidating manner." *Spreadbury v. Bitterroot Pub. Libr.*, 862 F.Supp.2d 1054, 1056 (D. Mont. 2012). This amounted to adequate due process, because the library provided the person with written notice of the ban and its basis, and afforded him one opportunity to request reconsideration from the library's board. *Id.* at 1057–57.

Here, Ribar received more than adequate due process for his Library suspension *See* (ECF No. 70-9 at 0:12:41–13:12, 0:25:30–26:23); (ECF No. 71 at 2:22:06–53:31); (ECF Nos. 99-30, 99-32, 99-36, 99-38 at pp. 2–3). An FAC video exhibit shows that Ribar was provided verbal notice along with personal service of a printed packet that included the basis for his suspension, a copy of the Library's code of conduct, and a copy of the Library's suspension policy with proper appeals procedures. (ECF No. 70-9 at 0:12:41–13:12, 0:25:30–26:23); *see also* (ECF No. 99-30). Staff verbally informed Ribar that he was suspended for one year due to his behavior at the 2024 RainbowFest event for "forcefully entering the library and injuring a staff person" and explained "… you will not be able to go into the library. If you do enter the library, we will have to trespass you." (ECF No. 70-9 at 0:12:41–13:12). Ribar exercised his *first* appeal, submitting an appeal form claiming his suspension was based on protected activity. Ex. 3 at ¶32; Ex. 11 at p. 4, no. 8; Ex. 32. Defendant McKenzie reviewed and denied the appeal, explaining to Ribar that he violated the Code of Conduct by harassing staff with repeated questions and accusatory comments, Ribar was disruptive and

disturbing to staff and patrons, he interfered with staff's ability to do their job, and he engaged in unsafe and dangerous behavior that resulted in a staff injury. (ECF Nos. 99-33, 99-34). Ribar exercised his *second* appeal to Director Scott, who denied the appeal. (ECF Nos. 99-35, 99-36). He sent Ribar the denial letter via email and mail stating, "Your actions, which include harassing staff and patrons and attempting to break into a Storytime for children, disrupt our operations and make it difficult for us to fulfill our mission. Regardless of your personal opinions, this is not acceptable to us." *Id.*

Ribar exercised his *third and final* appeal to the Library Board of Trustees ("LBOT"). (ECF No. 71 at 2:22:06–53:31). The LBOT gave him more than a meaningful opportunity to be heard at the third appeal before deciding to uphold the suspension. *See id.* Ribar first received five (5) minutes to speak, which he used to recite law, make sarcastic comments such as "I'm a terrorist," and irrelevantly discuss his YouTube channel and candidacy for state elected offices, etc. (ECF No. 71 at 2:23:32–28:57). The LBOT Chair then gave him almost twenty-two (22) additional minutes to speak and answer questions from the LBOT members as he did not meaningfully use his initial five minutes. *Id.* at 2:29:13–51:00.

Additionally, broadly construing the FAC to the extent it relies on Nevada's Open Meeting law notice requirements, this theory fails to state a due process claim. *See* (ECF No. 65-1 at p. 7 lns. 4–6). Nevada law requires certain written notice and service before a public body can hold a meeting to consider a person's alleged misconduct or to take administrative action against a person. *See* NRS 241.033; NRS 241.0333. The FAC refers to exhibits regarding this legal notice to support the due process claim. (ECF No. 65-1 at p. 8 ln. 1); (ECF Nos. 69-8, 69-9, 70, 70-1, 70-2). Despite the LBOT's offers to hear the meeting later and allow for open meeting law notice, Ribar expressly waived this extended notice so that the LBOT could hear his appeal in August rather than in September. *See* (ECF No. 70-1 at pp. 8, 10); (ECF No. 71 at 2:31:38–34:17). This cannot form the basis of a viable due process claim. *See Correa v. Nampa School Dist. No. 131*, 645 F.2d 814, 816–17 (9th Cir. 1981) (affirming a finding that a due process claim was waived after voluntary and knowing choice

to forgo available procedures). Moreover, the FAC exhibits show that Ribar was afforded meaningful notice of the August 21, 2024, LBOT meeting with substantial emails to and from Ribar regarding the meeting date, that his suspension appeal would be heard, and the basis for his suspension. *See* (ECF Nos. 68-8, 68-9, 70, 70-1, 70-2).

