LINDSAY LIDDELL
Deputy District Attorney
Nevada State Bar Number 14079
COBI BURNETT
Deputy District Attorney
Nevada State Bar Number 16505
One South Sierra Street
Reno, NV  89501
lliddell@da.washoecounty.gov
cburnett@da.washoecounty.gov
(775) 337-5700
ATTORNEYS FOR WASHOE COUNTY
DEFENDANTS

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
* * *

DREW RIBAR,

        Plaintiff,

   vs.

WASHOE COUNTY, et al.

        Defendants.
_____/

Case No.  3:24-CV-00526-ART-CSD

**COUNTY DEFENDANTS' MOTION
FOR PRELIMINARY INJUNCTION
AGAINST HARASSMENT**

     Defendants Washoe County, Washoe County Library System ("Library"), Jeff Scott ("Director Scott"), Stacy McKenzie, Jonnica Bowen, Jennifer Cole, Deputy "Rothkin" (Rothgeb), Deputy Sapida, and Sgt. Gomez (the original "County Defendants") by and through counsel, hereby move this Court for a preliminary injunction enjoining Plaintiff Drew ("Ribar") from engaging in harassing and stalking conduct. This Motion is based upon the following Memorandum of Points and Authorities and all pleadings and papers on file.

//

//

//

//

//

//

//

//

## TABLE OF CONTENTS

I.      INTRODUCTION                                                                     5
II.     RIBAR'S ESCALATING HARASSMENT AND STALKING        7
        a.  2024 Doxing and Harassment of County Defendants         7

        b.  In Summer 2025, Ribar Expanded his Aim to Defense        9
            Counsels and BOC

        c.  Ribar's Conduct After County Defendants' Emergency Motion.    17

        d.  Ribar's Conduct Following the Court's Amended Restraining Order.   19

III.    Legal Argument                                                               23
        a.  A Preliminary Injunction is Necessary.                             23

            i.    County Defendants Have a Likelihood of Success on the Merits.    24

            ii.   There is a Likelihood of Irreparable Harm.                26

            iii.  The Balance of Equities Favors an Injunction and is    28
                  in the Public Interest.
            iv.   An Injunction is Within the Confines of the First Amendment.   31

        b.  A Nominal Bond as Security for the Injunction is Appropriate.    33

        c.  The Court Should Award Attorney Fees to County Defendants.    33

IV.     CONCLUSION                                                            35

# TABLE OF AUTHORITIES

**Cases**

*B. Willis, C.P.A., Inc. v. Goodpaster*,
   183 F.3d 1231, 1234 (10th Cir. 1999) .......................................................... 32

*Beyond Blond Prods., LLC v. Heldman*,
   No. CV205581DSFGJSX, 2022 WL 2784404, at *8 (C.D. Cal. June 17, 2022. 24, 25, 27,
   29, 32

*Business Guides, Inc. v. Chromatic Comm. Enters., Inc.*, 121 F.R.D. 402, 405 (N.D. Cal. 1988)
   ................................................................................................................. 34

*Chambers v. Nasco, Inc.*, 501 U.S. 32, 45–46 (1991) ......................................... 34

*Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir.
   2003) ........................................................................................................... 34

*Counterman v. Colorado*,
   600 U.S. 66, 79–80 (2023) ........................................................................... 32

*De Long v. Hennessey*,
   912 F.2d 1144, 1147 (9th Cir. 1990). ........................................................... 24

*Doe v. Fitzgerald*, No. 2:20-cv-10713-MWF-ROA, 2022 WL 423495, at *4 (C.D. Cal. Feb. 2,
   2022). .......................................................................................................... 32

*Ex.-Imp. Bank of the U.S. v. united California Disc. Corp.*, Case No. CV 09-2930 CASPLAX,
   2011 WL 165312, at *2 (C. D. Cal Jan. 12, 2011) ......................................... 34

*Fredin v. Middlecamp*, No. 17-cv-03058 (SRN/HB), 2020 WL 6867424, at *7 (D. Minn.
   Nov. 23, 2020), *aff'd*, 855 F. App'x 314 (8th Cir. 2021) ............................... 29

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89, 104, n. 21 (1981) ..................................................................... 31

*Hamilton v. Daley*,
   777 F.2d 1207, 1213 (7th Cir. 1985) ............................................................ 34

*Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 776 (1984) ..................................... 27

*Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992)...30, 33

*Lahiri v. Univ. Music & Video Distribution Corp.*,
   606 F.3d 1216, 1219 (9th Cir. 2010) ............................................................ 34

*Lavite v. Dunstan*,
   932 F.3d 1020, 1029 (7th Cir. 2019) ............................................................ 33

*Napier v. Thirty or More Unidentified Fed. Agents*,
   855 F.2d 1080, 1092–93 (3rd Cir. 1988) ....................................................... 34

*Otero v. Johnson*, No. CIV 16-090-TUC-CKJ, 2016 WL 6476292, at *4 (D. Ariz. Nov. 2,
   2016). .......................................................................................................... 34

*Roadway Express Inc. v. Piper*,
   447 U.S. 752, 764 (1980) .............................................................................. 34

*Rouzan v. Dorta*, 2014 WL 1716094, *11-12 (C.D. Cal. 2014), *report and rec. adopted,* 2014
   WL 1725783 (C.D. Cal. 2014) ...................................................................... 33

*Seattle Times Co. v. Rhinehart*,
   467 U.S. 20, 32 n.18 (1984) .......................................................................... 31

*Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*,
   609 F.3d 975, 982 (9th Cir. 2010) ................................................................ 24

*United Artists Corp. v. United Artist Studios LLC*,
   No. CV 19-828- MWF-MAAX, 2019 WL 6917918, at *5 (C.D. Cal. Oct. 17, 2019) ... 24, 27, 29
*United States v. Lipman*, No. 2:23-CR-00491-FLA, 2024 WL 4043810, at *9 (C.D. Cal. Sept. 4, 2024) .......................................................................................................... 32
*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008)). ......................................................................................24, 27
*Yates v. Belli Deli*,
    No. C07-01405 WHA, 2007 WL 2318923, at *3 (N.D. Cal. Aug. 13, 2007). ............. 24

**Statutes**

(NRS 200.571(1)(a)(4) ................................................................................................. 26
(NRS 200.575(1) ......................................................................................................... 26
18 U.S.C.A. § 2261A (2) .......................................................................................25, 26
FRCP 65(c) ................................................................................................................. 34
NRS 200.571(1)(a)(4 ................................................................................................... 25
NRS 200.575(1) .......................................................................................................... 25
NRS 239.0107(1). ....................................................................................................... 11

MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

A preliminary injunction is necessary to enjoin Ribar from continuing to harass and stalk the parties and defense counsel. County Defendants and Build Our Center ("BOC") previously filed motions for restraining orders after Ribar escalating harassment, intimidation, menacing, and inappropriate behavior toward counsel that caused substantial mental harm. *See* (ECF Nos. 130, 140, 172). The Court granted County Defendants' Motion, which restrained Ribar from physically approaching the parties, defense counsel, and their respective employees, physically entering defense counsels' parking lots, submitting bad faith public records requests directly to defense counsels, and posting content on social media about this case, including parties, witnesses, and counsels. (ECF No. 176 at p. 5). After a hearing, the Court issued an Amended Order, removing the prohibition that Ribar not approach parties or witnesses and the prohibition regarding posting social media content. (ECF No. 186). Once the Court amended its Restraining Order, Ribar immediately resumed his campaign of harassment, defamation, and intimidation against defense counsels, and has now added this Court as a target.

To be clear, County Defendants are not ideologically opposed to transparency in government. An informed citizenry is vital to democratic function, especially if officials' behavior threatens democracy. Passively filming government employees working in public spaces can contribute to accountability, *e.g.*, in instances of police brutality that would otherwise go unchecked. Transparency and accountability are not furthered, however, by the following practices employed by Ribar: (i) antagonizing government employees with cameras, (ii) shouting at them, (iii) lingering at their nonpublic forum workplaces, (iv) refusing to leave when politely asked, (v) intimidating them by demanding they call the police to make you leave, (vi) asking them repeated questions while twisting their words to frustrate and provoke them, (vii) misdirecting public records requests to "test" their knowledge and require them to expend resources by responding, (viii) publishing self-

servingly edited and one-sided aggressive, defamatory, or harassing videos, (ix) doxing employees, (x) engaging in character assassinations of opposing counsel during litigation to which he is a party, (xi) intimidating opposing counsel by lobbying for the termination of their employment, (xii) inviting harassment onto government employees by engaging in performative litigation, or (xiii) by otherwise misusing the judiciary. Ribar's behavior is in sharp conflict with the First Amendment's purpose to facilitate public debate.

The Court should enter a preliminary injunction that will remain in effect during the pendency of this case. Despite evidence of mental harm from his actions, and the Court's recent finding that "[i]ntimidating litigants and defense counsel appears to be [Ribar's] goal," Ribar proceeded to publish several disturbing and harassing videos related to this case. In one, he displayed the Senate confirmation hearing for the Judge of this Court and referred to her as a "social justice warrior," facilitating comments from his followers such as, "These judges need to be put down like rats in Farmers fields." As of the time of this filing, Ribar has chosen to let these and other incendiary comments remain posted.

In other posts, Ribar continued to defame defense counsels, calling them liars, and again labeling undersigned counsel as "Lying Lindsay." He ridiculed and belittled defense counsels for the mental suffering he caused them. He stationed himself outside undersigned counsel's office building attempting to pass out flyers for a video of "Lying Lindsay."

An injunction that prohibits Ribar from: (1) coming within 100 feet of defense counsels and their staff, the Library, Defendants Bowen, McKenzie, and Cole (except if attending a hearing in this case or, at the Library if attending a public meeting or using it for emergency evacuation); (2) physically entering the Washoe County D.A.'s Office (1 S. Sierra Street, 4th Floor, Reno, NV) or the gated-entry parking lot for the Washoe County D.A.'s Office staff; (3) submitting public records requests directly to defense counsel, and instead using the Washoe County online public records request portal; and (4) posting content from or regarding this case, including individual defense counsels, witnesses, and individual defendants. Additionally, the Court should exercise its inherent authority to sanction, find

that Ribar has acted in bad faith, and award County Defendants their attorney's fees in connection with the briefing in support of this Motion and the preceding restraining order motions. This injunction is necessary to protect the fair administration of justice in this case. An award of attorney's fees is also a critical deterrent to prevent Ribar from persisting in further acts of bad faith, harassment, stalking, and intimidation.

