1  Alison R. Kertis, Esq. (NSB 13875)
   akertis@sierracrestlaw.com
2  SIERRA CREST BUSINESS LAW GROUP
   6770 S. McCarran Blvd., Reno, Nevada 89509
3  (775) 448-6070, Facsimile: (775) 473-8292
   *Counsel for Defendant BUILD OUR CENTER*
4

5

6                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
7
   DREW RIBAR,
8                              Plaintiff,         Case No. 3:24-cv-00526
           v.
9
   WASHOE COUNTY; WASHOE COUNTY
10 LIBRARY SYSTEM; JEFF SCOTT; THANH
   NGUYEN; JAMIE HEMINGWAY; BEATE
11 WEINERT; STACY MCKENZIE; JONNICA        **DEFENDANT**
   BOWEN; BEN WEST; BUILD OUR CENTER,      **BUILD OUR CENTER'S**
   INC.;   STACEY   SPAIN;   ANGELINE      **MOTION FOR PRELIMINARY**
12 PETERSON;   CHRISTOPHER   DANIELS;      **INJUNCTION AGAINST PLAINTIFF**
   DEPUTIES ROTHKIN, SAPIDA, GOMEZ;        **DREW RIBAR**
13 KRISTEN RYAN, JENNIFER COLE; and
   JOHN/JANE DOES 1-10;
14                             Defendants.

15

16        Defendant BUILD OUR CENTER INC., by and through its undersigned counsel,

17 respectfully files this *Motion for Preliminary Injunction Against Plaintiff Drew Ribar*

18 pursuant to the Court's November 5, 2025 *Amended Temporary Restraining Order* [ECF

19 186].

20        This Motion is made and based upon all pleadings and records on file herein, the

21 *Declaration of Alison R. Kertis, Esq.* which is attached hereto as **Exhibit 1** together with

22 every exhibit attached hereto (each of which is incorporated herein by this reference),

23 as well as the points and authorities set forth hereinafter. This Motion fully incorporates

24 herein in its entirety, including all facts, case law, and arguments in Defendant Washoe

25 County's *Motion for Preliminary Injunction Against Plaintiff Drew Ribar* filed

26 contemporaneously herewith.

27 / / /

28 / / /

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ 4

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 6

**Introduction** ................................................................ 6

**Factual Background** .......................................................... 7

Mr. Ribar Trespasses at a Private BOC Event ............................ 7

Mr. Gibar Begins a Campaign of Public Doxing, Harassment,
and Stalking ........................................................... 9

Mr. Ribar Harasses, Stalks, and Doxes Yvonne Allen and her Partner .......... 10

Cease and Desist Letter and Resulting Email Harassment and Stalking ........ 11

Doxing, Harassment, and Staling of Dr. Allen Ratliff ...................... 13

Ribar Witnessed Unlawfully Trespassing at Sierra Crest Law ................ 16

Mr. Ribar Stalks and Harasses Stacey Spain at Public Event ................ 18

Social Media Content Targeting Counsel Kertis and Staff at Sierra Crest ...... 18

Yelling at Counsel Outside Federal Courthouse and State Bar Complaint ..... 21

Build Our Center is the Victim of a Hate Crime ........................... 21

**Legal Standard** ............................................................. 22

Preliminary Injunction Standard ....................................... 22

Nevada Law Permits Extended Restraining Order to Restrict Harassment
And Stalking............................................................ 23

There is a Distinction Between Free Speech and Doxing, Harassment, and
Stalking of Which the Court Can Restrain ............................... 24

**Legal Argument** ............................................................ 25

Build Our Center has a Likelihood of Success on the Merits of Showing
Mr. Ribar Engaged in Doxing, Harassment, and Stalking ................. 26

*Mr. Ribar Doxed Dr. Ratliff, Stacey Spain, Yvonne Allen, and
Counsel* .............................................................. 26

Doxing of Dr. Ratliff ............................................. 26

Doxing of Stacey Spain ............................................ 27

Doxing of Yvonne Allen and Her Partner ............................ 27

Doxing of Counsel and Staff ....................................... 27

*Mr. Ribar Harassed Dr. Ratliff, Stacey Spain, and Counsel* .................. 27

Harassment of Dr. Ratliff ........................................ 28

Harassment of Stacey Spain ....................................... 29

Harassment of Counsel and Staff .................................. 29

/ / /

*Mr. Ribar Stalked Stacey Spain, Allen Ratliff, and Counsel* ................... 30

Stalking of Dr. Ratliff ...................................................... 30

Stalking of Stacey Spain ............................................... 30

Stalking of Counsel and Staff ...................................... 31

Build Our Center and Counsel Will Likely Suffer Irreparable Harm in the

Absence of Preliminary Relief .................................................. 31

The Balance of Equities Weights in Build Our Center's Favor ..................... 33

The Public Interest Will be Served by an Injunction ...................... 34

**Conclusion** ........................................................................ 35

CERTIFICATE OF SERVICE .................................................. 37

LIST OF EXHIBITS ................................................................. 38

### TABLE OF AUTHORITIES

**CASES**

*Wells Fargo & Co. v. ADB Ins. & Fin. Servs., Inc.,*
    758 F.3d 1069, 1071 (9th Cir. 2014) ................................................................ 22

*All. For the Wild Rockies v. Cottrell,*
    632 F.3d 1127, 1134 (9th Cir. 2011). ............................................................... 22

*Beyond Blond Productions, LLC v. Heldman,*
    2022 WL 2784404 (C.D. Cal. 2022) ................................................................. 23

*Chambers v. NASCO, Inc.,*
    501 U.S. 32, 33 (1991 ...................................................................................... 24

*De Long v. Hennessey,*
    912 F.2d 1144, 1147 (9th Cir. 1990) ................................................................ 24

*Giboney v. Empire Storage & Ice Co.,*
    336 U.S. 490, 503 (1949) ................................................................................. 23

*Gulf Oil Co. v. Bernard,*
    452 U.S. 89, 104, n. 21 (1981); ........................................................................ 24

*Lewis v. S.S. Baune,*
    534 F.2d 115, 1121 (5th Cir. 1976) .................................................................. 25

*Myrart v. Taylor,*
    No. SA 5:16-CV-736-DAE, 2016 WL 5376227,
    at *4 (W.D. Tex. Sept.26, 2016) ...................................................................... 25

*R.A.V. v. City of St. Paul, Minn.,*
    505 U.S. 377, 382 (1992). ............................................................................... 23

*Recycle for Change v. Oakland,*
    856 F.3d 666, 669 (9th Cir. 2017). ................................................................... 22

*Seattle Times Co. v. Rhinehart,*
    467 U.S. 20, 32 n.18 (1984); ............................................................................ 24

*Test Masters Educ. Servs., Inc. v. Singh,*
    428 F.3d 559, 580 (5th Cir. 2005) ............................................................ 23, 25

*United States v. Lipman,*
    2024 WL 4043810 (C.D. Cal. 2024), ............................................................... 24

*United States v. Osinger,*
    753 F.3d 939, 945 (9th Cir. 2014). ........................................................... 23, 24

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7, 22 (2008) ...................................................................................... 21

*Yates v. Belli Deli,*
    No. C 07-01405 WHA, 2007 WL 231892, at *3 (N.D. Cal. Aug 13, 2007) .......... 24

**RULES**

18 U.S.C. § 2261A ................................................................................................... 24

28 U.S.C. § 1651 ...................................................................................................... 21

FRCP 65(b), ............................................................................................................. 21

NRS 41.1347 ............................................................................................................ 25

NRS 41.1347(1)(e) ................................................................................................... 25

NRS 200.571 ............................................................................................................ 29

NRS 200.575 ..................................................................................................... 29, 30

NRS 200.575(11) ..................................................................................................... 29

NRS 200.591 ............................................................................................................ 22

NRS 205.4617 .......................................................................................................... 25

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Article One Section 9 of the State of Nevada Constitution provides, "[e]very citizen may freely speak, write and publish his sentiments on all subjects **being responsible for the abuse of that right**." Mr. Ribar should be held accountable for abusing that right, as his conduct undoubtedly crosses the line from protected speech into doxing, harassment, and stalking.

Since the inception of this lawsuit, Plaintiff Drew Ribar ("Mr. Ribar") has engaged in a course of alarming conduct that necessitates a finding of a preliminary injunction to restrain him from his public doxing, harassment, and stalking of Defendant Build Our Center ("BOC") and BOC's counsel and law office (Sierra Crest Business Law Group). As set forth below, BOC can establish that Mr. Ribar engaged in (and continues to engage in) public doxing, harassment, and stalking, and that BOC will suffer irreparable harm (reputational and physical) absent a preliminary injunction. Given the severity of Mr. Ribar's conduct, the equities strongly favor granting injunctive relief. The public has a significant interest in the issuance of a preliminary injunction to protect BOC's personal safety and the general safety of the Reno, Nevada community.

The Court should issue a preliminary injunction against Plaintiff Drew Ribar ("Mr. Ribar") as follows:

1. Enjoining and restraining Mr. Ribar from physically approaching any employee, board member, or volunteer of Build Our Center;

2. Enjoining and restraining Mr. Ribar from physically approaching Ms. Kertis or any of Sierra Crest Business Law Group's employees or staff;

3. Enjoining and restraining Mr. Ribar from entering the private property, building, and front entrance of Build Our Center located at 1745 S. Wells Avenue, Reno, NV 89502;

4. Enjoining and restraining Mr. Ribar from entering the parking lot of Sierra Crest Business Law Group located at 6770 S. McCarran Blvd.

