UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DREW J. RIBAR,

Plaintiff,

v.

WASHOE COUNTY, et al.,

Defendants.

Case No. 3:24-cv-00526-ART-CSD

PRELIMINARY INJUNCTION

*Pro se* Plaintiff Drew Ribar sued Defendants Washoe County, Washoe County Library System ("WCLS"), Jeff Scott, Stacy McKenzie, Jonnica Bowen, Jennifer Cole, Deputy "Rothkin," Deputy Sagida, and Sgt. Gomez ("County Defendants"), as well as Reno's Build Our Center ("BOC") LGBTQ+ Center, alleging various constitutional and state law violations. Before the Court now are Defendants' motions for a preliminary injunction. (ECF Nos. 203; 205; 251.)[1] This Order also addresses a number of other motions pending before the Court, many of which are now moot. As detailed below, the Court grants Defendants' motions for a preliminary injunction in part.

## I.    PROCEDURAL HISTORY

Mr. Ribar, a self-described journalist, filed this lawsuit, after he attempted to attend and film Drag Queen Story Hours ("DQSH") at various WCLS branches in 2023 and 2024. On March 24, 2025, he filed the First Amended Complaint ("FAC") alleging fourteen causes of action: (1) violation of the First Amendment; (2) violation of the Fourth Amendment; (3) violation of the Fourteenth Amendment's Due Process Clause; (4) violation of the Fourteenth Amendment's

---

[1] Although BOC's motion at ECF No. 251 is styled as an emergency motion for sanctions, because it seeks an order prohibiting Mr. Ribar from harassing, threatening and doxing attorneys, the Court construes it as a motion for preliminary injunction, in line with Defendants' other motions for a preliminary injunction.

1

Equal Protection Clause; (5) *Monell* liability under 42 U.S.C. § 1983; (6) 42 U.S.C. § 1983 conspiracy; (7) conspiracy to violate civil rights under 42 U.S.C § 1985(3); (8) violation of Article 1, §§ 9, 10 of the Nevada Constitution; (9) denial of public library access under NRS 379.040; (10) assault and battery; (11) intentional infliction of emotional distress; (12) defamation; (13) negligent supervision; and (14) violation of NRS 241.035, Nevada's Open Meeting law. Defendants subsequently filed motions to dismiss Mr. Ribar's FAC. (ECF Nos. 105; 107; 109; 111; 126.)

Before the Court ruled on Defendants' motions to dismiss, on September 18, 2025, BOC filed a non-emergency motion for a temporary restraining order ("TRO"). (ECF No. 130.) In response, Mr. Ribar filed several identical motions including a motion for sanctions, a motion to dismiss, and a motion to strike documents, related to BOC's inclusion of declarations detailing Mr. Ribar's appearances near Sierra Crest Business Law Group, the law firm of BOC's defense counsel, Attorney Alison Kertis. (ECF Nos. 141; 142; 143.)

On October 29, 2025, County Defendants filed a motion for an emergency TRO (ECF No. 172), which requested relief similar to BOC's prior motion for TRO. (ECF No. 130). Defendants alleged "escalating harassment, intimidation" and "menacing and inappropriate behavior" that is causing "substantial mental harm." (ECF No. 172.) The Court scheduled a hearing regarding this motion (ECF No. 173) but granted interim relief because of the serious threats to personal safety that Defendants alleged. (ECF No. 176.) Mr. Ribar responded to the emergency TRO (ECF No. 179) and filed additional motions to dissolve or modify the interim order. (ECF Nos. 180; 184.)

The Court entered an amended TRO extending some of the relief granted in the interim order, namely the directives prohibiting Mr. Ribar from physically approaching defense counsel and their workplaces, while declining to extend

2

relief regarding social media posting. (ECF No. 186.) Mr. Ribar then filed a motion for reconsideration of the amended TRO. (ECF No. 188.)