Defendants Scott, McKenzie, and Bowen are further entitled to qualified immunity. Whether there is a liberty interest in generally using a library is not a clearly established right. *Upton*, 2024 WL 5466464 at *7. Moreover, the level of due process required for library suspensions is not established, and existing case law shows that Ribar was provided with more process than was found adequate in existing case law. Neither Defendants Scott, McKenzie, nor Bowen would have been on any notice that their participation in Ribar's suspension procedures violated clearly established law. As such, they are entitled to qualified immunity.

The Court should dismiss with prejudice the Due Process claim based on Ribar's suspension. The procedures and notice afforded to Ribar go far beyond the *one* appeal opportunity held sufficient in *Nappi*, and *Spreadbury*. 2015 WL 3936308, at *1, *3; 862 F.Supp.2d at 1056–57. Even if insufficient, qualified immunity would bar the claims. Therefore, the suspension portion of Count III should be dismissed with prejudice.

### ii. The "Falsified Records" Due Process Claim Fails.

Ribar attempts to pursue a due process claim based on "falsified records," citing an FAC exhibit with April 17, 2024, LBOT meeting minutes. (ECF No. 65-1 at p. 8 ln. 1); (ECF No. 69-6). Dismissal is warranted because there are no allegations in the FAC or its exhibits that plausibly point to Defendants Scott, McKenzie, or Bowen's personal participation in adopting these meeting minutes. *See id.*; *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012). As a matter of law, the LBOT, not any employee, approves and maintains its meeting minutes. NRS 241.035(1). Additionally, there is no identifiable liberty interest for an individual to have their public comment displayed verbatim, rather than an interpreted summary, in Nevada public body meeting minutes. *See* NRS 241.035 (requiring only the

1    "substance of remarks" be reflected in meeting minutes). Therefore, the Court should

2    dismiss the "falsified records" portion of Count III with prejudice as to Defendants Scott,

3    McKenzie, and Bowen with prejudice.

4    **E. Ribar Does Not State a Plausible Equal Protection Claim.**

5        A class-of-one equal protection claim can only be stated if defendants intentionally

6    treated a plaintiff differently than other similarly situated individuals and without a rational

7    basis for doing so. *Gerhart v. Lake Cnty., Mont.*, 637 F.3d 1013, 1021 (9th Cir. 2011). A "class-

8    of-one plaintiff must be similarly situated to the proposed comparator in all material

9    respects." *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1123 (9th Cir. 2022).

10       Here, Ribar does not and cannot allege a viable Equal Protection claim against

11   Defendants Scott, McKenzie, or Bowen. He fails to include any allegation that Defendants

12   Scott, McKenzie, or Bowen treated Ribar differently than any other person. *See* (ECF No.

13   65-1). The video exhibits likewise do not show Ribar treated differently than any other

14   similarly situated person, *i.e.* a self-proclaimed "journalist" at a Library event antagonizing

15   staff, interrogating them with condescending questions, and attempting to circumvent

16   established policies and rules to view a children's story hour program. *See* (ECF Nos. 70-6,

17   70-7, 70-8); *see also* Ex. 5; Ex. 6. The Equal Protection Claim against Defendants Scott,

18   McKenzie, Bowen, and Washoe County should be dismissed with prejudice because Ribar

19   fails to state a viable claim and amendment would be futile.

20   **F. The Conspiracy Claims Fail.**

21       **i.   The Section 1983 Conspiracy Claim Fails.**

22       "Conspiracy itself is not a constitutional tort" under Section 1983. *Lacey v. Maricopa*

23   *Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012). "It does not enlarge the nature of the claims asserted

24   by the plaintiff, as there must always be an underlying constitutional violation." *Id.*

25       Ribar cannot state a viable Section 1983 Conspiracy claim against Defendants Scott,

26   McKenzie, or Bowen because there are no underlying constitutional violations as set forth

27   above. The Section 1983 conspiracy claim, Count VI, should be dismissed with prejudice

### ii.    The Section 1985 (3) Conspiracy Claim Fails.

To state a claim under 42 U.S.C. Section 1985, a plaintiff must allege "(1) a conspiracy; (2) for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Steshenko v. Gayrard*, 70 F. Supp. 3d 979, 998 (N.D. Cal. 2014). The second element also requires a showing that the deprivation was "motivated by some racial, or perhaps other class-based, invidiously discriminatory animus behind the conspirators' action." *Id.*

Ribar's Section 1985(3) Conspiracy claim, Count VII, against Defendants Scott, McKenzie, and Bowen fails because there are no allegations that they acted with any racial or other protected class-based animus, nor was there a deprivation of rights. *See* (ECF No. 65-1). Amendment to this claim would be futile because the video exhibits are uncontroverted evidence that no deprivation nor protected-class animus occurred. Count VII should be dismissed with prejudice.