## II. RIBAR'S ESCALATING HARASSMENT AND STALKING

### a. 2024 Doxing and Harassment of County Defendants

The following summarizes Ribar's history of harassing and doxing Defendants Bowen and McKenzie. Ribar is aware of the doxing and the effects of his harassment; in March and May 2025 County Defendants filed a Motion for Protective Order prohibiting publication of discovery (ECF No. 64) and a related Motion Prohibiting Video Recorded Depositions (ECF No. 90). The Magistrate Judge overseeing discovery granted a protective order and order prohibiting deposition video recording. (ECF Nos. 89, 98). These facts are relevant now, demonstrating that Ribar is aware of the potential for doxing and likelihood of mental distress from his conduct.

Ribar is a self-proclaimed journalist and "First Amendment auditor" who operates various social media accounts with tens of thousands of subscribers. *See* (ECF No. 64-6); *see also* (ECF No. 168 at pp. 9–12) (reflecting Ribar's evidence that his Facebook page receives several million views). Ribar remarked that users' comments "help[s] with the algorithm" of his YouTube channel, presumably meaning it boosts his ability to reach viewers. *See id.* at p. 21. In a 2024 comment, Ribar encouraged viewers to repost his video because he was "[g]etting privacy strikes from youtube complaints. Spread the word!!" *Id.* at p. 20.

After Ribar posted videos of Defendants Bowen and McKenzie and their work email addresses in August 2024, they received harassing and frightening emails. (ECF No. 64-5, attached hereto as Ex. 1); (ECF No. 64-7, attached as Ex. 2 at ¶¶5–17); (ECF No. 64-8, attached as Ex. 3); (ECF No. 64-9, attached as Ex. 4 at ¶¶5–10, ¶18). One person both commented on Ribar's video (ECF No. 64-6 at p. 21) and sent Defendants Bowen and

McKenzie a barrage of disturbing emails: "…you lying fucking pervert…" (Ex. 1 at p. 24); "You and your bubblehead girlfriend should both be fired. You're both fucking ignorant perverts." (*Id.* at p. 25); "You grinning fucking clown" (*Id.* at p. 1); "**You'll pay cunt**" (Ex. 3 at p. 2 (emph. added)); "**You're gonna pay bitch**" "You don't get to allow somebody to have their rights you dumb fucking whore" (*Id.* at p. 3 (emph. added)); "**Somebody should slap you in the fucking face** you pig" (*Id.* at p 4 (emph. added)); "Violent lying whore" (*Id.* at p. 6); "…**Watched you be a fat lying whore** of an americlown **on YouTube**…" (*Id.* at p. 8 (emph. added)); "Bye bye whore" (*Id.* at p. 9); "… you fucking ignorant Cunt" (*Id.* at p. 14).

Defendants Bowen and Mckenzie received several other emails that included the following language: "…you silly silly pervert [four middle finger emojis]" (Ex. 1 at p. 2); "…**you are a tyrant CUNT**. It's public property…We can criticize our government employee whenever we want… **We will come and video you all we want you fucking NAZI BITCH**" (*Id.* at p. 3); "…You should either educate yourself or resign immediately!" (*Id.* at p. 4 (emph. added)); "all your feelings mean nothing… you idiots at libraries are fkn nazis…you would think you idiots with books and info you would know the first amendment. pound sand you mutt…" (*Id.* at p. 8); "…you are a disgrace to America…grooming pedos… STOP GRPOOMING [sic] KIDS YOU SICK FUCK." (*Id.* at p. 15); "Tyrant Librarian… If you can't handle peoples' Right to Free Speech…being called a pervert, which you most certainly are….you cant trespass them without them having broken a LAW. Feckless, brainless, immoral trash people, like you, is why this country/this world is falling apart." (*Id.* at p. 18); "You got busted you fucking CUNT. Typical tyrant employee." (*Id.* at p. 20); "You are an uneducated **lying disgusting piece of shit** hopefully you get fired soon… You don't deserve to serve the community… You should be ashamed of yourself and quit…" (Ex. 3 at p. 13 (emph. added)); "You are a fucking CUNT…You NAZI CUNT. **Please go home and unalive yourself please, you are a waste of space** in this Free America." (*Id.* at p. 11 (emph. added)); "… pull your head out of your ass before you get the living shit beat out of you. You trespassed a person for reasons that fit your style. **You do the same to me and my group, and**

**you'll be held to the whipping post and punished accordingly**. Resign ASAP…You are a horrible person and you should leave our community." (*Id.* at p. 9 (emph. added))

Defendants Bowen and McKenzie also received harassing voicemails in August 2024. Ex. 2 at ¶9; Ex. 4 at ¶11. The voicemails were similar and referred to them as Nazis, said they owed money, " to pay up," told Defendant Bowen that she joined the Nazis "the moment that [she] started pulling [her] BS with the library," that she would be on the front page of a newsletter for pedophiles looking to hire "groomers" "just in case they want to hire [her]… to groom their children," that they would be "randomly sending people in," that Defendant Bowen could move to Russia, North Korea, or Cuba, and as a "gay American female" those countries would "put [her] in jail and kill [her]." *Id.*

As a result of Ribar's videos and the ensuing doxing, Defendants Bowen and McKenzie experienced significant mental distress. Ex. 2 at ¶7, ¶8; Ex. 4 at ¶¶9–17. The email threatening to beat and whip her made Defendant Bowen fear for her personal safety. *Id.* at ¶8. She had difficulty with her work and took time off. *Id.* at ¶7. She sought mental healthcare and took medication to help her sleep. *Id.* at ¶10; ¶12; ¶14. Discussing these occurrences with her family humiliated her. *See id.* at ¶12. She also expended personal funds on an "online deletion platform" to mitigate harassing contact. *Id.* at ¶13. Defendant McKenzie experienced interference with her work. Ex. 4 at ¶12. She spent personal time and money on home security and to removing her online information. *Id.* at ¶13. She was humiliated and unable to sleep due to her stress and fear. *See id.* at ¶16, ¶17.

**b. In Summer 2025, Ribar Expanded his Aim to Defense Counsels and BOC.**

In August 2025, Ribar posted a video attacking undersigned counsel. *See* Ex. 5. He asks his viewers, "WANT TO SEE ATTORNEY LIDDELL LIE IN A COURT //

//

//

//

//

-9-

DOCUMENT??" *Id.* at p. 1. He displayed a filing in this case, saying "WHY LIE??,"[1] and inviting his viewers to "ASK HER AT LLIDDELL@DA.WASHOECOUNTY.GOV." *Id.* at p. 2. Shortly after, Ribar posted another video where he attended a campaign event for counsel's employer and publicly told the District Attorney in front of several attendees, "…one of your attorneys, Lindsay Liddell…lied to the Court…" Ex. 6.

On September 6, 2025, Ribar attempted to attend a private Pride festival event, but apparently was not permitted to do so. Since then, Ribar's harassment and inappropriate conduct substantially escalated toward individuals involved in this case.

On September 10, 2025, weaponizing the Nevada Public Records Act, Ribar submitted a frivolous records request to undersigned counsel. Ex. 7. Ribar is well aware of the laws governing public records requests, including the requirement that the recipient respond within five business days regardless of whether they have the records. *See* NRS 239.0107(1). He inappropriately consumed counsel's time and resources in requiring her to respond and inform him of what he already knew. *See* Ex. 7.

On September 16, 2025, Ribar posted a video of his harassing contact with BOC volunteer, YeVonne Allen, at her workplace, Truckee Meadows Community College. Ex. 8 *see also* Ex. 5. Despite history of his harassment and victims experiencing doxing, Ribar posted live feed video to his YouTube channel displaying Ms. Allen's personal FaceBook page. Ex. 8 at 0:15:23–16:11. Ex. 9 at p. 1–2. Even more contemptible, Ribar guided his viewers to the "relationship" section of Ms. Allen's personal account, and then to Ms. Allen's fiancée's personal FaceBook account, a private person with no connection to Ribar or the instant case. *Id.* He announced and displayed the full name and workplace of Ms. Allen's fiancée. *Id.* Ribar's harassment and oppression of Ms. Allen and her fiancée demonstrates a

---

[1] The "lie" that Ribar alleges is based on County Defendants' description of his camera equipment as a "bulky tripod." Apparently, Ribar's camera attachment is technically a "gimbal," which has many features including a built-in tripod. It is a distinction without a difference. *See e.g.* Ex. 11 at 0:15:12–28.

dangerous escalation into the private lives of his targets with no legitimate justification besides inciting intimidation and harassment.

Around midnight, early into September 17, 2025, Ribar emailed a video hyperlink to undersigned counsel and the employer of BOC's counsel, with the subject line "Do not lie to me." Ex. 10 at pp. 2–3. When counsel responded that it appeared to be another false accusation of lying, Ribar continued to accuse defense counsel of lying. *Id.* at p. 1–2. That day, Ribar attended a Library Board of Trustees ("LBOT") meeting and displayed grossly inappropriate behavior. *See* Ex. 11; Ex. 12; Ex. 13; Ex. 14. Before the meeting, he handed copies of the purported "banned list" from the Pride event to the LBOT Trustees, aggressively calling one a "fucking communist." Ex. 11 at 0:04:49–4:53; Ex. 12 at ¶3; Ex. 13 at p. 1. He sarcastically announced, "I might be a little angry." Ex. 11 at 0:05:12–17; Ex. 13 at p. 2. During the initial public comment period, Ribar refused to comply with the decorum rules and forced the meeting to briefly recess while he verbally sparred with the LBOT. Ex. 12 at ¶4; *see also* Ex. 11 at 0:15:59–18:32. In the last public comment period, Ribar claimed to be on a "political hit list," and discussed "killing some conservatives." Ex. 11 at 0:29:46–31:08; Ex. 12 at ¶5; Ex. 13 at p. 3; Ex. 14.