Reno, NV 89509;

5. Enjoining and restraining Mr. Ribar from submitting any in-person public records requests to any employee, board member, or volunteer of Build Our Center;

6. Enjoining and restraining Mr. Ribar from disseminating, publishing, or posting—on any platform or in any medium—any information or commentary about this lawsuit, Build Our Center, or its employees, board members, or staff for the duration of this litigation.

7. Enjoining and restraining Mr. Ribar from disseminating, publishing, or posting—on any platform or in any medium—any information or commentary about defense counsel, Ms. Kertis, and Sierra Crest Business Law Group itself, and its employees and staff for the duration of this litigation.

Because of the widespread public exposure and deliberate targeting fueled by Mr. Ribar's conduct, Build Our Center became the victim of a hate crime on November 16, 2025, when swastikas and SS symbols were gratified on its Midtown Reno office. This escalation is disturbing and unacceptable. Absent Mr. Ribar's toxic online campaign against Build Our Center, this recent surge of white nationalist hostility would not have been directed at the organization. At this stage, injunctive relief is the only effective means to mitigate the harm suffered by Build Our Center and to stem the tide of hate that Mr. Ribar has unleashed.

## II. FACTUAL BACKGROUND[1]

### MR. RIBAR TRESPASSES AT A PRIVATE BOC EVENT[2]

---

[1] Mr. Ribar uses Artificial Intelligence to generate his briefs and caselaw citations. *See Reno Bans Me* (**Exhibit 4**, to be filed manually, at timestamp 1:01:27-1:01:45). The Court should caution Mr. Ribar against using artificial intelligence to generate his filings.

[2] Mr. Ribar did not provide defense counsel with a complete log of all the videos and social media posts he has caused to be published on the internet. Based on this lack of compliance with the Court's order, BOC is highly prejudiced and reserves the right to supplement this Motion upon full and complete compliance with the Court's November 3, 2025, order. This also shows

**(SEPTEMBER 6, 2025)**

On or about September 6, 2025, Mr. Ribar, a self-described "journalist," trespassed on a private event held by BOC. This private event was permitted through the City of Reno for a private Pride Festival wherein entrants were required to pay a five-dollar ($5.00) entrance fee. [See the Declaration of Jeromy Manke ("Dec-Manke") which is attached hereto as **Exhibit 2**, at ¶ 5]. Mr. Ribar had his video camera with him and recorded his entire interaction with various participants at the event, including the Reno Police Department and a private security guard who were stationed outside the barrier to the private event.[3] [Declaration of Alan Ratliff ("Dec-Ratliff") which is attached hereto as **Exhibit 3**, at ¶ 5; *Reno Bans Me* Video (Ex. 4 at timestamp 9:00.]

In the *Reno Bans Me* Video[4] [Ex. 4], Mr. Ribar repeatedly and aggressively targets Dr. Allen Ratliff (a BOC Board Member) while discussing footage he took at BOC's private Pride event. [Dec-Ratliff, Ex. 3 at ¶ 6; *Reno Bans Me* Video, Ex. 4 at timestamp 9:00.] Mr. Ribar is shown standing just outside the event's barricade. [*Id.*] Private security tells him multiple times that he is not welcome at the private event and directs him to a designated free-speech area [*Id.* at 9:00, 14:55, 18:00, 23:45.] Dr. Ratliff also informs Mr. Ribar directly that he is not permitted inside the private event. [*Id.* at 11:17 and 14:45; Dec-Ratliff, Ex. 3 at ¶ 7.] Despite these clear warnings, Mr. Ribar trespasses by walking through an entryway monitored by unassuming volunteers. [*Reno Bans Me* Video, Ex. 4 at timestamp 1:00-07 and 19:09.]

When a BOC volunteer encounters him inside the event and again advises him that he is not allowed to be there and must leave [*Id.* at 19:45], Mr. Ribar films the

---

Mr. Ribar's reckless behavior in that he has no control or grasp of the extent of his toxic social media content.

[3] The original video posted by Mr. Ribar has since been removed from YouTube and is not contained in the video logs he has disclosed to date. The undersigned was able to capture another video, but it does not document Mr. Ribar's initial interactions with RPD, event security, or Dr. Ratliff. [Dec-Kertis, Ex. 1 at ¶ 33.]

[4] Mr. Ribar mentions going to the UNR School of Social Work in this video, so presumably this video was posted on or around September 12, 2025.

volunteer and states, "remember this person—we're going to see this person when I try to go get public records [from the University of Nevada Reno School of Social Work]." [*Id.*]

Moments later, Dr. Ratliff approaches and reiterates, "okay, my friend, we have talked about this before. We need to ask you to leave." *Id.* at 20:10. [Dec-Ratliff, Ex. 3 at ¶¶ 7-8.] Mr. Ribar responds, "I am willing to leave under the threat of arrest." [*Reno Bans Me* Video, Ex. 4 at timestamp 20:20; Dec-Ratliff, Ex. 3 at ¶ 8.] Dr. Ratliff then calls for security to escort him out. [*Reno Bans Me* Video, Ex. 4 at timestamp 20:30; Dec-Ratliff, Ex. 3 at ¶ 9.] Mr. Ribar is removed from the private event by Dr. Ratliff (who does not touch him). [*Reno Bans* Me Video, Ex. 4 at timestamp 20:00-22:20; Dec-Ratliff, Ex. 3 at ¶ 9.] Mr. Ribar goes on to identify Dr. Ratliff after Dr. Ratliff declines to provide his name, stating that Dr. Ratliff "does LGBTQ+ stuff at the University and gets paid for it." [*Reno Bans* Me Video, Ex. 4 at timestamp 22:15-28; Dec-Ratliff, Ex. 3 at ¶ 10.]

Further, Mr. Ribar films Stacey Spain of BOC without her consent and discusses her identifying information and her place of employment in the YouTube Video. [*Reno Bans Me* Video, Ex. 4 at timestamp 8:25; Declaration of Stacey Spain ("Dec-Spain") which is attached hereto as **Exhibit 27**, at ¶ 5.] He says, "So the lady in the green tripped right there, her name is Stacey Spain," "She is the Director of Our Center" "she is the woman in charge of this whole thing," "that is Stacey Spain right there." [*Id.*]

### MR. RIBAR BEGINS A CAMPAIGN OF PUBLIC DOXING, HARASSMENT AND STALKING (SEPTEMBER 7-12, 2025)

On September 7, 2025, counsel for BOC received an email from Mr. Ribar claiming, without any factual basis, that he intended to seek leave to amend his complaint a second time based on the private Pride Festival. [Dec-Kertis, Ex. 1 at ¶ 5; September 8, 2025, 10:29 a.m. email, a true and correct copy of which is attached hereto as **Exhibit 5**.] Undersigned counsel believed that those events were wholly unrelated to Mr. Ribar's pending claims against Defendants and so responded by requesting that Mr. Ribar clarify the legal and factual grounds for any proposed causes of action or damages,

noting that the video he referenced does not show any. [Dec-Kertis, Ex. 1 at ¶ 6; September 8, 2025, 10:29 a.m. email, Ex. 5.] Counsel also cautioned Mr. Ribar against pursuing unsupported amendments and advised that BOC may seek attorneys' fees and costs if it prevails in defending against such frivolous claims. [Dec-Kertis, Ex. 1 at ¶ 6; September 8, 2025, 10:29 a.m. email, Ex. 5.]

In response, Mr. Ribar initiated a series of emails in which he not only reiterated his baseless allegations against BOC but also refused to participate in a meet-and-confer unless he was permitted to record it. [Dec.-Kertis, Ex. 1 ¶ 7; September 9, 2025, 7:44 a.m. email, a true and correct copy of which is attached as **Exhibit 6**.] His campaign escalated to include an email to City of Reno attorney Karl Hall (September 9, 2025, 8:11 a.m. email, a true and correct copy of which is attached hereto as **Exhibit 7**, a demand that BOC produce a purported "banned list" (September 9, 2025, 2:27 pm email, a true and correct copy of which is attached hereto as **Exhibit 8**; an email to BOC board member Dr. Ratliff threatening litigation (September 10, 2025 6:55 a.m. email, a true and correct copy of which is attached hereto as **Exhibit 9**), and an email to a private security company threatening to name it as a defendant in this lawsuit (September 10, 2025, 9:33 a.m. email, a true and correct copy of which is attached hereto as **Exhibit 10**).

### MR. RIBAR HARASSES, STALKS, AND DOXES YVONNE ALLEN AND HER PARTNER (SEPTEMBER, 2025)

In Mr. Ribar's *Reno Bans Me* Video [Ex. 4], Mr. Ribar claims to have "found another person involved" in the Private event. [*Reno Bans Me* Video [Ex. 4 at timestamp 24:42.] He displayed BOC volunteer YeVonne Allen's private Facebook page and showed his viewers her places of employment, which includes the City of Reno and Truckee Meadows Community College. *Id.* He appears to target her based on a Facebook post she made about the private event. [*Id.* at timestamp 24:48-25:50.]