Defendants subsequently filed motions for preliminary injunctions, seeking to extend and expand the relief granted in the TRO. (ECF Nos. 203; 207.) BOC later substituted counsel, and BOC's new counsel, Rachel Wise, filed a motion seeking to extend any relief granted in a preliminary injunction to her, as well. (ECF No. 251.) In response, Mr. Ribar filed several motions, including a motion for an evidentiary hearing relating to the motions for a preliminary injunction, a request to compel witnesses at a preliminary injunction hearing, and a motion to strike declarations related to the motions for a preliminary injunction. (ECF Nos. 218; 220; 222.)

Mr. Ribar also filed his own motion for preliminary injunction, related to relief requested in the FAC.[2] (ECF No. 219.) In the motion, Mr. Ribar contends that Washoe County and WCLS violated his First Amendment rights by blocking him from their official Facebook pages. (*Id.*)

Th Court then entered an order granting Defendants' motions to dismiss, dismissing all causes of action, and both granting and denying leave to amend. (ECF No. 250.) The Court also denied Mr. Ribar's motion for leave to file an amended complaint, to the extent he was seeking to add additional, unrelated events to his complaint. (*Id.*) On March 1, 2026, Mr. Ribar filed his Second Amended Complaint. (ECF No. 259-3.)

## I.    LEGAL STANDARD

A party seeking a preliminary injunction must demonstrate (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if preliminary relief is not granted, (3) the balance of equities is in their favor, and (4) an injunction

---

[2] Because the requested relief is tied to claims asserted in the FAC, Mr. Ribar's filing of his Second Amended Complaint moots his motion for a preliminary injunction.

is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The analysis for a temporary restraining order is "substantially identical" to that of a preliminary injunction. *Stuhlbarg Intern. Sales Co, Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

## II.   DISCUSSION

### A. Conversion of TRO into Preliminary Injunction

The Court's amended TRO did not specify an end date for the TRO. (ECF No. 186.) Courts have discretion to convert a temporary restraining order into a preliminary injunction. S*ee Hawai'i v. Trump,* 245 F. Supp. 3d 1227, 1234–35 (D. Haw. 2017) (vacated in part); *Pinchi v. Noem,* 792 F. Supp. 3d 1025, 1030, 1031 (N.D. Cal. 2025); *see also Jimenez v. Barber*, 252 F.2d 550, 554 (9th Cir. 1958) (whether a TRO or a preliminary injunction should issue in the first instance is within the discretion of the trial court). The circumstances justify an exercise of discretion to convert the temporary restraining order into a preliminary injunction that lasts until the final entry of judgment. Conversion will clarify the terms of the ordered relief without materially altering them. *See ABX Air, Inc. v. Int'l Bhd. of Teamsters,* No. 1:16-CV-1096, 2016 WL 7117388, at *5 (S.D. Ohio Dec. 7, 2016). Conversion is also efficient, since the standard for issuing a temporary restraining order is the same as for a preliminary injunction, and Defendants met that standard. *Productive People, LLC v. Ives Design*, No. CV-09-1080-PHX-GMS, 2009 WL 1749751, at *3 (D. Ariz. June 18, 2009).

Nothing is lost by conversion, since the TRO could have been entered as a preliminary injunction in the first instance. When assessing whether a TRO can be construed as an appealable preliminary injunction, the Ninth Circuit assesses whether it functions as a preliminary injunction, looking to factors such as: whether an adversary hearing has been held, whether the nonmovant strongly challenged the motion, whether the duration of the TRO exceeds fourteen days,

4

and whether the TRO has the practical effect of a preliminary injunction. *Newsom v. Trump*, 141 F.4th 1032, 1043–44 (9th Cir. 2025) (internal citations omitted). Here, the parties were afforded notice, full briefing on the merits, and a hearing prior to entry of the TRO. While Rule 65 limits *ex parte* TROs to fourteen days unless extended, this TRO was issued with notice and not limited to fourteen days. Fed. R. Civ. P. 65(b)(2). There is little practical or legal distinction between the TRO and a preliminary injunction, and there is no reason not to change its name to avoid any potential uncertainty about its duration.

The Court will therefore adopt and incorporate the reasoning and conclusions contained in the prior order, while extending relief to BOC's recently added attorney, Rachel Wise. Mr. Ribar's motions for an evidentiary hearing on Defendants' motions for preliminary injunction are thus denied. (ECF Nos. 218; 222.)