### G. The *Monell* Claim Fails as to Defendants Scott, McKenzie, and Bowen.

A local government "cannot be held liable solely because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under [Section 1983] under a *respondeat superior* theory." *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978); *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 984 (9th Cir. 2002). Liability attaches only where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694; *Ulrich*, 308 F.3d at 984.

Here, the *Monell* claim, Count X, should be dismissed with prejudice as to Defendants Scott, McKenzie, and Bowen's actions. There are no constitutional violations, as set forth above, and therefore no *Monell* claim arising from their actions. Even if there were, Ribar's conclusory allegations do not establish a *Monell* claim. He alleges only

"policies of censorship and exclusion," without identifying the nature of the policies or the individuals who carried them out. *See* (ECF No. 65-1 at p. 8 ln. 11). The *Monell* claim against Washoe County based on Defendants Scott, McKenzie, and Bowen's actions should likewise be dismissed with prejudice.

### H. The "Assault and Battery" Claim Fails Against Director Scott.

In Nevada, to establish a battery claim, plaintiff must show the defendant "(1) intended to cause harmful of offensive contact, and (2) contact did occur." *Hunt v. Zuffa, LLC*, 361 F. Supp. 3d 992, 1009 (D. Nev. 2019). Assault requires a plaintiff to show that the defendant "(1) intended to cause harmful or offensive physical contact, and (2) the victim was put in apprehension of such contact." *Gonzalez v. Las Vegas Metro. Police Dep't*, No. 2:21-cv-01247-LDG, 2014 WL 1091012, at *14 (D. Nev. Mar. 18, 2014) (cit. omitted). A "plaintiff may not recover the damages sought if oral abuse or provocation is accompanied by an overt hostile act because such oral abuse may amount to a challenge to fight and constitute consent." *Id.* *15 (cleaned up). Where a person "was resistive, non-compliant and, in one instance, combative," "any reasonable person would realize that such actions would cause an altercation" and effectively consents to a responsive assault or battery. *Id.* Additionally, defense of others does not constitute battery. NRS 200.275; *Batson v. State*, 941 P.2d 478, 482 n. 2 (Nev. 1997). Moreover, "battery is not established unless and until plaintiff proves unreasonable force was used." *Pernell v. City of Los Angeles*, 650 F. Supp. 3d 910, 929 (C.D. Cal. 2022).

Here, the FAC's video exhibit shows there was no assault or battery. (ECF No. 70-7 at 1:21:29–22:59). The minimal contact Director Scott made was not offensive or unreasonable, and there was no harm to Ribar. *See id.* It also shows that Director Scott did not intend to cause harmful or offensive contact, and that Ribar was not in fearful apprehension of such contact from Director Scott. *Id.* As set forth above, any "force" was objectively reasonable. Even if it was unreasonable, harmful, or offensive, Ribar consented to the contact when he continued to be combative and hostile with a man and Director

Scott. *Id.* Notwithstanding, Director Scott was acting in defense of Ribar, who he believed would be imminently injured by the man based on Ribar's behavior, and thus "defense of others" precludes his Count X for assault and battery. *Id.*

### I. Ribar's Intentional Infliction of Emotional Distress Claim Fails.

An intentional infliction of emotional distress ("IIED") claim cannot be based on "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Candalore v. Clark Cnty. Sanitation Dist.*, 975 F.2d 588, 591 (9th Cir. 1992). It instead requires "extreme and outrageous conduct on the part of the defendant; (2) intent to cause emotional distress or reckless disregard for causing emotional distress; (3) that the plaintiff actually suffered extreme or severe emotional distress; and (4) causation." *Miller v. Jones*, 970 P.2d 571 (Nev. 1998). Extreme or outrageous conduct is conduct "outside all possible bounds of decency" and is deemed "utterly interoperable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998). IIED also requires distress that manifests as a physical injury or impact. *See Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998).