Ribar's YouTube posts are a breeding ground for the same type of threatening rhetoric and endorsement of violence toward individuals involved in this case, for example with one viewer commenting that it was "nothing 2A [the second amendment] cant fix…" and another that, "The left are extremely violent. I would recommend all persons not democrat extremists to excersize [sic] their 2nd ammendment [sic] for self protection." Ex. 13 at p. 6.

Also during the September 17, 2025, LBOT meeting, Ribar harassed members of the public. *See* Ex. 8 at pp. 4–6. Two young people who are, to Defendants' knowledge, unaffiliated with any defendant in this case, were in the audience filming the meeting and Ribar for a "movie." *See* Ex. 11 at 0:09:11–10:59. They adopted comic mannerisms, German accents, and theatrical wardrobe, and nonetheless have as much right to be present for the LBOT meeting as Ribar. *See id.* After the meeting, Ribar followed them outside, and

attempted to follow them to their vehicle. Ex. 11 at 0:35:38–39:28; Ex. 13 at pp. 4–6. One told Ribar, "I feel threatened by you right now, sir." Ex. 11 at 0:37:00–50; Ex. 13 at p.4. Ribar continued to follow them and said, "I'm just going to get your license plate." *Id.*

In September, Ribar posted several videos of his visit to the workplace (University of Nevada, Reno) of Dr. Allen Ratliff, a BOC board member. *See* Ex. 15. The school Dean, Dr. Lillian Wichinsky, explained to Ribar that Dr. Ratliff's conduct on Dr. Ratliff's own time "has nothing to do with the school of social work," to which Ribar argued that because Dr. Ratliff earns his wages from a tax-payer-funded employer, what he does in his free time is subject to inquiry. *Id.* at 1:16:27–55. Ribar refused to leave when asked, and told Dr. Wichinsky to call the police. *Id.* An Assistant Dean, Brandon Ford, later asked Ribar to leave, to which he again refused, demanded Mr. Ford call the police, and said he would only leave "under threat of arrest." *Id.* at 1:19:01–44. Ribar appears to believe he is entitled to interfere with individuals' private lives simply because they are government employees, and will harass others connected to them to intimidate and embarrass them *See id.*

Following Ribar's videos, Dr. Ratliff and his colleagues were doxed. Exs. 16–20. During his video, he displayed their work contact information. *See* Ex. 15 at 1:14:02–29; Ex. 16 at pp. 1–2. Reading Dr. Wichinsky's name aloud, he stated, "that sounds Polish." Ex. 15 at 1:14:16–29. Dr. Wichinsky then received an email, calling her a racial slur, "filthy Polock," and stating "You filthy communist scumbags…. We will not allow you faggots to destroy our high level societies… We are legally and lawfully going to fucking destroy you!" Ex. 17 at ¶2, Ex. A. Mr. Ford, a black man (*see* Ex. 16 at p. 3), received an email received an email titled "[N-word]!" stating, "Hey [N-word], are you trying to intimidate an old white man? …there are some of that out here that remember the [19]50's and aren't scared of you low IQ mother fucker's! [sic]" Ex. 18. Dr. Ratliff received an alarming voicemail from an individual claiming to be an attorney named "Peter Truman," claiming to specialize in suing "public idiots, of which you are now one," and threatening to "take everything you have- your position at uh college, your retirement, your real estate, your vehicles. So sir, be

prepared to lose that all…We will be there this coming Wednesday of the week. We will hunt you down. We have a subpoena for you…You have the night you deserve, Mr. Ratliff." (ECF Nos. 161-1, 162). The main line for Dr. Ratliff's School of Social Work received a similar voicemail. Ex. 17 at ¶2, Ex. B. Mr. Ford was sent a voicemail from the same person, who said Mr. Ford was "being sued…for being an asshole," that they would be coming to his workplace that week, and said, "I would call you can asshole but that's too light of a word. You're a motherfucker." Ex. 19; Ex. 20.

Despite BOC's initial restraining order motion filed September 18, 2025, outlining the safety concerns and harassment from Ribar, he did not relent. *See* Ex. 21. On or about September 20, 2025, Ribar posted another YouTube video centered on attacking Ms. Kertis titled "LYING ATTORNEY CAUGHT RED HANDED." *Id.* at p. 1. Thereafter, Ribar posted the video to "X"/Twitter and engaged in a dispute with a Nevada journalist stating "Check out LYING attorney Alison Kertis" with a link to his video. *Id.* at p. 2. That same day, he also posted a video along with words stating, "Attn. Lindsey Liddell, Washoe County's attorney, is accused of interfering with a political candidate." Ex. 22 at p. 1.

On October 15, 2025, the parties attended a hearing in this case. Ex. 23 at ¶7. Given Ribar's recent harassment, when the hearing concluded, defense counsels raced to the women's restroom hoping to allow Ribar sufficient time to exit and avoid unwanted confrontation. *Id.* When counsels attempted to exit a few minutes later, Ribar was on this Court's pavement next to the rotunda filming himself. *Id.* As counsels exited, Build Our Center's counsel Ms. Kertis walked past Ribar who began shouting at her, something to the effect of "ALLISON! DO YOU ALWAYS LIE TO JUDGES IN COURT?" *Id.* Undersigned counsel panicked and swiftly walked away, hiding behind a utility box at the crosswalk to avoid Ribar's line of sight and avoid harassment. *Id.* The interaction caused substantial distress and disrupted her ability to work on other matters. *Id.*

Ribar also obtained, without authority, an attorney-client privileged email sent by undersigned counsel to her clients regarding his harassment. Ex. 23 at ¶8. He refused to

disclose how he obtained the email and continues to use it to harass counsel. *See id.*; (ECF No. 141 at p. 63, 142 at p. 63, 143 at p. 63) (reflecting an email from undersigned counsel with the subject line "*confidential attorney-client privileged* Ribar lawsuit."); (ECF No. 160 at pp. 5–8); (ECF No. 166 at pp. 5–6) (ECF No. 170 at p. 71); Ex. 22 at p. 2; Ex. 24 at pp. 1–4, 6– 7 10, 14–15; He sent it to a local political gossip blog, Picon Press, who published a story about it, amplifying his harassing tactics. Ex. 24 at p. 10.

Ribar continues to post defamatory content about defense counsels and about this case on social media. *See* Exs. 22, 24. On October 22, 2025, he posted a video in front of undersigned counsel's office building in which he proclaims, "…never trust the district attorney because they might send out emails where they lie to you. And then the guy dealing with it might get copies of it." Ex. 25; Ex. 26 at pp. 1–5. Ribar appears to be taunting undersigned counsel and displaying his perceived power in obtaining her confidential and privileged email. *Id.*; Ex. 23 at ¶8.

Also on Wednesday, October 22, 2025, Ribar attended a state court criminal case hearing whereafter he pestered the prosecutor, undersigned counsel's coworker. *See* Ex. 23 at ¶9. Ribar attempted to ask the prosecutor several questions, despite the prosecutor stating he did not wish to speak with him. *Id.* Ribar asked something like, "Are you trying to silence the First Amendment like Lindsay Liddell?" *Id.* Undersigned counsel learned that Ribar was outside her office building for some time, and she was present in the office that day. *Id.* Ribar's lingering presence outside the office caused substantial distress and panic. *Id.* She was unable to complete any substantive work due to the anxiety it caused and was instead forced to employ coping mechanisms to avoid a panic attack. *Id.* Undersigned counsel felt unsafe leaving the building to get to her vehicle until she confirmed Ribar had left the premises. *Id.*

On October 25, 2025, Ribar posted an alarming video regarding defense counsels and the above-mentioned prosecutor, using a photograph of undersigned counsel apparently found online. Ex. 27; Ex. 26 at pp. 6–15. In it, Ribar displays the photograph, stating

undersigned counsel's name, stating "she's got quite a history actually on her." *Id.* at p. 8. Talking to his audience, Ribar states, "…So what I found on Miss Liddell is she likes to make stuff up and tell lies…" Ex. 27 at 0:05:54–06:04; *Id.* at p. 9. He continued to taunt undersigned counsel, using an aggressive tone to state, "If I'm libeling, sue me. Lindsay Liddell, you have lied. I'm proving it." Ex. 27 at 0:23:52–24:07; Ex. 26 at p. 11. He proclaimed that undersigned counsel is "the epitome of government corruption." *Id.* at p. 13. He then taunted BOC's counsel, aggressively stating, "Hey, Allison, if I'm libeling you, sue me." Ex. 26 at p. 14; Ex. 27 at 0:38:18–24; *see also* Ex. 27 at 0:34:45 –35:05 (aggressively asserting, "you fucking liars, you lied to the court, you perjured yourself, you fucked up"). Ribar also explained that in following people to their vehicles while filming, he "want[s] to get your license plate so [he] can know who you are." Ex. 27 at 0:10:32–46; Ex. 26 at p. 10.