On September 10, 2025, Mr. Ribar followed BOC volunteer YeVonne Allen to her workplace at Truckee Meadows Community College and recorded their entire interaction. [*Reno Bans Me* Video, Ex. 4 at timestamp 31:37-50:14.] His close,

confrontational approach, combined with the presence of a video camera, visibly made Ms. Allen uncomfortable. [*Id.*] Although Mr. Ribar claimed he was "seeking public records," it is evident that his true intent was to intimate and harass, as he has the ability and knowledge to obtain public records online. [*Id.*] Despite his history of harassment and victims experiencing doxing, Mr. Ribar posted a live video to his YouTube channel displaying Ms. Allen's personal Facebook page. [*Id.*] Concerningly, he directs viewers to the "relationship" section of her account and then to the Facebook account of her partner, a private individual unrelated to Mr. Ribar or this case. He further revealed and displayed the full name and workplace of Ms. Allen's partner [*Id.*] Mr. Ribar's actions are deeply alarming and distressing.

**CEASE AND DESIST LETTER AND RESULTING EMAIL HARASSMENT AND STALKING**

**(SEPTEMBER 10-12, 2025)**

Out of concern for the personal safety of Ms. Allen and other BOC employees, board members, and volunteers, undersigned counsel sent a cease-and-desist letter to Mr. Ribar, advising him that his following and harassment of Ms. Allen constituted an improper attempt to circumvent the Court's discovery stay and that his conduct was harassing and vexatious. [September 10, 2025, 10:17 a.m. email, a true and correct copy of which is attached hereto as **Exhibit 11**. [Dec-Kertis, Ex. 1 at ¶ 12.] Note, Mr. Ribar also posted this correspondence in a video to his YouTube channel where he provides commentary on the same. [*Reno Bans Me* Video, Ex. 4 at timestamp 51:25-48] and says, "this sounds like a load of shit to me." [*Id.*]  He then identifies undersigned counsel multiple times, including her place of work. [*Id.* at timestamp 52:00-08.] Then, he singles out Dr. Ratliff and says "I am going to sue you [Dr. Ratliff.]" [*Id*, at timestamp 53:33.]

In response to the email, Mr. Ribar, copying journalists from the Reno Gazette Journal, News4, and This Is Reno, asserted that his interaction with Ms. Allen was "in good faith" and claimed he was seeking her emails to conduct "preliminary fact-gathering" purportedly related to the September 6, 2025, private Pride Festival.

[September 10, 2025, 10:53 a.m. email, a true and correct copy of which is attached hereto as **Exhibit 12**. [Dec-Kertis, Ex. 1 at ¶ 13.]

In reply, undersigned counsel reiterated the points in her initial cease-and-desist letter, instructing Mr. Ribar not to communicate with anyone from BOC (a reasonable request), emphasizing that his intimidation and harassment constituted an abuse of process, and again warning that if he amended his complaint to include baseless claims, she would seek Rule 11 sanctions as well as attorneys' fees and costs. [Dec. Kertis, Ex, 1 at ¶ 14; September 10, 2025, 4:26 p.m. email, a true and correct copy of which is attached hereto as **Exhibit 13**.] Note, Mr. Ribar also posted this correspondence to his YouTube channel and claims he was merely conducting discovery "for what happened just the other day" and not part of the current lawsuit; therefore, his conduct is not proscribed by the court's discovery stay. [*Reno Bans Me* Video, Ex. 4 at timestamp 55:12-56:45.]. He then questions the reasonable request by the Undersigned not to contact anyone from BOC directly, and says, "bullshit," "this woman is crazy." [*Id.* at timestamp 56:45-57:00-10.] He then claims that counsel is trying to intimidate *him* by requesting he not contact members of BOC. [*Id.* at timestamp 58:27-35.]

Ignoring this email, Mr. Ribar escalated his campaign, including threatening BOC with alleged violations of the Internal Revenue Code, despite having no standing to enforce the provisions. [Dec-Kertis, Ex. 1 at ¶ 15; September 10, 2025, 6:19 p.m. email, a true and correct copy attached as **Exhibit 14**.] He then sent two additional emails reiterating his unfounded allegations and asserting that a purported "banned list" demonstrates a conspiracy by BOC to exclude individuals based on political views. [Dec-Kertis, Ex. 1 at ¶ 16; September 10, 2025, 7:57 p.m. and 10:23 p.m. emails, true and correct copies of which are attached as **Exhibits 15** and **16**.]

On September 11, 2025, undersigned counsel responded, declining to litigate these matters over email. [Dec-Kertis, Ex. 1 at ¶ 17; September 11, 2025, 7:48 a.m. email, a true and correct copy of which is attached as **Exhibit 17**.] Note, Mr. Ribar also posted this correspondence to his YouTube channel and, scoffing, states, "See what I

mean? She is full of shit." [*Id.* at 1:01:58-1:02:00.] He then asks why undersigned counsel will "not debate over email." [*Reno Bans Me* Video, Ex. 4 at timestamp 1:02:39-47.] Ultimately, he states, "she is just nuts." [*Id.* at timestamp 1:03:00-03.]

In response, undersigned counsel received an email from Mr. Ribar claiming he was providing notice under Federal Rule of Civil Procedure Rule 11 that he intended to seek sanctions based on prior email correspondence he characterized as "lacking factual support." [Dec-Kertis, Ex. 1 at ¶ 18; September 11, 2025, 8:20 a.m. email, a true and correct copy of which is attached as **Exhibit 18**.] Two minutes later, he sent another email threatening undersigned counsel, accusing her of violating the rules of professional conduct and again attempting to litigate these issues via email. [Dec-Kertis, Ex. 1 at ¶ 19; September 11, 2025, 8:22 a.m. email, a true and correct copy of which is attached as **Exhibit 19**.]

On September 12, 2025, Mr. Ribar emailed undersigned counsel asserting that, because he was allegedly a "candidate for public office," BOC's exclusion of him from the private September, 2025, event constituted "political intervention" and violated election law.[5] [Dec-Kertis, Ex. 1 at ¶ 20; September 12, 2025, 9:12 a.m. email, a true and correct copy of which attached as **Exhibit 20**.]

## DOXING, HARASSMENT, AND STALKING OF DR. ALLEN RATLIFF
## (SEPTEMBER 12-20, 2025)

In the *Reno Bans Me* Video [Ex.45] Mr. Ribar engaged in deliberate targeted doxxing of Dr. Ratliff. As he discusses the footage he recorded while trespassing at BOC's private event, he fixates on identifying Dr. Ratliff. [*Id.* at timestamp 11:15], Mr. Ribar narrates: "Ok. Let's look at this guy right here … get a better picture of him … this guy didn't want to tell me who he was … I figured out who he was." [*Id.*] He then pulls up Dr. Ratliff's professional profile from the Our Center website and announces: "There is Mr. Dr. Allen Ratliff. We found him. We found Mr. Ratliff. What do you know." [*Id.*] Mr.

---

[5] This was the first time Mr. Ribar made this claim to BOC or undersigned counsel about alleged political candidacy. [Dec-Kertis, Ex. 1 at ¶ 21.]

Ribar continues by navigating to the UNR School of Social Work website ("There is Allen Ratliff"), emphasizing that Dr. Ratliff "gets paid with taxpayer dollars" and is "working for UNR … and doing this Our Center thing." [*Id.*] He accuses Dr. Ratliff of working with Our Center on an alleged "banned list." [*Id.*] In that footage, Dr. Ratliff simply tells Mr. Ribar he is not welcome at the private event. [*Id.*]

Mr. Ribar's conduct in this video is not merely commentary—it is targeted exposure of Dr. Ratliff's identity, employment, and workplace for the purpose of retaliation and public shaming. His statements reflect a clear intent to subject Dr. Ratliff to public scrutiny, hostility, and potential harm by leveraging Dr. Ratliff's personal and professional information entirely unrelated to the private event. This video marked a clear escalation, transforming a brief interaction at a private gathering into a campaign to publicly identify, denounce, and endanger Dr. Ratliff.

Indeed, this targeted harassment and stalking of Dr. Ratliff continued through the week of September 12, 2025. On that day, undersigned counsel received another email in which Mr. Ribar claimed he went to the University of Nevada, Reno's School of Social Work to make a public records request about Dr. Ratliff and was allegedly informed by officers that undersigned counsel had provided UNR Police with a TPO/ cease-and-desist letter. [Dec-Kertis, Ex. 1 at ¶ 29; September 12, 2025, 3:43 p.m. email, a true and correct copy attached as **Exhibit 21**.] Counsel responded that she was aware Mr. Ribar had visited UNR seeking Dr. Ratliff's emails but had not communicated with anyone from UNR or its security/police. [Dec-Kertis, Ex. 1 at ¶ 23; September 12, 2025, 4:28 p.m. email, a true and correct copy attached as **Exhibit 22**.]  Fortunately, Dr. Ratliff was not on campus that day, but he nevertheless still felt frightened, intimidated, and fearful for his immediate safety. [Dec-Ratliff, Ex. 3 at ¶ 11.]

On September 19, 2025, Mr. Ribar posted a video of himself visiting the UNR School of Social Work, where Dr. Ratliff is employed. [*Reno Bans Me* Video, Ex. 4 at timestamp 1:03:58-1:14:11.] He asks for records of Dr. Ratliff. [*Id.* at 1:06:20-50.]