**B. Preliminary Injunction Analysis**

Defendants seek an order prohibiting Mr. Ribar from physically approaching Defendants and defense counsel, conducting in-person public records requests, and posting harassing and disparaging communications about Defendants and defense counsel on his social media channels. (ECF Nos. 203; 207; 251.)

**1. Background**

The instant litigation centers on a 2023 Drag Queen Story Hour for children that was planned by WCLS in collaboration with BOC. (ECF No. 259-3.) Mr. Ribar, a self-described journalist, claims that WCLS and BOC violated his constitutional rights by preventing him from entering the Drag Queen Story Hour while permitting another journalist to attend. (*Id.*) Mr. Ribar also claims that WCLS suspended him from WCLS campuses without sufficient due process and that BOC conspired with WCLS to violate Ribar's rights. (*See id.*) The following facts

are drawn from allegations in County Defendants' motion for a preliminary injunction (ECF No. 203), and BOC's motions for a preliminary injunction and order prohibiting Mr. Ribar's ongoing harassing and threatening conduct. (ECF Nos. 207; 251).

Since the commencement of this lawsuit, Mr. Ribar has targeted persons affiliated with County Defendants and BOC in a pattern of continued harassment, which escalated in September 2025. (ECF Nos. 203; 207.) Mr. Ribar's conduct first began in August 2024, when he posted videos of Ms. Bowen and Ms. McKenzie on his social media pages. (ECF No. 203 at 7–9.) As a result, Ms. Bowen and Ms. McKenzie received a barrage of threatening emails and voicemails from numerous people, rife with personal attacks and expletives. (*Id.*)

Mr. Ribar then targeted a BOC volunteer by showing up at her workplace and disclosing on his YouTube channel personal information about her and her partner. (ECF No. 203 at 10–11.) On September 10, 2025, Mr. Ribar showed up uninvited to the workplace of BOC volunteer Yvonne Allen, where he demanded, while filming, to conduct an in-person records request regarding a recent private BOC event. (*Id.*) Footage of this interaction was then posted to Mr. Ribar's YouTube channel. (*Id.*) Mr. Ribar also posted a live video to his YouTube channel wherein he displayed Ms. Allen's personal Facebook page, guided viewers to the relationship section of her account, and announced the full name and workplace of Ms. Allen's fiancé, a person unconnected to the instant litigation. (*Id.*)

Mr. Ribar subsequently directed his antagonistic behavior toward County Defendants and uninvolved individuals, when he showed up at a Library Board of Trustees ("LBOT") meeting. (ECF No. 203 at 11–12.) On September 17, 2025, Mr. Ribar attended and filmed a LBOT meeting, where he was verbally combative and aggressively called a Trustee a "fucking communist." (*Id.*) After the meeting, Mr. Ribar followed two young people, who attended the LBOT meeting, to their

vehicle. (*Id.*) Even after one of the individuals expressed that they felt threatened by Mr. Ribar, he continued to follow them, saying that he was going to film their vehicle's license plate. (*Id.*) On the YouTube video that Mr. Ribar posted of these interactions, one viewer commented that it was "nothing 2A [the Second Amendment] can't fix." (*Id.*)

Mr. Ribar then targeted another person involved with BOC under the pretense of conducting an in-person records request at their workplace. (ECF No. 203 at 12–13.) On September 19, 2025, Mr. Ribar showed up uninvited to the workplace of Dr. Allen Ratliff, a BOC Board Member, at University of Nevada-Reno's School of Social Work. (*Id.*) Mr. Ribar again, while filming, demanded to do an in-person public records request. (*Id.*) As the interaction escalated, Mr. Ribar threatened the employee speaking with him by saying that "you will see what happens" if the employee called the police on Mr. Ribar. (*Id.*) Mr. Ribar also refused to leave, saying that he would only exit the office if threatened with arrest by police. (*Id.*) After Mr. Ribar posted a video of this interaction, Dr. Ratliff and their colleagues received several alarming emails and voicemails. (*Id.*)