Ribar does not plausibly allege IIED, failing to include any details about any extreme or outrageous conduct or any physical injury associated with such conduct. Additionally, the FAC's video exhibits show that there was no extreme or outrageous conduct. *See* (ECF Nos. 70-6, 70-7, 70-8, 71). Amendment would be futile. The IIED claim should be dismissed with prejudice as to Defendants Scott, McKenzie, Bowen, and Washoe County.

### J. The Defamation Claim Fails.

Defamation cannot be based on a statement that is true, substantially true, an opinion, hyperbole, exaggeration, or generalization. *Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 715, 57 P.3d 82, 88 (2002). Defamation requires that there be "(1) a false and defamatory statement by [a] defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault…; and (4) actual or presumed damages." *Id.* 118 Nev. at 706, 57 P.3d at 90. Publication involved communicating the defamatory matter to another person other than the person claiming to be defamed. *Simpson v. Mars Inc.*, 929 P.2d 966,

967 (Nev. 1997). Communication between employees is not publication. *M & R Inv. Co., Inc. v. Mandarin*, 748 P.2d 488, 491 (Nev. 1987).

In Count XII, Ribar alleges a defamation claim against "All Defendants," and references an unreliable and unofficial A.I.-generated "transcript" of the August 2024 LBOT meeting. (ECF No. 65-1 at p. 9, lns. 6–7); (ECF No. 70-3); *see also* (ECF No. 71) (video of the August 2024 LBOT meeting). Ribar's claim fails because he does not allege which statement(s) is inaccurate or defamatory. All statements of fact are verifiable through Ribar's own FAC video exhibits. *See* (ECF Nos. 70-6, 70-7, 70-8, 71).

Therefore, the Court should dismiss the Defamation claim, Count XII, as to Defendants Scott, McKenzie, Bowen, and Washoe County with prejudice.

**K.  NRS 379.040 Does not Create a Private Right of Action.**

In Count IX, Ribar erroneously attempts to seek relief under NRS 379.040, alleging that "Defendants denied Plaintiff library access." (ECF No. 65-1 at p. 8). In Nevada, Libraries and their reading rooms must remain free and accessible to the public, *subject to such reasonable regulations as the trustees of the library may adopt*. NRS 379.040 (emph. added). "[T]he absence of an express provision providing for a private cause of action to enforce a statutory right strongly suggests that the Legislature did not create a privately enforceable judicial remedy." *Baldonado v. Wynn Las Vegas, LLC*, 194 P.3d 96, 101 (Nev. 2008).

Ribar's Count IX fails because NRS 379.040 does not create a private right of action. Even if it did, Ribar would still fail to state a claim because any legal right of access to Library spaces is subject to the Library's regulations. NRS 379.040. Ribar was "denied access" in accordance with those regulations. *See* (ECF No. 71 at 01:21:54–02:53:26). The Court should dismiss Count IX with prejudice.

**L.  Ribar Does Not State a Viable Negligence/ Negligent Hiring Claim.**

In Count XIII, Ribar attempts to assert a "Negligence/Negligent Supervision" claim against the County, alleging, the County "negligently supervised staff…" This appears to be solely a negligent supervision claim, which fails as a matter of law. *Paulos v. FCH1, LLC*, 456

P.3d 589, 596 (Nev. 2020). Discretionary act immunity specifically precludes actions for negligent hiring, training, and supervision. *Id.*; *see also Neal-Lomax v. Las Vegas Metro Police Dep't*, 574 F.Supp. 2d 1170, 1192 (D. Nev. 2008) ("Because Nevada looks to federal case law to determine the scope of discretionary immunity, and because federal case law consistently holds training and supervision are acts entitled to such immunity, [Defendant] is entitled to discretionary immunity…"). Nevada law precludes claims for negligent hiring, training, and supervision against government defendants. *Paulos*, 456 P.3d at 596. The Court should therefore dismiss Count XIII with prejudice.

**M. Defendants Scott, McKenzie, Bowen, and Washoe County are Entitled to Discretionary Act Immunity for the State Law Claims.**

Under Nevada law, no action may be brought against a public employee or political subdivision "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty…whether or not the discretion involved is abused." NRS 41.032(2). There is "a two-part test for determining whether a discretionary-function immunity under Nev. Rev. Stat. 41.032 applies to shield a defendant from liability, "which looks to whether "the decision (1) involves an 'element of individual judgment or choice,' and (2) is 'based on considerations of social, economic, or political policy.'" *Clark Cnty. Sch. Dist. v. Payo*, 403 P.3d 1270, 1276 (Nev. 2017) (citations omitted).