Ribar also embarked on a defamatory and intimidating social media campaign against undersigned counsel, including posting the following:

- On a DA's Office post about dog training, Ribar commented, "Was the dog searching for Lindsay Liddell's lies to her clients about me…" Ex. 24 at p. 1;

- On a DA's Office Facebook post about Domestic Violence Awareness Month, Ribar commented, "why did your Deputy DA Lindsay Liddell lie about me to her clients??," then tagging Washoe County Commissioner Chair Alexis Hill to put "this issue" on a board agenda, "Or do you support corrupt government [emoji]." *Id.* at p. 2;

- On a DA's Office Facebook post, Ribar commented with a photo of undersigned counsel's attorney-client privileged email, stating "…Check out this email that was sent to their clients LYING about me!!…" *Id.* at p. 3;

- On a DA's Office Facebook post, Ribar commented that DA Hicks "allows (perhaps encourages [pondering emoji]) his Deputy DA Lindsay Liddell to LIE about me to his clients and to mislead the court…" and included a copy of the attorney-client privileged email. *Id.* at p. 4;

- On an old March 2024 post from the DA's Office's X/Twitter about undersigned counsel, Ribar replied asking if it was a pattern and practice for its "attorneys to lie to clients and misrepresent non factual things to the courts [pondering emoji]," and included a link to his YouTube video. *Id.* at p. 5;

- On County Commissioner Alexis Hill's FaceBook post, Ribar commented to her, "…Do you believe lying… Deputy DA Lindsay Liddell should be fired [pondering emoji] Why would she lie … about me in this email??," and included the privileged email. *Id.* at p. 6;

- On a County Commissioner Alexis Hill FaceBook post, Ribar responded to another person, asking if they saw the privileged email counsel's clients "… where she lied about me?? Should lawyers lie [pondering emoji] Should our elected servants allow corruption [pondering emoji]." *Id.* at p. 7;

- Responding to the State Bar of Nevada's X/Twitter post about bar exam results, Ribar replied, "Will these new attorneys follow in their predecessors footsteps and be lying Nevada Bar Attorneys like Lindsay Liddell and Allison Kertis?? … stay tuned bar complaints and videos comping soon." *Id.* at p. 9;

- Commenting on a local news blog, Picon Press, FaceBook post, Ribar including a copy of undersigned counsel's attorney-client privileged email and stated, "would you believe… Deputy DA lied about me in an email to her clients? Would you believe the DA office appears to be working hand in glove with Our Center attorney Alison Gansert Kertis…" *Id.* at p. 10;

- Replying to Nevada Attorney General Aaron Ford's X/Twitter post, Ribar sent a video mentioning undersigned counsel and asked, "Will you prosecute attorneys that lie/commit perjury [pondering emoji] or do you support corrupt government [pondering emoji]" *Id.* at p. 11;

- Replying to a Las Vegas reporter's X/Twitter post, Ribar included a YouTube link stating "…Check out LYING attorney Alison Kertis" *Id.* at p. 12;

- Replying to acting U.S. Attorney for the District of Nevada, Sigal Chattah's X/Twitter post, Ribar asked when she would investigate BOC. *Id.* at p. 13.
- On County Commissioner Clara Andriola's Facebook post, Ribar commented, "Check out… Deputy DA Lying Lindsay Liddell letter to her clients about me!!" with a photo of the privileged email. *Id.* at p. 14.

On October 29, 2025, Ribar filed a bar complaint against defense counsels and filed the same in this case. (ECF No. 171). Ribar also emailed a copy of the baseless complaint to undersigned counsel's employer, DA Hicks. *See id.* at p. 10.

Like counsel for BOC, undersigned counsel suffered significant mental anguish resulting from Ribar's recent behavior. *See* Ex. 23 at ¶¶10–22. Undersigned counsel has taken precautions to avoid Ribar's harassment, including avoiding events and Library branches where Ribar may be present, as well as precautionarily working from home, and carrying protection devices. *Id.* at ¶10. Undersigned counsel remains on high alert in public. *See id.* at ¶13, ¶¶15–17, ¶¶21–22. Ribar's escalating, obsessive and alarming behavior has caused counsel to experience several panic attacks, disrupting her work and home life. *Id.* ¶11. Undersigned counsel also experienced substantial disruption and inability to sleep, exacerbating the anxiety Ribar continues to cause. *Id.* Undersigned counsel was required to

seek mental healthcare, had high blood pressure, and received prescription medication as a result of the mental harm Ribar's behavior has caused her thus far. *Id.*

Ribar continues to show no regard for the professional decorum that litigation mandates, no regard for personal boundaries, and continues to harass, oppress, and engage in threatening behavior, evoking fear from those involved. He followed people toward their vehicle with the stated intent to get a license plate so he can "know who [they] are." Ex. 11 at 0:37:00–50. Ribar admitted during the last hearing in this case that his towing company gives him access to database(s) that identify home addresses, but claimed he would not use that access. This nonetheless gives rise to fear and distress that Ribar may be able to locate home addresses, even if they are confidential, as Ribar continues to show. Ex. 23 at ¶22.

**c. Ribar's Conduct After County Defendants' Emergency Motion.**

On October 29, 2025, County Defendants refiled their Motion for Restraining on an Emergency Basis due to Ribar's continued escalating harassment. (ECF No. 172). On October 30, 2025, Ribar published a livestream video on his YouTube and FaceBook accounts titled "LYING ATTORNEYS try for TRO on ME!!!" Ex. 28. Guiding viewers through the Motion and counsel's declaration, he made the following statements:

- "…they lied to the Court. That's why the title of this is Lying Lindsay. She's lied to her clients in an email… **Lying Lindsay lies about me**. Why do you gotta lie? I hate liars." (Ex. 28 at 0:03:49–04:05);

- "You're supposed to be a professional Lindsay. A professional." *Id.* at 0:05:17–22;

- "…We the People. You know, Lindsay, you're supposed to serve us. Did you take an oath, Lindsay Liddell, to uphold the Constitution, enforce the laws of the land… I really just wish you'd stop lyin'." *Id.* at 0:05:47–06:04;

- "…instead of serving the people, you're [undersigned counsel] just trying to harm people. Hey, that part's my opinion, but you're still a liar. **Sue me for libel if I'm not telling the truth Lindsay. You lied.**" *Id.* 0:06:45–57;

- "[Washoe County D.A., and undersigned counsel's employer] Christopher Hicks, **you need to fire this Lindsay Liddell chick**- because, again, sue me, but you're A LIAR." *Id.* at 0:12:25–34;

- "[loudly] **Hey! Lindsay, I hope you're watching today**." *Id.* at 0:13:41–44;

- "She's [undersigned counsel] anxious?! She's a very anxious woman." *Id.* at 0:15:51–54;

- "Yeah, **she [undersigned counsel] needs to resign**." *Id.* at 0:17:41–5;

- Ribar laughed at the statement that defense counsels ran to the bathroom to evade him following a court hearing. *Id.* at 0:20:28–33;

- "…Ms. Liddell, you're part of the corrupt government," and taunting undersigned counsel for not wishing to speak to him "on camera." *Id.* at 0:22:40–46;

- Ribar read counsel's description of the mental distress resulting from Ribar shouting at counsel Alison Kertis outside the courthouse in a sarcastic and demeaning tone, called counsels "lying pieces of garbage," and **in response to counsel's statement about being unable to focus on other work Ribar laughed and stated, "Why? Were you drinkin' or somethin'**?" *Id.* at 0:23:10–25:00;

- Ribar taunted undersigned counsel regarding his unauthorized possession of an attorney-client privileged email from undersigned counsel to clients, accused counsel of lying, and stated he filed a Bar complaint against counsel with "more coming." *Id.* at 0:27:54–28:38;

- Ribar read undersigned counsel's description of the mental distress she experienced when Ribar was outside of her office building on October 22, 2025, and stated, "**[laughing] Oh I make your heart rate go up. That's fuckin' sad. [continued laughing]** …[laughing and smiling while reading that undersigned counsel became very shaken and felt like she could not breathe]…[**laughing that undersigned counsel engaged in coping mechanisms to avoid a panic attack**]… Oh Lord God! Help me….[using a sarcastic tone] **Lindsay, you need a drink or somethin' [continued laughing] oh, chill out girl**. *Id.* at 0:29:36–30:31;

- "[with a demeaning tone] I don't care about you Lindsay, other than you lied…," and claimed he "won't hurt a single hair on your [undersigned counsel's] head…" *Id.* at 0:34:49–35:19;

- [regarding undersigned counsel's statement that Ribar's behavior was causing her daily anxiety, Ribar sarcastically stated, "Sorry Lindsay. Don't lie! That's all you gotta do!" *Id.* at 0:38:26–39;

- Referring to the Motion, "This is what losers do. They deflect. If you gotta strong case, just go with your strong case and HAMMER MY ASS" *Id.* at 0:38:50–59;

- "**She sought mental healthcare because of me [laughing] She sought mental healthcare because of me! [continued laughing, eye rolling]** Oh Jeeze! Oh shit! [continued laughing] Why do you [undersigned counsel] need to fuckin' talk to anybody about this bullshit?! [shaking head]…" *Id.* at 0:39:20–59;

- "Lets keep reading this line of bullshit this woman has written." *Id.* at 0:40:20–37;

- "Oh! She carries protection devices now- I wonder what these protection devices are. **HEY LINDSAY, I LOVE THE 2A [Second Amendment] I hope you're carrying a gun. Make sure you're well protected**. Open carry. I just believe in the 2A I'm not gunna say anymore than that… without the Second Amendment we don't have the First Amendment. Thank God. *Id.* at 0:40:48–41:47;

- Reading undersigned counsel's statement that her blood pressure was high from the stress Ribar caused, Ribar sarcastically stated, "oh lord! Eat better, okay. Bananas, they're high in potassium…[laughing]" *Id.* at 41:22–39;

- Regarding undersigned counsel being prescribed medication as a result of the mental distress from Ribar, he exclaimed, "**Hey cool! She's got some drugs now! [laughing] She gets to go to work and stay high!** [laughing] *Id.* at 0:41:39–54;

- "**Hey Lindsay, if you're watchin' this video I appreciate it**. Thanks very much. Keep tunin' in. And Lindsay, if you like it, hit that like button. Comment. Subscribe, you know…" *Id.* at 0:41:58–42:10;

- "**If you're so goddamn weak, take yourself off the case and put a real attorney on it**…" *Id.* at 0:42:53–43:00;

- Regarding undersigned counsel's statement of working from home as a result of Ribar's behavior, he stated, "Keep doin' that Lindsay!, and told counsel, who is female, "you gotta kid. Take care of your babies…" *Id.* at 0:44:44–59;

- Regarding LBOT Trustee Rodriguez, Ribar stated, "I'll say it exactly as I told it to your face. [demeaning tone] You're a fucking communist…[sarcastic tone] That must've really hurt when I called you a communist. You should go cry. [smiling]" *Id.* at 0:51:10–49; and

- Ribar encouraged viewers to go to Defendant BOC's Board Member, Dr. Ratliff's workplace, stating "Go to the School of Social Work and do a public records request. Find out who Mr. Allen Ratliff is…" *Id.* at 0:54:18–39.