The school's Dean (presumably Dr. Ratliff's supervisor) informed Mr. Ribar that

whatever Dr. Ratliff does on his personal time "has nothing to do with the School of Social Work." [*Id.*]  Undeterred, Mr. Ribar argued that because Dr. Ratliff works for a taxpayer-funded institution, his private activities are subject to public scrutiny. [*Id.*]. This exchange is alarming and shows Mr. Ribar's misplaced belief that he is entitled to intrude into the personal lives of government employees.

Mr. Ribar also targeted the Dean of the School of Social Work [*Id.* at 1:14:21-30], emphasizing her last name and speculating about her Polish heritage. [*Id.*] On October 7, 2025, the Dean received a threatening email from a "7thnativist@protonmail.com" entitled "You Filthy Pollock Bitch!" The email states, "You filthy communist scumbags will be exposed and will be held accountable! We will not allow you faggots to destroy our high level societies with your degenerate, multicultural bullshit! We are legally and lawfully going to fucking destroy you!" [October 7, 2025, 8:25 a.m. email, a true and correct copy of which is attached hereto as **Exhibit 23**.]  This is exceptionally alarming.

Mr. Ribar also videos a UNR Student who also attended the private Pride event [*Reno Bans Me* Video, Ex. 4 at 1:09:25-1:12:24.] and targets her (mis-gendering her as a "him") harassing her for her name. [*Id.*] She responds that she is just studying and says that he is just "giving her information" about BOC's taxpayer status. [*Id.*]

Based on Mr. Ribar's conduct, the UNR School of Social Work's Dean determined that it was in the best interest of the staff, professors, and students to lock the building down from future similar targeted encounters. [Dec-Ratliff, Ex. 3 at ¶ 18.]

Even more concerning, shortly thereafter on September 20, 2025, Dr. Ratliff received a highly disturbing voicemail from someone claiming to be an attorney who sues "public idiots of which you are now one." [Dec-Ratliff, Ex. 3 at ¶ 12.] The caller threatened to file a federal lawsuit over supposedly Dr. Ratliff "barring a guy from Pride" and stated that he and "twenty attorneys" would "take everything [Dr. Ratliff] has," including Dr. Ratliff's job, retirement, real estate, and vehicles. [Dec-Ratliff, Ex. 3 at ¶ 13.] The message concluded with the explicit threats: "Be prepared to lose it all," "be prepared to search for some other place of employment," and "We will hunt you down.

Have the night you deserve, Mr. Ratliff." *Id.* [Dec-Ratliff, Ex. 3 at ¶ 13.] This same individual left a similar voice message with the Dean of the School of Social Work's alluding to her refusing to cooperate with an unnamed individual's public record's request. *See* Declaration of Lilian Wichinsky attached as Exhibit B to her Declaration filed with the *Washoe County Defendants' Motion for Preliminary Injunction.* This was clearly a direct reference to Mr. Ribar.

The timing makes clear that these threatening voicemails to Dr. Ratliff and Dean Wichinsky were triggered by Mr. Ribar's conduct, either from his trespass at the September 2025 private event or his subsequent public videos targeting Dr. Ratliff, the dean, and the School of Social Work. [Dec-Ratliff, Ex. 3 at ¶ 14.] There is no doubt this message was a reference to Mr. Ribar and directly connected with his harassment and stalking. [Dec-Ratliff, Ex. 3 at ¶ 15.] It is evident this threatening voicemail was prompted by Mr. Ribar's trespass at the September 2025 private event and/or subsequent video post. [Dec-Ratliff, Ex. 3 at ¶ 16.] His public disclosure of information about Dr. Rattliff quickly followed by this menacing message, which directly referred to the Pride event and the allegation that Dr. Ratliff had barred Mr. Ribar from entering. [Dec-Ratliff, Ex. 3 at ¶ 17.]

### RIBAR WITNESSED UNLAWFULLY TRESPASSING AT SIERRA CREST LAW

### (SEPTEMBER 15-16, 2025)

Of utmost concern, Mr. Ribar was seen loitering and trespassing on the private property of Casey Neilon, Inc., an accounting firm from whom Sierra Crest Business Law Group rents office space. [Dec-Kertis, Ex. 1 at ¶ 24.] The parking lot is private property. . [Dec-Kertis, Ex. 1 at ¶ 24.] Mr. Ribar was seen loitering on two consecutive days, September 15 and 16, 2025. [Declaration of Jeri Scott ("Dec-Scott") which is attached hereto as **Exhibit 24**; Declaration of Guadalupe Garcia which is attached hereto as **Exhibit 25**.] Although Mr. Ribar now claims he was not present and that unspecified "GPS data" somehow disproves his presence, those assertions are not credible. Multiple staff members, working independently of one another, personally

observed and later identified Mr. Ribar; their consistent accounts align with each other and are far more reliable than his self-serving denial and history of blatant falsehoods. Late in the afternoon on September 15, 2025, after business hours, a staff member observed Mr. Ribar standing against the exterior wall of the office building, talking on his phone. [Dec-Scott, Ex. 27 at ¶ 4.] His presence and behavior at that hour were unusual and made her uncomfortable. Mr. Ribar had no legitimate or lawful reason to be on Sierra Crest's private property that day. [Dec-Kertis, Ex. 1 at ¶ 25.]

The following afternoon, a different staff member saw Mr. Ribar slowly driving past the office while glaring in the windows in a menacing manner. [Dec-Garcia, Ex. 27 at ¶ 4.] She found the behavior highly concerning and, after reviewing a photograph of Mr. Ribar, independently confirmed he was the driver. [Dec-Garcia, Ex. 27 at ¶ 4.] This staff member has since reported that Mr. Ribar's conduct made her feel unsafe. As on the previous day, Mr. Ribar had absolutely no lawful business at Sierra Crest on September 16, 2025. [Dec-Kertis, Ex. 1 at ¶ 25.] In response, the owner of Sierra Crest Business Law Group mailed a letter to Mr. Ribar requesting he refrain from trespassing on private property and to direct all correspondence to counsel about this matter through U.S. Mail. (A true and correct copy of that letter is attached hereto as **Exhibit 26**.) [Dec-Kertis, Ex.1 at ¶ 26.]

There is no innocent explanation for repeatedly appearing on privately owned premises with no legitimate purpose, especially after hours and while behaving in a way that reasonably caused fear and alarm. This is not the first instance in which Mr. Ribar has trespassed on private property; and his escalating conduct has caused the staff at Sierra Crest Business Law Group significant distress.

As a result of these incidents and the very real concerns they created, Counsel Kertis has become extremely wary of unexpected encounters with Mr. Ribar, including potential aggressive or harassing comments intended to provoke or intimidate her. She was forced to install enhanced security measures at her home and was forced to warn her family, her young children's daycare, and her neighbors about the dangers posed

by Mr. Ribar's conduct. [Dec-Kertis, Ex. 1 at ¶¶ 27-28.]

### MR. RIBAR STALKS AND HARASSES STACEY SPAIN AT PUBLIC EVENT

On October 15, 2025, Stacey Spain attended a Washoe County Library Board Meeting to speak in support of the library. [Declaration of Stacey Spain ("Dec-Spain") attached hereto as **Exhibit 27** at ¶ 6.] During her public comment, Mr. Ribar positioned himself directly behind her, moved his phone in front of her face to record her, and repeatedly coughed loudly in an apparent effort to disrupt her remarks. [Dec. Spain, Ex. 27 at ¶ 7.] After she finished speaking and sat down, he followed her, called her a "fucking psycho," and made her feel threatened and intimidated. [Dec. Spain, Ex. 27 at ¶ 8.]

Mr. Ribar then deliberately moved his seat to sit directly behind Ms. Spain and began reading aloud to her from Build Our Center's website, including references to BOC's partnership with a queer sex education website. [Dec. Spain, Ex. 27 at ¶ 9.] Attempting to deescalate, Ms. Spain relocated to another seat. [Dec. Spain, Ex. 27 at ¶ 10.] When another library patron left the meeting, Ms. Spain followed, and Mr. Ribar did as well—shouting at the patron to "fuck off" and behaving aggressively. [Dec. Spain, Ex. 27 at ¶ 11.] When Ms. Spain re-entered the library, Mr. Ribar followed her again and began whispering in her ear that he was going to have BOC's 591(C)(3) status revoked. [Dec. Spain, Ex. 27 at ¶ 12.] She reported feeling extremely fearful because of this encounter and now fears attending future Library Board Meetings because she believes Mr. Ribar will continue harassing and intimidating her. [[Dec. Spain, Ex. 27 at ¶ 13.]

### SOCIAL MEDIA CONTENT TARGETING COUNSEL KERTIS AND STAFF AT SIERRA CREST (SEPTEMBER 15, 2025-THE PRESENT)

Mr. Ribar has produced a vast volume of social-media posts and videos, yet—even after the Court ordered him to provide opposing counsel with a complete log—he has not complied. Based on the limited materials he has provided, and what undersigned counsel has independently captured, it is nearly impossible to document

every instance of his toxic and obsessive online behavior. What follows is a chronological narrative illustrating the relentlessness with which he targets counsel and those associated with her.

The earliest example appears when a third party, Jeromy Manke, posted a review of Sierra Crest Business Law Group (on July 10, 2025). At some later undated time, Mr. Ribar inserted himself into the review, accusing undersigned counsel of dishonesty by commenting: "Why does your attorney need to make up lies about me?? Can't win without lies." A true and correct copy of that review is attached hereto as **Exhibit 28**.