When one BOC employee attempted to attend a LBOT meeting, they were subjected to Mr. Ribar's profane verbal attacks and threats. (ECF No. 207 at 18.) On October 15, 2025, Stacey Spain, Executive Director of BOC, attended a LBOT meeting where they experienced harassing conduct by Mr. Ribar. (*Id.*) After Spain made a statement at the meeting, Mr. Ribar followed Spain to their seat and called them a "fucking psycho." (*Id.*) Mr. Ribar sat directly behind Spain and read out loud from the BOC website during the meeting. (*Id.*) Spain attempted to move away from Mr. Ribar to de-escalate and disengage. (*Id.*) During the meeting, Mr. Ribar followed one attendee out to the parking lot. (*Id.*) Others at the meeting were concerned for this attendee and followed the attendee and Mr. Ribar out to the parking lot where they heard Mr. Ribar telling the attendee to "fuck off." (*Id.*)

When Mr. Ribar re-entered the meeting, he sat down behind Spain again and made comments at them about getting BOC's 501(c)(3) status revoked. (*Id.*)

Defendants' counsel have also felt targeted by Mr. Ribar's personal attacks in person and via video, and by uninvited visits to their workplaces. In September, Mr. Ribar showed up uninvited to the workplace of BOC's defense counsel, Attorney Allison Kertis, multiple times. (ECF No. 207 at 16–17.) After an in-person hearing for this instant litigation, Mr. Ribar shouted at Ms. Kertis outside of the courthouse, calling her a liar. (*Id.* at 21.) Mr. Ribar shouted so loudly that Ms. Kertis's ride, who was waiting for her nearby, heard him inside the car. (*Id.*) Mr. Ribar has also repeatedly accused Ms. Kertis of lying in numerous social media comments, posts, and YouTube videos, displaying photos of her and naming her workplace. (*Id.* at 19–21.)

County Defendants' defense counsel, Deputy Assistant Attorney Lindsay Liddell, has felt similarly targeted by Mr. Ribar's frequent personal attacks. County Defendants specifically allege that Mr. Ribar submitted frivolous public records requests and commenced a social media campaign, consisting of numerous harassing comments and videos he posted to his YouTube channel, repeatedly accusing Ms. Liddell of lying in this litigation. (ECF No. 203 at 13–15.) Ms. Liddell was also present when Mr. Ribar shouted at Ms. Kertis following a recent hearing and was so fearful of his harassment that she hid behind a utility box to avoid any interaction with him. (*Id.*) After the emergency TRO was filed, Mr. Ribar published a live video wherein he read through Ms. Liddell's declaration and belittled her, said that she should resign from her job if she was fearful of him, laughed at her for seeking mental health treatment for the anxiety Mr. Ribar's conduct has caused her, and accused her of being drunk at work. (*Id.* at 17–19.) Mr. Ribar also addressed Ms. Liddell directly at one point in the video, telling her she should carry a gun and "make sure you are well-protected." (*Id.* at

18.)

On November 17, 2025, counsel from Gordon Rees Scully Mansukhani, LLP ("GSRM") joined this litigation, representing BOC. (ECF No. 251.) Mr. Ribar has sent emails to unrelated partners and attorneys alleging that GRSM's counsel, Rachel Wise, is litigating in bad faith and threatening a bar complaint and lawsuit against her. (*Id.* at 8–9.) He also posted videos on his social media pages claiming that Ms. Wise is litigating in bad faith. (ECF No. 251-2.) As a result, Ms. Wise has received multiple threatening emails, including one that claimed that the author knew where Ms. Wise lived and was going to show up at her house. (*Id.*)

**2. Analysis**

District courts have inherent power to "issue an injunction against litigants who harass their opponents." *Yates v. Belli Deli*, No. C 07-01405 WHA, 2007 WL 231892, at *3 (N.D. Cal. Aug. 13, 2007) (citing *DeLong v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir.1990)). Courts, particularly, have the power to issue an injunction over conduct directly related to a lawsuit. *Beyond Blond Prods., LLC v. Heldman*, No. CV205581DSFGJSX, 2022 WL 2784404, at *4 (C.D. Cal. June 17, 2022). *See also United Artists Corp. v. United Artist Studios LLC*, No. CV 19-828-MWF (MAAX), 2019 WL 6917918, at *6 (C.D. Cal. Oct. 17, 2019); *Myart v. Taylor*, No. SA 5:16-CV-736-DAE, 2016 WL 5376227, at *4 (W.D. Tex. Sept. 26, 2016). Here, the conduct at issue in the preliminary injunctions is directly related to the lawsuit, as the allegedly harassing communications reference this litigation and the pleadings filed therein. (ECF Nos. 203; 207; 251.)