Here, Ribar's state constitutional claim (Count VIII), library access claim (Count IX), battery claim (Count X), IIED claim (Count XI), defamation claim (Count XII) should be dismissed against Defendants Scott, McKenzie, Bowen, and Washoe County based on discretionary act immunity. Decisions on how to interact with Ribar at RainbowFest events, whether to trespass or suspend him, whether his social media behavior warranted blocking, and how to present his behaviors to the LBOT all involved elements of judgment or choice. They are likewise susceptible to policy considerations, including event safety, library safety, library operation disruption, library social media disruption, and risks of further in-person harassment or future harassment through litigation.

-23-

1    Additionally, the battery/assault claim against Director Scott similarly fails based on

2  discretionary act immunity. NRS 41.032(2). Courts have applied discretionary act immunity

3  to situations involving use of force. *See Barnard v. LVMPD*, 2010 WL 11575609 at *6, 2:03-

4  cv-01524-RCJ-LRL (D. Nev. Jan. 26, 2010); *Trujillo v. Powell*, 3:10-cv-00360-RCJ-VPC,

5  2011 WL 3419504, at *8–9 (D. Nev. Aug. 2, 2011). Director Scott's intervention was a split-

6  second judgment call susceptible to social policy and public safety considerations, and thus

7  Director Scott is immune. *See* (ECF No. 70-7 at 1:21:29–22:59).

8    The Court should dismiss the state tort claims with prejudice as to Defendants Scott,

9  McKenzie, Bowen, and Washoe County. Even if Ribar could otherwise allege plausible

10 claims against them under the Nevada Constitution based on library access, battery, IIED,

11 or defamation, discretionary act immunity bars the claims as a matter of law.

12 **III. CONCLUSION**

13   The Court should put an end to Ribar's theatrics and dismiss the FAC with prejudice

14 as to Defendants Scott, McKenzie, Bowen, and Washoe County.  Ribar does not state any

15 claims upon which relief can be granted with his implausible and conclusory allegations.

16 The FAC's exhibits and documents subject to judicial notice further show that Ribar cannot

17 do so, and amendment is therefore futile. Dismissal with prejudice is appropriate.

18   Dated this 20th day of August, 2025.

19             By  ___/s/ Lindsay Liddell_____
20             LINDSAY LIDDELL
               Deputy District Attorney
21             COBI BURNETT
               Deputy District Attorney
22
               ATTORNEYS FOR WASHOE COUNTY
23             DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to FRCP 5(b), I certify that I am an employee of the Office of the District Attorney of Washoe County, over the age of 21 years and not a party to nor interested in the within action.  I certify that on this date, I deposited for mailing in the U.S. Mails, with postage fully prepaid, a true and correct copy of the foregoing document in an envelope addressed to the following:

DREW RIBAR
3480 PERSHING LANE
WASHOE VALLEY. NV 89704


I certify that on this date, the foregoing was electronically filed with the United States District Court.  Electronic service of the foregoing document shall be made in accordance with the Master Service List as follows:

DREW RIBAR

ALISON R. KERTIS, ESQ.

Dated this 20th day of August, 2025.

/s/ S. Haldeman
S. Haldeman

-25-

**INDEX OF EXHIBITS**

Exhibit 1    Screenshot of FAC Exhibit 27 (ECF No. 70-6) ................................. 1 page

Exhibit 2    Screenshot of FAC Exhibit 28 (ECF No. 70-7) at 0:47:44................... 1 page

Exhibit 3    Screenshot of FAC Exhibit 29 (ECF No. 70-8) at 1:09:07.................. 1 page

Exhibit 4    Screenshot of FAC Exhibit 29 (ECF No. 70-8) at 1:32:49.................. 1 page

Exhibit 5    Screenshot of FAC Exhibit 28 (ECF No. 70-7) at 0:49:59.................. 1 page

Exhibit 6    Screenshot of FAC Exhibit 29 (ECF No. 70-8) at 1:19:47.................. 1 page

INDEX OF EXHIBITS