On October 30, 2025, the Court issued a temporary restraining Order that prohibited Ribar from physically approaching defense counsel, defendants, and any employee thereof, prohibited him from physically entering defense counsel's parking lot, prohibited from sending public records requests directly to defendants and defense counsel, and prohibited him from posting content on social media about the case. (ECF No. 176). Despite this Order, Ribar posted on five different social media platforms about the aforementioned Order. *See* Ex. 29. On one post, Ribar maintained an alarming comment from another user: "send them my way. Id like to see the ZOG machine do something about protected speech." *Id.* at p. 1. On information and belief, "ZOG machine" refers to the antisemitic "Zionist Occupation Government" conspiracy that Jews secretly control governments.

**d. Ribar's Conduct Following the Court's Amended Restraining Order.**

On November 5, 2025, this Court issued an Amended Restraining Order removing the provision prohibiting Ribar from posting about this case, defendants, and witnesses. *See*

(ECF No. 186). On or about November 7, 2025, he commented on an October 31st DA's Office post about Nevada Day with his photo of counsel's privileged email, stating "Check out… Deputy DA Lying Lindsay Liddell letter to her clients about me!!!" Ex. 24 at p. 15.

On or about November 7, 2025, Ribar published a disturbing video about this case titled, "Journalist Gagged by Court," on his social media pages, with a cover image of himself with a gag physically covering his mouth. Ex. 30 at p. 1; Ex. 31. In the video, he attacked this Court, first stating, "So uh…**let's find out who this Judge Anne Traum is**." Ex. 31 at 0:06:58–0:07:04. He displayed a portion of Judge Traum's Senate confirmation hearing for her judiciary appointment. *Id.* 0:07:15–14.14. Ribar added commentary, "This is the woman that signed that uh restraining order…," "This is Judge Anne Traum, my Judge, getting her confirmation. So, **you all [Ribar's viewers] decide what kind of judge she is** and what her- is she a fair and neutral impartial judge." *Id.* Later, Ribar remarked, "…I'm finding that the courts are just as corrupt as the rest of it--at least the way I consider **this left-wing Biden judge that uh, you know, is a social justice warrior**." *Id.* at 0:26:44–57. He also stated, "… Federal Judge Anne Traum doesn't uh seem to think that need to pay attention to the laws [sic]…" (*Id.* at 0:35:57–36:05), and, "**So in…Nevada, United States District Judge Anne Traum, it's all about feelings over facts and which political side she thinks you're sitting on.** It's my opinion. Don't do any harm…" (*Id.* at 0:38:15–40).

The video gave rise to alarming comments from Ribar's viewers. Ex. 30 at pp. 2–3. Most concerning, a profile named "Warhammer Netherlander" commented, "**These judges need to be put down like rats in Farmers fields**." *Id.* at p. 3. Others include, "Fuck that tyrant judge," "She's definitely corrupt," "Keep it up Drew… We are basically getting great clarification on the definition of Tyranny…" *Id.* at pp. 2–3. There was also the strange comment, "She's married to the ABA!" *Id.* at p. 3. Ribar is aware of the comments, because // he also commented, "thanks for watching." *Id.* at p. 2. To date, these comments, including that judges be "put down like rats," remain on Ribar's Facebook page. Ex. 23 at ¶26.

Ribar's video also remarked about defense counsels. With regard to the mental distress Ribar caused defense counsels, Ribar rhetorically asked in a demeaning tone, "**Should they be doing this job if they got mental health issues?**" Ex. 31 at 0:18:48–56. He added, "…why are we paying somebody with mental health issues tax dollars to represent people? And if you can't handle just some guy on the internet who talks about this stuff and you don't sue him for libel because everything I do is truth… I don't get it." *Id.* at 0:19:18–45. He stated, "when you've got everything documented and **you can't win, you gotta cheat and lie and steal**….**That's what this Lindsay Liddell is doing along with Alison Kertis**. They're just lying to everybody." *Id.* 0:23:40–54.

Between November 7th, 8th, and 9th, Ribar published a three-part series titled "Obeying Judge Anne Traum," across his social media platforms where he guided viewers through the videos of defense counsels for the court-ordered log. Ex. 32; Ex. 33; Ex. 34. He claims that "in the last 28 days, my channels, my social media has had 73 million views." Ex. 32 at 0:11:57–12:06. In his first video Ribar displayed a photo of BOC counsel, stating in an aggressive tone, "**Hi, Alison. Welcome to the internet, you lyin' sack of crap. I cussed at you! Does that make you afraid again? Again, go pop some pills. Not my problem.**" *Id.* at 0:33:53–34:09. He also stated, "They watch my videos. **HEY ALISON. HEY LINDSAY. YOU LYIN' SACKS OF CRAP**." *Id.* at 1:27:44–55. He went on, "… **the judge is easily manipulated because she's part of this social justice bullshit**." *Id.* at 1:28:31–41.

In Ribar's November 8, 2025 "Obeying Judge Traum Part 2" video, he continues his harassing, defamatory, and bizarre rhetoric about the case. Ex. 33. Going through and replaying videos for his "log," Ribar announced, "uh oh! Here's one. I was naughty! Here's the name, Alison Kertis, and I said she lied in Court and there's her picture. So I better make sure we share this with the judge…", then played a video of himself aggressively calling Ms. Kertis a liar. *Id.* at 0:22:53–23:37. Ribar invited viewers to "donate to [him]," displayed a QR code to receive funds, and instructed that a donation link was also available. *Id.* at 0:31:56–32:57. He asserted, "So this judge is a liberal judge that's making me do this…" and

proceeded to display a clip of Judge Traum's Senate hearing, sarcastically stating, "**That's my judge. Wouldn't you want to be in front of her?** [Shakes head]." *Id.* at 0:42:29–48:06.

In part 3, Ribar continued to assert that undersigned and BOC's counsel "lied to the Court." Ex. 34 at 0:01:00–21, 0:59:44–52. He aggressively declared that defense counsels are, "these two fucked up and mentally ill attorneys. At least Lindsay Liddell…she's had to go to mental health counseling to deal with them when all you got to do Lindsay, is sit down with me…but instead you gotta play these bullshit games where you're afraid…" *Id.* 0:40:20–54. He explained, "…the Court ordered me to go find these fuckin' videos about these piece-of-shit attorneys…" *Id.* at 0:41:28–38. He stated, "I'll give them [counsels] more words to use. **Wacked-out,-fuckin' psychotic, probably borderline personality disorder, Lying sacks-of-shit Attorneys.**" *Id.* at 0:41:40–51. He claimed, "the government is punishing me. This judge is punishing me. When I've done nothing." *Id.* at 1:16:02–23.

Ribar posted on social media about this Court, "Judge Anne Truam has a vast gag order issued on me…" (Ex. 30 at p. 1), and "The Constitution and rule of law do not exist in Judge Anne Traum's court…" (*Id.* at p. 4). He posted generally, "Bad Judges that do not follow the rules, laws and UPHOLD Constitutional Rights have got to GO!!!" *Id.* at p. 5. On November 12, 2025, he reposted a local news article about this case, stating, "Gotta be doing something right when… DDA Lindsay Liddell has to make up lies about me." Ex. 22 at p. 6. He reposted another, again suggesting counsels lied to the Court. *Id.* at p. 7.

On November 13, 2025, Ribar was stationed outside the building that houses undersigned counsel's office, where he invited passersby to take a flyer from him, touting an upcoming video about "Lying Lindsay Liddell." Ex. 35; Ex. 36. As people exited the building, they were met with Ribar who loudly asked, "You want to watch a video about a corrupt district attorney?" (Ex. 35 at 0:06:08–13), "You wanna watch a video tonight? [person says no] about a lying district attorney…I'm going to do a little livestream…" (*id.* at 0:06:31–40), "You wanna watch a video about uh district attorneys lying?...wanna watch a video about lying district attorneys? [person says no] You don't think district attorneys

should lie to the courts and their clients?.. it will be live tonight on YouTube…" (*id.* at 0:07:56–8:57), "I'm gonna publish a video showing Lindsay Liddell lying…" (*id.* 0:09:18–29). Ribar then asked counsel's coworker if he wanted to watch the video, and briefly followed him while loudly questioning him. *Id.* at 0:08:58–9:10. Undersigned counsel understandably felt terrorized by Ribar when she learned of this incident. Ex. 23 at ¶16.

That evening he posted a video, "Lying and Attacking Corrupt District Attorneys," where acknowledged defense counsels "are probably being very truthful with this part-they're very afraid of me." Ex. 37 at 0:00:04–15. In that video, he also guided viewers as he identified BOC's new co-counsel, Rachel Wise (not yet appearing in this case), and commented on her biography from her law firm's webpage. *Id.* at 0:04:09–8:36. He said, "Hi Rachel if you're watchin'," invited her to talk to him about resolving the case, and invited her to do a "livestream" video with him. *Id.* at 0:04:09–5:10. In the 48 hours preceding the filing of this Motion, Ribar appears to have posted several "short" videos regarding counsel and this case, including with accusations of undersigned counsel lying. Ex. 23 at ¶26.

## III.   LEGAL ARGUMENT

### a)   A Preliminary Injunction is Necessary.

"Courts may issue an injunction over conduct that is directly related to the lawsuit." *United Artists Corp. v. United Artist Studios LLC*, No. CV 19-828- MWF-MAAX, 2019 WL 6917918, at *5 (C.D. Cal. Oct. 17, 2019) (enjoining party from "directly or indirectly making any harassing or threatening communications to anyone connected with this lawsuit."); *see also Beyond Blond Prods., LLC v. Heldman*, No. CV205581DSFGJSX, 2022 WL 2784404, at *8 (C.D. Cal. June 17, 2022) (enjoining party from sending harassing or threatening emails, from posting threatening or harassing content about counsels, the parties, or the case, and from coming within 100 feet of opposing party or counsel except in court for that case, and ordering party to remove existing posts referencing opposing parties or counsel). "[T]here is a strong precedent establishing the inherent power of federal courts to regulate the activities of abusive litigants by imposing carefully tailored restrictions under the appropriate

circumstances." *De Long v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir. 1990). "[A] district court has the inherent power to issue an injunction against litigants who harass their opponents." *Yates v. Belli Deli*, No. C07-01405 WHA, 2007 WL 2318923, at *3 (N.D. Cal. Aug. 13, 2007).