The harassment escalated on September 15, 2025, when Mr. Ribar tagged undersigned counsel's law firm in a Facebook post declaring that "attorney Alison Kertis lied about me." He displayed a screenshot of counsel's photograph alongside a Rule 11 email and directed viewers to a timestamp in a YouTube video alleging that "a UNR Police Sergeant stated he was acting on information received from you." A true and correct copy of that post is attached hereto as **Exhibit 29**.

Just five days later, on September 20, 2025, he published a series of video shorts to Facebook. In one, he asked whether undersigned counsel was "trying to waste the court's time." A true and correct copy of that video, filed manually, is **Exhibit 30** hereto. In another posted the same day, he accused her of "attempting to interfere with a political candidate."   A true and correct copy of that video, filed manually, is **Exhibit 31** hereto.

On September 25, 2025, Mr. Ribar encouraged his followers to save, record, and widely circulate his content, explicitly granting "free rights" to anyone who wished to share his videos—further amplifying his online attacks. A true and correct copy of that video, filed manually, is **Exhibit 32** hereto.

Around this same period, and after his September 16, 2025, trespass, Mr. Ribar posted an undated video reel in which he targeted Sierra Crest's receptionist, Guadalupe—a witness who has not been involved in the litigation beyond observing his conduct. Staring into the camera, he said: "Guadalupe, I am sure you believe in the

Constitution don't you? You wouldn't do anything to deny another citizen's constitutional rights, would you?" There is no legitimate reason for him to have singled out a receptionist by name. The video is plainly meant to intimidate. A true and correct copy of that Video, filed manually, is **Exhibit 33** hereto.

His attacks intensified in October. On October 25, 2025, posting to "Reno Cop Watch" through his "Auditing Reno 911" page, he wrote: "Is Attorney Alison Kertis of the Sierra Crest Law LYING?? Let's look at the documents and you decide ... why would lawyers let lies happen in a court room??" A true and correct copy of that Post is attached hereto as **Exhibit 34** hereto.

In another undated video reel posted after this period, Mr. Ribar again displayed undersigned counsel's photograph and announced, "let me put your mug back up there so everyone can see." He then accused her of lying, stated he was "pissed off," and encouraged viewers to scrutinize her. A true and correct copy of that Video, filed manually, is **Exhibit 35** hereto.

On November 8, 2025, Mr. Ribar posted to his "Ribar for Assembly 40" page what appears to be a conspiratorial narrative claiming coordinated misconduct by the Reno Police Department, Our Center, Washoe County, the City of Reno, and others. He tagged multiple government employees—and undersigned counsel—in an effort to publicly attach her to this imagined conspiracy. A true and correct copy of that Post is attached hereto as **Exhibit 36**.

Mr. Ribar is *still* posting content to his YouTube channel about counsel and this litigation despite the Court's TRO. strongly implying that his conduct is inappropriate. True and correct copies of his Vides re *Obeying Judge Traum*, filed manually herein, are **Exhibit 37, 38**, and **39**. Of extreme concern is a comment to one of Mr. Ribar's "Threads" posts. Mr. Ribar posts, "A court has issued a TRO against me. I will be removing some of my political content. America." Followed by a questioning face emoji and three communist flag emojis. A comment posted by an "aquan4sir" states, "send them my way. id [*sic*] like to see the ZOG machine do something about protected

speech." A true and correct copy of a screenshot of this colloquy is attached hereto as **Exhibit 41**."[6] As of the date of the filing of this Motion, this comment is still available to the public and has not been removed. Dec-Kertis, Ex. 1 at ¶ 29.]

Taken together, these posts reflect a persistent and escalating campaign in which Mr. Ribar repeatedly and deliberately targets undersigned counsel and those associated with her, despite court orders, and with no sign of restraint. What is most alarming is that despite defense counsels' numerous requests that he stop engaging in this behavior, despite filing various motions with the Court, and having a Temporary Restraining Order imposed, Mr. Ribar still continues to harass and stalk counsel online.

### YELLING AT COUNSEL OUTSIDE FEDERAL COURTHOUSE AND STATE BAR COMPLAINT (OCTOBER 15, 2025)

On October 15, 2025, undersigned counsel appeared in front of Judge Denny regarding discovery issues on this matter. Given Mr. Ribar's recent doxing, harassment, and stalking, defense counsel raced to the women's restroom hoping to allow Mr. Ribar sufficient time to exit and avoid unwarned confrontation. Dec. Kertis. When counsel attempted to exit a few minutes later, Mr. Ribar was on the Court's pavement next to the rotunda filming himself. *Id.* As counsel exited, undersigned counsel attempting to quickly get to her ride, was forced to walk past Mr. Ribar who shouted "ALISON! DO YOU ALWAYS LIE TO JUDGES IN COURT?" *Id.* Undersigned counsel was extremely frightened and felt terrorized by this conduct. *Id.*

### BUILD OUR CENTER IS THE VICTIM OF A HATE CRIME (NOVEMBER 16, 2025)

Despite being put on notice that his online content has created an extremely toxic and radicalized environment, Mr. Ribar has refused to refrain from targeting Build Our

---

[6]"ZOG" is an acronym for Zionist Occupied Government, which is an antisemitic conspiracy theory among the far-right; this theory holds that the U.S. is secretly controlled by Jewish people. *See* https://www.adl.org/resources/hate-symbol/zog and https://en.wikipedia.org/wiki/Zionist_Occupation_Government_conspiracy_theory

Center and defense counsel. In fact, his activity has only increased.

Only yesterday, November 16, 2025, Build Our Center was the victim of a brazen hate crime. [Dec. Stacey Spain]. Vandals graffitied swastikas and SS symbols across BOC's Midtown Reno location—an attack that is both terrifying and destabilizing for an organization dedicated to community support and inclusion. [Dec-Spain, Ex. 27 at ¶ 14; Photographs of vandalism attached hereto as **Exhibit 42.**] As a result, BOC has been forced to divert resources to further upgrade an already stringent security system, incurring unplanned expenses simply to safeguard its staff, members, and visitors. [Dec-Spain, Ex. 27 at ¶ 14.] More critically, this incident has inflicted profound emotional distress. [Dec. Stacey Spain]. Employees, members, and volunteers are now operating under a heightened sense of fear, constantly on alert, and many are reluctant to appear in public due to the personal safety risks associated with being connected to BOC. [[Dec-Spain, Ex. 27 at ¶ 14.]

This harm is not abstract; it is immediate, personal, and deeply felt. Mr. Ribar's sustained campaign of online hostility has undeniably fueled this atmosphere of hate, emboldening those who seek to intimidate and silence BOC and the community it serves.

## III.   LEGAL STANDARD

### a.   Preliminary Injunction Standard

"The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in the aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. This includes issuing a preliminary injunction. Pursuant to Federal Rule of Civil Procedure 65(b), a court may grant a preliminary injunction to prevent "immediate and irreparable injury." A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain such relief, a plaintiff must establish four elements: "(1) a likelihood of success on the merits; (2) that the plaintiff will likely suffer

irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that the public interest favors an injunction." *Wells Fargo & Co. v. ADB Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014), as amended (Mar. 11, 2014) (citing *Winte*r, 555 U.S. at 20). "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FRCP 65(c). Here, BOC believes a bond of $1.00 is a sufficient bond under the circumstances.

The Ninth Circuit uses a sliding scale variant of the Winter standard, often referred to as the "serious questions" test. *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011). Under this approach, a preliminary injunction may issue when the plaintiff raises serous questions on the merits and the balance of hardships tips sharply in the plaintiff's favor, provided the plaintiff also demonstrates likely irreparable harm and that the injunction serves the public interest. *Id.* at 1135. This framework is applied on a sliding scale, meaning that a stronger showing on one factor can compensate for a weaker showing on another. *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017).

### b. Nevada Law Permits Extended Restraining Order to Restrict Harassment and Stalking

In addition to the above, Nevada law permits a court to issue a temporary or extended restraining order against a person for stalking and/or harassment. NRS 200.591 allows anyone who reasonably believes they are being stalked, aggravatedly stalked, or harassed to seek a temporary or extended protective order from a court. Such an order can require the perpetrator to (a) stay away from the victim's home, workplace, school, business, or any other court-designated location; (b) avoid contacting, intimidating, threatening, or otherwise interfering with the victim or any other person the court order covers, including family or household members; and (c) follow any additional restrictions the court finds necessary to protect the victim or other named

individuals.

    **c.** **There is a Distinction Between Free Speech and Doxing, Harassment, and Stalking of Which the Court Can Restrain**

The Court is permitted to restrain Mr. Ribar's doxing, harassment, and stalking, all of which are excluded and not considered "free speech." Courts have routinely "made a distinction between communication and harassment." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 580 (5th Cir. 2005) (citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 503 (1949)); *see also R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992). Courts "have the power to enjoin harassing communication." *Test Masters*, 428 F.3d at 580. The First Amendment does not permit a person to make harassing or threatening communications. *Id.*; *see also United States v. Osinger*, 753 F.3d 939, 945 (9th Cir. 2014).

Courts consistently recognize that while the First Amendment protects expressive activity, it does not shield harassing, threatening, or obstructive conduct—particularly when such conduct targets litigants, counsel, or the administration of justice. Three recent authorities illustrate this principle.