The Court next considers whether Mr. Ribar can be restrained from future harassing conduct and communications. "The First Amendment generally prevents the government from proscribing speech," however, courts have "made a distinction between communication and harassment." *R.A.V. v. City of St. Paul,*

*Minn.*, 505 U.S. 377, 382 (1992); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 580 (5th Cir. 2005). Courts "do have the power to enjoin harassing communication," and have rejected arguments that the First Amendment allows a person to make harassing or threatening communications. *Test Masters*, 428 F.3d at 580; *see also United States v. Osinger,* 753 F.3d 939, 945 (9th Cir. 2014).

Because the Court has determined that it can restrain Mr. Ribar from harassing conduct and communications, it next considers whether County Defendants and BOC have met their burden on the four prongs required for a preliminary injunction. As this order is related to Mr. Ribar's harassing conduct, the four prongs refer to the likelihood of success on the merits of showing harassment, instead of the merits of the underlying lawsuit. *See Beyond Blond Prods.,* 2022 WL 2784404, at *5. Under Nevada law, a person is guilty of harassment if they "knowingly threaten[] to do any act intended to substantially harm the person threatened with respect to their mental health or safety, and the person by words or conduct places the person receiving the threat in reasonable fear that the threat will be carried out." NRS 200.571(1)(a)(4)–(1)(b).

Ms. Kertis, Ms. Liddell, and Ms. Wise have shown a strong likelihood of proving harassment by Mr. Ribar. Against this documented pattern of intensifying personal attacks, in-person use of profanities and threats, refusing to de-escalate in-person confrontations, and doxing, Mr. Ribar's targeted attacks on defense counsel have caused them to feel extremely fearful of future confrontations with him. Intimidating litigants and defense counsel appears to be Mr. Ribar's goal, as evidenced by his unwillingness to de-escalate or end a confrontation, even when the other person expressed feeling threatened or attempted to disengage. Similarly, Mr. Ribar's use of profanities, threats, and shouting in his interactions with litigants and defense counsel have caused defense counsel to fear that his behavior may continue to escalate. In addition,

given Mr. Ribar's history of publicizing personal details about litigant's family members to his social media followers and his follower's comments advocating the use of firearms to address perceived slights, Ms. Kertis is extremely fearful for the safety of her young children.

Ms. Kertis, Ms. Liddell, and Ms. Wise have also shown that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter,* 555 U.S. at 20. Plaintiff's harassing behavior has seemingly intensified as litigation has progressed, and defense counsel have experienced resultant consequences. (ECF Nos. 203; 207; 251.) In particular, Ms. Kertis has experienced high levels of emotional distress, resulting in her warning family members and her children's daycare about Plaintiff's conduct and purchasing an upgraded home security system. (ECF No. 130.) Mr. Ribar's behavior has similarly interfered with Ms. Liddell's work in this litigation, required her to seek mental health care, and resulted in her experiencing high blood pressure and being prescribed medication to treat anxiety. (ECF No. 172.) Ms. Wise has experienced severe emotional distress, and has filed multiple police reports and contacted family and friends to warn them about Mr. Ribar's behavior. (ECF No. 251-2 at 6–7.) GRSM has also enacted additional security protocols to secure their office building in response to Mr. Ribar's harassing conduct. (*Id.*)

The Court must also "balance the competing claims of injury and [] consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. A narrowly tailored order prohibiting Mr. Ribar from approaching Ms. Kertis, Ms. Liddell, and Ms. Wise, from showing up to their workplaces uninvited, and from submitting in-person public records requests will not impose significant hardship on Mr. Ribar. It does not prevent the parties from litigating the case, and does not prohibit Mr. Ribar from expressing his views or filing public records requests, so long as he does so in a manner that does not

11

constitute personal harassment of defense counsel.