A party seeking injunctive relief must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in its favor; and (4) an injunction is in the public interest. *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008)).

### i. County Defendants Have a Likelihood of Success on the Merits.

With preliminary injunctions arising from the Court's inherent authority to protect parties from harassment from another party, the first prong addresses the "likelihood of success on the merits of showing harassment, rather than the merits of the underlying lawsuits." *Beyond Blond*, 2022 WL 2784404 at *5. The Court looks to relevant statute regarding harassment, including applicable state law. *See id.* One court found likelihood of success on the merits where a party sent a series of harassing emails to counsel, including that they need to be disbarred, used foul language with counsel, posted false and defamatory content about counsel online, and posted defamatory reviews of counsel. *See id.* at *1–3.

In Nevada, a person is guilty of harassment where the person knowingly threatens to do any act intended to substantially harm the person threatened with respect to their mental health or safety. NRS 200.571(1)(a)(4). A person is guilty of stalking who willfully or maliciously engages in a course of conduct directed toward a victim that would cause a reasonable person under similar circumstances to feel terrorized, frightened, intimidated, harassed or fearful for their immediate safety and actually causes the victim to feel as such. NRS 200.575(1). Under federal law, the crime of stalking exists when a person uses an interactive computer service with the intent to harass, or intimidate another person to cause, attempt to cause, or would be reasonably expected to cause substantial emotional distress to another person. 18 U.S.C.A. § 2261A (2).

Here, there is a showing of harassment and stalking that supports injunctive relief. Ribar's behavior is intentional, as he is aware similar behavior caused Defendants Bowen and McKenzie to be doxed and to otherwise experience mental harm. *See* Exs. 1–4; (ECF Nos. 64, 89, 98). He also acknowledged that defense counsels are "very truthful" in stating they are afraid of him. Ex. 37 at 0:00:04–15. In targeting defense counsels, parties, witnesses, and now this Court, there is at least a preponderance showing that he knows his conduct will result in substantial mental or emotional harm. *See id.* Ribar describes himself as "a large individual (6'3", 250 lbs.)." (ECF No. 169 at p. 2 ln. 16). Yet, his physical conduct includes shouting at counsels outside the courthouse, causing counsels to hide in a bathroom while he left the courthouse, swiftly exiting the courthouse and hiding behind a utility box to avoid his line of sight, lingering at or outside workplaces, following undersigned counsel's coworker while making defamatory comments, appearing uninvited inside workplaces and refusing to leave when asked, and attempting to follow individuals to their vehicle. Ex. 8; Ex. 15; Ex. 23 at ¶7, ¶9, ¶16; Ex. 25; Ex. 36.

He compounds this behavior with his online scheme of harassment, spamming various social media pages with attacks of counsel (Exs. 21–22, Ex. 24, Exs. 29–30), and posting so many videos even he cannot count (*see* ECF No. 196). The social media content contains a barrage of personal attacks, defamation, belittling, gaslighting, demeaning, and intimidating commentary about defense counsels, parties, and witnesses. *See id.*

Ribar's own actions, however, are only part of the problem. Ribar can claim that he never crossed the line of physical violence with defense counsels, and that he never physically threatened University employees, for instance. But his social media platform is an ecosystem he created, encourages, and profits from. Despite knowing of a history of mental harm and doxing, he posted work contact information for the University employees, Dr. Ratliff's coworkers. Ex. 15 at 1:14:02–29. His audience did what they have in the past and sent disturbing emails and voicemails to those employees. Ex. 17 at ¶2, Ex. A, Ex. B; Exs. 18–20. When he perfunctorily adds "don't do any harm…," it is as if he instructs them to do the

opposite. At minimum, the online cesspool that Ribar fosters and profits from also inflates the mental distress on his targets who are left in fear that one of his followers may become physically violent toward them. *See* Ex. 23 at ¶13.

Any reasonable person would feel threatened with respect to their mental health, terrorized, frightened, fearful for their safety, and experience substantial emotional distress as a result of Ribar's conduct. Indeed, Ribar's behavior caused defense counsel to experience substantial mental harm, including severe anxiety, panic attacks, high blood pressure, for which she sought mental healthcare. Ex. 23 at ¶11. Thus, County Defendants show a likelihood of success on the merits of Nevada's harassment (NRS 200.571(1)(a)(4)) and stalking (NRS 200.575(1)) laws, as well as the federal stalking law (18 U.S.C.A. § 2261A(2)).

### ii   There is a Likelihood of Irreparable Harm.

The moving party must show that irreparable harm is likely to obtain preliminary injunctive relief. *Winter*, 555 U.S. at 22. False statements of fact harm both the subject of the falsehood and the readers of the statement. *See Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 776 (1984). Harassing conduct is also likely to harm the target. *See Beyond Blond*, 2022 WL 2784404, at *5; *United Artists*, 2019 WL 6917918, at *11. One court found irreparable harm where a party's harassment continued to escalated, harmed the party's reputation, and may dissuade the opposing party and counsel from fully participating in the case. *United Artists*, 2019 WL 6917918, at *11. Another court found likelihood of irreparable harm where the party's harassing conduct caused counsel to "suffer anxiety and distress over his personal safety," and impacted his professional reputation." *Beyond Blond*, 2022 WL 2784404, at *5.

Here, as set forth above, there has been and there is a likelihood of continued irreparable harm. Ribar's behavior made the courthouse feel unsafe to counsel after shouting at Ms. Kertis following a hearing in this case. *See* Ex. 23 at ¶7. Ribar continues to engage in personalized attacks of counsel, appeared at undersigned counsel's workplace, and has continued amplifying his social media campaigns attempting to discredit, intimidate, and defame defense counsels. *See* Ex. 22 at pp. 6–7; Ex. 23 at ¶16, ¶26;  Ex. 24 at p. 15. Ribar is

terrorizing counsel and inhibiting counsel's ability to fully and fairly participate in the instant case. *See id.*; Ex. 23 at ¶¶10–22. Undersigned counsel's only connection or involvement with Ribar is that she is representing the County Defendants in this case, and his conduct directed toward her arisings solely in the context of this case. Ex. 23 at ¶24. His behavior has and continues to irreparably harm and damage counsel's reputation, has caused substantial psychological harm, and resulting fear from Ribar's harassing and intimidating conduct. Ex. 23 at ¶¶10–22.

There is also likelihood of accelerating his attacks onto the individual Library Defendants and Library, as he has in the past. *See* Exs. 1–4. Ribar engaged in in-person intimidation, going to the workplaces of witnesses/BOC representatives, lingering outside the building of undersigned counsel's office, and using profanity in telling a LBOT Trustee she is a "fucking communist." *See* Ex. 12 at ¶4; Ex. 11 at 0:15:59–18:32; Ex. 15 at 1:14:02–29; Exs. 17–20; Ex. 23 at ¶9, ¶16. A BOC Board member and their coworkers were doxed. Ex. 15 at 1:14:02–29; Exs. 17–20. At a Library meeting, he made attendees feel threatened when he tried to follow them to their vehicle. Ex. 11 at 0:37:00–50. He previously stated he does not use the Library or have a Library card, but only goes to Libraries to conduct his "audits." Ribar already has a documented history of violating boundaries, such as when he pulled open a door to a closed building that caused injury to a Library staff member. *See* (ECF Nos. 99-22 at 1:09:09–12; 99-26 at ¶8; 99-27; 99-28.). He has a history of verbal aggression, and inciting confrontations with Library employees. *Id.*; *see also* (ECF Nos. 99-2; 99-3; 99-8; 99-12 at 0:27:27–36, 0:32:41–37:00, 0:52:11–53:18, 0:57:33–59:11, 1:15:00–16:21, 1:21:29–22:49; 99-22 at 0:13:29–14:34, 0:16:29–29:09, 0:51:02–12, 1:09:05–1:13:13; 99-23; 99-24 at pp. 8–12; 99-25; 99-40 at 0:01:38, 0:18:01–21:09; 99-41). Meanwhile, it appears as though anyone with a potential connection to this case, their coworkers or the family, has or will be exposed to Ribar's doxing and harassment, including the Library Defendants. *See* Ex. 8 at 0:15:23–16:11. Ex. 9 at p. 1–2; Ex. 15 at 1:14:02–29; Exs. 17–20; Ex. 23 at ¶17, ¶22; Ex. 37. His behavior has a likelihood of interfering with the Library's ability to conduct its business

and the Library's, Defendants Bowen, McKenzie, and Cole's, and any other future appearing defendant employed at the Library's ability to participate in this case. *See id.*

Ribar is relentless in the efforts he will undertake to intimidate and harass any person he perceives as involved in this case. *See* Ex. 23 at ¶22, Ex. 37. Once the Court amended is restraining order, he resumed harassing conduct in full throttle, attacking the Court, continuing his attacks on counsel, and showing up outside undersigned counsel's workplace to advertise a YouTube video of "Lying Lindsay Liddell." Ex. 22 at pp. 6–7; Ex. 23 at ¶17; Ex. 24 at p. 15; Exs. 31–37. He acknowledged that counsels are afraid of him, but continues to embark on his harassing and stalking behavior. *See id.*; Ex. 37 at 0:00:04–15. Defendants should not have to wait until Ribar's behavior escalates into even more unwanted confrontations, more personal attacks or invasions of privacy, doxxing from his followers, or even physical violence from him or his followers. Ribar will not stop unless a Court intervenes. The Court should find that there is a likelihood of irreparable harm in the absence of injunctive relief.