In *Beyond Blond Productions, LLC v. Heldman*, 2022 WL 2784404 (C.D. Cal. 2022), the court granted a temporary restraining order after finding the defendant engaged in a sustained campaign of harassment, including racist and homophobic messages to counsel, anonymous threatening emails, and defamatory online postings such as fake websites and fabricated reviews. *Id.* The court held that such conduct constituted actionable harassment causing emotional distress and emphasized that the First Amendment does not protect threatening or harassing communications. *Id.* Because the harassment interfered with the litigation process, the court exercised its authority to restrain the defendant, ordering him to cease all harassing communications and remove defamatory online material. *Id.*

The Ninth Circuit reached similar conclusions in *United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014), upholding the federal cyberstalking statute, 18 U.S.C. § 2261A,

against First Amendment, overbreadth, and vagueness challenges. *Id.* The court explained that § 2261A targets conduct—a course of harassing acts causing substantial emotional distress—not speech itself. *Id.* Because the statute uses commonly understood terms such as "harass" and "substantial emotional distress," it provides fair notice and does not permit arbitrary enforcement. *Id.*

Finally, in *United States v. Lipman*, 2024 WL 4043810 (C.D. Cal. 2024), the court reaffirmed that litigants do not "surrender their First Amendment rights at the courthouse door," but those rights may be subordinated to the court's duty to ensure fairness and protect participants. *Id.* The court recognized that courts may restrict speech when necessary to curb improper, abusive tactics. *Id.* (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984); *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 104, n. 21 (1981); and *B. Willis, C.P.A., Inc. v. Goodpaster*, 183 F.3d 1231, 1234 (10th Cir. 1999)).

Together, these cases demonstrate that courts may—and must—restrain harassing or threatening conduct, especially when it targets parties, counsel, or the judicial process, without offending the First Amendment.

## IV.  **LEGAL ARGUMENT**

"Federal courts have the inherent power to manage their own proceedings and to control the conduct of those who appear before them." *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 33 (1991)("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates."); *see also De Long v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir. 1990)("[T]here is strong precedent establishing the inherent power of federal courts to regulate the activities of abusive litigants by imposing carefully tailored restrictions under the appropriate circumstances.")

District courts have inherent power to "issue an injunction against litigants who harass their opponents" *Yates v. Belli Deli*, No. C 07-01405 WHA, 2007 WL 231892, at *3 (N.D. Cal. Aug 13, 2007) (citing *DeLong*, 912 F.2d at 1147). "Injunctive relief, where warranted, can be a useful tool to aid a court in controlling the conduct of litigants."

*Lewis v. S.S. Baune*, 534 F.2d 115, 1121 (5th Cir. 1976). Moreover, courts may issue an injunction over conduct that is directly related to the lawsuit. *Myrart v. Taylor*, No. SA 5:16-CV-736-DAE, 2016 WL 5376227, at *4 (W.D. Tex. Sept.26, 2016) (concluding that the court has jurisdiction to prohibit a party's threatening and harassing conduct toward the other parties because the conduct was "directly related to the instant suit."); *Test Masters Educational Servs., Inc. v. Singh*, 428 F.3d 559, 580 (5th Cir. 2005) (upholding a portion of the district court's injunction prohibiting Defendant "from threatening or harassing [Plaintiff], its employees, its staff, [Plaintiff's] counsel, counsel's employees, or counsel's staff.)

   a. **Build Our Center has a Likelihood of Success on the Merits of Showing Mr. Ribar Engaged in Doxing, Harassment, and Stalking**

   i. *Mr. Ribar Doxed Dr. Ratliff, Stacey Spain, Yvonne Allen, and Undersigned Counsel*

Doxing is "the act of publicly providing personal identifiable information about an individual or organization, usually via the Internet and without their consent."[7] NRS 41.1347 defines it as disseminating personal identifying or sensitive information without consent, with intent to cause harm or facilitate conduct likely to cause death, bodily injury, or stalking. "Personal identifying information" includes name and place of employment (NRS 205.4617). "Sensitive information" includes sexual orientation and transgender status (NRS 41.1347(1)(e)).

   ***Doxing of Dr. Ratliff** –*

Following his removal from a private Pride event on September 6, 2025, Mr. Ribar publicly identified Dr. Ratliff in an online video, stating he "does LGBTQ+ stuff at the University and gets paid for it" [*Reno Bans Me Video*, Ex. 4 at timestamp 22:15–28; Dec. Ratliff, Ex. 3 at ¶ 10.] He highlighted Dr. Ratliff's workplace and professional role,

---

[7] https://en.wikipedia.org/wiki/Doxing

navigated to the UNR website, and emphasized that he was taxpayer-funded. This deliberate disclosure violated Dr. Ratliff's explicit non-consent, exposing him to threats, including a September 20, 2025, voicemail threatening to "hunt [him] down" [Dec. Ratliff, Ex. 3 at ¶ 13.] The UNR School of Social Work locked down in response. Mr. Ribar's conduct satisfies all elements of doxing under NRS 41.1347.

**Doxing of Stacey Spain –**

Mr. Ribar filmed Ms. Spain without her consent, identified her by name and employment, and emphasized her leadership role at BOC [*Reno Bans Me* Video, Ex. 4 at timestamp 8:25]. The intentional exposure of her personal information in the context of ongoing hostility satisfies NRS 41.1347, as it created a reasonable fear of harassment or stalking.

**Doxing of Yvonne Allen and Her Partner –**

In his undated video, Mr. Ribar displayed Ms. Allen's private Facebook page, highlighting her employers, including the City of Reno and Truckee Meadows Community College [Ex. 4 at timestamp 24:42–25:50.] On September 10, 2025, he followed her to her workplace and recorded her for over an hour [ *Id.* at 31:37–50:14]. He further exposed her partner's personal information without consent [Dec.-Allen, Ex. 11 at ¶ 6.] The cumulative effect demonstrates deliberate doxing intended to intimidate and threaten.

**Doxing of Undersigned Counsel and Staff—**

On September 10, 2025, counsel sent Mr. Ribar a cease-and-desist letter, which he publicly posted on YouTube, identifying counsel by name and employment [Ex.4 at 51:25–52:08]. He repeatedly highlighted counsel in videos, copied journalists, and encouraged dissemination, targeting staff as well. His sustained publication of identifying information with intent to harass satisfies NRS 41.1347.

     *ii.   Mr. Ribar Harassed Dr. Ratliff, Stacey Spain, and Undersigned Counsel*

The crime of harassment is set forth in NRS 200.5719(a)-(b), and provides that a

person commits harassment when they knowingly make a threat (without lawful authority): "(a)…(4) [t]o do any act which is intended to substantially harm the person threatened or any other person with respect to his or her physical or mental health and safety; and (b) The person by words or conduct places the person receiving the threat in reasonable fear that the threat will be carried out."

**Harassment of Dr. Ratliff—**

Mr. Ribar's actions constitute harassment of Dr. Allen Ratliff under NRS 200.571(a)-(b).

In the undated video *Reno Bans Me* [Ex. 4], Mr. Ribar aggressively targets Dr. Ratliff while trespassing at BOC's private Pride event. [Dec-Ratliff, Ex. 3 at ¶ 6.] Despite repeated warnings fro Security, the Reno Police Department, and Dr. Ratliff himself (*Reno Bans Me* Video, Ex. 4 at timestamps 9:00, 11:17, 14:45, 14:55, 18:00, 23:45], Mr. Ribar deliberately entered the event to film and intimidate BOC members. He filmed a volunteer and stated, "remember this person—we're going to see this person when I try to go get public records [from UNR]," then explicitly refused to leave until escorted by security. *[Id.]*

Mr. Ribar's harassment continued in the video through targeted doxxing, publicly identifying Dr. Ratliff by name, employment, and workplace, emphasizing that he "gets paid with taxpayer dollars" and alleging involvement with a "banned list." [Reno Bans Me Video, Ex. 4 at timestamp 11:15; Dec-Ratliff, Ex. 3 at ¶ 10.] This conduct was intended to expose, shame, and intimidate Dr. Ratliff, creating reasonable fear for his safety and professional wellbeing.

Subsequent acts included: visiting UNR School of Social Work on September 12, 2025, to seek Dr. Ratliff's records [Dec-Ratliff, Ex. 3 at 11]; posting another video demanding records on September 19, 2025, and threats via email to the School's Dean on October 7, 2025. On September 20, 2025, Dr. Ratliff received a voicemail threatening to destroy his career, property, and personal safety, explicitly referencing the Pride event and his barring of Mr. Ribar. [Dec-Ratliff, Ex. 3 at ¶¶ 12-13.] A true and correct copy of

that message, filed manually, is **Exhibit 40.]**

Through repeated trespass, defiance of lawful directives, doxxing, public shaming, and incitement of threats, Mr. Ribar knowingly acted to harm Dr. Ratliff's mental health, sense of security, and personal safety. [Dec. Ratliff] His conduct constitutes ongoing harassment under NRS 200.571.

### *Harassment of Stacey Spain—*

Mr. Ribar has harassed Stacey Spain, Director of BOC, in violation of Nevada law. In the *Reno Bans Me* Video, he filmed Ms. Spain without consent, identified her by name and role, and linked her to her organization. [*Reno Bans Me* Video, Ex. 4 at timestamp 8:25.]