Additionally, an injunction would be in the public interest because it will help ensure the fair administration of justice, as defense counsel will be able to participate in the lawsuit without harassment from Mr. Ribar. Thus, because Defendants have made a showing on all four prongs required for a preliminary injunction, Defendants' request for an order enjoining Mr. Ribar from harassing defense counsel is granted.

The Court again declines to extend the interim relief prohibiting Mr. Ribar from posting content on social media about this case, or the parties involved. As noted above, the Court has the authority to enjoin harassing or threatening communications and takes allegations of such conduct by litigants extremely seriously. *Test Masters*, 428 F.3d at 580; *see also Osinger,* 753 F.3d at 945; *Beyond Blond Prods.,* 2022 WL 2784404, at *4–5. However, at this juncture, Mr. Ribar's social media posts regarding the case have been largely limited to criticizing defense counsel's litigation tactics. The parties are reminded, though, that social media posts that are "threatening, harassing, or defamatory" to the parties involved "are not protected under the First Amendment." *United Artists Corp.*, 2019 WL 6917918, at *10.

Finally, the Court concludes that no bond is necessary for the preliminary injunction to issue. Rule 65(c) gives this Court considerable discretion in setting any bond required for injunctive relief. The purpose of the bond is to provide a wrongfully enjoined party recourse for the wrongful issuance of an injunction. *Connecticut General Life Ins. Co. v. New Images of Beverly Hills,* 321 F.3d 878, 882 (9th Cir. 2003). "[T]he amount may be set at zero if there is no evidence the party will suffer damages from the injunction." *Otero v. Johnson,* No. CIV 16-090-TUC-CKJ, 2016 WL 6476292, at *4 (D. Ariz. Nov. 2, 2016). Because Mr. Ribar has not presented evidence that he will be harmed by the injunction, the Court

12

will not impose a bond.

**C. Plaintiff's Motion to Strike (ECF No. 220)**

Mr. Ribar argues that the declarations of Jeri Scott (ECF No. 207-24), Guadalupe Garcia (ECF No. 207-25), and Dr. Allen Ratliff (ECF No. 207-3) should be struck because they contain incorrect factual assertions about his location. (ECF No. 220.) He asserts that unauthenticated GPS location data shows that he did not loiter around or drive by Sierra Crest Business Law group, as stated in Mr. Scott and Ms. Garcia's declarations. (*Id.*) Dr. Allen Ratliff's declaration, which states that Mr. Ribar trespassed at a private event and harassed them, is similarly disproven, according to Mr. Ribar, by video evidence. (*Id.*)

In support of his motion to strike, he cites the sham affidavit rule, which prohibits a party from "creat[ing] an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (citations omitted). This rule allows a court to "prevent[ ] a party who has been examined at length on deposition from raising an issue of fact simply by submitting an affidavit contradicting [his or her] own prior testimony," during summary judgment proceedings. *Id.* (cleaned up). This rule, however, is inapplicable in the instant circumstance because the declarations do not seek to contradict prior deposition testimony and there is not a motion for summary judgment before the Court.

Mr. Ribar also argues that the Court should use its inherent authority to strike the declarations. However, Mr. Ribar's evidence does not establish that the declarations are false, and the Court is not relying on the declarations to satisfy Defendants' burden under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). During the November 3, 2025, hearing, the Court heard from Ms. Kertis, who described Mr. Ribar's appearances near Sierra Crest Business Law Group's offices. As a result, the Court bases the preliminary injunction on actual

statements made by defense counsel, and so the truth of the declarations is not being decided at this juncture. The Court therefore denies Mr. Ribar's motion to strike.