**iii. The Balance of Equities Favors an Injunction and is in the Public Interest.**

Where a party harasses opposing counsel and parties, injunctive relief is in the public interest to ensure the fair administration of justice, because it will ensure the opposing party and counsel "can fully participate in this lawsuit without the fear of receiving harassing communications from [the other party]." *Beyond Blond*, 2022 WL 2784404, at *6; *see also United Artists*, 2019 WL 6917918, at *11. Whatever right a litigant may have to "publicly criticize Defendants' counsel and the court is subordinate to the public's interest in the judiciary's ability to make decisions without fear of harassing and defamatory reprisal, as well as Defendants' interest in preserving their counsel from [plaintiff's] harassment." *Fredin v. Middlecamp*, No. 17-cv-03058 (SRN/HB), 2020 WL 6867424, at *7 (D. Minn. Nov. 23, 2020), *aff'd*, 855 F. App'x 314 (8th Cir. 2021).

Here, the balance of equities tips in favor of injunctive relief, and it is in the public interest for fair administration of justice. He has already interfered with the administration

of justice in this case, causing severe mental distress to defense counsels to the point where undersigned counsel was required to seek mental healthcare. Ex. 23 at ¶¶5–22. There are motions to dismiss pending and discovery is stayed, and in any other case the parties would be at a stand-still absent an unusual issue. *See* (ECF Nos. 105, 107, 109, 126, 165). Yet, Ribar continues to engage in conduct that makes undersigned counsel feel threatened, publish harassing and defamatory content along with suggestions that counsel simply "sit down" with him to resolve the case (Ex. 34 at 0:40:20–54), consume counsels' time with a myriad of filings in this case and a sending her a frivolous public records request. Ribar's apparent intention appears to be intended to disenchant counsel, intimidate counsel, and persuade her to resign from her employment, the legal profession, or from this case. His viewers exacerbate the mental distress, doxing some of his targets and posting threatening commentary, and leaving counsel in fear that Ribar may provoke them to become violent. Ex. 23 at ¶13. Ribar's behavior suggests that he desires to obtain a favorable outcome by intimidating counsel, and that he otherwise gets personal satisfaction from obtaining perceived power and attention.

The public interest is also furthered by demonstrating the importance of civility in litigation, and to validate the harmful effects of harassment and stalking. Ribar's behavior in belittling counsel for seeking mental healthcare undermines decades of social progress to destigmatize mental health and mental healthcare. *See* Ex. 23 at ¶14. Ribar's comments serve only to invoke shame and chill others, including sarcastically remarking it was "fuckin' sad" that counsel's heart rate increased immediately after he engaged in threatening behavior, rhetorically asking if counsels should not be attorneys "if they got mental health issues," saying BOC counsel should "go pop some pills," and calling them "mentally ill," and Wacked-out, fuckin' psychotic, probably borderline personality disorder…attorneys." *See id.* Members of the legal community, whether they are attorneys, judges, staff, or others, should not be subjected to attacks, embarrassment, or shame for seeking mental healthcare or for experiencing situational mental health disruptions. *See id.* Mental healthcare is a positive tool to promote any person's overall wellness and only strengthens members of the legal

community who utilize those resources. Moreover, a disruption in one's mental health is a normal and expected outcome to any person, including attorneys, who are forced to experience Ribar's extremely alarming and relentless mental warfare. While mental healthcare addresses the effects, injunctive relief is necessary to address its cause. The public interest is served by quashing Ribar's attempts to ridicule mental health and to demonstrate the importance of civility in the context of litigation.

Any interest Ribar may have in his disruptive, harassing, defamatory, and threatening behavior is heavily outweighed by the defendants' and counsels' interest in avoiding harassment, defamation, intimidation, and disruption. Likewise, there is a public interest in the Library's ability to carry out its services to the community at large. *See Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992). Contrary to Ribar's belief, an individual's status as a public employee does not grant any person the right to stalk, harass, intimidate, dox or expose them or their families, or otherwise interfere with their private lives. *See* Ex. 15 at 1:16:27–55.

The Court should find that both the balance of equities and the public interest tip in favor of injunctive relief. Ribar exhibits a pattern of abuse to gain power and control over his victims, including testing boundaries with physical and self-instigated confrontations, using his platforms and followers as a force multiplier, engaging in reputational coercion to disenchant counsel and pressure a favorable outcome, asserting dominance through public displays and antagonism, reversing the victim/offender role to justify his own escalation, and using public processes not to resolve disputes or gain records but to extract leverage over his victims. He often engages in the "DARVO" (deny, attack, and reverse victim and offender) abuse tactic: gaslighting his targets to feel like their memory or experience is invalid or minimizing his conduct; attempting to attack the target's credibility as "lying" or "psychotic," or redirect blame to the target, like accusing counsel of being drunk in response to effects of his threatening behavior; and warping himself into the victim causing targets to then defend themselves against his baseless accusations, like saying counsel "lied to the

court" in describing his "gimbal" equipment (which has a tripod feature) as a "tripod." *See* Ex. 23 at ¶25. This abusive behavior has no place in litigation. The Court should not permit a pro se litigant to harass or stalk attorneys, parties, or witnesses in this District and make them fear for their personal safety.

**iv. An Injunction is Within the Confines of the First Amendment**.

"Although litigants do not 'surrender their First Amendment rights at the courthouse door,' those rights may be subordinated to other interests that arise in this setting." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984) (citation omitted). "In the conduct of a case, a court often finds it necessary to restrict the free expression of participants, including counsel, witnesses, and jurors." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 104, n. 21 (1981). "The First Amendment does not shield improper tactics used by litigants to advance their interests, even if those tactics involve communication of a message." *B. Willis, C.P.A., Inc. v. Goodpaster*, 183 F.3d 1231, 1234 (10th Cir. 1999).

Additionally, the First Amendment does not protect harassing speech, stalking, defamation, or fighting words. "Courts have rejected arguments that the First Amendment allows a person to make harassing or threatening communications." *Beyond Blond*, 2022 WL 2784404, at *5. "[H]arassing speech is not protected speech." *Doe v. Fitzgerald*, No. 2:20-cv-10713-MWF-ROA, 2022 WL 423495, at *4 (C.D. Cal. Feb. 2, 2022). Recklessness, or the conscious disregard of a substantial and unjustifiable risk that conduct will cause harm to others, is the constitutional "intent" standard for stalking and harassment causing emotional distress. *Counterman v. Colorado*, 600 U.S. 66, 79–80 (2023). With stalking causing emotional distress, expressive aspects of the person's speech are not entitled to First Amendment protection where they are integral the underlying conduct, intentionally harassing or intimidating the target and placing the target in reasonable fear or causing them substantial emotional distress. *United States v. Lipman*, No. 2:23-CR-00491-FLA, 2024 WL 4043810, at *9 (C.D. Cal. Sept. 4, 2024).

Here, Ribar's conduct bursts through the protective bubble of the First Amendment and crosses the line into harassment and stalking. His conduct is not simply speaking critically of government employees, but is instead litigation-adjacent intimidation, harassment, and stalking. The fact that Ribar films and publishes video of his conduct does not transmute that underlying conduct into protected speech. He acted, at minimum, with recklessness, knowing the existing mental harm his behavior caused Defendants Bowen and McKenzie, then directing similar and escalated behavior toward defense counsels in this case. *See* Exs. 1–4; Exs. 5–6; Exs. 21–22; Exs. 24–36. Ribar's behavior is not First-Amendment-protected, and an injunction that prohibits him from continuing to engage in that behavior would be constitutional.

County Defendants understand the nuances of being government defendants, but the individuals seeking protection, defense counsels, the Library, and Library staff, are not elected officials. Undersigned counsel is not even in the second or third in-chain-of-command to the elected District Attorney, is not a "Chief" in the Office. Ex. 23 at ¶24. The Library is not a public forum, and is instead a limited public forum, and conduct inconsistent with Library operations can be prohibited. *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992). Lobbies inside government buildings are not public fora. *See Rouzan v. Dorta*, 2014 WL 1716094, *11-12 (C.D. Cal. 2014), *report and rec. adopted,* 2014 WL 1725783 (C.D. Cal. 2014) (discussing courthouse lobby); *Lavite v. Dunstan*, 932 F.3d 1020, 1029 (7th Cir. 2019) (holding county administration building that housed over 20 county departments was a nonpublic forum). Moreover, even in public fora, harassment, fighting words, stalking, and defamation are not protected speech.

A preliminary injunction prohibiting Ribar from engaging in this harassing and stalking conduct would not offend the First Amendment. It would not prohibit Ribar from posting about any elected official, or from attending and speaking at public meetings. It would prohibit: : (1) coming within 100 feet of defense counsels and their staff, the Library, Defendants Bowen, McKenzie, and Cole (except if attending a hearing in this case or, at the

Library if attending a public meeting or using it for emergency evacuation); (2) physically entering the Washoe County D.A.'s Office (1 S. Sierra Street, 4th Floor, Reno, NV) or the gated-entry parking lot for the Washoe County D.A.'s Office staff; (3) submitting public records requests directly to defense counsel, and instead using the Washoe County online public records request portal; and (4) posting content from or regarding this case, including individual defense counsels, witnesses, and individual defendants. Ribar has demonstrated either an unwillingness or inability to control himself online and in person, and refrain from engaging in conduct that has a substantial likelihood of causing the target substantial emotional distress. As such, the conduct is not protected speech, and an injunction would be within the First Amendment.

**b) A Nominal Bond as Security for the Injunction is Appropriate.**

Under Rule 65(c), the Court must order "security in an amount…proper to pay the costs and damages by any party found to have been wrongfully enjoined or restrained." The Court has wide discretion in setting the amount. *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). "[T]he amount may be set at zero if there is no evidence the party will suffer damages from the injunction." *Otero v. Johnson*, No. CIV 16-090-TUC-CKJ, 2016 WL 6476292, at *4 (D. Ariz. Nov. 2, 2016).

Here, the Court should issue a preliminary injunction with security from County Defendants in the amount of $0 or $1. Ribar's behavior caused counsels substantial mental harm, and he has no viable interest in continuing his unlawful behavior. Therefore, County Defendants should be ordered to post nominal security under FRCP 65(c).