On October 15, 2025, at a Washoe County Library Board Meeting, Mr. Ribar positioned himself behind Ms. Spain, repeatedly recording her and coughing loudly to disrupt her remarks [Dec-Spain, Ex. 27 ¶¶ 6-7.] After she sat, he followed her, called her a "fucking psycho," and continued intrusive behavior, including reading aloud from BOC's website and threatening BOC's 591(c)(3) status. [Dec-Spain, Ex. 27, ¶¶ 8-12.]

These targeted actions caused Ms. Spain significant fear, leading her to avoid future public meetings. Dec. Spain. His persistent filming, public identification, verbal threats, and intrusive presence constitute harassment under NRS 200.571.

### *Harassment of Undersigned Counsel and Staff—*

Mr. Ribar's actions toward undersigned counsel, Alison Kertis, and staff constitute harassment under Nevada law. On September 7, 2025, he emailed counsel alleging baseless claims regarding the private Pride Festival [Dec-Kertis, Ex. 1 at ¶ 30.] Counsel requested clarification and warned of potential sanctions. Rather than complying, Mr. Ribar escalated with threatening emails to counsel, BOC board members, a City attorney, and a security company [Dec.-Kertis, Exc. 1 at ¶ 31.] later posting this correspondence publicly to YouTube.

On September 15–16, 2025, he loitered and trespassed on private property at Sierra Crest Business Law Group [Dec-Scott, Ex. 24; Dec-Garcia, Ex. 25], prompting

enhanced security measures. On October 15, 2025, while counsel appeared before Judge Denny, Mr. Ribar positioned himself outside the courthouse, filming and shouting at counsel: "ALISON! DO YOU ALWAYS LIE TO JUDGES IN COURT?" [Dec.-Kertis, Ex. 1 at ¶ 32].

Mr. Ribar's repeated threats, public disclosure of personal and professional information, trespass, and online harassment caused reasonable fear and mental distress, constituting harassment under NRS 200.571.

     *iii.*    *Mr. Ribar Stalked Stacey Spain, Allen Ratliff, and Undersigned Counsel*

Under NRS 200.575, stalking occurs when a person, without lawful authority, willfully or maliciously engages in a course of conduct directed at a victim that would cause a reasonable person to feel terrorized, frightened, intimidated, harassed, or fearful for immediate safety, and actually causes the victim to feel the same. NRS 200.575(11) defines "course of conduct" as two or more acts over time evidencing continuity of purpose directed at a specific person.

**Stalking of Dr. Ratliff—**

Mr. Ribar's targeted, repeated conduct toward Dr. Ratliff satisfies NRS 200.575. In *City of Reno Bans Me*, he repeatedly filmed and doxxed Dr. Ratliff, trespassing despite multiple warnings (timestamps 9:00, 11:17, 14:45, 14:55, 18:00, 23:45) and stating, "I am willing to leave under the threat of arrest" (20:30). He publicly shamed Dr. Ratliff by identifying him and highlighting employment details (11:15–28).

Subsequent acts include visiting UNR on September 12th, posting another video September 19th, harassing the Dean, and the September 20th threatening voicemail [Dec-Ratliff, Ex. 3]. These constitute a deliberate course of conduct causing fear, harassment, and intimidation, satisfying stalking under NRS 200.575.

**Stalking of Stacey Spain—**

On October 15, 2025, Mr. Ribar stalked Ms. Spain during the Washoe County Library Board Meeting. He positioned himself behind her, repeatedly filmed, disrupted

her speech, verbally harassed, and followed her when she relocated. He read aloud from BOC's website and made pointed threats regarding BOC's status. [Dec. Spain. Ex. 28.] These repeated acts constitute a course of conduct directed at Ms. Spain, causing fear and intimidation, satisfying NRS 200.575.

### *Stalking of Undersigned Counsel and Staff—*

Mr. Ribar's targeted, escalating conduct toward counsel and staff constitutes stalking. He sent repeated baseless emails and legal threats, posted public attacks on YouTube, loitered and trespassed on private property (September 15–16, 2025), and confronted counsel outside the courthouse on October 15, 2025 [Dec-Kertis, Ex. 1 ; Post re "Alison Lied," Ex. 29; Post re "Wasted Time," Ex. 30, Video re "Interference with political candidate," Ex. 31; Video targeting Guadalupe," Ex. 33.]

His acts form a continuous, willful, and malicious course of conduct directed at specific victims, causing terror, fear, and intimidation, satisfying all elements of stalking under NRS 200.575.

### b. **Build Our Center and Counsel Will Likely Suffer Irreparable Harm in the Absence of Preliminary Relief**

There can be no serious dispute that, absent preliminary relief, BOC and undersigned counsel will continue to suffer irreparable harm. In fact, BOC suffered irreparable harm only yesterday when it was the victim of a targeted and malicious hate crime.

The harm inflicted by Mr. Ribar is not merely theoretical or reputational—it is immediate, personal, and continuing. Indeed, *it has already happened.* The Court must enjoin Mr. Ribar's conduct. BOC members Stacey Spain and Dr. Ratliff were already experiencing severe mental and emotional distress as a direct result of Mr. Ribar's ongoing doxing, harassment, and stalking prior to the targeted hate crime. This is not the type of injury that can be undone with monetary damages. Once private information is disseminated, it cannot be retrieved; once safety is compromised, that sense of security cannot simply be restored. BOC's safety is currently compromised and will

continue to deteriorate absent Court intervention.

BOC, Stacey Spain, and Dr. Ratliff now live with a daily fear of encountering Mr. Ribar or his followers in public settings. Their workplaces have been forced into heightened security protocols and lockdown conditions because of the unpredictability of Mr. Ribar's conduct. Each day they face the dread of discovering new harassing emails, voicemails, or public attacks targeting them by name. These are classic forms of irreparable harm—ongoing fear, psychological trauma, and loss of personal security are injuries that courts consistently recognize as warranting immediate injunctive relief.

The threatening voicemail directed at Dr. Ratliff underscores the seriousness of the situation. Its clear purpose is to intimidate him into leaving his professional position in order to safeguard his livelihood and safety. Threats designed to coerce someone out of their job go far beyond ordinary conflict; they strike at a person's ability to earn a living and participate freely in their professional community.

Equally alarming is the in-person harassment of Ms. Spain. Mr. Ribar intentionally sat behind her during a public meeting, followed her when she attempted to leave, and called her a "fucking communist." This is menacing, targeted behavior. It is not normal public discourse—it is intimidation meant to instill fear. The subjective experience of being followed and verbally attacked in public is distress that no later remedy can cure.

Moreover, without preliminary relief, undersigned counsel herself faces a substantial and imminent risk of irreparable harm. Mr. Ribar has already escalated his conduct beyond online harassment—he has physically appeared at counsel's workplace without invitation, continued to dox her on the internet, and most recently shouted at her after a court hearing. His repeated public accusations that counsel is "nuts," "crazy," and a "liar" are not only defamatory but designed to undermine her professional reputation and intimidate her in the course of her duties as an officer of the court.

The cumulative impact of this conduct has caused undersigned counsel significant stress, anxiety, and fear for her personal safety. She has felt compelled to

warn her family members and even her children's daycare about the risk posed by Mr. Ribar's unpredictable and escalating behavior. She has been forced to install an upgraded home security system, alter her usual routes and methods of transportation to and from court hearings, and remain constantly vigilant in public settings due to a well-founded concern that Mr. Ribar may confront her again.

These are not inconveniences that can be remedied with monetary damages. They represent ongoing threats to counsel's physical safety, mental well-being, and ability to perform her job without fear of harassment or retaliation. Such harms—loss of personal security, credible fear of future encounters, and the emotional toll of ongoing stalking-like conduct—are precisely the types of irreparable injuries that warrant immediate injunctive relief.

In sum, the escalating pattern of doxing, stalking, and targeted harassment places BOC members and counsel in continuing danger, interferes with their ability to safely perform their jobs, and causes profound psychological and emotional harm. These injuries are ongoing, cannot be undone after the fact, and therefore constitute irreparable harm warranting immediate relief.

### c. <u>The Balance of Equities Weighs in Build Our Center's Favor</u>

The balance of equities decisively favors Build Our Center. When weighing the harms, the Court must compare the minimal burden placed on Mr. Ribar by narrowly tailored injunctive relief against the substantial, ongoing harm suffered by BOC, its members, and undersigned counsel.

Mr. Ribar may argue that restricting his ability to post on social media affects his livelihood. That claim does not withstand scrutiny. Mr. Ribar owns and operates a successful towing business; his income does not depend on his ability to broadcast targeted attacks online. The requested injunction does not silence him from participating in public life, nor does it prohibit lawful speech—it merely restrains him from using social media as a weapon to dox, harass, intimidate, and endanger others. Courts routinely recognize that where speech is being used to facilitate stalking, threats,

and the dissemination of private identifying information, limited restrictions are both reasonable and necessary.

By contrast, the harm to BOC and undersigned counsel is profound and continuing. The conduct at issue has caused real reputational damage, instilled fear, required heightened workplace security, and placed multiple individuals—including counsel—in a persistent state of vigilance. Members of BOC and counsel have been forced to modify their daily routines, warn family members and employers, and take defensive measures simply to feel safe. The emotional and psychological toll cannot be overstated.