### D. Anti-SLAPP

In response to Defendants' first motion for a TRO, Mr. Ribar filed a "special motion to strike, dismiss, and for sanctions under Nevada's anti-SLAPP statute." (ECF Nos. 141; 142; 143.) That motion concerns the declarations addressed above, and asserts that Defendants' TRO motion should be dismissed under Nevada's anti-SLAPP statute because it is an attempt to restrain speech. (*Id.*)

Under NRS 41.650, "[a] person who engages in a good faith communication in furtherance of the right to petition is immune from civil liability for claims based upon the communication." NRS 41.650. Nevada's anti-SLAPP statute was enacted to protect "well-meaning citizens who petition [the] government and then find themselves hit with retaliatory suits known as SLAPP[] [suits]." *John v. Douglas Cnty. Sch. Dist.*, 219 P.3d 1276, 1281 (Nev. 2009), superseded by statute on other grounds as stated in *Shapiro v. Welt*, 389 P.3d 262, 266 (Nev. 2017).

Motions brought under Nevada's anti-SLAPP statute follow a two-step, burden shifting framework. Under the first prong, the Court evaluates "'whether the moving party has established, by a preponderance of evidence,' that he or she made the protected communication in good faith." *Rosen v. Tarkanian*, 453 P.3d 1220, 1223 (Nev. 2019) (quoting NRS 41.660(3)(a)). A party makes that showing if the communications fit into one of the four categories in NRS 41.637 and were "truthful or made without knowledge of its falsity." *Id.* (citing NRS 41.637). As relevant here, NRS 41.637(4) covers "[c]ommunication[s] made in direct connection with an issue of public interest in a place open to the public or in a public forum." NRS 41.637(4). If the movant prevails at the first step, the burden then shifts to the nonmoving party to "demonstrate[] with prima facie evidence a

probability of *prevailing on the claim.*" *Rosen*, 453 P.3d at 1223 (emphasis added) (citation omitted).

Because Defendants' have not filed any counterclaims against Mr. Ribar, an anti-SLAPP motion to dismiss is not an appropriate vehicle to strike their TRO motion or the declarations attached. Additionally, because the motion concerns the initial TRO motions, which have now been replaced by an amended TRO and this preliminary injunction, the "special motion to strike, dismiss, and for sanctions under Nevada's anti-SLAPP statute" is denied as moot.

## III.    CONCLUSION

It is therefore ordered that County Defendants' motion for preliminary injunction, (ECF No. 203), BOC's motion for preliminary injunction (ECF No. 207), and BOC's emergency motion for sanctions (ECF No. 251) are granted in part, and denied in part. During the pendency of this litigation, Mr. Ribar therefore is restrained from:

1. Physically approaching Ms. Kertis, Ms. Liddell, and Ms. Wise, except when attending in-person hearings for this instant case, and this case alone;

2. Physically entering the gated parking lot designated for employees of Washoe County District Attorney's Office;

3. Showing up uninvited to the Washoe County District Attorney's Office, which is located on the fourth floor of 1 South Sierra Street in Reno, Nevada;

4. Showing up uninvited to the offices of Sierra Crest Business Law Group, located at 6770 S McCarran Blvd in Reno, Nevada;

5. Showing up uninvited to the offices of Gordon Rees Scully Mansukhani, LLP, located at 300 South Fourth Street in Las Vegas, Nevada;

6. Submitting any in-person public records request to County Defendants

15

and Ms. Liddell; such requests must be made using Washoe County's online public records request portal.

IT IS FURTHER ORDERED that Mr. Ribar shall not use any other person, directly or indirectly, to perform any of the conduct described above.

IT IS FURTHER ORDERED that Defendants' motions for leave to file excess pages (ECF Nos. 202; 205) are GRANTED.

IT IS FURTHER ORDERED that Mr. Ribar's motions for evidentiary hearing (ECF Nos. 218; 222) on Defendants' motions for preliminary injunction are DENIED.

IT IS FURTHER ORDERED that Mr. Ribar's motion to strike (ECF Nos. 141; 142; 143), motion for sanctions (ECF No. 170), motion to dissolve or modify order (ECF No. 180), motion for reconsideration (ECF No. 188), and cross-motion for preliminary injunction (ECF No. 219) are DENIED as moot.

DATED: June 8, 2026

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

16