**c) The Court Should Award Attorney Fees to County Defendants.**

Federal Courts have inherent power to impose sanctions "to regulate their docket, promote judicial efficiency, and deter frivolous filings." *Business Guides, Inc. v. Chromatic Comm. Enters., Inc.*, 121 F.R.D. 402, 405 (N.D. Cal. 1988)(quoting *Roadway Express Inc. v. Piper*, 447 U.S. 752, 764 (1980)). "[A] court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Chambers v. Nasco, Inc.*,

1   501 U.S. 32, 45–46 (1991) (citations omitted). Sanctions imposed under the Court's inherent

2   authority require a finding of bad faith. *See Lahiri v. Univ. Music & Video Distribution Corp.*,

3   606 F.3d 1216, 1219 (9th Cir. 2010).

4       Ample authority supports awarding reasonable market rate attorneys fees for in-house

5   government attorneys. *See e.g. Napier v. Thirty or More Unidentified Fed. Agents*, 855 F.2d 1080,

6   1092–93 (3rd Cir. 1988)(Assistant U.S. Attorney's fee should "be valued at a market rate");

7   *Ex.-Imp. Bank of the U.S. v. united California Disc. Corp.*, Case No. CV 09-2930 CASPLAX,

8   2011 WL 165312, at *2 (C. D. Cal Jan. 12, 2011)(awarding a reasonable market rate to

9   government attorneys); *Hamilton v. Daley*, 777 F.2d 1207, 1213 (7th Cir. 1985)(calculating

10  county attorneys' fees with "reasonable billing rates in the relevant community").

11      Here, the Court should exercise its inherent authority to sanction, find that Ribar acted

12  in bad faith, and award County Defendants their attorney fees incurred as a result of filing

13  the Motions for Restraining Order and the instant Motion. Ribar engaged in bad faith to

14  intimidate, stalk, and defame counsels and parties in this case. *See* (ECF No. 172); (ECF No.

15  130). He further engaged in bad faith when he resumed and continued his attacks

16  immediately following the Amended Restraining Order, escalating his behavior to include

17  attacking this Court, and continuing to post videos with photos of counsels calling them liars,

18  foul names, and belittling the mental distress he caused them. His appearance at undersigned

19  counsels' office building, which also houses several courts, while loudly asking passersby to

20  view his video of "Lindsay Liddell lying" shows that Ribar will find whatever loophole he

21  believes exists to further harassment, stalking, and intimidating counsel. *See* Ex. 35; Ex. 36.

22  He acknowledged that defense counsels are being "very truthful" in stating they are fearful

23  of him (Ex. 37 at 0:04:09–5:10), but continued his harassing and stalking behavior. This is

24  bad faith. The existing restraining order was apparently not enough to deter Ribar's behavior

25  toward counsel, which further warrants an attorney fee sanction as a tool to address this

26  conduct and allow the parties to proceed fairly in the course of this case.

27  //

While Ribar is *pro se*, he is not appearing *in forma pauperis*. In a recent video, Ribar stated he was "monetized," meaning he received income for social media views. *See* Ex. 34 at 0:59:20–29. In other filings, he discussed his current annual business revenue as less than $1,000,000. (ECF No. 152 at p.5 ln. 23). Therefore, a monetary sanction of attorneys fees is a sanction that Ribar has the ability to perform.

The Court should award County Defendants their attorneys' fees in bringing the Motions for Restraining Order (ECF Nos. 140, 172), and the instant Motion. Ribar engaged in bad faith in the course of this litigation, including through a relentless scheme of harassing and stalking defense counsels, and refusing to subside even after acknowledging that they are "very truthful" in stating they are afraid of him. A monetary sanction is necessary to serve as an additional deterrent for future misconduct, and Ribar is not *in forma pauperis*.

## V. CONCLUSION

The Court should lend any patience nor tolerance for patently harassing, vexatious, defamatory, stalking, and contumacious behavior by any litigant against another party or their counsel. Ribar continues to engage in inappropriate conduct designed to harass counsel and defendants, and now the Court. Injunctive relief is necessary appropriate to protect the parties, counsel, and witnesses. The Court should find that a nominal security in the amount of $0 or $1 is appropriate, and issue an injunction that prohibits Ribar from the following: (1) coming within 100 feet of defense counsels and their staff, the Library, Defendants Bowen, McKenzie, Cole, and any subsequent defendant who appears in this case and is employed at the Library (except if attending a hearing in this case or, at the Library if attending a public meeting or using it for emergency evacuation); (2) physically entering the Washoe County D.A.'s Office (1 S. Sierra Street, 4th Floor, Reno, NV) or the gated-entry parking lot for the Washoe County D.A.'s Office staff; (3) submitting public records requests directly to defense counsel, and instead using the Washoe County online public records request portal; and (4) posting content from or regarding this case, including individual defense counsels, witnesses, and individual defendants.

The Court should also find that Ribar engaged in bad faith, and exercise its inherent authority to sanction Ribar by awarding County Defendants its attorneys fees in filing the instant Motion and motions for restraining order (ECF Nos. 140, 172), in an amount to be determined by a subsequent motion for attorneys' fees filed in accordance with this Court's rules. Additionally, given Ribar's inappropriate behavior at the courthouse, the Court should hold future hearings remotely unless in-person hearings are deemed necessary by the Court. Counsel should not be subjected to Ribar shouting at any person, including them, while entering or exiting a hearing in this case. Because Ribar has demonstrated that he does not respect the decorum of this courthouse and cannot control his behavior, in-person hearings should be avoided in this case to protect counsel and potential escalation toward court staff.

Dated this 17th day of November, 2025.

By ___/s/ Lindsay Liddell_____
LINDSAY LIDDELL
Deputy District Attorney

ATTORNEY FOR WASHOE COUNTY
DEFENDANTS

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I certify that I am an employee of the Office of the District Attorney of Washoe County, over the age of 21 years and not a party to nor interested in the within action. I certify that on this date, I deposited for mailing in the U.S. Mails, with postage fully prepaid, a true and correct copy of the foregoing document in an envelope addressed to the following:

DREW RIBAR
3480 PERSHING LANE
WASHOE VALLEY. NV 89704


I certify that on this date, the foregoing was electronically filed with the United States District Court. Electronic service of the foregoing document shall be made in accordance with the Master Service List as follows:

ALISON R. KERTIS, ESQ.

Dated this 17th day of November, 2025.

/s/ S. Haldeman
S. Haldeman

**INDEX OF EXHIBITS**

Exhibit 1    Bowen emails ........................................................................25 pages

Exhibit 2    Bowen Dec......... ........................................... 2 pages

Exhibit 3    McKenzie Emails .................................................. 14 pages

Exhibit 4    Declaration of Defendant McKenzie ................................. 7 pages

Exhibit 5    Screenshots of August 2024 Video Harassing DDA Liddell ............. 2 pages

Exhibit 6    Screenshot of YouTube Video DA Hick Event .................................. 1 page

Exhibit 7    Public Records Request.................................................... 3 pages

Exhibit 8    Ribar's 9/16/25 Video "Is This Fair to Call Someone
             Anti-LGBTQ" ................................................................ 1 USB

Exhibit 9    YouTube Screenshot of BOC Volunteer Fiancé.................................. 2 pages

Exhibit 10   Email to DDA Liddell, dated September 17, 2025 ......................... 2 pages

Exhibit 11   Ribar's Video, "This Public Meeting Got Wild Fast!" ....................... 1 USB

Exhibit 12   Declaration of Trustee Marie Rodriguez............................................ 1 page

Exhibit 13   Screenshots of YouTube Video of September LBOT Meeting ........... 6 pages

Exhibit 14   Screenshot of YouTube Video discussing "political hit list ................ 1 page

Exhibit 15   Ribar's September 2024 Video, "City of Reno
             Bans Me from Public Events.................................................. 1 USB

Exhibit 16   Screenshots of Ribar's September 2024 City of Reno Bans Me Video.. 3 pages

Exhibit 17   Declaration of Dr. Wichinsky ................................................. 1 page

Exhibit 17A  Email to Lillian Wichinsky, dated October 7, 2025 ......................... 1 page

Exhibit 17B  Voicemail to School of SW ................................................ 1 USB

Exhibit 18   Ford Doxing Email ........................................................ 1 page

Exhibit 19   Email Delivering Ford Voicemail ........................................ 2 pages

Exhibit 20   Ford Voicemail ......................................................... 1 USB

Exhibit 21   Screenshots of Ribar's Social Media discussing
             BOC Counsel Ms. Kertis.................................................. 5 pages

Exhibit 22    Screenshots of Ribar's Social Media discussing County Defendants' Counsel ............................................................ 7 pages

Exhibit 23    Declaration of DDA Lindsay Liddell ............................................. 12 pages

Exhibit 24    Screenshots of Ribar's Social Media Comments................................. 15 pages

Exhibit 25    Clip of Ribar's Video, "This Advice Saved Me…" ............................. 1 USB

Exhibit 26    Screenshots of Ribar's YouTube Videos Sept - Oct 2025 ................. 15 pages

Exhibit 27    Ribar's Video: "Lying Lawyers" ........................................... 1 USB

Exhibit 28    Ribar's Video: "LYING ATTORNEYS try for TRO on ME!!!" .......... 1 USB

Exhibit 29    Social Media Posts Between 11/1/25-11/6/25................................. 5 pages

Exhibit 30    Ribar Social Media Posts Regarding Court and Judge...................... 5 pages

Exhibit 31    Ribar's Video: "Journalist Gagged By Court"..................................... 1 USB

Exhibit 32    Ribar's Video: "OBEYING JUDGE ANNE TRAUM"..................... 1 USB

Exhibit 33    Ribar's Video: "Obeying Judge Traum Part 2" .................................. 1 USB

Exhibit 34    Ribar's Video: "Obeying Judge Traum Part 3" .................................. 1 USB

Exhibit 35    Ribar's Video: "COURTHOUSE STEPS" ........................................ 1 USB

Exhibit 36    Screenshot of Ribar's "Lying Lindsay" Video Flyer ........................... 1 page

Exhibit 37    Clip of Ribar's Video, "Lying and Attacking Corrupt District Attorneys" ............................................................... 1 USB