The comparative burden is stark: on one side, a modest restriction preventing a single individual from posting abusive and dangerous content; on the other, the personal safety, mental well-being, and peace of mind of multiple victims who have already endured months of doxing, harassment, and stalking. The equities therefore weigh overwhelmingly in favor of granting injunctive relief.

In short, the requested relief imposes almost no legitimate hardship on Mr. Ribar, while failing to impose it leaves BOC and undersigned counsel exposed to escalating danger and irreparable harm. The balance is not close.

### d. **The Public Interest Will Be Served By an Injunction**

Granting the requested injunction also serves the public interest in multiple significant ways. At its core, this case involves repeated acts of doxing, harassment, intimidation, and stalking—conduct that Nevada law expressly condemns because it poses serious risks not only to individual victims but to the community at large. Issuing an injunction here reinforces the public's interest in ensuring that such unlawful behavior is not tolerated and that individuals who engage in it are swiftly restrained.

First, the public has a compelling interest in maintaining the integrity and safety of community organizations like Build Our Center, which exist to promote civic engagement, inclusion, and public welfare of the LGBTQ+ community. When individuals or organizations are targeted with doxing and harassment for participating in

community life, others are deterred from volunteering, attending public meetings, or engaging in local advocacy. An injunction will signal that the court system protects those who serve their communities rather than leaving them vulnerable to retaliatory attacks.

Second, the public has a strong interest in ensuring that attorneys, staff, and volunteers can perform their roles without fear of intimidation or retaliation. Undersigned counsel was targeted precisely because she performed her professional duties and did so pro-bono. Allowing such conduct to continue would send a dangerous message that litigants may harass or stalk opposing counsel without consequence, undermining the justice system as a whole. The public interest always favors safeguarding the fair and orderly administration of justice.

Third, enjoining doxing and harassment promotes public safety. The conduct at issue has already caused workplaces to enact lockdown measures, forced individuals to alter travel routines, and created fear in public spaces. When a person repeatedly disseminates private information, appears uninvited at workplaces, and targets victims in public meetings, the risk of escalation is substantial. The public is best served when courts intervene early to prevent foreseeable harm.

Finally, the public interest favors protecting free and open civic participation without the threat of personal targeting. This case involves harassment directed at community members engaging in public comment, educational work, and community events. If such conduct is allowed to persist, it chills public expression and deters participation in democratic and community processes—an outcome squarely contrary to the public interest.

In sum, the injunction sought here does not merely protect the individual victims; it safeguards community safety, the orderly administration of justice, and the broader public's ability to engage in civic life without fear.

## V.    **CONCLUSION**

Based on the foregoing,    the Court should issue a preliminary injunction against Plaintiff Drew Ribar ("Mr. Ribar") as follows:

1. Enjoining and restraining Mr. Ribar from physically approaching any employee, board member, or volunteer of Build Our Center;

2. Enjoining and restraining Mr. Ribar from physically approaching Ms. Kertis or any of Sierra Crest Business Law Group's employees or staff;

3. Enjoining and restraining Mr. Ribar from entering the private property, building, and front entrance of Build Our Center located at 1745 S. Wells Avenue, Reno, NV 89502;

4. Enjoining and restraining Mr. Ribar from entering the parking lot of Sierra Crest Business Law Group located at 6770 S. McCarran Blvd. Reno, NV 89509;

5. Enjoining and restraining Mr. Ribar from submitting any in-person public records requests to any employee, board member, or volunteer of Build Our Center;

6. Enjoining and restraining Mr. Ribar from disseminating, publishing, or posting—on any platform or in any medium—any information or commentary about this lawsuit, Build Our Center, or its employees, board members, or staff for the duration of this litigation.

7. Enjoining and restraining Mr. Ribar from disseminating, publishing, or posting—on any platform or in any medium—any information or commentary about defense counsel, Ms. Kertis, and Sierra Crest Business Law Group itself, and its employees and staff for the duration of this litigation.

DATED November 17, 2025.

SIERRA CREST BUSINESS LAW GROUP

By: _____

Alison R. Kertis, Esq. (NSB 38???)
akertis@sierracrestlaw.com
6770 S. McCarran Blvd., Reno, NV 89509
(775) 448-6070, Fax: (775) 473-8292
*Counsel for Defendant BUILD OUR CENTER*

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the SIERRA CREST BUSINESS LAW GROUP who, on the below-written date, caused a true copy of the foregoing to be transmitted via email and also to be filed using the above-entitled Court's electronic filing (CM/ECF) system which will automatically e-serve the same) on the person(s) and/or entity(ies) set forth directly below:

**Drew Ribar**
480 Pershing Lane, Washoe Valley, NV 89704
(775) 223-7899
const2audit@gmail.com
*Plaintiff in propria persona*

**Lindsay L. Liddell** (SBN 14079)
**Andrew Cobi Burnett** (SBN 16505)
DEPUTY DISTRICT ATTORNEYS
One South Sierra Street Reno, NV 89501
lliddell@da.washoecounty.gov
cburnett@da.washoecounty.gov
(775) 337-5700
*Counsel for Plaintiffs Washoe County and its Library*
*System, Jeff Scott, Stacy Mckenzie, Jonnica Bowen,*
*Jennifer Cole; Deputy C. Rothkin, Deputy R. Sapida,*
*and Sgt. George Gomez*

**Craig J. Mariam** (SBN 10926)
**Rachel L. Wise** (SBN 12303)
**GORDON REES SCULLY MANSUKHANI, LLP**
300 S. Fourth St., Suite 1550
Las Vegas, Nevada 89101
(702) 577-9300
Email: cmariam@grsm.com
            rwise@grsm.com

DATED: November 17, 2025.

_____
an employee of the
SIERRA CREST BUSINESS LAW GROUP

# INDEX OF EXHIBITS

to

DEFENDANT BUILD OUR CENTER'S
MOTION FOR PRELIMINARY INJUNCTION AGAINST PLAINTIFF DREW RIBAR

re

*Ribar vs. Washoe County, et alia*
*(Case No. 3:24-cv-00526)*

| Exh. No. | Exhibit Description | Pages (+ Cvr) |
|---|---|---|
| 1. | Declaration of Alison R. Kertis | 7 |
| 2. | Declaration of Jeromy Manke. | 3 |
| 3. | Declaration of Alan Ratliff | 6 |
| 4. | Video re "Reno Banned Me" – filed manually | 1 |
| 5. | September   8, 2025, 10:29 a.m. Email | 3 |
| 6. | September   9, 2025,   7:44 a.m. Email | 4 |
| 7. | September   9, 2025,   8:11 a.m. Email | 3 |
| 8. | September   9, 2025,   2:27 p.m. Email | 3 |
| 9. | September 10, 2025,   6:55 a.m. Email | 2 |
| 10. | September 10, 2025,   9:33 a.m. Email | 3 |
| 11. | September 10, 2025, 10:17 a.m. Email | 2 |
| 12. | September 10, 2025, 10:53 a.m. Email | 2 |
| 13. | September 10, 2025,   4:26 p.m. Email | 3 |
| 14. | September 10, 2025,   6:19 p.m. Email | 4 |
| 15. | September 10, 2025,   7:57 p.m. Email | 2 |
| 16. | September 10, 2025, 10:23 a.m. Email | 3 |
| 17. | September 11, 2025,   7:48 a.m. Email | 2 |
| 18. | September 11, 2025,   8:20 a.m. Email | 2 |
| 19. | September 11, 2025,   8:22 a.m. Email | 7 |
| 20. | September 12, 2025,   9:12 a.m. Email | 4 |
| 21. | September 12, 2025,   3:43 p.m. Email | 2 |
| 22. | September 12, 2025,   4:28 p.m. Email | 2 |
| 23. | October 7, 2025, 8:25 a.m. Email | 2 |
| 24. | Declaration of Jeri Scott | 3 |
| 25. | Declaration of Guadalupe Garcia | 3 |
| 26. | September 18, 2025, Letter | 3 |
| 27. | Ribar Video re Wasting Court's Time – filed manually | 4 |
| 28. | Sierra Crest Review | 2 |

| Exh. No. | Exhibit Description | Pages (+ Cvr) |
|---|---|---|
| 29. | Facebook Post re Alison Lied" | 2 |
| 30. | Ribar Video re Wasting Court's Time – *filed manually* | 1 |
| 31. | Ribar Video re Interfering with Political Candidate – *filed manually* | 1 |
| 32. | Ribar Video re Save-Record-Circulate – *filed manually* | 1 |
| 33. | Ribar Video targeting Guadalupe – *filed manually* | 1 |
| 34. | Reno Cop Watch Post | 2 |
| 35. | Ribar Video re Pissed Off – *filed manually* | 1 |
| 36. | Post re Imagined Conspiracy | 2 |
| 37. | Ribar Video re Obeying Judge Traum, Part 1 or 3 – *filed manually* | 1 |
| 38. | Ribar Video re Obeying Judge Traum, Part 2 or 3 – *filed manually* | 1 |
| 39. | Ribar Video re Obeying Judge Traum, Part 3 or 3 – *filed manually* | 1 |
| 40. | Voicemail left for Alan Ratliff – *filed manually* | 1 |
| 41. | Ribar-Aquan4sir Posted Comments | 2 |
| 42. | Photographs of Vandalism | 3 |
|  |  |  |
|  |  |  |